LAW OFFICE OF
**ROBERT L. KEOGH**
POST OFFICE BOX GZ
HAGATÑA, GUAM 96932
TELEPHONE (671) 472-6895

Attorneys for Plaintiffs



FILED
DISTRICT COURT OF GUAM

AUG 10 2007

**JEANNE G. QUINATA**
**Clerk of Court**

## IN THE DISTRICT COURT OF GUAM

| | |
|---|---|
| **DEBORAH K. RUTLEDGE and THOMAS R. RUTLEDGE,** | **CIVIL CASE NO. CIV06-00008** |
| Plaintiffs, | |
| vs. | **DECLARATION OF ROBERT L. KEOGH** |
| **UNITED STATES OF AMERICA,** | |
| Defendant. | |

I, ROBERT L. KEOGH, hereby declare as follows.

1.   I am counsel for plaintiffs in this action, I am over 18 years of age, am competent to testify about the matters set forth herein and have personal knowledge of the matters testified about unless stated otherwise herein.

2.   Depositions have been taken of five treating medical personnel through video conference at the U. S. Attorney's Office on Guam.  The depositions of both plaintiffs were taken in person in Los Angeles with counsel from both sides present in January, 2007.

3.    The parties stipulated to two extensions to the expert identification deadline of the Scheduling Order because defendant was unable to procure the attendance of Dr. Douglas Duncan, a critical fact witness treating physician.    The expert discovery deadline was not addressed in the Stipulation or Order.

4.    Plaintiffs submitted their expert reports within the identification date ordered.    Their first report of Dr. John Steele was submitted on October 5, 2006.    The identification date for defendant's experts has not passed yet.    No expert depositions have been taken.

5.    Attached hereto and marked as Exhibit "A" is a copy of selected pages of the transcript of the deposition of Douglas Duncan taken on June 30, 2007 showing an estimated 79 objections and interruptions made by defendant's counsels over 49 pages of testimony provided.

6.    Attached hereto and marked as Exhibit "B" is a copy of the cover page and page 235 of the transcript of the deposition of plaintiff Deborah Rutledge taken on January 10, 2007 in Los Angeles, California.

7.    A schedule for the taking of further expert depositions has been agreed upon by the parties subject to the approval of the Court.

- 2 -

8.    I declare under penalty of perjury under the laws of Guam (6 G.C.A. §4308) that the foregoing is true and correct.

Date: ___8/8/07___                    _____
                                       ROBERT L. KEOGH

IN THE UNITED STATES DISTRICT COURT
FOR THE TERRITORY OF GUAM

| | |
|---|---|
| DEBORAH K. RUTLEDGE and, THOMAS RUTLEDGE, | ) CIVIL CASE NO. 06-00008 |
| Plaintiffs, | ) |
| vs. | ) |
| UNITED STATES OF AMERICA, | ) |
| Defendant. | ) |

VIDEO TELECONFERENCE
DEPOSITION TRANSCRIPT

OF

# DOUGLAS DUNCAN

June 30, 2007
(Guam Time)



PREPARED BY:     GEORGE B. CASTRO
**DEPO RESOURCES**
#49 Anacoco Lane
Nimitz Hill Estates
Piti, Guam 96915
Tel:(671)688-DEPO ♦ Fax:(671)472-3094

# IN THE UNITED STATES DISTRICT COURT
## FOR THE TERRITORY OF GUAM

| | |
|---|---|
| DEBORAH K. RUTLEDGE and,<br>THOMAS RUTLEDGE,<br><br>       Plaintiffs,<br><br>    vs.<br><br>UNITED STATES OF AMERICA,<br><br>       Defendant. | ) CIVIL CASE NO. 06-00008<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Video Teleconference Deposition of **Dr. Douglas Duncan**, taken on Saturday, June 30, 2007, at the hour of 5:26 a.m. (Guam time), at U.S. Attorney's Office, District of Guam, 108 Hernan Cortez Avenue, Hagatna, Guam, before George B. Castro, pursuant to Notice. That at said time and place there transpired the following:

### APPEARANCES

For the Plaintiffs             LAW OFFICE OF ROBERT L. KEOGH
                                   By: **Robert L. Keogh, Esq.**

For the Defendant             OFFICE OF THE U.S. ATTORNEY
                                   GENERAL, DISTRICT OF GUAM
                                   By: **Mikel W. Schwab, Esq.**

Also present                   Katharyne Clark, Esq.,
                                   *via phone line*

1  counselor?

2          MR. KEOGH:  All right.

3  BY MR. KEOGH:

4      Q   What I'm asking you is, in the last

5  sentence of the patient history portion of

6  Document 57, where it states, "The patient will

7  need surgery immediately or will lose bowel or

8  bladder function permanently", whether that

9  information came from you?

10     A   I cannot answer that question based on

11 the fact that I don't know.

12     Q   All right.  Do you know where it might

13 have come from other than you?

14     A   No, sir.  I do not know the answer to

15 that question.

16     Q   Okay.  And was it your perception on

17 August 27, 2004 that if Mrs. Rutledge did not

18 receive surgery immediately, she had the risk

19 of losing bowel or bladder function

20 permanently?

21     A   I cannot comment on the state of my

22 mind or at that time.  The question is, I feel,

23 is a expert opinion matter; what is the

24 definition of cauda equine and what are the

25 risks of having cauda equina syndrome?  And

1 that's probably been covered, I would assume

2 with expert testimony.

3     Q  So, you are refusing to answer the

4 question then?

5         MR. SCHWAB:  He answered the question.

6 I'll object to that characterization.

7 BY MR. KEOGH:

8     Q  Well, you're saying -- doctor, you're

9 saying it's expert testimony and you're

10 refusing to answer the question on the grounds

11 that it calls for providing expert testimony.

12 Is that what you're saying to me?

13         MR. SCHWAB:  Objection, that's not at

14 all what he said.  He said cauda equina has

15 characteristics that an expert would have to

16 explain.

17     A  For one, I don't appreciate your

18 adversarial tone or accusatory manner of

19 questioning me.  If you'd like to ask me

20 respectfully these type of questions, I'll --

21 be easier for me to answer.

22 BY MR. KEOGH:

23     Q  Doctor, I'm not trying to be --

24     A  I don't like the tone of --

25     Q  I'm not trying to be accusatory or

1  confrontational in any way.  I am trying to get
2  answers    to   questions    that    are    of    critical
3  importance to Mrs. Rutledge.

4      A    I feel that you've attack my character
5  in the very early on of this interview, this
6  deposition.

7          MR.  SCHWAB:    If I can just intervene.
8  Don't take umbrage -- nobody, attorney or the
9  witness.    Attorneys  ask  questions,  sometimes
10  they  are  appropriate  or  inappropriate,  and
11  you're  absolutely  on  point  to  say  "I  don't
12  understand"  or  "that's  outside  my  knowledge".
13  But,  attorneys  are  irritating  and  I  apologize
14  in  advance,  but  we'll  try  not  to  go  that  route
15  of  being  insulted.    So,  please  tolerate  us.
16  Mr. Keogh?

17 BY MR. KEOGH:

18      Q    Doctor, I'm not trying to insult you or
19  antagonize  you  or  confront  you  in  any  way,  I'm
20  trying  to  ask  questions.    I  wasn't  there,  Mr.
21  Schwab  wasn't  there,  on  August  27,  2004,  and
22  we're  simply  trying  to  get  information  from
23  people  who  were  there.    And  that's  the  purpose
24  of  this  deposition.    And  Mrs.  Rutledge  has
25  retained  me  to  do  that  for  her  and  I  have  the

1    Q    All right.    Then two sentences later,
2  it says "The patient must move as soon as
3  possible in order to salvage any remaining
4  bowel or bladder function".    Is that
5  information that you would have provided to who
6  ever generated this document?

7    A    I suggest you -- it looks like JTC
8  generated this document.    He would be the
9  person to ask, whoever that would be.

10   Q    And who is JTC?

11   A    I don't know.    There's initials JTC
12 there, I would suggest maybe that would be the
13 one to ask.

14   Q    Yes.    And do you know at Naval Hospital
15 Guam in August of 2004 had the initials of JCT
16 -- JTC?

17   A    No, sir, I do not.

18   Q    Can you tell me whether or not on
19 August 27, 2004, your perception of Mrs.
20 Rutledge's condition was that she must move as
21 soon as possible in order to salvage any
22 remaining bowel or bladder function?

23   A    I do not know.

24   Q    And can you tell me why you don't know
25 that?

1      A    Because the length of the time that has
2  transpired.      You're   asking   me   to   make   a
3  perception in time from nearly -- how long ago
4  was this?  Three years ago?  Almost?  You know,
5  the  three  years  --  you  want  me  to  go  back  in
6  time  three  years  ago.   Sir,  can  you  tell  me,
7  were you were on July 27 --
8           MR.  SCHWAB:    I'm  going  just  instruct
9  that   we   don't   want   to   ask   the   attorney
10 questions.
11     A    Okay.
12          MR.  SCHWAB:    That  would  take  too  much
13 time.
14     A    Okay.
15 BY MR. KEOGH:
16     Q    So, is it your testimony --
17     A    I don't know.
18     Q    Is  it  your  testimony  then  that,  because
19 of the amount of time that has passed, that you
20 just   don't   remember   the   answer   to   that
21 question?
22     A    That's correct.
23          MR.  SCHWAB:    And  I'm  going  to  object
24 because what you're asking questions about is a
25 document  that  the  Joint  Transport  generated,

1    and not -- and the doctor is having trouble
2    telling you whether what Joint Transport put
3    down has anything to do with what he put down.
4    And he has documents that he generated from
5    that time.   And I put that in the form of an
6    objection in that he has asked and answered
7    about this document and his lack of knowledge
8    about it.
9    BY MR. KEOGH:
10       Q   All right.   Let's not refer to the
11   document.   We won't look at page 58.   We won't
12   discuss the document at all.   What I would like
13   to ask you, doctor, is whether or not on August
14   27, 2004, it was your perception of the
15   condition of Mrs. Rutledge was such that she
16   has to be moved as soon as possible in order to
17   salvage any remaining bowel or bladder
18   function?
19       A   I don't know what -- I cannot answer
20   that question.   I don't remember what I was
21   thinking three years ago.   All I can answer is
22   exactly what I wrote on my documents.
23   Discharged, Y spine for medivac.   I wrote,
24   discharge med is, in my impression, was cauda
25   equina syndrome --

1     Q   Okay.  And then it states, "Plain films

2 where   unremarkable,   except   for   decrease   disk

3 space between L5 and S1".  Do you have or have

4 you   seen   any   radiology   reports   of   the   plain

5 films   or   the   x-rays   that   were   taken   that   you

6 ordered to be taken on August 27, 2004?

7     A   I   would   have   to   go   through   the

8 paperwork to see what I have.

9     Q   Yeah.  And what you have there, do you

10 recall   seeing   any   documentation   of   x-rays

11 August 27, 2004, Guam Naval Hospital X-rays?

12     A   Right now, at top of my head, I didn't,

13 I  don't  --  I  don't  know  the  answer  of  that

14 question.  I'd have to look through it to see.

15     Q   Can you do that and see if you have any

16 such documentation there?

17     A   Sure, I'd be happy --

18     MR. SCHWAB:  Are  you  directing  him  to

19 have a record that we have or --

20     MR. KEOGH:  For   the   record,   I   have

21 never  seen  any  record  of  an  August  27,  2004

22 Naval Hospital X-ray.

23     MR. SCHWAB:  Uh-huh.

24     MR.  KEOGH:   And  I'm  inquiring  if  the

25 doctor  has  seen  one  or  has  one  there  or  can

1    refer us to a document that's in the records
2    that does represent that.

3         MS. CLARK:  Gentlemen, excuse me.
4    Maybe I'm confused, but it seems like in the
5    first setting of this deposition, we talked at
6    length about Dr. McSwain's note and Dr.
7    Duncan's pattern of practice of how he would
8    enter whether or not he reviewed an x-ray.  And
9    we certainly took Dr. McSwain's deposition.

10        MR. KEOGH:  And Dr. McSwain reviewed an
11   August 2, 2004 x-ray, not an August 27, 2004 x-
12   ray.

13        MR. SCHWAB:  And now there's a reference
14   to a 2000- -- of August 27, x-ray?

15        MR. KEOGH:  I'm asking the doctor
16   whether or not --
17   BY MR. KEOGH:
18        Q  Well, let's look at -- first of all,
19   let's go back to the question, doctor.  Do you
20   have any documentation there that relates to
21   any x-rays taken on August 27, 2004?
22        A  Well, let me go through the
23   documentation.  (lengthy pause; peruses
24   documents)  Oh, I see.  Yeah, on my note I did
25   document the fact that I reviewed x-rays on

1  would get an MRI ahead of time if possible.

2      Q    All right.   And an MRI would be more

3  helpful  in  reaching  the  diagnosis  of  cauda

4  equina syndrome?

5      A    Yes, sir.   Exactly, you got to --

6           MS. CLARK:   Excuse  me,  counsel.   Has

7  this witness become an expert now?   I thought

8  he was a fact witness.

9           MR. KEOGH:   Why is this --

10          MS. CLARK:   He's supposed to testify as

11  what his action.

12          MR. KEOGH:   Why    is    this    lawyer

13  presenting an objection?   Who's doing it --

14          MS. CLARK:   Counsel,  I  represent  the

15  Department --

16          MR. KEOGH:   Excuse me, Ms. Clark, for a

17  minute, to state my objection.

18          MR. SCHWAB:   You have two lawyers in the

19  room from the U.S. Attorney's Office.   I think

20  they can both speed up --

21      A    Can I use the restroom, while you guys

22  are talking?

23          MR. SCHWAB: Yeah.

24          MS. CLARK:   Yeah.

25          MR. KEOGH:   Yeah, but we're running out

1   of time here, doctor, so --

2           MR. SCHWAB:  Let's do a quick restroom

3   and then use as much time as we can.

4       A   I've been holding for 20 minutes.

5           MR. SCWAB:  Okay.  You go ahead.

6           MS. CLARK:  On behalf of the Department

7   of Defense, you're asking this physician to

8   violate Navy regulations by going outside his

9   personal knowledge of facts in the case.

10          MR. SCHWAB:   I understand.  We were

11  within bounds and we were starting to go out of

12  bounds, and I think Mr. Keogh knows that, so

13  that's okay.

14          MR. KEOGH:  Well, I'm not asking the

15  doctor to do anything other than to explain the

16  statements that he's already made.  So, he's

17  volunteering these opinions and I have a right

18  to explore them now that he's volunteered them.

19          MR. SCHWAB:  No, you're --

20          MS. CLARK:  When you ask him if an MRI

21  would be superior, his response would be a

22  violation of Navy regulations.  He is a fact

23  witness.   If you're asking him about his

24  present impression when he saw the patient,

25  that's acceptable, but that's not the question

1  you asked.  The question you asked calls for

2  this witness to violate Navy regulation.

3       MR. KEOGH:  I'd like to ask once again

4  for the role of Ms. Clark in this proceeding

5  now that she is starting to interject

6  objections.  As far as I know --

7       MS. CLARK:  I will be more than happy

8  to (unintelligible; overspeaking) --

9       MR. KEOGH:  Can I please finish my --

10      MS. CLARK:  -- the documentation.

11      MR. KEOGH:  Can I please finish my

12  comment before you interrupt me once again?

13      MS. CLARK:  Before I answer you?

14      MR. KEOGH:  Before you interrupt me

15  once again.  As far as I'm concerned, as far as

16  I know, there has been no entry of appearance.

17  I have raised this at several depositions.  At

18  the first deposition that Ms. Clark appeared at

19  when I raised the question of what her role was

20  in this proceeding, she immediately threatened

21  to terminate the deposition that we had all

22  traveled a great distance for --

23      MR. SCHWAB:  Excuse me.  That's way out

24  of line.  What are you --

25      MR. KEOGH:  May I finish my statement?

1  alongside you, I would make the same -- my

2  impression stands. I agree with the same

3  impression I had then based on what I'm reading

4  today. That's all I can comment on.

5      Q  All right. Would you agree that the

6  symptoms that Mrs. Rutledge presented with on

7  August 27, 2004 would represent classic

8  symptoms of cauda equina syndrome?

9      MR. SCHWAB: Objection. I'm not sure

10  what "classic syndromes" would be.

11      MR. KEOGH: That's all right. That's

12  if you're objecting that it's vague, then

13  that's fine. But if the doctor can answer it,

14  then he can answer it.

15  BY MR. KEOGH:

16      Q  Can you answer the question?

17      MS. CLARK: I again need to raise, on

18  behalf of the DOD, that this is a fact witness.

19  If you're asking him if his present impression,

20  on 27 August '04, was such and such, that's one

21  question.

22      MR. KEOGH: I think that's the question

23  that was asked.

24      MS. CLARK: Asking him what he thinks

25  today is enough.

1       MR. KEOGH:   I think that's the question

2   that was asked.

3   BY MR. KEOGH:

4       Q   On August 27, 2004, did the symptoms

5   that Ms. Rutledge present, at the clinic when

6   you saw her, did they represent what you would

7   consider to be classic symptoms of cauda equina

8   syndrome?

9       A   What do you define as classic, sir?   I

10  don't understand.

11      Q   Well, I guess I would ask you, if you

12  can define it as a classic -- as classic

13  symptoms.

14      A   I believe -- I may be mistaken here,

15  but I believe that would be a good question for

16  your expert.   I may be mistaken, but I believe

17  that's more of an expert witness question.

18      Q   All right.   But --

19      A   If you're asking me, did I think the

20  patient had cauda equina syndrome on that day,

21  that's what I documented, yes, sir.

22      Q   All right.   From your experience,

23  doctor, back in August of 2004, with the

24  symptoms that you saw Ms. Rutledge having, is

25  this the type of diagnosis that you would have

1   also expected, again, in August of 2004, that

2   you would have expected an urgent care clinic

3   such as the Andersen Clinic to be able to make?

4        MR. SCHWAB:   Objection.   That calls for

5   outstanding speculation.

6   BY MR. KEOGH:

7        Q   Can you answer the question, please,

8   doctor?

9        A   That's speculation, sir.

10       Q   So you can't answer the question?

11       MR. SCHWAB:   The patient didn't present

12  herself at Andersen.   She presented herself at

13  the Naval Hospital.   Are you asking him about

14  something that happened in the past that he

15  wasn't present for?

16       MR. KEOGH:   No, I'm asking this doctor

17  --

18  BY MR. KEOGH:

19       Q   Shall I repeat the question for you,

20  doctor?

21       A   Yes, sir.

22       Q   All right.   Based upon the symptoms

23  that Ms. Rutledge presented to you on August

24  27, 2004, from your experience in August of

25  2004, is that the -- and you made the diagnosis

1  of cauda equina syndrome, is that the type of

2  diagnosis that you would expect an urgent care

3  clinic, such as Andersen Clinic, to be able to

4  make based on those symptoms?

5          MR. SCHWAB: Same objections.

6          MR. KEOGH: If you can answer that

7  question --

8          MS. CLARK: What are you asking him,

9  his opinion of standard of care?

10          MR. KEOGH: Well, all right. Let me

11  tell you what I'm asking this doctor. This is

12  the doctor, the first doctor, in a month of

13  examining Mrs. Rutledge, who came to the

14  correctic diagnosis of cauda equina syndrome.

15  This doctor is responsible --

16          MR. SCHWAB: But --

17          MR. KEOGH: Well, let me state my

18  point. You asked me a question.

19          MR. SCHWAB: Well, no, no -- the

20  objection is that, this presentation was on

21  that date. The presentation wasn't at

22  Andersen.

23          MR. KEOGH: I understand.

24          MR. SCHWAB: The incontinence two days

25  before, all of these different --

1    MR. KEOGH:   I'm answering the question

2   that Ms. Clark had asked me, which is, what am

3   I asking this doctor?   And the point is, is

4   that, Dr. Duncan, more than anybody, is

5   responsible for Mrs. Rutledge having some

6   quality of life left, because he's the first

7   and only person to have diagnosed cauda equina

8   syndrome.   And I'm trying to determine from him

9   what he reasonably expects the professionals,

10   the medical care professionals that he works

11   with, such as the Andersen Clinic people, to be

12   able to diagnose and make a referral to him on.

13   So, that's the basis of the question.   And it's

14   based upon --

15    MS. CLARK:   But mister --

16    MR. KEOGH:   -- his experience in August

17   of 2004.   And I'm not asking for an expert

18   opinion, I'm asking for his clinical experience

19   and his expectations --

20    MR. SCHWAB:   But you're asking him --

21    MR. KEOGH:   -- in a clinic situation in

22   August of 2004.

23    MR. SCHWAB:   And you're asking, had she

24   presented at Andersen instead of to him, which

25   is a speculation on his part.   Had she

1   presented to Andersen with two days having this
2   onset, if he would have expected, that's what
3   you're asking?

4       MS. CLARK:    Well, my concern is that
5   your question presumes that she had cauda
6   equina syndrome when she was at Andersen.    And
7   secondly, you're asking this Navy witness, this
8   Navy physician, to state a standard of care
9   that goes beyond being a fact witness.    Mr.
10  Keogh, I think you're doing it inadvertently,
11  but it's like you're trying to get this man in
12  trouble.

13      MR. KEOGH:    I'm not trying to get Dr.
14  Duncan in trouble.    If anything, Mrs.
15  Rutledge's is so grateful to Dr. Duncan as
16  opposed to the other medical care practitioners
17  that she saw prior to seeing Dr. Duncan,
18  because he's the one who has salvaged her
19  condition by properly diagnosing cauda equina
20  syndrome.    And I'm trying to determine from Dr.
21  Duncan what his expectations are of clinicians
22  at places such as the Andersen Clinic.    Well,
23  let's move on to a different question.    Doctor,
24  let me have you --

25      MS. CLARK:    Well, let me just finish

1    this --

2          MR. KEOGH:   I withdraw the question.

3          MS. CLARK:    -- every single time we've

4    done a witness, we've gone over, they are

5    limited to testifying as to their perceptions,

6    etcetera, etcetera, at the time they treated

7    the patient, and certainly not these broad

8    questions about whether an MRI is better or

9    what you expect somebody to do?

10          MR. KEOGH:   What I --

11          MS. CLARK:    That's why -- we go over it

12   so much, that's why I'm -- surely you're not

13   trying to get this officer in trouble by asking

14   him repeatedly to violate Navy regulations.

15   Please stop it.

16          MR. KEOGH:    I am not trying to get

17   anybody in trouble and I will not take

18   instructions from you to stop doing anything.

19   I asked the question of what his expectations

20   were on August 27, 2004.   It's not asking for

21   an expert opinion, it's asking for his clinical

22   experience and his expectations within that

23   clinical experience.   But, let's go to --

24          MS. CLARK:   Well, I feel differently.

25          MR. KEOGH:   I'm sure you do.

BY MR. KEOGH:

   Q   Let's go to RUT36 for a minute, doctor. Can you look RUT36, please?

   A   Okay.  I have RUT036 in front of me.

   Q   Okay.   I'd like to go through the various symptoms that were described in this document to the Andersen Clinic physician on August 2, 2004 when Mrs. Rutledge presented there.  All right?  And if we look at the, the very first line --

   MR. SCHWAB:   I'm going to object on lack of foundation.  Are you saying this is a document that the doctor had seen at the time that he saw her?

   MR. KEOGH:  No, I'm not saying that. I'm asking him questions about it.

BY MR. KEOGH:

   Q   I'd like to be able to go through with you, doctor, what symptoms Mrs. Rutledge presented with on August 2, 2004?

   MR. SCHWAB:   I'm going to object. You're asking him to what, oversee what they looked at and pass judgment on the --

   MR. KEOGH:  No.   Why don't you wait until I ask the question, and then you'll know

1  what I'm asking?

2        MR. SCHWAB:   I'll wait, but I think I

3  know what you're doing, and it's not proper.

4        MR. KEOGH:   All right.   You can make an

5  objection, Mr. Schwab --

6        MR. SCHWAB:   I did.

7        MR. KEOGH:   -- but you can't continue --

8        MR. SCHWAB:   I just did.

9        MR. KEOGH:   You    can't    continue    to

10  instruct this witness or interfere with this

11  examination.

12        MR. SCHWAB:   I'm trying to instruct the

13  attorney, I think.

14        MS. CLARK:   Excuse me, why don't we

15  just go on a break --

16        MR. KEOGH:   Well, you're not here to

17  instruct me either, Mr. Schwab.

18        MS. CLARK:    --   to   get   this   under

19  control.

20  BY MR. KEOGH:

21     Q   I'd like to ask you, doctor --

22        MR. SCHWAB:   Let's get the question.

23  BY MR. KEOGH:

24     Q   -- I'm trying to get this done before

25  our 20 minutes are up.   If you can look,

doctor, at the top of the document, one of the
first symptoms that Mrs. Rutledge presented
with, appears to be "right side of back is
numb".

MR. SCHWAB: Wait a minute, where does
it say that?
BY MR. KEOGH:

Q Can you see that, doctor, up on the top
right-hand corner of the document?

A But, again, I'm unclear on why I'm
being asked to review a note that's not my
note, sir. That's --

Q Okay. It will become clear to you,
doctor, once I'm allowed to go through this and
ask you the question that I'm going to ask you,
okay?

MR. SCHWAB: Because the context of
this has been recovered in another deposition
as to what was presented and then what was said
to her and then what was --

MR. KEOGH: Are you going to instruct
this -- are you going to instruct the doctor
not to answer any further questions from me in
this regard --

MR. SCHWAB: No, but I'm going --

1    MR. KEOGH: -- or you're going to let me
2 ask the question?

3    MR. SCHWAB: But I'm going to defend
4 him if you're trying to get into an area where
5 he's looking at a document out of context that
6 he has no --

7    MR. KEOGH: I haven't had a chance to
8 let him to look at the document yet.

9    MR. SCHWAB: Well, there's a reason for
10 that.

11    MS. CLARK: Excuse me. I didn't bring
12 my bate stamped documents from Andersen, not
13 anticipating that, since he never saw them
14 before, he wouldn't be testifying about them.
15 I've got my clip together medical records.
16 What page are you looking at now?

17    MR. SCHWAB: This is the 2 August --

18    MR. KEOGH: Number 36.

19    MR. SCHWAB: -- the 2 August thing
20 where she circled some things and some things
21 were written, and then later in the testimony
22 that we have, she was questioned extensively by
23 the person there at Andersen Clinic.

24    So, what I'm concerned about is, he's
25 presenting something to the doctor that's out

1    of context.

2          MR. KEOGH:   Will you let me --

3          MS. CLARK:   Well, I know --

4          MR. KEOGH:   Will   you   let   me   ask   the
5    question?

6          MS. CLARK:   That's why didn't even --

7          MR. SCHWAB:   That in fact, it took the
8    entire deposition to the point the context.

9          MS.  CLARK:   That's  why  I  didn't  even
10   bring these records to the deposition.

11         MR. SCHWAB:   Right.

12         MR. KEOGH:   Everybody  seems  to  be  all
13   upset about what's going on here.   All I want
14   to  do  is  ask  the  question.    May  I  please
15   proceed with asking the question?   If not, if
16   you're going to continue to interrupt me, then
17   we will suspend this deposition and we will go
18   to the court and ask whether or not I can get
19   some  guidance  from  Judge  Tydingco-Gatewood  as
20   to whether or not I can ask these questions.

21         MS.  CLARK:   Well,  as  I  told  you,
22   Robert,  I'm  just  trying  to  find  the  page
23   because -- since these weren't records he made
24   or reviewed prior to the litigation, I didn't
25   expect we'd be talking about them.

**DEPO RESOURCES**
George B. Castro
**Court Reporter**
Tel.(671)688-DEPO * Fax(671)472-3094

1    MR. SCHWAB:   That's 2 August?

2    MR. KEOGH:   2 August '04.

3    MS. CLARK:   Gotch ya.

4    MR. SCHWAB:   Got you.

5    MS. CLARK:   Gotch ya.

6  BY MR. KEOGH:

7    Q    All right.   Doctor, do you see up top

8  where it states -- actually, where it starts

9  stating, "Quit 7 months ago", that's referring

10 to smoking, correct?

11   MR. SCHWAB:   How will he know that?

12 Objection.

13 BY MR. KEOGH:

14   Q    All right.   Then, let's just go through

15 the symptoms that this document appears to

16 represent.   Would you --

17   MR. SCHWAB:   I object to that.   There's

18 not symptoms represented.   These are --

19   MR. KEOGH:   All right.   We're going to

20 suspend this deposition and we're going to go

21 to court and find out --

22   MR. SCHWAB:   Oh, you go ahead and ask

23 the question.

24   MR. KEOGH:   Will you let me ask the

25 question?

1    MR. SCHWAB: You can go ahead
2  (unintelligible; overspeaking) without
3  objections. Go ahead.
4  BY MR. KEOGH:
5    Q  There is a reference to "right side of
6  back is numb and starts to tingle and burn", do
7  you see that, doctor?
8    A  Now, have you asked Captain Rau these
9  questions --
10    Q  I have.
11    MR. SCHWAB: We have, and that's my
12  objection, but let him ask this question.
13  BY MR. KEOGH:
14    Q  And I'm asking you if you can see that
15  this document states that on August 2, 2004,
16  Mrs. Rutledge presented to the Andersen Clinic
17  that she had right side of back being numb and
18  that it starts to tingle and burn. Do you see
19  that reference?
20    MR. SCHWAB: Objection, you're saying
21  "she presented". All you're asking him is,
22  does that what it says on this document.
23    MR. KEOGH: Yes.
24  BY MR. KEOGH:
25    Q  Do you see that that's what this

1   document refers to?

2     A   My "numb" is cut-off. I see N-U-
3   something.

4     Q   N-U-M? All right. Can you assume for
5   the purpose of this discussion that, that
6   states "right side of back is numb"?

7     A   Again, I would -- okay, I mean --
8   (pauses).

9     Q   Yes? And then it says it starts to
10   tingle and burn?

11     A   I don't like to make assumptions, sir,
12   on notes that aren't mine, but I'll -- for the
13   sake of your questioning, would be interested
14   in -- what would you like to know, sir?

15     Q   Okay. So, let's say that the Mrs.
16   Rutledge presented at Andersen and she stated
17   "right side of back is numb and starts to
18   tingle and burn". All right, Number 1. Number
19   2, it states that "it's taking longer to use
20   the bathroom." Do you see that reference?

21     A   I see that, yes, sir.

22     Q   Do you also see that on the area where
23   you check yes and no, that down, the third from
24   the bottom, she's checked "yes" when it says,
25   Loss of sensation in the groin area.

1    MR. SCHWAB: I'm on object on two

2 grounds. It doesn't say who checked that.

3 And, this is a document completely out of

4 context that he never used. So, you're asking

5 our fact witness about something that he didn't

6 witness.

7    MR. KEOGH: All right. The objection

8 is noted.

9 BY MR. KEOGH:

10   Q   Do you see that it is checked on the

11 document a "yes" for a loss of sensation in

12 groin area?

13   A   I see a circled "yes".

14   Q   All right. Do you also see on the

15 right side, there's a little box that has some

16 indications on it and it says -- it looks likes

17 "shooting pain down leg". Do you see that?

18   A   I believe it could say that, yes.

19   Q   All right. And then on the other

20 history by PCM reference, it discusses, numb,

21 tingling, inferior right glut. That's the

22 buttock, correct, on the right side? That's

23 what "glut" refers to?

24   A   Right. I would assume so.

25   Q   All right. And, radiating down left

1 leg to calf. Do you see that reference?

2    A    I see that. That's what it looks like
3 to me.

4    Q    All right. And then there's a
5 reference to, trouble sleeping at night due to
6 pain, correct, poor sleep due to pain?

7    A    Again, I would assume that's what that
8 said.

9    MR. SCHWAB:    Now, can I ask for a
10 proffer at this point, because what I don't
11 want this doctor to do is something that he's
12 not allowed to do, which is to give you some
13 sort of expert scrutiny of somebody else's
14 treatment that happened; that's something that
15 he didn't see or have anything to do with at
16 the time that he did history.

17    MR. KEOGH:    All right. Objection is
18 noted.

19    MS. CLARK:    It's inappropriate
20 foundation; might be the first time this
21 witness ever saw this medical record, too.

22 BY MR. KEOGH:

23    Q    Doctor, when they refer to numb,
24 tingling inferior right glut and radiation down
25 left leg to calf, is that something that would

1  indicate to you bilateral manifestations in

2  this regards?

3      MR. SCHWAB:  Objection, you're asking

4  for expert testimony.

5      MR. KEOGH:  No, I'm not.

6      MR. SCHWAB:  You're asking him to

7  speculate about something based on information

8  you provided him.

9  BY MR. KEOGH:

10     Q   All right.  Let me ask you this then,

11 doctor, since there seems to be --

12     MR. KEOGH:  Well, are you instructing

13 the witness not to answer that question?

14     MR. SCHWAB:  I will if you ask him for

15 expert testimony.

16     MR. KEOGH:  I'm asking the doctor

17 whether or not a reference to a right glut

18 numbness and tingling and the left leg

19 radiation of the calf represents bilateral

20 symptoms.

21     MR. SCHWAB:  And he's already testified

22 that there are a number of symptoms that he saw

23 that could have added up.

24     MR. KEOGH:  Will you state your

25 objection, please, not rephrase what his

testimony is.

MR. SCHWAB: The objection is, I'm asking for a proffer to make sure you're not asking for expert testimony.

MR. KEOGH: All right. I'm asking the question.

BY MR. KEOGH:

Q Does reference to a right numbness and tingling on the right glut and radiation down the left leg to the calf, does that represent -- does that indicate to you bilateral manifestation of the symptoms?

A All I can say, my understanding is, as a fact witness, I'm allowed to discuss the way the patient presented to me and what I documented on my note. All I can testify as to, I believe, and correct me if I'm wrong, but on the day that she presented to me, based on the patient's subjective history that she verbalized to me, which is what I had access to as her personal history, this is the conclusion I came to as I've documented this on my note, RUT046.

If I'm supposed to do something beyond that, please let me know and I'll be happy to

1  cooperate in any way possible.

2      Q   Is that your answer to the question?

3  Are you able to answer the question of whether

4  or not those symptoms of right glut and left

5  leg radiation to calf represents bilateral

6  symptomatology?

7          MS. CLARK:   Are you asking him if on

8  the 27th of August or anytime subsequent, if he

9  had that impression?

10         MR: KEOGH:   I'm asking the question

11 that I'm asking him.

12         MS. CLARK:   Well, if you're asking him

13 what he thinks about it now, if he answers

14 that, he's violating Navy Regulations, Bob.

15 What are you trying do, get this sailor

16 keelhauled?

17         MR. KEOGH:   My name is not Bob.

18 BY MR. KEOGH:

19     Q   Doctor, are you able to answer the

20 question?

21     A   Counsel, I don't want to be keelhauled.

22     Q   I don't know what that means, but

23 nobody's asking you to be keelhauled.   Are you

24 able to answer the question, doctor?

25     A   On 27 August 2004, sir, my impression

1    was, based on the symptoms I saw then, the
2    patient had cauda equina syndrome.

3        Q    All right.  Well, let me ask you this
4    then.  From your experience, back in August of
5    2004, if the type of symptomatology,
6    symptomatology that is presented in this RUT36,
7    such as, right side back is numb and starts to
8    tingle and burn; taking longer to use the
9    bathroom; loss of sensation in the groin area;
10   shooting pain down the leg; numbness and
11   tingling in the right glut and left leg to the
12   calf; and poor sleep due to pain at night, if
13   that symptomatology was presented --

14        MR. SCHWAB:  Objection.
15   BY MR. KEOGH:

16       Q    -- from your experience, in August of
17   2004, would you expect an urgent care clinic,
18   that is presented with those types of symptoms,
19   to refer that patient to a specialist such as
20   yourself?

21       MR. SCHWAB:  Objection.  It's out of
22   context, and it assumes facts not an evidence,
23   and you're also asking him to speculate.
24   BY MR. KEOGH:

25       Q    Can you answer the question, doctor,

1  please?

2     A   I remember in my total -- some total

3  experience, on 27, August 2004, included a week

4  of practice as an independent provider.  So, in

5  that previous week, I had not -- this is my

6  first case as a -- I'm a newly minted

7  orthopaedic surgeon at this point, remember.

8  So, I don't have the ability to answer that

9  question from an experienced standpoint, sir.

10    Q   Prior to August of 2004, had you ever

11 had experience with urgent care clinics

12 referring patients to you?

13    A   Not as an independent provider, no,

14 sir.

15        MR. SCHWAB:  You're asking him the past

16 judgment on a clinic and that, I think, is

17 improper questioning.

18        MS. CLARK:  And we're qualifying him as

19 an expert too, sounds like.  Excuse me, I'm

20 going to have to take a break to return a phone

21 call.  Can we take 10?

22        MR. KEOGH:  We don't have 10.  I'm

23 sorry.  We're going to continue on with this

24 deposition.

25        MR. SCHWAB:  Can it wait or are you --

1   is it --

2       A    What's that?   Oh, give me just minute,

3   that I got to see what they're saying.   I'll be

4   right back.

5           MR. SCHWAB:   All right, all right.

6           MR. KEOGH:   This is an outrage.

7           (Off the record from 7:29 a.m. to 7:29

8   a.m.)

9           MR. KEOGH:   Can we work on a --

10          MR. SCHWAB:   How many more questions do

11  you have?   Shall we be begging for time and --

12          MR. KEOGH:   We should be begging for

13  time.   Yes.   I mean --

14          MR. SCHWAB:   So, you mean you're asking

15  --

16          MR. KEOGH:   -- I've been here for two

17  and a half hours while all of these arguments,

18  and    waiting    outside,    and    telephone

19  conversations going on, and we got, maybe an

20  hour's worth of questioning done in all this

21  time.

22          MS. CLARK:   Well, you have a client to

23  represent as to -- wait, can I just ask a

24  question?   What is the point of asking this

25  fact witness to read somebody else's medical

1 records? The words say what the words say.

2 The interpretation of, or the significance of

3 them, clearly is expert opinion. This doctor

4 didn't even have these records at anytime when

5 he treated your client. So, I'm wondering what

6 the point of this is?

7         MR. SCHWAB: Yeah. Why are we getting

8 beyond what his treatment was?

9         MR. KEOGH: We're not getting beyond

10 his treatment.

11         MR. SCHWAB: We're way beyond his

12 treatment.

13         MR. KEOGH: Are we back in -- are we on

14 the record here or --

15         COURT REPORTER: We're on the record.

16         MR. SCHWAB: We're on the record; you

17 want to go off the record?

18         MR. KEOGH: Well, I want to finish my

19 questioning of Dr. Duncan. Is he gone?

20         MR. SCHWAB: I think he's negotiating

21 with the people that are locking up.

22         MR. KEOGH: I'm asking this witness of

23 what his expectations were in August of 2004

24 with respect to referrals.

25         MS. CLARK: And that's something he's

1  already told you, he didn't know, he was fresh

2  on Guam, he was a fresh -- I think he's a

3  freshly minted orthopaedic surgeon.  I mean,

4  it's seems you're digging heels and being

5  stubborn, you're going to ask this question no

6  matter what --

7          MR. KEOGH:  Okay.  Well --

8          MS. CLARK:  -- and it seems foolish to

9  keep anybody locked in the courthouse there

10 asking this witness questions that -- (pauses).

11 Ask the writer of the note.  Ask your expert.

12 Ask our expert.

13         MR. KEOGH:  We're going to court on

14 this question.

15         MS. CLARK:  Okay.  Do that.

16         MR. KEOGH:  This deposition is

17 suspended.

18         MS. CLARK:  I think it's probably

19 appropriate.

20         MR. KEOGH:  I have more questions to

21 ask of Dr. Duncan.  If he is no longer

22 available, he seems to have left the room.

23         MR. SCHWAB:  No, he still has his --

24         MS. CLARK:  Well, his stuff is laid in

25 there.

1    MR. SCHWAB: Let's go. Here we go.

2    MR. KEOGH: Are we still able to
3 proceed, Dr. Duncan?

4    A    I think he's calling to get permission
5 now. So, he said he'd get right back to me.

6    MR. KEOGH: Well, why don't we continue
7 while he's doing that?

8 BY MR. KEOGH:

9    Q    Doctor, your practice as an orthopaedic
10 surgeon is --

11    MR. SCHWAB: How many more questions do
12 you have?

13    MR. KEOGH: I don't know. If I can get
14 them asked, we can be done quickly, but there
15 seems to be --

16    MR. SCHWAB: But you're asking
17 something improper.

18    MR. KEOGH: I'm not asking something
19 improper.

20    MR. SCHWAB: Do you need 5 minutes, 6
21 minutes, 7 minutes, what do you need?

22    MR. KEOGH: I don't know. 15 minutes.

23    MR. SCHWAB: Can we impose upon you for
24 10 minutes of your time? (pauses; conversation
25 with Hawaii technician ensues)

1        MR. KEOGH:    Let's clarify one point
2  here.   And that is, I want to ask Dr. Duncan
3  what his expectations --
4  BY MR. KEOGH:
5        Q   Well, first of all, let me ask you
6  doctor, your practice as an orthopaedic surgeon
7  is one where patients are generally, if not
8  always, referred to you; correct?
9        A   That is often how it goes, yes, sir.
10       Q   Okay.   I mean, you don't have an actual
11  open clinic where patients come in and present
12  themselves to you in the first instance;
13  correct?
14       A   Nearly always referred for me, the
15  emergency room or primary care; that's correct.
16       Q   All right.   So, referrals come to you
17  from emergency rooms or such places such as the
18  Andersen Clinic; correct?
19       A   That's correct.
20       Q   All right.   What I'm driving and asking
21  you, doctor, is what your expectations would be
22  of an emergency clinic or an urgent care clinic
23  such as Andresen Clinic.   Now, if you're going
24  to be instructed not to answer that question,
25  I'd like to have that on the record now and

1 I'll move on.

2 MR. KEOGH: Can I ask, counsel, if
3 you're going to instruct the witness not to
4 answer that question?

5 MR. SCHWAB: I'm not even sure what the
6 question is yet.

7 MR. KEOGH: I've just said it to you.
8 I'm going to ask him what his expectations are
9 from an urgent care clinic from someone
10 presented with the symptoms that I've described
11 to him. And we're talking about on August of
12 2004. Are you going to instruct this witness
13 not to answer that question?

14 MR. SCHWAB: No. But I think this
15 witness is trying his best to stick with what
16 was presented to him.

17 MR. KEOGH: Just tell me whether or not
18 you're going to instruct this witness not to
19 answer the question.

20 MR. SCHWAB: I'm going to ask him not
21 to do anything to act as an expert and I think
22 he's doing his best to answer the questions
23 about what was presented to him.

24 MR. KEOGH: All right.

25 MR. SCHWAB: He understands he's in a

1  fact the witness.   I don't -- I think you're

2  trying to squeeze out something that you need

3  to get from your expert.

4       MR. KEOGH:   No.   I'm trying to find out

5  what --

6       MS. CLARK:   Maybe a good foundation

7  question would be, "Did you have any

8  expectations on 27 August 2004?"

9  BY MR. KEOGH:

10      Q   Doctor, will you be able to answer a

11  question with respect to what expectations you

12  had of an urgent care clinic with respect to

13  referring patients to you as an orthopedic

14  specialist or orthopedic surgeon?

15      MR. SCHWAB:   I'm just going to object

16  on vagueness.

17  BY MR. KEOGH:

18      Q   It calls for a yes or no answer.   Will

19  you be able to answer a question such as that?

20      MR. SCHWAB:   It doesn't call for a yes

21  or no answer.   It depends.   Object as to

22  vagueness.

23      MR. KEOGH:   I just can't get anywhere

24  with you folks.

25  BY MR. KEOGH:

1 front". It's that 2nd --

2       MS. CLARK: Still that second --

3       MR. SCHWAB: Yeah, next page of --

4       MS. CLARK: -- that August 2nd then?

5       MR. SCHWAB: -- 2 August '04.

6       MS. CLARK: Thanks.

7 BY MR. KEOGH:

8    Q All right. And there is a check mark

9 in the consultation to physical therapy. And

10 I've also seen that there is a referral to

11 physical therapy of Mrs. Rutledge back in the

12 early August 2004 time frame.

13       Doctor, from your experience, in or

14 about August of 2004, if a patient with

15 symptoms such as I have described, right side

16 back being numb, starting to tingling and burn,

17 taking longer to use the bathroom, loss of

18 sensation in the groin area, shooting pain down

19 the leg, numbness and pain in the right glut

20 and radiating down the left calf, and poor

21 sleep due to pain. If, in August of 2004, from

22 your experience, if a patient with symptoms

23 such as those, presented to a physical therapy

24 clinic at the Naval Hospital, would you expect

25 them to proceed with physical therapy or refer

1  the patient to a specialist such as yourself?

2         MR. SCHWAB:    I'm going to object,

3  because it seems assumes facts not an evidence.

4  It's a classic question for an expert witness.

5  And it tells this fact witness that he has to

6  speculate about something that he doesn't know

7  about.

8         MR. KEOGH:    All right.   Are you

9  instructing this witness not to answer the

10 question?

11        MS. CLARK:   And, again, your question

12 violates Navy Regulations.    You are asking

13 "would you".   A proper question would be "did

14 you", as in, is this a fact that occurred?   But

15 that you're asking him to offer opinion when

16 you phrase it, "would you".   That violates the

17 Navy regulations.

18        MR. SCHWAB:   Well, and this is exactly

19 why we've hired experts to answer the exact

20 questions you asked, to scrutinize what did

21 Andersen Clinic do and what is up to the

22 standard of care?   Is it the proper thing to

23 do?   Is it what's supposed to be done?   And

24 that's what you're asking of this doctor.

25        MR. KEOGH:    With all that testimony

done, I'd like to ask the question, are you
instructing this witness not to answer that
question?

MR. SCHWAB:  I don't think I have too.
I think he's well aware and struggling with the
fact that you're trying to get him to
speculate.

BY MR. KEOGH:

Q   Doctor, can you answer the question for
me, please?

A   What's the question, sir?

MS. CLARK:  Again, why are you doing
this?  You have an expert, we have an expert.
Those were the appropriate witnesses to ask
these "would you", "could you", "should've"
questions.

MR. KEOGH:  Well, I'm doing what I want
to do because it's appropriate --

MS. CLARK:  This is a (unintelligible).

MR. KEOGH:  -- inquiry for me and I
want to continue to ask this question.

BY MR. KEOGH:

Q   Doctor, would you like me to repeat the
question?

A   Could you repeat the question?

1    Q    Yes.    From your experience on August of
2  2004, if a patient with symptoms described,
3  that I just described to you, and there were
4  six of them, if a patient with those symptoms
5  presented to physical therapy at the Guam Naval
6  Hospital, would you have expected at that time
7  for physical therapy to proceed with therapy on
8  this patient or to refer that patient to a
9  specialist such as yourself?
10        MR. SCHWAB:  Same objection.
11 BY MR. KEOGH:
12    Q    Can you answer that question, please?
13        TECHNICIAN:        I'm    sorry,    Patrick
14 (phonetic), we got about three more minutes.
15    A    I don't know the answer of to that, Mr.
16 Keogh.
17 BY MR. KEOGH:
18    Q    And why is it you don't know the answer
19 to that?
20    A    I don't -- I do not know the experience
21 of the physical therapist that you're referring
22 to in this situation or what his background was
23 or his abilities.  And I was not there for that
24 particular visit.  In other words, I wasn't a
25 witness to that particular visit.

1    Q   All right.   Let me move on and ask you
2  this.   On or about August 27, 2004, during or
3  in connection with you're your examination and
4  treatment of Mrs. Rutledge, did you form an
5  opinion at that time about the care and
6  treatment provided to Mrs. Rutledge over the
7  preceding three to four weeks by the Andersen
8  Clinic?
9         MR. SCHWAB:   Objection.
10    A   I don't know.   I cannot remember what
11  my perspective was at that time.   All I can
12  tell you is what I documented, sir.
13  BY MR. KEOGH:
14    Q   Okay.   You don't recall whether you
15  formed an opinion then at that at that time of
16  the care that was given to Mrs. Rutledge at the
17  Andersen Clinic?
18         MR. SCHWAB:   Objection --
19    A   Yes, sir.   I'm sorry.   I don't recall.
20         MR. SCHWAB:   -- it asks for an opinion.
21         MR. KEOGH:   An opinion form at the time
22  of treatment of Mrs. Rutledge is what I'm
23  asking for.
24         MS. CLARK:   He's already said he didn't
25  remember.

BY MR. KEOGH:

Q    All right.    Did you ever express an opinion to Mrs. Rutledge about the care that was provided to her at Andersen Clinic?

A    I do not recall, sir.

Q    Okay.    If I advise you that Mrs. Rutledge will testify at trial that you told her that it was criminal what was done to her by the people at Andersen Clinic, would you agree with that statement that she makes?    That she will make?

A    I will say that sounds very uncharacteristic of anything that I would say, sir.

Q    All right.    Are you denying that you said that?

A    I do not really understand it.

MS. CLARK:    He's already answered it.

MR. KEOGH:    He hasn't answered that.    He says it's uncharacteristic.

BY MR. KEOGH:

Q    Is it possible you made a comment like that to Mrs. Rutledge?

A    I don't recall, sir.

Q    Is it possible that you made a comment

1  like that?

2          MR. SCHWAB:  Asked and answered.

3      A    Very unlikely, I believe, based on my

4  history.

5      Q    Okay.  Unlikely, but not impossible?

6      A    Well, I believe in God, I believe that

7  anything is possible, I believe He's sovereign.

8  And the Lord can do -- I believe anything is

9  possible.  I believe in miracles.

10     Q    Okay.  But, I'm not asking you about --

11     A    I believe all things are possible.

12     Q    I'm asking you whether or not it's

13  possible you made a comment to Mrs. Rutledge

14  about what the Andersen -- the way that

15  Andersen Clinic treated her at that time was

16  criminal?

17     A    I don't believe I said that, sir.

18         MR. KEOGH:  All right.  With that, I

19  have no further questions other than that I

20  will proceed with the motion on the other

21  matters that you prevented me from questioning

22  this doctor about.

23         MR. SCHWAB:  Kathy, you want to talk to

24  me real quick before we --

25         MS. CLARK:  Yeah, sounds good.  I've

1   got to return this phone call. Are you getting

2   ready to go home and go back to bed or are you

3   up or --

4       MR. SCHWAB:  I'm up, you can call me

5   later.  But the question is, do we have any

6   questions for cross?  So, do you need to talk

7   to me and we'll ask a question or not?

8       MS. CLARK:  Yeah, yeah, let's take a --

9       MR. SCHWAB:  Let's do that and I --

10      MS. CLARK:  -- 10-minute break and

11  let's --

12      MR. SCHWAB:  -- apologize to everybody

13  we're imposing on.  We've got three people

14  standing by waiting to shut us down.  So, let's

15  go off the record for two minutes and we'll go

16  back on and I hope it won't be more than two

17  minutes beyond that.

18      (Off the record from 7:43 a.m. to 7:48

19  a.m.)

20      MR. SCHWAB:  We're back on the record

21  in this deposition and I have no questions of

22  Dr. Duncan.  Dr. Duncan, thank you so much,

23  it's the second time you've come down to rally

24  for us.

25      MR. DUNCAN:  Yes, sir.

1      MR. SCHWAB:   We really appreciate it.
2 Thank you for all that you do for us as
3 individuals and for the country.
4      MR. DUNCAN:   Yes, sir.   My pleasure.
5 I'll cooperate in any way you can.
6      MR. SCHWAB:   Thank you, sir.   And
7 Kathy, thank you, and thank everybody at the
8 Hawaii Office, the Rally (phonetic) Office and
9 my people here at this office.   This is sure
10 easier than --
11      MS. CLARK:   My pleasure.
12      MR. SCHWAB:   -- getting on an airplane.
13 Thank you.
14      MS. CLARK:   Well, you all have a good
15 weekend.   Are you open --
16      MR. SCHWAB:   Bye, Robert.   We're off
17 now?
18      MR. KEOGH:   Okay.
19
20      (Deposition concluded at 7:48 a.m.)
21   **HAGATNA, GUAM, SATURDAY, JUNE 30, 2007 (GUAM TIME)**
22
23
24
25

CERTIFIED
COPY

1

2

3

4

5

6       DEBORAH K. RUTLEDGE and            )

7       THOMAS R. RUTLEDGE,                 )

8                       Plaintiffs,        )

9              vs.                          )    Civil Case No.

10      UNITED STATES OF AMERICA,           )    06-00008

11                      Defendant.          )

12      _____   )

13

14

15

16

17      DEPOSITION OF:

18             DEBORAH K. RUTLEDGE

19             WEDNESDAY, JANUARY 10, 2007

20             12:30 P.M.

21

22

23      Reported by:

24             Kathleen E. McCarthy

25             CSR No. 4483

1

MERRILL   LEGAL   SOLUTIONS
800-826-0277   818-593-2300   Fax 818-593-2301   www.merrillcorp.com
Case 1:06-cv-00008   Document 24   Filed 08/10/2007   Page 57 of 58

1    sure.

2        Q.    I know.    I said in your opinion.

3            MR. KEOGH:    She's not here to give opinions.

4            But you can answer the question if you can, but I

5    object on the grounds --

6            MS. CLARK:    She said the doctor was the first

7    one --

8            MR. KEOGH:    Please let me finish once gain.

9            MS. CLARK:    If you'll do it quickly.    I would

10   like to get out of here, and it's really kind of frivolous

11   to make an objection like that.

12           MR. KEOGH:    Counsel, to try to rush me at this

13   point is extremely uncivil.    I am entitled to make an

14   objection and --

15           MS. CLARK:    Take as long as you want.

16           MR. KEOGH:    -- I would like to do it without you

17   interrupting me.

18           MS. CLARK:    Take as long as you want to make such

19   an insubstantial objection, but please do it.

20           MR. KEOGH:    I think we're finished now.    Let's

21   go.

22           MS. CLARK:    No.    I would like to get a complete

23   answer to the question.

24           MR. KEOGH:    The objection is she is not here to

25   give opinions.