EXHIBIT "A"

IN THE DISTRICT COURT OF GUAM
CIVIL CASE NO. CIV06-00008

DEBORAH K. RUTLEDGE and
THOMAS R. RUTLEDGE,

    Plaintiffs,

vs.

UNITED STATES OF AMERICA,

    Defendant.

- - - - - - - - - - - - - - - - -/

**Condensed Transcript**

DEPOSITION OF: MICHAEL W. MERIWETHER, M.D., Ph.D.

TAKEN BY:     Plaintiffs

DATE:     September 7, 2007

TIME:     9:10 a.m. to 12:50 p.m.

PLACE:     JMC Reporting, Inc.
1800 Second Street, Suite 830
Sarasota, Florida 34236

BEFORE:     WENDY WEISE, RPR
1800 Second Street

Suite 830
Sarasota, Florida 34236

(Pages 1 - 172)

Page 2

```
 1        APPEARANCES:
 2   ROBERT L. KEOGH, ESQUIRE
     Law Office of Robert L. Keogh
 3   251 Martyr Street, Suite 105 C & A
     Professional Building
 4   Hagatna, GU 96932
     (671) 472-6895
 5        On Behalf of the Plaintiffs
 6
     KATHARYNE CLARK, ESQUIRE
 7   Special Assistant
     Tripler Army Medical Center
 8   1 Jarrett White Road
     Honolulu, HI 96859
 9   (808) 433-4968
          On Behalf of the Defendant
10
11   MIKEL W. SCHWAB, ESQUIRE
     Assistant United States Attorney
12   Sirena Plaza, Suite 500
     108 Hernan Cortez Avenue
13   Hagatna, GU 96910
     (671) 472-7332
14        On Behalf of the Defendant
15
16         I N D E X
17                              PAGE
18   Direct examination By Mr. Keogh............... 4
19   Plaintiffs' Exhibit Nos. 1 through 12
```

Page 3

```
 1         E X H I B I T S
 2   NO.     DESCRIPTION         PAGE
 3   1   Notice of Deposition....................... 4
 4   2   Expert Opinion of Dr. Meriwether........... 4
 5   3   Medical Record, RUT 031.................... 4
 6   4   Medical Record, RUT 033.................... 4
 7   5   Patient Lab Inquiry, RUT 035............... 4
 8   6   Medical Record, RUT 036.................... 4
 9   7   Radiologic Examination Report, RUT 040..... 4
10   8   Radiologic Examination Report, RUT 038..... 4
11   9   Telephone Consultation, RUT 041............ 4
12  10   Telephone Consultation, RUT 042............ 4
13  11   Medical Record, RUT 043.................... 4
14  12   Orthopedics Consult, RUT 045............... 4
```

Page 4

1    The deposition, upon oral examination, of
2   MICHAEL W. MERIWETHER, M.D., Ph.D., taken on th
3   7th day of September, 2007, at the offices of JMC
4   Reporting, Inc., 1800 Second Street, Suite 830,
5   Sarasota, Florida, beginning at 9:10 a.m., before
6   Wendy Weise, RPR, Notary Public in and for the
7   State of Florida at Large.
8         - - - - - - - -
9        (Plaintiffs' Exhibit Nos. 1 through 12
10   were marked for identification.)
11        MICHAEL W. MERIWETHER, M.D., Ph.D.,
12   being first duly sworn to testify the truth, the
13   whole truth, and nothing but the truth, was
14   examined and testified as follows:
15        DIRECT EXAMINATION
16   BY MR. KEOGH:
17    Q.  Dr. Meriwether, my name is Robert Keogh.
18   I represent --
19        (Brief interruption.)
20        (Discussion held off the record.)
21   BY MR. KEOGH:
22    Q.  -- the plaintiffs in this action; and you
23   have been identified to us as an expert who is
24   going to be providing opinion testimony at the
25   trial in this matter.

Page 5

1    A.  Yes, sir.
2    Q.  I have marked the notice of this
3   deposition as Exhibit 1.  Before we begin, I'd
4   just like to give a few instructions on what we're
5   doing.  You've done, I assume, many depositions
6   before?
7    A.  Yes, I have.
8    Q.  And you're presently under oath, so the
9   rules with respect to false swearing are in
10   effect.  Do you understand?
11    A.  Yes, I do.
12    Q.  Okay.  We're going to proceed here the
13   same as if a judge were present today.  If you
14   don't understand a question I ask, please don't
15   answer it.  Please ask me for clarification.  I
16   need to have you provide us with verbal responses
17   to all questions.  Okay?
18    A.  Yes, sir.
19    Q.  At some point, I know it's common for
20   human interaction to nod and say uh-huh.  If you
21   do that, I may ask you if that's a yes or a no.
22   I'm not trying to be rude when I say that.  I'm
23   just trying to protect the record.
24    A.  Okay.  I understand.
25    Q.  I'd also like to ask if you could please

1  wait until I completely ask the question before
2  you start to answer so that the transcript remains
3  clear.
4    A. Sure.
5    Q. Again, you may want to answer my
6  questions as quickly as you can. If you do start
7  answering before I finish, I may put my hand up
8  and ask you to wait. Again, I'm not trying to be
9  rude by doing that. I'm just trying to protect
10 the record.
11   A. No problem.
12   Q. Can you tell us what you did to prepare
13 for this deposition today?
14   A. Yes. I reviewed documents, researched
15 available medical literature pertinent to this
16 issue and went over the previous medicals and also
17 had a chance to review a number of depositions. I
18 think they're all listed in my report, but that's
19 basically it.
20   Q. All right.
21   A. And last night, I did meet with
22 Mr. Schwab and Ms. Clark just to talk about some
23 general principles.
24   Q. How long was your meeting last night?
25   A. Oh, probably a couple of hours.

1    Q. When did you first become involved in
2  this case?
3    A. That's a tough question. I think it was
4  back in April or thereabouts that I heard about
5  the fact that, you know, there was a case out
6  there that was looking for a neurosurgery expert.
7       I couldn't tell you the exact date, but
8  it was somewhere in the spring that I was
9  contacted. It was kind of like a halting sort of
10 back and forth contact on the phone and e-mail and
11 that sort of thing; and then eventually, I got the
12 details of the case, reviewed what was going on;
13 and that's how I got involved.
14   Q. April of this year?
15   A. Yes, sir.
16   Q. Doctor, I'd first like to ask you whether
17 you would agree with the statement that the
18 essence of science is to disclose both the data
19 upon which a conclusion is based and the methods
20 by which the conclusion is obtained.
21      MS. CLARK: I'm going to object to the
22   form of the question, please.
23   A. I think very much so in general terms. I
24 would agree with that.
25      -----

1  BY MR. KEOGH:
2    Q. Thank you. You prepared a report in
3  connection with your expert opinion in this
4  matter?
5    A. Yes, sir. I have a copy of it here.
6    Q. I've marked as Exhibit 2 what's been
7  provided to us. I'd like to ask you to take a
8  quick look through that and tell me if that's your
9  entire report.
10   A. Yes. This looks like my report along
11 with a list of depositions I've done in recent
12 three or four years and a copy of my CV. Yes,
13 sir. I think that's -- that's the -- along with I
14 should add some of the research that we did over
15 the Internet.
16   Q. All right. When you say "we," who are
17 you referring to?
18   A. Oh, I just mean me.
19   Q. Okay. Because that's my next question.
20 Did you have any assistance in preparing this
21 report?
22   A. No. I talked to some other doctors about
23 the case in general. I talked to Dr. Calvin
24 Early. Used to be the -- my boss and the head at
25 Bethesda Naval Hospital and trained me in

1  neurosurgery.
2       I talked to him about the case on a
3  couple of occasions over the telephone. I talked
4  to a rehab doctor down here in Tampa, Dr. Santo
5  Bifulco, B-i-f-u-l-c-o, who is a well-known rehab
6  doctor and a personal friend and just ran some
7  ideas by him on the case.
8       So there were -- that's the two that come
9  to mind most readily. There may have been a
10 couple of others, but I did ask for some other
11 opinions, not formally, not with all the data, but
12 in terms of particularly recovery. You know, on
13 what happens down the road.
14   Q. Okay. Dr. Early's specialization is
15 what?
16   A. He's the head of neurosurgery at Bethesda
17 Naval Hospital for a number of years. He's a
18 rather extraordinary individual. Very, very high
19 in our hierarchy in the American Association of
20 Neurological Surgery and is retired now, but --
21 but occasionally will consult on a case.
22   Q. All right. When you prepared your
23 report, is it fair to say that you tried to be as
24 accurate and as thorough as possible?
25   A. I did.

1  Q. You've testified in cases in the federal
2  courts before, yes?
3  A. Yes, I have.
4  Q. Let's take a look at your statement
5  contained on what we have marked as RUT 394. It
6  is the depositions by Dr. Meriwether since January
7  2006.
8  A. Yes, sir. I have it here.
9  Q. I counted 29 depositions and two court
10 proceedings since January of '06. Are there any
11 since March of '07?
12 A. Not to my memory. One court appearance.
13 There may have been one or two depositions since
14 January of '06. I can't recall off the top of my
15 head, but that data I could retrieve from my
16 office on my computer.
17 Q. Is the statement a thorough and accurate
18 statement of the depositions that you've testified
19 in since January of '06?
20 A. Yes. Over the past two years, yes.
21 Q. This is a period of about 14 or 15
22 months. Were there depositions prior to January
23 of '06?
24 A. In general, yes.
25 Q. Can you explain what you mean by "in

1  general"?
2  A. Well, when you ask the question are there
3  depositions, are you referring to a specific case
4  or a specific patient? You know, are there -- is
5  there some particular question that you ask; or
6  are you on a fishing expedition here?
7  Q. Well, we're not fishing.
8  A. For all cases -- excuse me. Let me
9  finish. For all cases prior to that?
10 Q. Let me ask you this: Out of the 29
11 depositions that you've listed in Exhibit 2, were
12 any of those in federal court proceedings?
13 A. No. I don't think any of them were.
14 Q. Have you ever been involved in a case
15 involving a federal court before?
16 A. You know, I think I was, Mr. Keogh; and
17 right after I had gotten out of the Navy Medical
18 Corps back in 1985, there was a case involving
19 Oakland Naval Hospital. I was in private practice
20 here; and I do remember I had to go back and
21 actually testify in a federal case because a lady
22 with a brain problem had been -- had filed a suit
23 against --
24 Q. Excuse me for interrupting. I'm not
25 asking for the details. That was just yes or no

1  whether you'd been involved in such --
2  A. Yes. I think there was one.
3  Q. All right. Thank you. When you were
4  preparing your report for this case, were you
5  informed that this was a federal court proceeding?
6  A. Yes.
7  Q. Were you provided with the rules with
8  respect to preparing reports in federal court?
9  A. Yes.
10 Q. Have you reviewed the provisions of Rule
11 26(b) with respect to -- excuse me -- preparation
12 of expert reports in federal proceedings?
13 A. I don't know that -- I don't remember a
14 specific 26(b) or (d) or whatever you said. I
15 don't remember a specific rule. I know I was
16 given a form by Ms. Clark's office that apparently
17 one has to follow when you file your report
18 stating the subject and the case number and that
19 sort of thing and the documents reviewed.
20     So I remember that, but no, I did not
21 review the law. I'm certainly not a lawyer and
22 wouldn't presume to do that.
23 Q. Let me ask you this: I'd like to read to
24 you from Federal Rule of Civil Procedure 26(b)
25 with respect to a written report prepared by an

1  expert.
2      MS. CLARK: Excuse me. Is this a
3  question? Are you asking him to form a legal
4  conclusion on the basis of the federal rule?
5      MR. KEOGH: Please state your objection
6  in a concise --
7      MS. CLARK: It's not an objection. I'm
8  asking you a question.
9      MR. KEOGH: I'm not answering your
10 questions. I'm asking the doctor questions,
11 and he's to answer.
12     MS. CLARK: Please don't make any legal
13 conclusions, Dr. Meriwether.
14     THE DEPONENT: I would be poorly equipped
15 to do that.
16 BY MR. KEOGH:
17 Q. Doctor, I'd like to read to you from Rule
18 26(b), which states, The expert shall contain a
19 complete statement of all opinions to be expressed
20 and the basis and reasons therefore.
21     The data or other information considered
22 by the witness in forming the opinions and
23 exhibits to be used as a summary of or support for
24 the opinions, the qualifications of the witness,
25 including a list of all publications authored by

1 the witness within the preceding 10 years, the
2 compensation to be paid for the study and
3 testimony and a listing of any other cases in
4 which the witness has testified as an expert at
5 trial or by deposition within the preceding four
6 years.
7 All right. Prior to today, have you been
8 made aware of the requirements of Rule 26(b)?
9   A. I think so.
10   Q. All right. So now that's why I'm asking
11 you about the depositions that you have listed on
12 your report, which start from January 4, 2006,
13 which is less than two years ago. The requirement
14 of the rule says you are to provide for us a list
15 of all cases in which you have testified as an
16 expert at trial or by deposition within the
17 preceding four years.
18 Is the list that's contained in your
19 report therefore incomplete?
20   A. It's -- it only is as complete as our
21 data on our computer would show. There's no
22 compelling evidence for us to keep those records
23 or keep that data beyond two years. So that's
24 what we have now.
25   Prior to that, did I testify in civil

1 proceedings here in terms of depositions or court
2 appearances? Certainly. We don't have any record
3 of it in our computer at the office.
4   Q. So you have only provided us with the
5 depositions that you've testified in since January
6 of 2006 through March of 2007, but there have been
7 depositions that you've testified in prior to
8 January of 2006 that you have not provided us?
9   A. Yes. Under Florida law, I'm not required
10 to keep those records beyond the two-year limit.
11   Q. Do you know what that Florida law is?
12   A. I'm not a lawyer. No, I don't.
13   Q. You've referenced that you -- are you
14 familiar with the provisions of that Florida law?
15   A. Only that I don't have to keep a record
16 of, say, depositions and courtroom appearance back
17 10 years and certainly not beyond two years.
18 So. . .
19   Q. We're in the federal court; and the
20 federal court requires that you provide us with
21 depositions that you've testified in for the
22 preceding four years; and you're unable to do that
23 today?
24   A. We don't have those records.
25   Q. The list that you have provided us from

1 January of '06 until March of '07 are any -- when
2 you have a client name, what are you referring to
3 as the client there?
4   A. Well, it's the patient involved.
5   Q. That's the patient?
6   A. I'm sorry?
7   Q. That's the patient's name there?
8   A. Right. Uh-huh.
9   Q. And it was the patient that retained you
10 for your services?
11   A. Yes. My data -- if you don't mind --
12 many of these were accident cases sent to us
13 through the emergency room by virtue of being on
14 call at the hospital, et cetera.
15 So we have no control of the flow of
16 those patients in or what happened to them
17 subsequently, but these are the ones who did
18 continue to pursue a course of action, had a
19 lawsuit; and we were required then by being their
20 treating doctor to have to give a deposition or a
21 depositional statement about them.
22   Q. Okay. How many of these 29 depositions
23 that are listed from January 4, '06 until March 3
24 of '07 were for -- were involved in medical
25 malpractice cases?

1   A. None.
2   Q. How many of these were involved in
3 personal injury accidents?
4   A. They're all -- 100 percent were involved
5 in personal injury, including the two courtroom
6 appearances.
7   Q. All of these individuals, do you know
8 whether they were -- were they all the plaintiffs
9 in those personal injury actions?
10   A. Yes, sir.
11   Q. Including the two court proceedings?
12   A. Right.
13   Q. So at least since January of 2006, you
14 have not testified in a medical malpractice case?
15   A. No, I have not.
16   Q. How about for the approximately
17 two-and-a-half years before January of '06? Did
18 you testify at all in any medical malpractice
19 cases?
20   A. Not to the best of my memory. There is a
21 small hiatus built in there which I had a
22 traumatic head-on auto accident and was out of
23 work for nearly a year.
24   Q. When was that?
25   A. From July of '04 until mid '05 and I had

1  neck surgery, artificial hip, chest tubes and a
2  number of things. I was in a trauma center for
3  three months and rehab for three months after
4  that.
5      So there was a hiatus in my medical
6  practice period there, including probably these
7  sorts of data that we're talking about, because I
8  was in a hospital bed. I would not have seen
9  patients or given an opinion about anything.
10     Q. How about from mid '05 up until January
11 of '06? I suppose you have a six-month period in
12 there? Are there any cases that are not
13 represented?
14     A. There may have been a deposition or two
15 in there. I'm not sure, but there were not med.
16 mal. cases.
17     Q. Okay. Referring to your report, Doctor,
18 can you tell me when you prepared this?
19     A. It took place over a matter of several
20 weeks. I should say several months in terms of
21 reviewing literature and medical records and
22 formulating my opinions about what happened.
23     So I can't give you an exact, like, X
24 number of weeks or months, but it was -- I should
25 say the product, this work product, if you will,

1  is a result of several months, at least three or
2  four months of looking at data and looking at
3  research with respect to the problem presented
4  here. The report itself was written probably
5  within a space of about a week, given that data.
6      Q. Can you tell me if the report is dated,
7  sir? I haven't been able to find a date on it.
8      A. No. I don't see a date on mine either.
9      Q. Is it your normal practice in preparation
10 of reports that you don't date them?
11     A. No, not at all. It should have a date on
12 it. Of course, it covers quite a bit of time and
13 quite a bit of the patient time as well as my
14 time. So it should have a date on it, but I don't
15 see one here.
16     Q. Are you able to tell us today when the
17 report was completed? When it was actually
18 written and completed?
19     A. I had sent it to Ms. Clark's office, both
20 FedEx as well as by computer. I don't recall that
21 exact date. It was in the summer. I realize
22 that, and I don't know the exact date.
23     Q. All right. You told me before that you
24 believe that you were first contacted about this
25 assignment in April of 2007; is that correct?

1      A. I think that's right. That's an
2  estimation, because I'm not sure when the phone
3  calls or stuff took place in terms of, you know,
4  do we review a case. Here's the facts and
5  da-da-da-da. Usually I look at the facts of a
6  case before I review it.
7      Q. All right.
8      A. And then make a decision. So, Mr. Keogh
9  I'm not sure of the exact timing of that.
10     Q. Now, were you compensated for this work
11 sir?
12     A. Yes.
13     Q. Can you look at Exhibit 2 and tell me
14 whether or not anywhere in Exhibit 2 there is a
15 statement about the compensation that you're to be
16 paid for the testimony and the study in there?
17     A. Well, I can tell you, if you will, that I
18 think to date it's something like $38,000 for all
19 the time that I have spent reviewing literature,
20 medical records and providing this report.
21     Q. 38,000?
22     A. Yes.
23     Q. The question I asked you is whether or
24 not from looking at Exhibit 2 you can point to me
25 where it states what the compensation to be paid

1  for the study and your testimony is?
2      A. No. There's no billing records there.
3  Those are separate from that report.
4      Q. Do you have your billing records with you
5  today?
6      A. I don't.
7      Q. Where are your billing records?
8      A. I have them at home.
9      Q. Would you be willing to provide me with
10 copy of those?
11     A. Absolutely.
12         MS. CLARK: He can provide them to me.
13 BY MR. KEOGH:
14     Q. Doctor, is there a reason why you haven't
15 provided in your report a statement about the
16 compensation you're to be paid for your study an
17 for the testimony?
18     A. No. I think that's at the discretion of
19 the U.S. Attorney's office, depending upon how
20 much time is put in, whether or not this comes to
21 trial, whether or not I travel to Hawaii or Guam
22 and on and on and on. So there are a lot of
23 unknowns yet in the equation. To make a long
24 story short, the jury, quote/unquote, is still
25 out.

1    Q. Can you tell me what your hourly rate for
2 working in this case has been?
3    A. I charge $500 an hour to review records,
4 to formulate opinions and write reports.
5 Depositional time is usually charged at $1,000 an
6 hour. A little more if it's a video deposition.
7 Those are roughly my rates.
8    Q. Have you treated the assignment that has
9 been given to you and with respect to this case
10 any differently because it's Guam? Because it
11 involves the Guam federal court or the Guam court
12 system?
13         MS. CLARK: Object to the form.
14    A. No. I don't really understand that
15 question. Why would a patient's case be any
16 different if it was China or if it's New York?
17 That doesn't --
18 BY MR. KEOGH:
19    Q. The answer is?
20    A. No.
21    Q. The answer is no. Thank you.
22         MS. CLARK: Did you need clarification of
23 that question, Dr. Meriwether? I still don't
24 understand it myself.
25         THE DEPONENT: I don't understand it

Page 23

1 actually.
2 BY MR. KEOGH:
3    Q. Does your report Exhibit 2 contain a full
4 listing of all the documents that you reviewed in
5 preparation -- in advanced preparation for the
6 report?
7    A. Yes, sir. I think in general it's a --
8 it's kind of a qualitative statement under 3 C
9 about enumerated journal articles used as
10 background review. That process was at that point
11 150 peer-reviewed articles; and I think since that
12 time, it's been considerably more. However,
13 that's kind of a qualitative look at that.
14    Q. Excluding three, which we'll get to
15 later, under Roman numeral II, the documents --
16    A. Oh, okay.
17    Q. -- that you reviewed?
18    A. No, sir.
19    Q. You have six documents that you reviewed
20 or sets of documents that you reviewed in
21 preparation for -- in advance of preparing your
22 report. Is that an exhaustive list of what you
23 reviewed?
24    A. I think so. Yes.
25    Q. So you reviewed the depositions of both

Page 24

1 Mr. and Mrs. Rutledge, the deposition of
2 Dr. Jablonski and medical records from July 27 to
3 August 27, 2004, the Naval Regional Medical Center
4 at Guam records on August 27th, 2004 and the
5 records from Tripler from August 27 to August 29.
6 I'm sorry. August 27, 2004 to August 29, 2005.
7 That's the universe of what you reviewed in
8 preparation for the report?
9    A. For the preparation of the report, yes.
10 There has been some medical records that have come
11 to light since then.
12    Q. Have you supplemented your report since
13 this was prepared? Since the original report was
14 prepared?
15    A. No, I haven't. It hasn't changed my
16 basic opinion. Reviewing private records from
17 urology and neurology at Oklahoma City and
18 Bethesda Naval Hospital, it has not changed my
19 opinion.
20    Q. All right. Let me go back to when the
21 report was prepared. You told us that you became
22 involved in approximately April of 2007. If you
23 look at Exhibit 2, this document was provided to
24 my office on May 21, 2007.
25         Does that somehow help you in refining

Page 25

1 when the undated report was actually prepared?
2    A. No. The report was prepared sometime
3 after this, but this may be memorialized as the
4 formal contract between myself and the U.S.
5 Attorney's office to do this and to review this
6 data, et cetera, but I had heard about it, I'm
7 sure, in a qualitative sense back in April or
8 thereabouts. In other words, would you do this or
9 would you be involved in this case?
10    Q. My question to you is -- well, let me
11 clarify your answer. Is it your testimony that
12 you prepared your report after May 21st, 2007?
13    A. Oh, absolutely.
14    Q. After?
15    A. After.
16    Q. Doctor, this report was served upon us on
17 May 21st, 2007.
18    A. Does that include my final report?
19    Q. Everything that's there in Exhibit 2 was
20 served upon my office on May 21st, 2007.
21    A. Then it would have to be around that
22 time, I would presume. I have no independent
23 recollection.
24    Q. All right. And this is -- what's
25 contained in Exhibit 2 is the only report you've

Page 26

1  prepared?
2  A. Right.
3  Q. Am I correct then in my understanding
4  that prior to preparing your report, which is
5  marked as Exhibit 2 in this proceeding, that you
6  did not review the deposition transcript of
7  Natalie Giscombe?
8  A. It says here that I reviewed the
9  deposition of both Rutledges, Dr. Jablonski and
10 the records of the hospitals involved. It does
11 not appear according to what I list here that I
12 reviewed the record of the deposition of
13 Ms. Giscombe.
14 Q. All right. Then am I also correct in my
15 understanding that prior to preparation of your
16 report, which is marked as Exhibit 2, that you did
17 not review the deposition transcript of Steven
18 Rau?
19 A. I think that's correct.
20 Q. And am I also correct that you did not
21 review prior to preparing your report the
22 deposition transcript of Dr. Hugh McSwain?
23 A. I think that's correct.
24 Q. Am I correct in my understanding that
25 prior to the preparation of your report, you did

Page 27

1  not review the transcripts of two separate
2  depositions of a Dr. Douglas Duncan?
3  A. No. I have since then. All of these
4  records I've reviewed.
5  Q. Prior to the preparation of your report,
6  did you review that?
7  A. No.
8  Q. Prior to the preparation of your report,
9  am I correct that you did not review the
10 deposition transcript of a Dr. Orchowski?
11 A. No.
12 Q. I'm not correct about that?
13 A. No. I did not review Dr. Orchowski's
14 depo.
15 Q. Okay. Prior to the preparation of your
16 report, did you review the expert reports of a
17 Dr. John Steele?
18 A. Prior to this document, no.
19 Q. Okay. Have you reviewed Dr. John
20 Steele's reports since preparation of this report?
21 A. Yes, I have.
22 Q. How about prior to the preparation of
23 your report, did you review the expert report of a
24 Dr. Gary Toll (phonetic)?
25 A. No. Only recently.

Page 28

1  Q. And prior to the preparation of your
2  report, did you review any medical records
3  whatsoever after August 29th, 2005?
4  A. I don't think so.
5  Q. All right.
6  A. Whatever records have been available
7  since then I've reviewed, but at the time of the
8  report -- there was a deadline for the report to
9  be put in -- I did not review those records, some
10 of which occurred after this report was prepared
11 and after the deadline had ensued to provide them
12 with this report.
13 Q. All right. Explain to me, please, what
14 you understood or understand the deadline for the
15 report to have been.
16 A. I don't recall the exact date, but there
17 were numerous e-mails and communications between
18 Gil Mones in the Guam office and myself on e-mail
19 about the report becoming due; and there was a
20 certain date that they needed to have it by and
21 that sort of thing. So I'd have to look at those
22 e-mails and memorialize them and document to
23 answer that question more accurately.
24 Q. And who was the person whose name you
25 mentioned?

Page 29

1  A. Gil Mones, M-o-n-e-s.
2  Q. And who is Gil Mones?
3  A. He's an assistant, as I understand it, in
4  the U.S. Attorney's Office in Guam.
5  Q. Is it your understanding that the expert
6  report had a deadline that was prior to or close
7  to May 21, 2007?
8  A. It's my understanding, yes.
9  Q. Have you ever been advised that you had
10 an opportunity to supplement or amend your report
11 at any time up until August 8th of 2007?
12 A. Not that specific date, but I've been
13 advised that when new medical records arose, such
14 as her treatment in Oklahoma City, for example,
15 the urology and neurology group there, that I
16 could amend the report. I didn't feel the need to
17 do that after reviewing their records.
18 Q. Okay. I'd also like to confirm that you
19 have not in any way medically examined
20 Mrs. Deborah Rutledge?
21 A. No. I've never seen her.
22 Q. Did you request an opportunity from the
23 counsel that retained you to examine her before
24 issuing your opinion?
25 A. No.

1  Q. Is there a reason why you didn't request
2  that?
3  A. Well, I think time and distance
4  constraints are number one. Number two, her
5  residual problems are a little bit far from my
6  primary area of expertise.
7      They involve urinary and bowel and
8  bladder complaints, I should say; and those were
9  things better dealt with by urology. We order
10 them. We look at them. Make an assessment on
11 them, but I don't do those tests.
12 Q. All right. What is your understanding of
13 the time and distance problems associated with
14 examining Mrs. Rutledge?
15 A. That I would have to require her to come
16 to Sarasota, Florida; and I would not be willing
17 to go outside of my area to examine a patient.
18 Q. Why is that?
19 A. It's totally time ineffective for me, and
20 I think it's cost ineffective for the government
21 or whoever is footing the bill. It's a long way,
22 a long distance and probably very inconvenient for
23 Mrs. Rutledge.
24 Q. Do you know where Ms. Rutledge lives at
25 the present time?

1  A. Right now, no.
2  Q. Do you know where she has lived in the
3  last two years?
4  A. No. I thought she was on Guam.
5  Q. Okay. Have you ever in past cases that
6  you've been involved with examined a patient prior
7  to providing an expert opinion?
8  A. Yes and no. When patients are nearby,
9  it's convenient to do so; and it is imperative to
10 see what their neurologic deficit is prior to the
11 case. It's my preference to examine them or have
12 them examined by a colleague who's in my area of
13 specialty, but in general what's practically
14 happened, theoretically -- excuse me -- that's
15 been our intent.
16     In general, it's been very inconvenient
17 to match up the patient and myself, you know, in
18 terms of travel plans and clinic appointments.
19 Q. So there have been times then when you
20 have had a colleague of yours, for example,
21 examine an injured party or a plaintiff in a case?
22 A. Sure.
23     MS. CLARK: I'm going to object to the
24     form specifically because he's already when
25     you went over the list, I think, made it clear

1  that the majority of these depositions were
2  his patients. I think your question is
3  misleading.
4      MR. KEOGH: I note the objection.
5  BY MR. KEOGH:
6  Q. Let's go back and cover that for a
7  minute, Doctor. My understanding was that these
8  were plaintiffs in accident cases?
9  A. Yes.
10 Q. Are all of these 29 client names
11 referenced in your report on RUT 394? I don't
12 know if your copy is marked or not. If you want
13 to look at the exhibit, it is.
14     Are all of these client names your
15 patients?
16 A. Yes, they are. I was the treating
17 physician either through the emergency room or
18 some other referral pattern. So they were -- I
19 was the treating doctor.
20 Q. On all 29 of these?
21 A. Yes.
22 Q. So you were not testifying as a retained
23 expert in any of these cases?
24 A. Oh, no, sir. I was the treating doctor.
25 Q. How about in the two in court? Were you

1  also the treating physician on those?
2  A. I was. As you might imagine, you know,
3  these are the ones obviously who didn't resolve
4  the issues and went on to court, whether in
5  mediation or what have you.
6  Q. I notice that from the two in court, the
7  first one, the September 26th, '06, R. Schrader
8  client is also listed in the deposition list under
9  April 12, the second from the bottom of the
10 deposition list.
11 A. Yes, sir.
12 Q. I don't see M. Bradley-Jernigan in that
13 list of 29. Was your deposition not taken in the
14 M. Bradley-Jernigan case?
15 A. I guess it was not. It may well have
16 been an emergency room referred patient that I saw
17 and they never took my deposition, but just called
18 me to court.
19 Q. All right. So just to confirm in
20 all actual -- we now have 30 since the
21 Bradley-Jernigan is not in the deposition list --
22 in all 30 of the cases listed in your report, you
23 were testifying as a treating physician and not
24 qualified as an expert to give opinion testimony;
25 is that correct?

Page 34

1  A. Yes, sir.
2     MS. CLARK: I'm going to object to the
3  form of the question to the extent that you're
4  asking the doctor to form a legal conclusion
5  as to whether he was qualified as an expert.
6  BY MR. KEOGH:
7     Q. Let's confirm that, Doctor. Were you
8  retained in any of these cases to provide expert
9  opinion testimony?
10    A. Well, I don't know the legal niceties of
11 it, but I was a treating doctor; and so I presume,
12 given my credentials, that the reason they came to
13 me and I was a treating doctor and I am an expert
14 in neurosurgery, so -- but I was not retained as
15 an outside expert to come in and look at the case
16 and give that sort of opinion.
17    Q. So the opinions that you gave in these
18 cases were opinions that you formed in the course
19 of treating the patients?
20    A. That's correct. Yes, sir.
21    Q. These were not opinions that you provided
22 upon a review of records or a separate examination
23 of the patient being retained by counsel to do so?
24    A. No, sir. Not at all. I haven't found a
25 good way of avoiding a subpoena. I'm working on

Page 35

1  it.
2     Q. Did you ever request from the counsel in
3  this case involving Mrs. Rutledge an opportunity
4  to examine Mrs. Rutledge?
5     A. No, I didn't.
6     Q. Did you ever discuss with the counsel who
7  retained you in this case about the possibilities
8  or the -- whether or not it was possible to
9  examine Mrs. Rutledge?
10    A. I don't think I ever did. It was my
11 understanding -- it may be erroneously -- that she
12 was living on Guam; and she has medical problems
13 that would be quite a stretch for me to go there
14 or her to come here. So I don't think it ever
15 came up.
16    Q. If Mrs. Rutledge weren't living on Guam,
17 but instead were living here in the United States,
18 would that have changed your view on whether or
19 not it was possible to examine her?
20    A. It would have changed my view if it was
21 convenient for her. I understand this lady has
22 problems; and, you know, I think it might be very
23 inconvenient for her to, you know, fly or drive or
24 whatever to be able to examine her.
25       It's not my practice to go fly around the

Page 36

1  country examining plaintiffs. So it just sort of
2  never came up; and I guess maybe I'm wrong, but I
3  thought she was living on Guam all this time.
4     Q. Would you agree with me, Doctor, that a
5  physician who has had an actual opportunity to
6  examine a patient is in a better position to give
7  a diagnosis and a prognosis of that patient's
8  condition than someone who just reviews records?
9     A. No.
10    Q. It's not your -- it is your opinion that
11 someone who reviews records is in equally as good
12 a position as someone who actually examines a
13 patient to give an opinion on the prognosis?
14    A. Depends on the training and the expertise
15 and the personal and literature experience of the
16 physician. A general practitioner, a physician's
17 assistant, a non-spine surgeon.
18    Q. That's a good point.
19       MS. CLARK: Were you finished with your
20 answer, Doctor?
21       THE DEPONENT: Yeah. Non-spine surgeon.
22 I think that in this case, there's been a
23 dearth of neurosurgery opinions on the chart.
24 BY MR. KEOGH:
25    Q. Okay. All right. Don't recall if you've

Page 37

1  actually -- if I've asked you the question, but
2  let me ask you this now. Since providing your
3  report to us May 21 of 2007, have you had an
4  opportunity to review two reports prepared by
5  Dr. John Steele?
6     A. Two reports since my report? Is that --
7     Q. Well, have you reviewed them since your
8  report? You didn't review them prior to the
9  report?
10    A. Yes, I have. Yes.
11    Q. Have you reviewed them since preparing
12 your report?
13    A. I reviewed a number of documents, and
14 reports by Dr. Steele were included in that.
15    Q. Are you familiar with Dr. Steele?
16    A. I'm not. No.
17    Q. Have you reviewed his credentials at all?
18    A. I've looked at them at one point, but I'm
19 not familiar with him at all.
20    Q. What do you -- what is your understanding
21 of Dr. Steele's credentials from having reviewed
22 his curriculum vitae?
23    A. Primarily that he's a non-surgeon; that
24 he doesn't do back surgery. He's never seen or
25 done a back operation; and that's a crucial

10 (Pages 34 to 37)

All Florida Reporting, Inc.
800-898-7373

Case 1:06-cv-00008    Document 40-2    Filed 01/10/2008    Page 11 of 20

1 question here.
2     This is not the province of neurology or
3 a non-spinal surgeon, orthopedics or rehab
4 medicine or general practitioner. This is the
5 province of the neurosurgeon, and Dr. Steele is
6 not a neurosurgeon. So in my opinion, I think
7 right off the bat that disqualifies him from
8 making a cogent clinical conclusion about what
9 went on here or what should have gone on here and
10 what have you.
11     Q. Okay. I'm referring now -- we're not
12 talking about the surgical issues. I'm asking
13 you --
14     A. I am. I'm talking about surgical issues.
15     Q. So that's all you're giving opinions on
16 here is surgical issues?
17     A. The necessity for surgery, the risk of
18 surgery, the post-operative complications of
19 surgery. That sort of thing. That's the crucial
20 part of this case in my opinion.
21     Q. So your only objection to Dr. Steele is
22 that he's not a surgeon? He's a neurologist?
23     A. It's a fairly serious objection. I mean,
24 you know, that could be my only objection, but
25 it's a disqualifying objection in terms of having

1 the expertise to be able to evaluate the case and
2 having no personal experience with cauda equina
3 syndrome, having no training doing cauda equina
4 surgery or being able to recognize it, not knowing
5 the surgical parameters involved and not seeing
6 the post-operative complications of any back
7 operation, much less something as serious as cauda
8 equina. So yes. That one objection for me covers
9 a lot. I think it's a disqualifying objection in
10 my mind.
11     Q. How do you know these things about
12 Dr. Steele's experience?
13     A. It's my understanding from review of his
14 deposition and review of the statements that were
15 given me through the U.S. Attorney's office, he's
16 not a spine surgeon, not a neurosurgeon. He's
17 never done back surgery.
18     Q. When did you review a deposition of
19 Dr. Steele?
20     A. I can't tell you off the top of my head.
21 There's so many depositions flying around in this
22 case of everyone, but I certainly know that his
23 credentials do not include spine surgery.
24     Q. All right. But is it your testimony
25 today that you have reviewed a deposition of

1 Dr. Steele?
2     A. I have reviewed documents pertaining to
3 Dr. Steele; and rather than impeach myself in
4 saying I reviewed a deposition that never took
5 place, I would tell you that it seems to me that I
6 reviewed a deposition, but certainly I have on
7 file his records and his CV, his credentials, I
8 should say. So...
9     Q. Okay. Are you familiar with a condition
10 referred to as progressive supranuclear palsy?
11 Ever heard of that before?
12     A. Yes, I have.
13     Q. Have you ever heard of it as referred to
14 as the Steele Richardson Olszewski syndrome?
15     A. Yeah.
16     Q. Are you familiar with the Steele in that
17 name as Dr. John Steele?
18     A. It could well be. I'm not familiar that
19 it's him. It's an inherited neurologic disease
20 that is a non-surgical condition. A typical thing
21 that neurologists delight in, finding something
22 that they can treat.
23         MS. CLARK: We've been going for a hour
24     now. Can we take a break?
25         MR. KEOGH: We have not been going for an

1 hour. We've been going for less than an hour.
2         MS. CLARK: Can we take a break anyway?
3         THE DEPONENT: I'm okay, unless you-all
4     need to go to the restroom or something.
5         MS. CLARK: Are you good to go? Okay.
6         THE DEPONENT: Yeah. I'm okay for a
7     little bit. I'm going to have to go to the
8     bathroom in a few minutes, but go ahead, sir.
9         MR. KEOGH: We started this deposition 35
10     minutes late. I'm limited to seven hours that
11     I have with this doctor. I'm trying to get as
12     much done as I possibly can.
13         MS. CLARK: I'm sorry. I have limited
14     bladder capacity.
15         THE DEPONENT: Go ahead, sir.
16 BY MR. KEOGH:
17     Q. Now, Doctor, the report that's marked as
18 Exhibit 2, which you've taken a look at, am I
19 correct that that report contains all of the
20 opinions that you will be called upon to testify
21 at trial?
22     A. Yes, sir. I think you're correct in
23 assuming that. Now, should some -- this is an
24 ongoing dynamic situation. It's not a static
25 image.

1  Should there come on the literature -- in
2  the literature, I should say, a new treatment or a
3  new consideration for cauda equina syndrome and
4  whatever, I would reserve the opportunity to amend
5  my opinions and report based on that evidence that
6  if things have changed or there's a new and
7  unusual consideration for this very rare and
8  unusual problem, that I don't want to ignore that
9  data in terms of being a medical person and
10 providing a report based on it. So other than
11 that, my opinions are as stated. Yes, sir.
12    Q. And as we sit here today, having reviewed
13 what you've reviewed, you are not amending or
14 supplementing your report in any respect?
15    A. Not at this point, but I'd like to
16 reserve the opportunity to do that if the
17 literature or medical treatment changes or a new
18 study comes out showing, you know, a different
19 conclusion than we've seen. That happens not
20 infrequently in medicine.
21    So I don't want to make medicine look
22 like it's carved in stone like the 10
23 commandments. I think it changes. Sometimes more
24 quickly than we would like.
25    Q. Now, the opinions that you're providing

1  us are listed as 1 through 8 on the third page of
2  your report; is that correct?
3     A. Yes, sir. I have it in front of me.
4     Q. This 1 through 8 represents the universe
5  of opinions that you will be testifying to at
6  trial; is that correct?
7     A. Excuse me. That's a good way to put it.
8  I think it does represent the universe. There may
9  be a few small planets hidden behind the moon or
10 something that might pop out and surprise the hell
11 out of me. I don't know, but you're right. I
12 think it's a good way to put it.
13    MS. CLARK: Whatever happened to Pluto?
14 BY MR. KEOGH:
15    Q. All right. Now then, would I be correct
16 in my understanding, Dr. Meriwether, that you are
17 not going to give any opinion testimony at trial
18 with respect to the standard of care that was
19 provided to Mrs. Rutledge at the Andersen Air
20 Force Base clinic?
21    A. I think my opinions do without directly
22 stating it circumvent the -- or not circumvent,
23 but circle around the concept of standard of care
24 and what has done -- what is and should be done
25 with a patient with this problem.

1     Q. All right. Can you point to me any place
2  in your report where the term "standard of care"
3  is stated?
4     A. Standard of care is not stated, but as I
5  said, the concept here involves standard of care;
6  and quite candidly, it involves the standard of
7  care in an outlying facility that is certainly not
8  as well equipped as Bethesda Naval Hospital or
9  Walter Reed Army Hospital or other major medical
10 facilities in the continental U.S. who could bring
11 to bear a more weighty decision and course of
12 action on these kinds of problems.
13    So in that respect, I guess it's
14 unspoken. I didn't spell it out saying that I'm
15 critical or supporting of the standard of care,
16 but I think this is about standard of care because
17 it's about what's available thousands of miles out
18 in the middle of the Pacific; and should that be
19 the same care that's available at a stateside
20 major university type medical center, that's --
21 that's something that worries me to this day.
22    Q. All right. Now that entire statement
23 that you've just made, can you point to me where
24 in your report that is stated?
25    MS. CLARK: Excuse me. I don't

1  understand your question.
2     A. It's not stated directly, but under
3  number 8, there's quite a bit of talk about the
4  actual progress of the disease and the diagnosis
5  and the early versus late diagnosis and treatment
6  and the recovery from these sorts of injuries.
7     So I think inherent in that is the
8  understanding that competent and concerned
9  physicians that are aware and do know what they're
10 doing both in diagnosing the problem, treating the
11 problem and then allowing the patient to recover
12 in a rehab setting, it's inherent, the concept of
13 standard of care. I don't say it. I don't make a
14 positive or negative statement about the standard
15 of care in this -- in these reports, no.
16 BY MR. KEOGH:
17    Q. All right. And then when the Rule 26
18 requires that the report to be provided by the
19 expert shall contain a complete statement of all
20 opinions to be expressed and the basis and the
21 reasons therefore, with respect to standard of
22 care provided to Mrs. Rutledge at the Andersen Air
23 Force Base clinic, you have not provided us with
24 any, no less a complete statement of an opinion on
25 that issue, correct?

## Page 46

1  MS. CLARK: Object to the form of the
2  question. Would caution the physician about
3  forming a legal conclusion.
4  MR. KEOGH: I'm not asking him for a
5  legal conclusion.
6  BY MR. KEOGH:
7  Q. Doctor, can you answer the question,
8  please?
9  A. I think I can. As I say, with
10 particularly number 7 and 8, I'm addressing what
11 actually happened and what can be expected from
12 what happened with this lady in terms of recovery
13 and I think that indirectly refers itself back to
14 standard of care.
15    It does not state directly this person,
16 that person, the other person did or did not
17 follow the standard of care, but I think the
18 overall milieu of having a complex, rare spinal
19 problem in a middle of the Pacific Ocean without
20 available neurosurgical support and instant MRI
21 scanning raises a lot of questions about standard
22 of care.
23 Q. All right. Where is that contained in
24 your report?
25 A. It's just around the edges. You have to

## Page 47

1  read between the lines, Counsel.
2  Q. Thank you. So your report, am I correct,
3  has not stated specifically -- and we'll say with
4  a complete statement of opinions to be expressed
5  on the basis therefore has not stated that the
6  treatment provided to Mrs. Rutledge at the
7  Andersen Air Force Base clinic on July 27, 2004
8  was within the standard of care?
9  A. Did not state that. No.
10 Q. Okay. And your report did not state
11 specifically again that the treatment provided to
12 Mrs. Rutledge at the Andersen Air Force Base
13 clinic on August 2, 2004 was within the standard
14 of care?
15    MS. CLARK: I'm going to object to the
16 question. You've asked it. He's answered
17 it.
18 A. No.
19 BY MR. KEOGH:
20 Q. Your report did not state that the
21 treatment provided to Mrs. Rutledge at the
22 Andersen Air Force Base clinic on August 17, 2004
23 was within the standard of care?
24 A. No, but I will say that the expectation
25 of a standard of care that we are used to in the

## Page 48

1  continental U.S. and even as we sit in this town
2  in Sarasota, Florida, I don't see how it could be
3  approached on a Pacific island with limited
4  resources, doctors, whatever.
5  Q. Does --
6  A. I think they're up against it to be able
7  to perform at that level.
8  Q. Does your report state that the
9  expectation of physicians performing their duties
10 on Guam is different than the expectation of
11 physicians performing their duties elsewhere than
12 on Guam?
13 A. No. My report does not state that. On
14 the other hand, she didn't see a physician for a
15 number of weeks of any kind.
16 Q. Okay. Does your report state that the
17 expectations of physician assistants or nurse
18 practitioners performing their duties on Guam is
19 different than expectations of nurse practitioners
20 and physician assistants performing their duties
21 on the continental United States?
22 A. Well, the facts that are in evidence and
23 the facts --
24 Q. Doctor, yes or no. Does your report
25 state that?

## Page 49

1  MS. CLARK: Excuse me. He's answering
2  your question.
3  MR. KEOGH: He's answering -- the
4  question calls for a yes or no answer.
5  MS. CLARK: And the document says what
6  the document says. It's clear to anyone who
7  reads it what it says.
8  MR. KEOGH: Please state your objection
9  in a concise, non-argumentative,
10 non-suggestive manner. This is an expert
11 witness.
12 MS. CLARK: My objection is that the
13 physician attempted to answer the question,
14 and you interrupted him.
15 BY MR. KEOGH:
16 Q. Doctor, yes or no. Does your report
17 state that?
18 A. Yes and no.
19 Q. Where is the yes?
20 A. The --
21 MS. CLARK: Please let him finish his
22 first answer.
23 A. The yes is that you can't expect the
24 standard of care to be equivalent between a
25 physician's assistant on a Pacific desert island,

13 (Pages 46 to 49)

All Florida Reporting, Inc.
800-898-7373

Case 1:06-cv-00008   Document 40-2   Filed 01/10/2008   Page 14 of 20

## Page 50

1  if you will, and a modern medical center such as
2  Walter Reed Army Medical Center or Bethesda Naval
3  Hospital or Harvard Medical School.
4      It's inconceivable that the standard of
5  care would -- the same standard of care would
6  apply to both.
7      Q. Where is that stated in your report,
8  Doctor?
9      A. No. It's stated right here on the
10 record. This is my report coming out of my mouth.
11     Q. Where is it stated in your written
12 report?
13     A. It's not.
14     Q. Thank you. Am I correct in my
15 understanding, Doctor, that you are not going to
16 be testifying at trial to give an opinion that
17 waiting 14 or 15 days to review a radiologist's
18 report is within the standard of care?
19     MS. CLARK: Object to the question to the
20     extent it assumes facts not in evidence.
21     A. I'm unaware that that's a fact in this
22 case.
23 BY MR. KEOGH:
24     Q. But you will not be testifying to that at
25 trial, correct?

## Page 51

1      A. I'm unaware of the facts in the case.
2  You're asking me to testify whether or not a UFO
3  landed in the hospital parking lot. I have no
4  evidence that it did or didn't.
5      Q. You will not be providing us with opinion
6  testimony at trial that failing to act on a
7  radiologist's suggestion to have an MRI done is
8  within the standard of care?
9      A. Well, I certainly may well be testifying
10 to that.
11     Q. Where is that contained in your report?
12     A. That's not been asked of me yet. You're
13 asking and I'm answering. It's a very common
14 statement by radiologists that further clinical
15 correlation is considered and other tests may be
16 ordered. It happens every day.
17         Whether or not that specifically should
18 be done or, you know, they fall beyond the
19 standard of care if they don't I think is a tough
20 bow to draw and hit that target.
21     Q. There's no opinion provided in your
22 report with respect to that issue, correct?
23     A. No. It's not -- never came up.
24     MS. CLARK: He's certainly available if
25     you'd like to explore that. That's the

## Page 52

1      purpose of this deposition.
2      MR. KEOGH: Counsel, will you please
3      refrain from testifying and simply do as the
4      rules and Judge Manibusan has ordered; that
5      you state an objection in a concise,
6      non-argumentative and non-suggestive manner
7      and let the witness answer the question.
8      MS. CLARK: No. I'm not testifying, and
9      I'm not offering an objection. I just want
10     you to be fully aware that you have the
11     opportunity to explore any opinion this
12     witness has while we're sitting here.
13 BY MR. KEOGH:
14     Q. Can we proceed, Doctor?
15     A. Yes, sir.
16     Q. It's correct, Doctor, then that you will
17 not be offering an opinion at trial that the
18 failure of a physician assistant to disclose to a
19 patient that the physician assistant is not an
20 M.D. is within the standard of care?
21     MS. CLARK: Object to the question as
22     assuming facts not in evidence.
23     A. I have no opinion about that.
24 BY MR. KEOGH:
25     Q. Thank you.

## Page 53

1      A. It does not appear in my report.
2      Q. And you will not be testifying at trial
3  that the failure of a nurse practitioner to
4  disclose to a patient that he or she is a nurse
5  practitioner as opposed to a doctor is within the
6  standard of care?
7      MS. CLARK: I'll object to that as
8      assuming facts not in evidence as well.
9      A. I'm not aware it's the physician
10 assistant's necessity or responsibility to do
11 that. She should reportedly have a name tag which
12 identifies her as a non-physician.
13 BY MR. KEOGH:
14     Q. All right. And nothing with respect to
15 that issue is contained in your report?
16     A. No.
17     Q. Am I correct that it is -- that you will
18 not be giving us an opinion that is within the
19 standard of care for an urgent care clinic to
20 represent to a patient that a practitioner is a
21 doctor or refer to that practitioner as a doctor
22 when they're actually a physician assistant or a
23 nurse practitioner?
24     A. Not at all. No, sir.
25     MS. CLARK: Same objection as to facts

14 (Pages 50 to 53)

All Florida Reporting, Inc.
800-898-7373

Case 1:06-cv-00008    Document 40-2    Filed 01/10/2008    Page 15 of 20

## Page 54

1 not in evidence.
2 BY MR. KEOGH:
3 Q. You will not be giving any opinions with
4 respect to the standard of care applicable to
5 physician assistants or nurse practitioners?
6 MS. CLARK: You've already answered that
7 and he's --
8 A. I think I've answered in this way, and
9 I'll repeat if you like. That I do not expect
10 them to be held to the same standard as a board
11 certified neurosurgeon in a major medical center,
12 no.
13 BY MR. KEOGH:
14 Q. Where is that contained in your report?
15 A. It's around the edges. You have to read
16 between the lines, I think.
17 Q. Okay. Thank you. Am I correct that you
18 will not be giving a critique of Dr. Toll's report
19 and his opinions in your testimony at trial?
20 A. Dr. Toll?
21 Q. Yes.
22 A. No. I think I will.
23 Q. Where is it contained in your report?
24 A. The report was done before I saw
25 Dr. Toll's deposition.

## Page 55

1 Q. Are you aware that you have until August
2 8, 2007 to supplement or prepare an additional
3 report?
4 A. I think I've seen Dr. Toll's deposition
5 after August 8th.
6 Q. You've seen Dr. Toll's deposition
7 already?
8 A. After.
9 Q. You've read his deposition transcript?
10 A. I've read his deposition and his CV and
11 his history of his emergency room career.
12 Q. All right. Have you read his report?
13 A. I think I have. I couldn't tell you
14 right now. I'd have to look. All this is on my
15 computer.
16 Q. You don't have your computer with you
17 today?
18 A. No.
19 Q. Did you read Dr. Toll's report prior to
20 August 8th, 2007?
21 A. Not to the best of my memory.
22 Q. So am I correct that there's nothing in
23 the report that you provided to us that
24 constitutes a critique of Dr. Toll's report?
25 A. No. That will follow.

## Page 56

1 Q. When is that going to follow, Doctor?
2 A. At trial.
3 MS. CLARK: You're free to ask him about
4 it today. You can explore any opinion he
5 has.
6 BY MR. KEOGH:
7 Q. And am I correct that you're not going to
8 give a critique of Dr. Steele's reports or
9 Dr. Steele's opinions?
10 A. Oh, I think you'll hear that at trial,
11 too.
12 Q. For the first time I will hear it at
13 trial; is that correct?
14 A. If you like, yes. We can talk about it
15 today.
16 Q. It's not contained anywhere in your
17 report?
18 A. No. The report was done much earlier.
19 Q. You did not supplement that report,
20 correct?
21 A. No.
22 Q. Yes, it is correct you did not supplement
23 the report?
24 MS. CLARK: Object to form.
25 A. Yes.

## Page 57

1 BY MR. KEOGH:
2 Q. Thank you. I would like to walk through
3 with you, Doctor, the medical records from the
4 Andersen Air Force Base clinic.
5 A. Sure. Thank you.
6 Q. I'd like to provide you first with -- on
7 the top of that stack of documents is a document
8 marked Exhibit 3. Have you seen that document
9 before?
10 A. Yes, sir. I have.
11 Q. Did you review this document in advance
12 of preparation of your report?
13 A. Yes.
14 Q. Am I correct in my understanding that
15 that document is a telephone triage encounter
16 which is recorded as having taken place on July
17 27, 2004? Is that correct?
18 A. That's correct.
19 Q. All right. If you see there's
20 highlighted in the middle of that document a term
21 "woodke" back pain. Do you know what that refers
22 to?
23 A. No.
24 Q. Never heard that term before?
25 A. No. Back pain, of course. I have no

All Florida Reporting, Inc.
800-898-7373

## Page 58

1  concept of what woodke is.
2  Q. Thank you. I'd like you to look at
3  Exhibit 4, which is the next document in order.
4  A. The next complete document?
5  Q. Yes.
6  A. Yeah. Okay. Put that upside down.
7  Q. Have you seen that document before?
8  A. I have.
9  Q. Am I correct in my understanding that
10 that is a clinic note from the Andersen Air Force
11 Base clinic dated July 27, 2004?
12 A. Yes, sir.
13 Q. All right. Is it your understanding,
14 Doctor, that this is a form that is used by the
15 clinic for low back pain complaints by an adult?
16 A. Yes. It appears to be so.
17 Q. All right. And the several yes and no
18 questions that are asked up top are pre-printed
19 questions on a form for a clinic practitioner to
20 use in getting a subjective history from that
21 patient, correct?
22 A. Yes.
23 Q. These yes and no questions have been
24 referred to previously in this case as red flags.
25 Would you agree with the characterization that

## Page 59

1  these are red flagged questions?
2  A. I wouldn't characterize them as red
3  flags. I would characterize them as symptoms that
4  need to be investigated.
5  Q. All right. And if any of these symptoms
6  are checked as a yes, that is something that the
7  practitioner is to investigate?
8  A. Yes.
9  Q. And would you agree with me, sir, that
10 this form on July 27, 2004 relating to Deborah
11 Rutledge had a yes checked for the pain that she
12 was experiencing being worse at night in bed?
13 A. Yes.
14 Q. And that's a symptom that a practitioner
15 should explore further or investigate further?
16 A. Yes. History-wise.
17 Q. All right. And that Deborah Rutledge
18 also in her form that's checked yes for she had
19 new urine or stool problems like leakage or
20 incontinence, correct?
21 A. Yes.
22 Q. And she also checked loss of sensation in
23 the groin area, correct?
24 A. Yes.
25 Q. So out of these symptoms that need to be

## Page 60

1  investigated, three of them were checked by
2  Mrs. Rutledge, correct?
3  A. Yes. They were.
4  Q. Okay. And would you agree that on this
5  form that urination frequency is noted by
6  practitioner at the clinic?
7      MS. CLARK: I'm going to object to the
8  form of the question to the extent you're
9  asking this witness to assume who wrote what.
10 BY MR. KEOGH:
11 Q. That's correct, Doctor. You didn't read
12 the deposition transcript of Natalie Giscombe
13 prior to preparing your report, correct?
14 A. No.
15 Q. Am I correct that you did not read her
16 transcript?
17 A. Prior to my report, no. Afterwards, yes.
18 Q. From reading it afterwards, are you
19 familiar with who wrote urination frequency on
20 Exhibit 4?
21 A. I would presume that she did, but I don't
22 have any independent recollection of her testimony
23 that she did or didn't, but someone wrote on there
24 urinary frequency.
25 Q. What is urination frequency?

## Page 61

1  A. Means that you have to go more often than
2  normal.
3  Q. That's the full definition of urination
4  frequency?
5  A. Yes. It's a nonspecific sign. It can
6  happen with drinking too much fluid. It can
7  happen with a urinary tract infection. There's a
8  number of things that can happen. It is not
9  necessarily an insidious indication of a spinal
10 cord tumor or compression.
11 Q. Okay. The clinic note also refers to the
12 pain that Mrs. Rutledge is reporting as being a 7
13 out of 10 night versus morning?
14 A. Yes.
15 Q. She has a constant dull pain?
16 A. It appears so. Yes.
17 Q. And that she's having difficulty sleeping
18 and an inability to get comfortable at night,
19 correct?
20 A. Yes.
21 Q. Doctor, looking at your report -- you may
22 do that. I'm sorry. You have one there. Opinion
23 number 1 that you've stated, you stated that the
24 presentation of Mrs. Deborah Rutledge on 7/27/04
25 was consistent with a diagnosis of lumbar strain

## Page 62

1 and lumbar disc disease, correct?
2    A. Right.
3    Q. Okay. Can you tell me where on Exhibit
4 4, which is the July 27, 2004, the diagnosis of
5 lumbar strain and lumbar disc disease is stated?
6    A. At the top of the form, it says low back
7 pain adult. That's why she presented to the
8 clinic.
9    Q. Is that a diagnosis in your opinion?
10   A. It is. Low back pain.
11   Q. That's a -- a statement on a preprinted
12 form is a diagnosis?
13      MS. CLARK: Wait a minute. Are you
14   asking him what his -- I mean, your question
15   was, is that your diagnosis. Are you asking
16   him to read the form? I'm confused.
17      MR. KEOGH: The objection is noted.
18 BY MR. KEOGH:
19   Q. Doctor, is the preprinted statement on
20 the top of Exhibit 4, low back pain adult, a
21 diagnosis in your opinion?
22   A. It is a diagnosis for these people; and
23 further down the middle of the page, she described
24 in I presume her handwriting, lower back right
25 side. There's no confusion about why she went to

## Page 63

1 the clinic. It wasn't her big toe that hurt. It
2 was her lower back.
3    Q. Can you distinguish for me, please, a
4 diagnosis by a practitioner as opposed to a
5 complaint by a patient?
6    A. Well, patients have many complaints; and
7 this lady had many complaints. They are not
8 necessarily findings, neurologic findings.
9       That's the confusion here is the idea if
10 you complain of numbness in your perineum or you
11 complain of numbness down your leg or whatever and
12 you examine -- and I have thousands and thousands
13 of patients. They're not numb. Do you see what
14 I'm saying?
15      It's their complaint. It's their
16 feeling, but it's not an actual finding. In this
17 particular exam, she came in to the low back adult
18 clinic; and she said she had pain in her back that
19 was giving her difficulty sleeping; and it was 7
20 out of 10 at night.
21      So to me, it's fairly straightforward.
22 There's no mystery. She had back pain, and it was
23 worse at night.
24   Q. Can you describe for me, please, Doctor,
25 what is a diagnosis?

## Page 64

1    A. It's a description of what's wrong with
2 the patient.
3    Q. By whom?
4    A. By the physician or health care provider
5 or by the patient themselves.
6    Q. Okay. You have stated in your opinion
7 number 1 on your report that the presentation of
8 Mrs. Deborah Rutledge on 7/27/04 was consistent
9 with a diagnosis of lumbar strain, lumbar disc
10 disease.
11      Can you please point to me on Exhibit 4
12 where there is contained a diagnosis of lumbar
13 strain or lumbar disc disease by the practitioner?
14   A. Well, this is my diagnosis based on this
15 report; and their conclusion, their diagnosis, is
16 right sciatica.
17   Q. Is sciatica a diagnosis, Doctor?
18   A. It is.
19   Q. Is sciatica a symptom or a condition?
20   A. Could be either.
21   Q. So the practitioner who saw Mrs. Rutledge
22 on 7/27/04 did not diagnose lumbar strain or
23 lumbar disc disease? That's your diagnosis,
24 correct?
25   A. That's the root diagnosis for what's gone

## Page 65

1 on here. They diagnose right sciatica, and the
2 way you have right sciatica is through lumbar disc
3 disease.
4    Q. That's a good point. Where do you see on
5 July -- on Exhibit 4 any evidence that supports a
6 diagnosis of lumbar strain?
7    A. Under the diagnosis right sciatica.
8 Right sciatica doesn't come out of the sky and
9 jump on you. It's the result of a back problem.
10   Q. Okay.
11   A. So they're trying to tell us in their way
12 this lady has a back problem that keeps her awake
13 at night, and it also has right sciatic pain
14 associated with it.
15   Q. I'm trying to distinguish, if you will,
16 the difference between lumbar strain and lumbar
17 disc disease. They're two different things,
18 correct?
19   A. They often are the same clinically,
20 though. They look the same.
21   Q. But they are two different diagnoses,
22 correct?
23   A. After the fact, they are. After you do
24 an MRI scan, after you do surgery, whatever, you
25 know. You're asking me, you know, to look at

## Page 66

1  facts not in evidence and draw a conclusion about
2  her lumbar or whatever. It's fairly clear this
3  lady has back pain and right sciatica. I don't
4  know what the confusion is.
5     Q. The confusion is is that you've now given
6  us a diagnosis that's not contained on Exhibit 4
7  that says that her conditions are consistent with
8  a lumbar strain; and I'm asking you for what
9  evidence is there on Exhibit 4 that supports a
10 conclusion of lumbar strain?
11       MS. CLARK: I'm going to object to the
12    form of the question.
13       MR. KEOGH: Objection is noted.
14       MS. CLARK: Excuse me. I'm going to
15    object to the form of the question to the
16    extent that you are mischaracterizing the
17    witness's testimony by saying what he did or
18    didn't say.
19       MR. KEOGH: Objection is noted.
20 BY MR. KEOGH:
21    Q. Doctor, can you answer the question?
22    A. Yes, I can; and I'm telling you again
23 this lady had lower back problems and had right
24 sciatica. She described it fairly well to them.
25 Despite no bowel or bladder, despite an intact

## Page 67

1  neurological exam, and it's very typical of a
2  patient with this sort of problem.
3     Q. How does a patient sustain what you refer
4  to here as a lumbar strain?
5     A. Well, could be any of a number of ways.
6  Lifting something heavy, turning or doing
7  something unusual, even in sleep. So you know,
8  there's a myriad of ways. How does one break
9  one's arm? That's the question you're asking me.
10 Well, it could be any of a number of ways.
11    Q. All right. What evidence do you have
12 here from Exhibit 4 that Mrs. Rutledge presented
13 on July 27, 2004 with a lumbar strain?
14    A. Because she had lower back pain and on
15 the right side under location of symptoms on the
16 front page. If you can think of a better
17 diagnosis than lumbar strain for this, I'd be
18 happy to hear it.
19    Q. Well, you've given two diagnoses. You've
20 given lumbar strain/lumbar disc disease. The
21 distinction between the two is what?
22    A. Is that it may well be that she's got a
23 herniated disc. You don't know. You have to
24 treat her. See if she gets better and you'll have
25 to get a scan if she doesn't get better.

## Page 68

1     Q. A lumbar disc disease would include a
2  herniated disc, correct?
3     A. It is a -- it could well include a
4  herniated disc. In this case with a right
5  sciatica, it makes you concerned for it.
6     Q. And the lumbar strain is something that
7  would come from either a trauma or an injury of
8  some kind, correct?
9        MS. CLARK: Objection. Asked and
10    answered.
11    A. Lumbar complaints consistent with a
12 strain are often coincident to a lumbar disc
13 herniation. People with lumbar disc herniation
14 don't have to do anything and they have a lot of
15 back pain as well as leg pain, so -- sometimes
16 they only have back pain.
17       So I'm looking at this with a little bit
18 different -- more experienced, more educated eye.
19 The patient's coming in with lower back pain and
20 right-sided pain. It's not a mystery to me.
21 They didn't have a gunshot wound or been stabbed
22 in the lower back. You know, it's fairly
23 straightforward. She has a lower back condition.
24    Q. All right. I'd like you to look at
25 Exhibit Number 5.

## Page 69

1     A. Number 5?
2     Q. It's right there in front of you, isn't
3  it?
4     A. Number 5. Yes. I see it.
5     Q. Am I correct in my understanding that
6  that's a patient lab inquiry report?
7     A. Yes.
8     Q. You mentioned something about a urinary
9  tract infection at one point about discussion of
10 Mrs. Rutledge's presentation on July 27, 2004.
11 Does this report successfully rule out urinary
12 tract infection as one of her conditions?
13    A. No.
14    Q. It does not?
15    A. No. It's not a culture. It's just a
16 urinalysis. A urinalysis could look relatively
17 clean, and she could still have an infection.
18    Q. All right. Is there any evidence here
19 with respect to whether a culture was taken?
20    A. Doesn't look like it. It says rule out
21 UTI at the top, order comment. I would presume
22 that they would have gotten a culture at the same
23 time as the urinalysis. It's just routinely done,
24 but I don't see any report of a culture here.
25       MS. CLARK: Excuse me. Can you clarify

## Page 70

1  the question? When you said is there any
2  evidence here, you were pointing at the
3  exhibit that the doctor's holding.
4     MR. KEOGH: Exhibit 5.
5     MS. CLARK: Is that the "here" you
6  referenced?
7  BY MR. KEOGH:
8     Q. Is there any evidence on Exhibit 5 that a
9  culture was taken?
10    A. No.
11    Q. How about on Exhibit 4? Any evidence on
12 Exhibit 4 that a culture was taken?
13    A. Let me see here. No. They didn't order
14 it.
15    Q. I'd like you to look at Exhibit 6,
16 Doctor.
17    A. Four. Five. Okay. I have it.
18    Q. Am I correct that this is a clinical
19 record from the Andersen Air Force Base clinic
20 relating to Mrs. Rutledge's presentation there on
21 August 2, 2004?
22    A. Yes.
23    Q. Am I correct at that time that
24 Mrs. Rutledge again checked a yes for a loss of
25 sensation in the groin area?

## Page 71

1     A. Yes.
2     Q. And that she left unchecked significant
3  localized muscle weakness associated with pain,
4  correct?
5     A. Yes. There's no mark there.
6     Q. And that there's a reference to right
7  side of back is numb and starts to tingle and
8  burn?
9     A. Uh-huh. Yes.
10    Q. And that it's taking longer to use the
11 bathroom, correct?
12    A. Yes.
13    Q. And that there is a pain intensity
14 referenced as 7 to 8, correct?
15    A. Yes.
16    Q. And that there's a report of shooting
17 pain down leg; is that correct?
18    A. Yes. It's cut off, but I would presume
19 it says leg. My copy here says down and it looks
20 like "L," but I presume that's the case.
21    Q. Okay. And then again that there's no
22 history of trauma, correct?
23    A. No.
24    Q. I'm sorry. I keep asking you correct and
25 you say no. Is it correct that there is no

## Page 72

1  history of trauma reported?
2     A. Yes.
3     Q. And that the additional history relates
4  that there is numbness, tingling inferior to the
5  right glute, correct?
6     A. Yes.
7     Q. And the right glute is the right
8  buttocks; is that correct?
9     A. Yes.
10    Q. Plus there is radiation down the left leg
11 to the calf; is that correct?
12    A. Yes.
13    Q. And that there's poor sleep due to pain,
14 correct?
15    A. Yes.
16    Q. Okay. Am I correct in my understanding
17 that in this August 2, 2004 clinic evaluation,
18 Mrs. Rutledge at this point on that date is
19 exhibiting to the practitioner bilateral symptoms,
20 correct?
21    A. Yes. It appears to be worse on one side.
22    Q. Bilateral meaning there are symptoms on
23 both sides, correct?
24    A. Yes.
25    Q. And that she is exhibiting bladder

## Page 73

1  problems in the sense that it is taking longer for
2  her to use the bathroom, correct?
3     A. Yes.
4     Q. And that she is exhibiting a loss of
5  sensation in the groin area, correct?
6     A. That's a complaint. It's not a -- not
7  noted to be a physical finding. Most people with
8  back pain will have pain in one or both legs; and
9  they have difficulty in voiding because of the
10 back pain, but her complaint of numbness and
11 tingling and what have you is not documented.
12 It's a history. It's a symptom. It's what the
13 patient tells you. It's not what was found on
14 examination.
15    Q. How would you find that on examination?
16    A. I'm looking at the exam. It does not
17 note it at all.
18    Q. How would a practitioner find that on an
19 exam?
20    A. He would test for it.
21    Q. How?
22    A. With a pinwheel.
23    Q. Pinwheel on the area that she's
24 complaining about having numbness?
25    A. Right. Her buttocks and her upper

19 (Pages 70 to 73)

All Florida Reporting, Inc.
800-898-7373

Case 1:06-cv-00008   Document 40-2   Filed 01/10/2008   Page 20 of 20