1 thigh. That sort of thing.
2    Q. That would require taking her clothes
3 off, correct?
4    A. It should. Yes.
5    Q. Is that a test that you believe should
6 have been taken with the presentation that Mrs. --
7 should have been made with the presentation that
8 Mrs. Rutledge made on August 2, 2004?
9    A. I think it would have been helpful.
10 However, you're dealing with a rare condition here
11 underlying all this; and the most common problem
12 with lower back pain is that you can have these
13 sorts of symptoms and urinary complaints and what
14 have you.
15      So it's impossible for the clinician,
16 even sometimes the neurosurgeon to sort this out
17 as I've seen in my own personal experience. So
18 it's a complaint. They do not demonstrate it as a
19 finding on their exam, but they took note of it;
20 and their diagnosis is musculoskeletal back pain.
21    Q. But we're talking about the loss of
22 sensation in the groin. Is that -- you've heard
23 the term "saddle anesthesia" before, correct?
24    A. That's a finding. That's an examination
25 finding. That's not the patient saying, I'm numb

1 in my nether regions or whatever.
2    Q. In order to diagnose saddle anesthesia,
3 you'd have to do a test for it, correct?
4    A. Right.
5    Q. Such as the pinwheel test that you've
6 described?
7    A. Right.
8    Q. If that's not done, the only thing you
9 have is the complaints of the patient, correct?
10    A. That's it.
11    Q. In addition to the bilateral symptoms,
12 the bladder problems, the loss of sensation in the
13 groin, Mrs. Rutledge also reported that she had
14 shooting pain down her leg, correct?
15    A. Yes.
16    Q. And that she had poor sleep at night,
17 correct?
18    A. Yes.
19    Q. All right. Would you agree, Doctor, that
20 these symptoms are what is referred to in the
21 literature as the classic symptoms of cauda equina
22 syndrome?
23    A. No.
24    Q. Okay. Would you agree that the checks on
25 the yes and no answers on the upper portion of the

1 form are -- either the checks or the non check is
2 something that requires -- they are symptoms that
3 need to be investigated further?
4    MS. CLARK: Asked and answered.
5 BY MR. KEOGH:
6    Q. With respect to this August 2, 2004?
7    A. I don't see -- the check you mean with
8 loss of sensation in the groin area? Yes. I
9 think that's something that should be examined,
10 and I agree.
11    Q. All right. And the significant localized
12 muscle weakness associated with pain is something
13 else that should be investigated further, correct?
14    A. Yes; and now again, you're talking about
15 someone who has pain. So it's difficult to test
16 people with pain. They have giveaway weakness.
17 The pain prevents them from being able to exercise
18 their muscles and oppose the examiner's muscle
19 testing accurately.
20      So when people are in pain, they're very
21 difficult to examine, if not impossible. The pain
22 itself can be an impediment to trying to get to
23 the diagnosis. So when you say significant
24 localized muscle weakness associated with pain,
25 you mean that she hurts; and it's almost

1 impossible to test her. So it's kind of
2 disqualifying in that regard.
3    Q. Are you giving us an opinion in this
4 proceeding, Doctor, that in any way relates to how
5 a physician assistant or a nurse practitioner
6 should deal with or should address symptoms such
7 as what are presented on July 27 and August 2 by
8 Mrs. Rutledge?
9    A. No. I'm not offering an opinion other
10 than to say that it appears to me that what they
11 did followed a correct course in terms of giving
12 the patient medication, exercise, physical
13 therapy, get some plain x-rays. Make sure there's
14 not something unusual going on and patient
15 education about a back problem.
16      So it seems to me that the profile of
17 what they did in terms of trying to make this
18 better -- I might add that 30 years ago in
19 neurosurgery, it's rather astonishing how many
20 people with a documented MRI or a CT myelogram
21 disc get better and don't have surgery.
22      So I can't fault them for taking a
23 conservative approach and trying to treat it
24 nonoperatively.
25    Q. Where in your report is there any

All Florida Reporting, Inc.
800-898-7373

1  statement that you don't fault them for the
2  approach that they took?
3      A.  My report to you today is --
4      Q.  No.  In your written report, Doctor.
5      A.  I was not asked to render that opinion on
6  that report.  I'm rendering it today.
7          MS. CLARK:  Let's take a break.
8  BY MR. KEOGH:
9      Q.  You're rendering it for the first time
10 today in this deposition?
11     A.  Under oath.
12         MS. CLARK:  All right.  It's 10:30.
13 Let's take a break, please.
14         (Brief recess.)
15         MR. KEOGH:  Back on the record.
16 BY MR. KEOGH:
17     Q.  Doctor, we've had about a 15-minute
18 break.  You're okay to continue at this point?
19     A.  Yes, I am.
20     Q.  Before we go back to the medical records,
21 since we've had this break, I'd like to take an
22 opportunity to go through your curriculum vitae.
23 Okay?
24     A.  Okay.
25     Q.  That's contained in your report.

1      A.  I think I have it here somewhere.
2      Q.  If you want to look at Exhibit 2, you
3  may.
4      A.  Oh, is there one in there?  Thank you.
5      Q.  Should be closer to the front.
6      A.  Oh, here we are.  Okay.  A couple of
7  pages in.  Yes, sir.
8      Q.  Okay.  There is a reference under Status
9  of chief of staff at HCA Doctors Hospital.  What
10 is HCA?
11     A.  Hospital Corporation of America.  It's a
12 big publicly-traded hospital.  It used to be the
13 biggest hospital -- maybe it still is.  The
14 biggest hospital chain publicly traded in the
15 world.
16     Q.  You're no longer chief of staff there?
17     A.  No.  It's an elected temporary
18 appointment.  I had been first chief of surgery
19 for a year.  Then vice chief of staff for a year.
20 Then I was chief of staff actually for two years
21 effectively because the gentleman who was in ahead
22 of me -- a nice gentleman, a chest surgeon,
23 developed lung cancer and died unfortunately
24 and --
25     Q.  Doctor, I don't mean to interrupt you,

1  but we don't need to know about the lung cancer o
2  your predecessor.  We're trying to keep this
3  simple.  Yes or no.  You're no longer chief of
4  staff at HCA Doctors Hospital?
5      A.  No, I'm not actually.
6      Q.  Thank you.  What is the date that this
7  curriculum vitae was prepared?  Can you tell me
8  that?
9      A.  No.
10     Q.  Again, it's not dated.
11     A.  No.  It's been there for a long time, and
12 it's periodically updated.
13     Q.  Do you know when the last time it was
14 updated was?
15     A.  No.  I can't tell you off the top of my
16 head.  It's done by my officer manager, secretary;
17 and I can't tell you at this point.
18     Q.  You've referenced a Website at the top.
19 Www.surgispine.com.
20     A.  Yes.
21     Q.  Still a current Website?
22     A.  Yes.
23     Q.  I've tried checking it several times
24 since I received this report, and every time I get
25 that the page no longer exists.  When is the last

1  time you checked that page?
2      A.  It's probably been months since I've
3  actually checked it.  I'm not actively practicing
4  surgery now.  It may be that the page has expired,
5  though I've had dinner and talked to the person
6  who did our page and who is our kind of media
7  consultant, if you will; and it was my
8  understanding it was still up, but maybe I'm
9  wrong.
10     Q.  When you say you're not actively
11 practicing surgery anymore, when did you stop
12 actively practicing surgery?
13     A.  After my accident.
14     Q.  That was --
15     A.  I had done -- leading up to my accident,
16 I had had a neck surgery in '03; and I had cut
17 back on my practice after that in June of '03.
18 Almost a year later when I was ready to go back to
19 practice full time, early July of '04, I was
20 involved in a head-on motor vehicle accident on a
21 Monday afternoon.  I was coming home from work an
22 that was when --
23     Q.  Okay.  Just -- again, we're trying to get
24 to the specifics.
25     A.  The short version.

All Florida Reporting, Inc.
800-898-7373

1    Q. You have not been actively practicing
2 neurosurgery then since June of '03; is that
3 correct?
4    A. No. I have not been actively doing
5 surgery. I've seen patients in the office ever
6 since then within two weeks after that surgery.
7    Q. And you see patients in what capacity?
8    A. As a second opinion, consultant,
9 independent medical exam. That kind of thing.
10    Q. Okay. You do independent medical
11 examinations?
12    A. Right.
13    Q. And have any of those been in connection
14 with litigation matters?
15    A. Most of them have been workman's
16 compensation matters. They're requested by the
17 court. I'm requested by the court to give a final
18 opinion.
19    Q. That's part of your practice today is
20 doing workers' compensation medical examinations?
21    A. Yes, sir.
22    Q. And that's not a neurosurgical activity,
23 is it?
24    A. Well, they're all related to back or neck
25 surgery. Back or neck problems. Do they need

1 it? If they've had it before, do they need
2 another one? All of it's related primarily to
3 back or neck problems.
4       In the rare case, a head injury in which
5 a patient has had diminished capacity and can't
6 perform and needs certain evaluations to see where
7 they are.
8    Q. All right. Now, you received your
9 bachelor's degree in 1971 and your M.D. degree in
10 1975, correct?
11    A. Correct.
12    Q. And you were in the military service
13 since 1971; is that correct?
14    A. Yeah.
15    Q. You were in the Navy?
16    A. Yes, sir.
17    Q. Am I correct in my understanding of your
18 CV that the Navy paid for you to go through
19 medical school?
20    A. They did.
21    Q. And you were in the active Naval service
22 from the beginning of medical school in 1971 until
23 1984; is that correct?
24    A. Yes.
25    Q. And then you were in the inactive Naval

1 Reserve for two years thereafter from '84 to '86,
2 correct?
3    A. Right.
4    Q. So you were -- during that '71 to '84
5 period, you were active duty United States Navy?
6    A. Yes, sir.
7    Q. Now, you received your -- it states
8 here -- I don't know if I'm going to pronounce
9 this word correctly. It's diplomate or diplomate
10 from the American Board of Neurological Surgery.
11 How do you pronounce that word?
12    A. Diplomate or diplomate. Either way.
13 That was my oral board examinations in
14 neurosurgery upon -- usually you practice for a
15 couple of years; and then you stand before a panel
16 of oral examiners.
17    Q. All right. And the reference to Mayo
18 Clinic, what is that reference? Is that where the
19 exam was given?
20    A. Yes.
21    Q. You weren't practicing at the Mayo
22 Clinic?
23    A. No. I was in the Navy. I had to fly
24 there and take the test.
25    Q. All right. So September 8th, 1982 is

1 when your oral board examination was?
2    A. Was completed. Yes.
3    Q. Okay. And there was a written exam
4 before that?
5    A. Yes.
6    Q. And you passed the written exam?
7    A. You have to do that to get out of
8 residency, and you have to do that before you can
9 take the orals.
10    Q. You have to pass the board exam before
11 you get out of residency?
12    A. You have to pass the written board.
13 There are two parts. Written and -- which is
14 rather rigorous and then there's an oral, which is
15 more psychologically harrowing.
16    Q. And so this refers to -- this diplomate,
17 American Board of Neurological Surgery, refers to
18 board certification; is that correct?
19    A. Exactly.
20    Q. And does board certification make you a
21 specialist in a field?
22    A. No. You do all neurosurgery. People may
23 go on to choose to specialize in pediatrics or
24 cerebrovascular or spine or whatever, but that's
25 their choice and their prerogative. There's no

1  special certification that's necessary to do that.
2      Q.  Right.  But what I'm asking you is does
3  board certification make you a specialist?
4          MS. CLARK:  I'm going to object to the
5      form as vague and perplexing.
6      A.  It gives you the highest level of
7  approval that you can get in whatever specialty,
8  whether you're a radiologist or whatever their
9  board exam is.
10         So the oral exam is -- the finishing
11  touch on your training is the board examination,
12  which is a whole lot of fun.  It makes depositions
13  look like a trip to Disney World.
14  BY MR. KEOGH:
15     Q.  So upon completion of the oral exam in
16  September of 1982, you were then board certified;
17  is that correct?
18     A.  Right.
19     Q.  In neurological surgery?
20     A.  Yes.
21     Q.  And then a little less than two years
22  later, you separated from the United States Navy,
23  correct?
24     A.  Yes.
25     Q.  Now there's a reference to a Master of

1  Science and a Doctor of Philosophy at American
2  International University.  Where is that located?
3      A.  It's American University in Washington,
4  D.C.  It's just there's an international arm of it
5  for people in certain subspecialties to be able to
6  do a clinical degree.
7          Paper, thesis and whatever; and it was
8  open to me -- actually, it was about an eight-year
9  project; and I was fortunately able to complete
10  it.
11     Q.  Did -- the Master of Science degree from
12  American University?
13     A.  Yes.
14     Q.  Okay.  Did that entail classroom
15  instruction?
16     A.  It's done on-line.
17     Q.  Done on-line?
18     A.  Right.  The other degree is research.
19  It's in medical research.  So it's done in
20  hospitals in a clinical practice, but it -- you
21  have an advisor, which I did in New York; and you
22  have deadlines to make and that sort of thing.
23  So. . .
24     Q.  All right.  I'm trying to refine what my
25  understanding is of the Master of Science degree.

1  That's an MS degree, correct?
2      A.  Right.
3      Q.  And that was obtained through an on-line
4  course of study, correct?
5      A.  Yes.
6      Q.  And then some kind of a project or a
7  report of some kind or a paper?
8      A.  A paper.  This is on the way to the
9  second degree, the Ph.D. in surgical research.
10     Q.  What was the subject of the paper in the
11  MS degree?
12     A.  It was on the effects of the Holmium/Yag
13  laser on human disc material; and it involved a
14  project of several thousand patients over about --
15  of a six-year period.  What their clinical
16  response was to endoscopic laser diskectomy.
17     Q.  All right.  And then the Doctor of
18  Philosophy.  That's a Ph.D. Degree; is that
19  correct?
20     A.  That's what this is referred to, surgical
21  research.
22     Q.  Is it a Ph.D. degree?
23     A.  Yes.
24     Q.  And that again was obtained from American
25  International University?

1      A.  That's right.
2      Q.  And that's American University in
3  Washington, D.C.?
4      A.  Right.
5      Q.  And did that involve classroom
6  instruction?
7      A.  No.  It involved basically meeting with
8  your advisor and some on-line work with him, but
9  primarily completion of your medical research
10  project, which at that point had been going on for
11  a number of years.
12         It was my job to kind of pull it all
13  together, which actually was facilitated by my
14  accident and being off from work.  So that was
15  2004.  I was able to get everything done and write
16  the thesis.  Got my advisor's approval and
17  subsequently received the degree.
18     Q.  All right.  So the Ph.D. also entailed
19  on-line course materials?
20     A.  To some degree.  Most of it was the
21  medical research that you do on patients in your
22  own practice.
23     Q.  And the thesis was on what, Doctor?
24     A.  As I just mentioned, it's the effects of
25  the Holmium/Yag laser on human disc tissue in a

**All Florida Reporting, Inc.**
**800-898-7373**

1  outpatient clinical setting.
2      Q.  The same topic as the MS degree?
3      A.  No.  The MS degree had nothing to do with
4  the laser project.  The MS degree was classical
5  scientific studies.  How they're organized, how
6  they're put together, Koch's postulates, what
7  comprises, you know, medical or any scientific
8  process for a study.  So there was a preparation
9  for the work that needed to be done in the process
10 of doing the Ph.D. research.
11     Q.  All right.  So when you described the
12 paper from the MS degree, you were actually
13 describing the thesis for the Ph.D.?
14     A.  Yeah.  There is no paper for the MS
15 degree.  The paper is for the Ph.D., but they are
16 interrelated.
17     Q.  Has any of your training or experience
18 been in the field of emergency medicine?
19     A.  Well, of course.  In neurosurgery, you
20 have -- a large proportion of our training is in
21 emergency medicine in terms of neurological
22 catastrophe, head injuries, broken necks, brain
23 hemorrhages, gunshot wounds and on and on.  So
24 there's a huge portion of it.
25     Q.  Is there a separate board certification

1  for emergency medication?
2      A.  No.
3          MS. CLARK:  I'm sorry?
4  BY MR. KEOGH:
5      Q.  Emergency medicine?
6      A.  No.
7      Q.  In your clinical practice now, you
8  mentioned that you do workers' compensation type
9  disability evaluations; is that correct?
10     A.  Yes.
11     Q.  And is that an area that your testimony
12 would be it's necessary to be a neurosurgeon in
13 order to engage in?
14     A.  Well, I should correct that.  It's an
15 error to say that it's disability determination.
16 I don't determine disability.  I determine whether
17 or not they need a back or neck surgery.  Usually
18 they'll have one doctor on one side saying they
19 need a surgery and the other one saying they
20 don't.
21         So the judge will write me a letter and
22 say, See this patient, please, at your discretion
23 and send me back a letter and tell me what you
24 think.  Usually that's the end of it.  I don't
25 treat the patient.  I have no further contact with

1  the patient.  You're not even allowed to prescribe
2  anything for the patient even if they're in pain.
3          So it's a pretty clean, interesting way
4  of trying to solve a problem, you know, that --
5  with the courts and the judge can make her mind
6  up -- his or her mind up on what needs to be
7  done.  So I kind of like it because it's a clean
8  deal.  It's a finished deal.
9      Q.  So your involvement in doing workers'
10 compensation evaluations is to determine whether
11 or not surgery is necessary?
12     A.  Exactly.
13     Q.  You don't do a disability rating?
14     A.  No.  I'm not qualified to do, like,
15 functional capacity evaluations and that sort of
16 thing.  We refer those out to specific people,
17 including rehab doctors in our area who do that.
18     Q.  Other neurologists perhaps do those kinds
19 of things?
20     A.  No.  Almost never a neurologist.  It's
21 usually a physiatrist or rehab doctor that does
22 those sorts of things or his worker that works
23 with him and is specially trained to do that.
24     Q.  Doing that kind of a disability
25 evaluation would entail knowledge of the America

1  Medical Association disability rating guidelines;
2  is that correct?
3      A.  I presume so.
4      Q.  You're not familiar with those?
5      A.  I'm very familiar with them, but it's not
6  my job to do that, you know.
7      Q.  Now, you've listed a number of
8  publications and presentations and courses that
9  you have taught in your CV, correct?
10     A.  Yes.
11     Q.  And memberships in professional
12 organizations, correct?
13     A.  Yes.
14     Q.  Am I correct in my understanding that
15 your clinical experience is -- has been entirely
16 in the field of neurosurgery?
17     A.  Yes.
18     Q.  And that the academic affiliations that
19 you've listed, I guess with the exception of the
20 Stetson Law School reference, has been in the
21 field of neurosurgery?
22     A.  Yes, it has.
23     Q.  The Stetson Law School, what do you teach
24 there?
25     A.  It's actual -- actually a program for the

1  senior students in the med. jur. class of which a
2  friend of mine was a senior professor there to
3  come and discuss med mal -- medical malpractice
4  issues relating to your specialty, problems that
5  arise, how to perhaps surmount them and to look at
6  the role of mediation and trying to settle cases
7  and for people to work together and see what's
8  best for the patient.
9      Q.  All right.  And is that a full-time
10 position, teaching that course?
11     A.  Oh, no.  It's, like, once a year I'll go
12 up.
13     Q.  And would that teaching position entail
14 you presenting a lecture or a presentation to law
15 students in the field of neurosurgery?
16     A.  Yes.
17     Q.  And your memberships in professional
18 organizations, all of those are in connection with
19 neurosurgery, correct?
20     A.  Yes.  I think so.  There's one here which
21 I have not been terribly active in, but it's the
22 Association of Military Surgeons of the U.S.
23 Those are all surgeons that have had military
24 background and experience.  So they are -- you
25 know, could be heart surgeons, general surgeons,

1  orthopedists, what have you.  So that one is
2  perhaps a bit different.
3      Q.  Did any of these memberships entail
4  examination to get into them?
5      A.  Examination?
6      Q.  Yes.
7      A.  Well, the AANS and the Congress are why
8  you take your boards in neurosurgery.  You cannot
9  be a member unless you're board certified.
10     Q.  Let me follow up on that.  The American
11 Association of Neurological Surgeons, that's your
12 board certification, correct?
13     A.  No.  That's the society for the board
14 certified members.  You have to apply to it once
15 you've passed your boards.  The Congress of the
16 Neurosurgical Society --
17     Q.  I'm sorry.  Let me finish with the
18 American Association.
19     A.  Okay.
20     Q.  Membership in the American Association of
21 Neurological Surgeons entails or requires board
22 certification in neurological surgery, correct?
23     A.  Right.
24     Q.  Tell me about the Congress of
25 Neurosurgical Society.

1      A.  The Congress is -- we call it more our
2  junior society and it's -- you can get in as a
3  resident or not a completely trained neurosurgeon,
4  but you have to be board eligible to get in; and
5  it has a strong emphasis on teaching and training
6  and that sort of thing.  So. . .
7      Q.  And board eligible is having passed the
8  written exam, correct?
9      A.  Exactly.
10     Q.  And it's the same written exam that is
11 required for membership in the American
12 Association of Neurological Surgeons?
13     A.  Right.
14     Q.  And it's the same written exam that would
15 qualify you to become a diplomate in the American
16 Board of Neurological Surgery?
17     A.  Yes.
18     Q.  It's just one test for all three of
19 those, correct?
20     A.  Three?
21     Q.  Your board certification, your American
22 Association and your Congress are all contingent
23 upon the one exam, correct?
24     A.  Pretty much.  Yes.
25     Q.  Well, when you say pretty much, is there

1  something else?
2      A.  Well, in the '70s, I actually belonged to
3  the Congress before I took my written boards.  In
4  those days, it was not a requirement.  Today
5  apparently it is.  So things change, you know, but
6  the big daddy is AANS.  You have to be board
7  certified.  You have to jump through all the hoops
8  and do all the things that they want before
9  they'll even look at you.
10     Q.  All right.  But what I'm trying to
11 confirm with you, Doctor, is that there is not a
12 separate test for membership.  It is the same test
13 that you take for your board certification?
14         MS. CLARK:  Objection.  Asked and
15     answered.
16     A.  Well, I think you're oversimplifying it
17 in this way, in that you can take a test, but that
18 doesn't guarantee you get in.  You have to apply.
19 You have to have recommendations of your
20 department chief, on and on and a history of
21 experience, you know, in the areas that they're
22 looking for.  So it's not just a matter of rubber
23 stamping that if you pass the test that you're
24 automatically a member at all.
25         -----

BY MR. KEOGH:

Q. Okay. But, Doctor, what I'm trying to confirm is that there isn't a separate examination for membership in these two organizations separate from the board certification examination?

A. No. In fact, some people who pass their boards and are in the senior society really don't care to belong to the junior society any more. It's more for younger people and residents. So they don't continue their membership.

Q. So there's only one examination?

MS. CLARK: Objection.

A. Well, there's one written exam during residency. Then there's a killer oral exam about two years later.

BY MR. KEOGH:

Q. In any of the other organizations that you've listed membership here, is there a separate examination for membership?

A. No. By and large, if you are board certified in your specialty, for example, International Society of Minimally Invasive Spinal Surgeons, if you're board certified in orthopedics or neurosurgery, you qualify to be a member. Doesn't guarantee they'll let you in, but --

Q. So the only examination then associated with any of these memberships is your board certification examination, correct?

A. Well, it's sort of like saying the only way you get a ring from winning the Super Bowl is to actually win it. It's a lot of work. You know, it's not a trivial thing.

Q. I'm not trying to trivialize it.

A. Sounds like you are.

Q. I'm trying to ask you whether or not there are separate examinations that are entailed in getting into these organizations.

MS. CLARK: And I'm going to object because you've asked him that --

A. Why would there be separate examinations? Why would there be separate examinations? And furthermore, I have nothing to do with those exams. They're by people that are my peers, and I have no input into that whatsoever. So. . .

BY MR. KEOGH:

Q. Let me give you an example, Doctor. To become licensed to practice law, for example, in the state of New Jersey, you have to take an examination.

To become licensed to practice law in the Territory of Guam, you have to take a separate examination. I'm trying to determine whether or not there are separate examinations for membership in these organizations, or is it all contingent upon the one board certification. I'm not trying to trivialize that. I'm just trying to determine what's involved.

A. I apologize, but you're mixing apples and oranges. For all of these people that take one or both of these exams and they want to practice in Nevada, New Hampshire, Florida, they have to take the State board. Do you see what I'm saying?

So it's like in law, you can't come and practice in Florida unless you take the Florida Bar. Pass the Florida Bar. So this is a national organization for the people that are running the programs, but when you go to actually practice medicine in California, you need to pass the California board.

Q. All right. Now that raises the next question, Doctor. I don't see any place on the curriculum vitae that you've provided for us that says where you're actually licensed to practice medicine. Can you point that to me, please?

A. Only in the state of Florida.

Q. That's the only state that you've ever been licensed to practice medicine?

A. Not at all.

Q. Where else have you been licensed to practice medicine?

A. I've been licensed to practice in Maryland, Virginia, California and Nevada, but none of those are current because they require, you know, for you to continue to keep up, pay fees, da-da-da-da; and if I'm not working, there's no sense in doing it.

Q. Your licensure to practice in the state of Florida, that entailed a separate examination?

A. Initially, yes. After that, you just maintain it, you know, by fulfilling their requirements of continuing medical education and that sort of thing.

Q. All right. And when was your examination for your licensure in Florida?

A. 1983.

Q. Okay. And your licensure in the state of Maryland, did that require a separate examination?

A. I can't even recall. That was in the early '70s.

All Florida Reporting, Inc.
800-898-7373

1    Q.   You don't recall if you had to take an
2  exam for that licensure?
3    A.   No.
4    Q.   How about the state of Virginia?  Did
5  that require a separate licensure exam?
6    A.   I don't remember.
7    Q.   When was that that you were licensed
8  there?
9    A.   In the '70s.
10    Q.   How about the state of California?  Did
11  that require a separate licensure examination?
12    A.   Yes, and interview.
13    Q.   And when did you take that exam?
14    A.   Somewhere in the early '80s.  I'm not
15  sure exactly.
16    Q.   And the state of Nevada, did that require
17  a separate examination?
18    A.   Yes.
19    Q.   And when did you take that?
20    A.   Again, somewhere in the middle -- early
21  '80s.
22    Q.   And continuing on with your CV, your
23  publications, am I correct in my understanding
24  that all of your publications are related to the
25  field of neurosurgery?

1    A.   Yes.
2    Q.   Am I correct in my understanding that all
3  of your presentations listed on your CV are
4  connected with the field of neurosurgery?
5    A.   Yes, sir.
6    Q.   And am I correct in my understanding that
7  the courses taught -- listed in your courses
8  taught there are related to the field of
9  neurosurgery?
10    A.   Yes.
11    Q.   Now, you've listed an invention here as a
12  box cage for spinal intervertebral body fusion.
13  Is that an invention that is also related to the
14  field of neurosurgery?
15    A.   Yes, it is.
16    Q.   I'd like to continue now with the review
17  of the Andersen Air Force Base clinic records.  Do
18  you still have those available to you?
19    A.   Yeah.  I think I do.  I have I guess it's
20  number 7.
21    Q.   We were looking at Exhibit 6.  Can we
22  continue with Exhibit 6?
23    A.   Okay.
24    Q.   You might want to keep your report
25  available as well.  On the second page of Exhibit

1  6, am I correct in my understanding that the
2  diagnosis by the physician assistant Steven Rau at
3  the time of his examination of Mrs. Rutledge was
4  musculoskeletal back pain; is that correct?
5    A.   Yes.
6    Q.   And is musculoskeletal back pain a
7  diagnosis in your view?
8    A.   Yes.
9    Q.   And from a review of this report, are you
10  able to determine whether or not an x-ray was
11  performed at that time?
12    A.   Yes.  It looks like he's describing an
13  x-ray.
14    Q.   Okay.  His description of the x-ray is
15  that there is something on L1-L2, 10 percent
16  spondylo -- I don't know if it's spondylolisthesis
17  or spondylosis.
18    A.   I believe that's right.  Yes.  I believe
19  that's right, and it looks like he has L2 superior
20  spur.
21    Q.   Okay.  And nothing is referenced as being
22  at the L5 or S1 level; is that correct?
23    A.   Not on this interpretation, no.
24    Q.   Now, if you can turn to Exhibit 7, did
25  you review Exhibit 7 in the preparation -- prior

1  to the preparation of your report?
2    A.   Yes.
3    Q.   And would you agree that that's the
4  radiological examination report from the x-ray
5  that was ordered on August 2, 2004 at the Andersen
6  Air Force Base clinic?
7    A.   Yes.  My highlighted date here says
8  August the 5th.
9    Q.   Can you look up to the top right where it
10  says exam date?
11    A.   Uh-huh.  Two August.  Yes.  2004.
12    Q.   And the finding or the impression is
13  degenerative disc disease at L5-S1, correct?
14    A.   Right.
15    Q.   And it says, Given the patient's
16  symptoms, MRI of the lumbar spine is suggested for
17  further evaluation; is that correct?
18    A.   Yeah.
19    Q.   And you see that the date of dictation of
20  this report was August 5, 2004?
21    A.   Yes.
22    Q.   And the date of transcription was August
23  6th, 2004?
24    A.   Yes.
25    Q.   And then it says transcription date time

27  (Pages  102  to  105)

1   August 9, 2004?
2       A.  Yes.
3       Q.  And then approved by August 9, 2004,
4   correct?
5       A.  Yes.
6       Q.  In your report, you have stated on two
7   different occasions a reference to the suggestion
8   here of an MRI.  Can you look on page 3 of your
9   report?
10      A.  Yes.
11      Q.  In opinion number 3, you state that the
12  proper diagnostic tool, an MRI -- I'm sorry.
13  Making urgent airevac referral to Tripler Army
14  Medical Hospital where the proper diagnostic tool,
15  an MRI scan, was available.
16      Is that what you stated in your report?
17      A.  Yes.
18      Q.  And then further down in paragraph 8, you
19  state reliance upon specific radiographic tests,
20  especially an MRI scan, not available on Guam at
21  the time, is key to establishing the diagnosis.
22      You were referring to cauda equina
23  syndrome diagnosis, correct?
24      A.  Yes.
25      Q.  And where did you get the information

1   that an MRI scan was not available on Guam at the
2   time?
3       A.  That was the information I had at the
4   time.
5       Q.  Where did you get it from?
6       A.  It likely was from counsel.
7       Q.  Okay.  Are you --
8       A.  If that's an error --
9       Q.  Are you certain of that or is that --
10      A.  I don't know.  Who would I call?  I
11  wouldn't call up and find out.  It would have to
12  be from Ms. Clark's office or Mr. Schwab's office,
13  but that's an incorrect statement.  Apparently
14  there was a civilian MRI scan available.
15      Q.  So your report was in error in that
16  respect?
17      A.  There's an error; and I would amplify
18  that to say that just having an MRI doesn't
19  guarantee it's a proper way to make the diagnosis
20  without the right MRI scan, the right technique,
21  the right radiologist to read it.  So it's like
22  having an Indy car in your driveway.  You got to
23  have someone to drive it.
24      Q.  Do you have any knowledge or information
25  with respect to the type of MRI scan available on

1   Guam or the radiologists that are available?
2       A.  I have the --
3           MS. CLARK:  I'm going to object to the
4       question.  It's a compound question.
5   BY MR. KEOGH:
6       Q.  We'll divide them up then.  With the type
7   of machine, the MRI scan?
8       A.  I understand it's a 1.5 Tesla unit, which
9   is about the standard size that most hospitals
10  use.
11      Q.  And with respect to radiologists
12  available on Guam?
13      A.  No.  I'm unaware of that -- of the
14  presence or training of a civilian or a military
15  radiologist that would be able to do this test and
16  read it.
17      Q.  Have you made any inquiries into that?
18      A.  No.
19      Q.  Did you speak with anyone on Guam with
20  respect to the MRI capabilities in August of 2004?
21      A.  No.
22      Q.  Your only knowledge or your only
23  information on this issue at the time of preparing
24  your report was from counsel?
25      A.  To the best of my knowledge and it was an

1   error.  There was an MRI -- a civilian MRI, I
2   might add, there.  I'm unaware about the state of
3   the radiology support and the technical support
4   which is pretty crucial in doing -- scheduling,
5   targeting and doing an MRI scan.  It's not like a
6   CAT scan, which one size fits all.  Pull the
7   switch and you got it.
8       Often the CT myelogram is a better
9   diagnostic tool in evaluating a tumor or a large
10  disc compression from a cauda equina type
11  picture.  Often a CT myelogram is a better test.
12      Q.  But you've said that specific
13  radiographic tests, especially an MRI scan, is key
14  to establishing the diagnosis.
15      A.  It is.
16      Q.  Are you changing that opinion now?
17      A.  No, not at all.  That's the entry level
18  test.  The final test in often these cases
19  involving a tumor or some other unusual condition
20  requires a CT myelogram before an operation.
21      Q.  Do you know if a CT myelogram was ever
22  performed on Deborah Rutledge before surgery was
23  performed?
24      A.  I don't think it was.
25      Q.  So the surgeons in Hawaii were able to

All Florida Reporting, Inc.
800-898-7373

1  sufficiently diagnose her condition with an MRI,
2  correct?
3      MS. CLARK: Object to the form of the
4  question.
5      A.  I would say that they had an emergency;
6  and they had to proceed to pace; and they had
7  plenty of reason to explore her.  So once they're
8  going to do the operation anyway, it kind of takes
9  away the necessity for other more invasive tests
10  in which you'd have to stick the spinal fluid with
11  a needle and put some dye in and take pictures.
12  BY MR. KEOGH:
13      Q.  The CT myelogram is an invasive test?
14      A.  Yes.
15      Q.  To answer the question, Doctor, go back
16  to the question, the surgeon in Hawaii was able to
17  satisfactorily confirm the diagnosis with an MRI,
18  correct?
19      A.  He was.  It's not always the case.
20      Q.  But in this case, it was?
21      A.  In this case, it was.
22      Q.  Now, comparing Exhibit 7 to Exhibit 8,
23  would you agree with me, Doctor, that they are the
24  same document except for the signature of Natalie
25  Giscombe?

1      A.  Yes.  It looks like the same printout.
2      Q.  All right.  I'd like to point an
3  additional difference is that the printed date up
4  on the top of Exhibit 7 states it was printed on
5  May 16th, 2005, correct?
6      A.  Yes.
7      Q.  Some nine months after the actual exam
8  was done, correct?
9      A.  Yes.
10      Q.  And the printed date on Exhibit 8 is
11  August 17, 2004, correct?
12      A.  Yes, it is.
13      Q.  Which is about eight days after the
14  radiological examination report was approved
15  apparently by Dr. McSwain, correct?
16      A.  I don't know anything about the approval
17  process, but. . .
18      Q.  Well, it states down at the bottom,
19  approved by McSwain, Hugh, NMI, 9 August 2004,
20  correct?
21      A.  Yes.
22      MS. CLARK:  Are you asking him if that's
23  what it says?
24      A.  Yes.  That's what it says.
25      -----

1  BY MR. KEOGH:
2      Q.  Is it your understanding from the review
3  of the records in this case that the radiological
4  examination report was actually viewed for the
5  first time by the clinic practitioner Natalie
6  Giscombe on August 17, 2004 approximately or
7  exactly 15 days after the x-ray was taken?
8      A.  Yes.  15 days.
9      Q.  And once again, Doctor, you are not
10  giving a report in this -- an opinion in this
11  proceeding there is your mind that of 15 days from the taking
12  of an x-ray and a review of the report by the
13  practitioner ordering the x-ray is within the
14  standard of care?
15      MS. CLARK:  I'm going to object to the
16      form of the question.  I'm going to object to
17      the question as assuming facts not in
18      evidence, and I will remind Counsel that the
19      witness is here if you would like to explore
20      his opinion on that issue.  He's right here.
21  BY MR. KEOGH:
22      Q.  Doctor, can you answer question, please?
23      A.  I'm sorry.  I got lost with the
24  objection.  Could you please run me that question
25  back?

1      MR. KEOGH:  Are you able to read the
2      question back?
3      (The requested portion was read by the
4      reporter.)
5      MR. KEOGH:  I'll restate the question.
6  BY MR. KEOGH:
7      Q.  Doctor, it is correct, is it not, that
8  you are not providing us an opinion in this matter
9  that waiting 15 days from the date of ordering and
10  reviewing an x-ray by the practitioner who ordered
11  it is within the standard of care?
12      MS. CLARK:  Same objection.
13      A.  No.  I'm not stating that is it within
14  the standard of care.  I would say it's a useless
15  x-ray, and it's of no benefit clinically.
16  Radiologists don't examine the patient, by the
17  way, either and are clinically incompetent to deal
18  with cauda equina syndrome.
19      So I would say far more so Ms. Natalie --
20  Major Giscombe is unable to interpret this with
21  any dispatch that would lead to the care of the
22  patient in a demonstrable way.  So it's a
23  non-issue with me.  It's a moot point.  Regular
24  x-rays are useless in dealing with issues that
25  involve the spinal cord and the spinal nerves.

29  (Pages 110 to 113)

1    Q. All right. The reports contained on
2  Exhibit 7 and Exhibit 8 give the diagnosis of
3  degenerative disc disease L5-S1 and state, Given
4  the patient's symptoms, MRI of the lumbar spine is
5  suggested for further evaluation.
6        Is that a suggestion or a recommendation
7  from a radiologist that you also considered to be
8  useless?
9    A. It's a recommendation they would probably
10  make in any case because the plain films are
11  useless, number one. Number two, I will guarantee
12  you that Dr. McSwain did not examine this lady;
13  and that if he did, he's incompetent to do so from
14  a neurologic standpoint.
15        So he's making a suggestion which all
16  radiologists do. Plain x-rays -- he's saying
17  plain x-rays are not helpful. We need something
18  more definitive. In that respect, I agree with
19  him, but it's a fallacy to think that he had a
20  clinical judgment that came to bear here based
21  upon his examination of the patient, review of the
22  records and his competence in dealing with cauda
23  equina syndrome.
24    Q. Right. So this report gets then reviewed
25  by the practitioner who ordered it, correct?

1    A. Right.
2    Q. And you're suggesting or you're
3  testifying today that this report is useless to
4  that practitioner?
5        MS. CLARK: Object to the --
6    A. Absolutely.
7        MS. CLARK: -- form of the question and
8    the tone of the voice. Please don't argue
9    with this witness.
10  BY MR. KEOGH:
11    Q. I'm not trying to do anything other than
12  exploring this issue, Doctor. It surprises me
13  that you would state --
14    A. Absolutely. Major Giscombe could no
15  better read a lumbar plain film report and x-rays
16  than you could, and it is useless in terms of
17  looking at what's really wrong with the patient.
18        You know, his suggestion is a good one,
19  to look for the MRI scan, because these reports
20  are -- I mean, these x-rays are useless, but
21  neither one of them are examining, looking at the
22  patient to the degree that they have the expertise
23  necessary to demand a lumbar myelogram CT or an
24  MRI scan immediately, you know; and so I think I
25  wouldn't read too much into this.

1    Q. The suggestion -- is it your testimony
2  that the suggestion from Dr. McSwain to have an
3  MRI of the lumbar spine for further evaluation is
4  a useless suggestion?
5    A. No. I would say that would be the first
6  suggestion. Not to waste two weeks jacking around
7  getting lumbar spine films checking -- that nobody
8  can really read anyway; and nobody has a clue how
9  it relates to the patient. Major Giscombe doesn't
10  and the doctor, the radiologist, doesn't either.
11        Radiologists don't take care of
12  patients. They're clinically incompetent. They
13  were declared such when I was in the Navy so they
14  wouldn't have the same call in the emergency room.
15    Q. So jacking around for two weeks, as you
16  testified, is something that you consider to be
17  useless? Jacking around with waiting for an
18  x-ray?
19    A. It's a waste of time to wait those two
20  weeks. Yes, sir.
21    Q. And the more appropriate thing to do
22  would be to have immediately gotten an MRI,
23  correct?
24    A. If they were -- if their level of concern
25  was at the point that x-rays are indicated, I

1  think they should get a MRI or a CT myelogram,
2  yes.
3    Q. In fact, that was Dr. McSwain's
4  suggestion, correct? .
5    A. It was, but I suspect he would have said
6  that anyway.
7    Q. Is that a suggestion that you believe a
8  practitioner such as Natalie Giscombe should have
9  followed up on?
10    A. Well, she's not competent in my opinion
11  to make those decisions.
12    Q. Who is competent?
13    A. A neurosurgeon or an orthopedic spine
14  specialist, you know, who saw the patient and said
15  Let's take this a bit further and if they were
16  concerned at that time and didn't regard it just
17  as a regular disc problem. That's the fix here.
18        That's the problem is that so many people
19  present with these kind of symptoms waxing and
20  waning, you can't put everybody in a scanner.
21  You'd be backed up for weeks. Nobody that was
22  really ill or had a problem or a brain tumor could
23  get in the scanner.
24        So you have to use some judgment in it,
25  and I would submit that neither one of these two

30  (Pages 114 to 117)

1  people has that judgment in terms of looking at
2  the patient clinically and deciding what goes on.
3  See what I mean?
4      They can order it. You could order it.
5  Someone -- any competent human being could say
6  what's the best test for this sort of problem and
7  order it, but you can't order it on everyone.
8  Excuse me.
9      Q.  But it could have been ordered for
10  Mrs. Rutledge, correct?
11     A.  It could have been apparently.  I just
12  was unaware that they even had one there at the
13  time that I reviewed this and produced my report.
14     Q.  I'm going to skip Exhibits 9 and 10
15  because -- well, if you'll take a look at them
16  quickly, 9 and 10, would you agree that they are
17  further telephone consultations or records of
18  further telephone consultations by Mrs. Rutledge
19  to the Andersen Air Force Base clinic between
20  August 2 and August 17, correct?
21     A.  Yes, sir.
22     Q.  Now, Mrs. Rutledge as evidenced by
23  Exhibit 11 appeared at the Andersen Air Force Base
24  clinic again for the third time on August 17,
25  correct?

1      A.  Yes.
2      Q.  Again, with loss of sensation in the
3  groin area, states numbness to peritoneal area.
4  That's a misstatement, correct?
5      A.  It's a misstatement. Yes. It's the
6  wrong word.
7      Q.  And above the word numbness, it looks
8  like the word "slight" has been written in; is
9  that correct?
10     A.  Yes.
11     Q.  Do you know the circumstances around why
12  the word slight was written in on top of the word
13  numbness?
14     A.  No.
15     Q.  You haven't spoken to Natalie Giscombe
16  about this?
17     A.  Never met any of these people.
18     Q.  You never spoke with Captain Rau about
19  this case?
20     A.  No, sir.
21     Q.  Okay.  And again, the description of the
22  symptoms states that there is low back pain with
23  numbness to the right gluteal, again peritoneal,
24  which is a misstatement, correct?
25     A.  Yes.

1      Q.  The correct word is perineal, correct?
2      A.  Yes.
3      Q.  So the right gluteal, peritoneal and
4  right thigh and left lower extremity to the foot,
5  plus there's a limp, correct?
6      A.  Yes.
7      Q.  Would you agree that from looking at the
8  July 27, August 2 to August 17 clinic records that
9  we've reviewed that there is progression of these
10  symptoms getting worse?
11     A.  It does appear that this record would
12  document that.
13     Q.  And then the history further taken, other
14  history as low back pain, no trauma, complains
15  of numbness again of the right glute over the
16  right -- again misstated -- peritoneal area down
17  the right thigh, also low back pain radiating down
18  the left lower extremity to the foot, correct?
19     A.  Yes.
20     Q.  Again, we have bilateral symptoms,
21  correct?
22     A.  Yes.
23     Q.  And it appears to be a progression of
24  those symptoms, correct?
25     A.  It does.

1      Q.  Okay.  And the diagnosis given by Major
2  Giscombe adult nurse practitioner at that time was
3  number one, low back pain and number two, I assume
4  that's degenerative disc disease in the lumbar
5  spine.  Right?
6      A.  Yes, with radiculopathy.
7      Q.  Radiculopathy is what?
8      A.  The pain down the leg.  I believe it was
9  her left leg, if I'm not mistaken.
10     Q.  All right.  And her --
11     A.  Left leg, yes.
12     Q.  Her discussion with respect to the
13  radiology reports were that there should be a
14  referral to the ortho, which I assume is
15  orthopedics, correct?
16     A.  Yes.
17     Q.  And to consider an MRI, correct?
18     A.  Yes.
19     Q.  And are you familiar with the orthopedic
20  referral that was made at the time on August 17,
21  2004?
22     A.  Yes.  I know that it was made.
23     Q.  If you look at --
24     A.  Dr. Duncan, I believe.
25     Q.  If you look at Exhibit 12 --

All Florida Reporting, Inc.
800-898-7373

1    A.  I have it here.  Yes.
2    Q.  All right.  Would you agree that that's
3  the referral documentation of initial referral of
4  August 17, 2004?
5    A.  Yes.
6    Q.  Do you see that the referral priority was
7  stated as routine?
8    A.  Let me find it here.  Oh, I see.  Yes.  I
9  see it.  It's highlighted.  Uh-huh.
10    Q.  Am I correct, Doctor, that in your report
11  you are not giving an opinion as to whether or not
12  making a routine referral with the symptoms that
13  are presented by Mrs. Rutledge in this case was
14  within the standard of care?
15    A.  No.  I'm not making that statement.
16    Q.  All right.  And then is it your
17  understanding, Doctor, that Mrs. Rutledge was
18  finally seen by an orthopedist on August 27, 2004
19  by Dr. Douglas Duncan at the Naval Hospital?
20    A.  Yes.
21    Q.  That's a full month after she first
22  presented to the Andersen Air Force Base clinic
23  with her initial symptoms, correct?
24    A.  Yes.
25    Q.  Am I correct, Doctor, that you are not

1  giving us an opinion in your report that a delay
2  of one full month from the date of first
3  presentation until the date of examination by
4  an orthopedist in Mrs. Rutledge -- with
5  Mrs. Rutledge's symptoms is within the standard of
6  care?
7    A.  I'm not saying it's within the standard
8  of care, but I would have to say that disc
9  problems that wax and wane, come and go, are the
10  pattern of dealing with disc problems.
11      When you see a progressive history such
12  as to the best of my review occurred at the end of
13  the month rather dramatically by the time
14  Dr. Duncan had seen her, then I think that's a
15  different situation.
16    Q.  You're not giving any opinions with
17  respect to the standard of care or --
18      MS. CLARK:  Yes, he is, Bob, and --
19      MR. KEOGH:  You're not testifying about
20  this, please.
21  BY MR. KEOGH:
22    Q.  You're not giving us any opinions in your
23  report with respect to the standard of care
24  provided to Mrs. Rutledge at the Andersen Air
25  Force Base clinic, correct?

1    A.  I am.
2    Q.  Where is it in your report?  Can you
3  please --
4    A.  I'm giving it to you today.
5    Q.  For the first time you're giving it to me
6  today?
7    A.  It's the first time we've met.
8      MS. CLARK:  He's here for you to explore
9  any opinions he might hold.  Anything you want
10  to know.
11      MR. KEOGH:  Well, we will address the
12  propriety of giving opinions for the first
13  time at a deposition in a separate motion.
14  BY MR. KEOGH:
15    Q.  But, Doctor, I'm just asking you to
16  confirm that these opinions that you're now
17  stating for the first time to me since we just met
18  today is the first time that you voiced or printed
19  these opinions in any respect in this case?
20      MS. CLARK:  Again, I will object to the
21  form of the question to the extent that you
22  state it is the first time.  If you read the
23  content of the report, it's clearly stated
24  there.
25      MR. KEOGH:  That will be for the judge to

1  decide indeed.
2  BY MR. KEOGH:
3    Q.  Can you answer the question?
4    A.  Yeah, I can.  I'm giving it to you
5  today.  This is the first time we've met and the
6  first time we've had a deposition.  I have held
7  those opinions before; and it is my opinion that
8  the initial treatment of any back problem has a
9  certain flow to it, given what people try to do,
10  which is conservative care.
11      They don't want to rush people into
12  surgery even if they have a disc.  This lady had a
13  disc problem to begin with.  She had a disc
14  problem at the end.  The disc problem got
15  demonstrably worse clinically with urinary and
16  rectal incontinence by the time she had actually
17  seen Dr. Duncan.
18      That represented a significant change,
19  and he was very forthright and proper I think in
20  trying to arrange -- apparently in the aftermath
21  of a storm to get her to Hawaii and get her
22  treated.
23      So I think there was a change at the end
24  of her month's treatment in which she developed
25  symptoms that were undeniably cauda equina

32  (Pages  122  to  125)

1 syndrome. Before she had symptoms that could or
2 not could not be just from a lumbar disc.
3    Q. All right. The opinions that you've
4 given in -- well, let's go back to number 3.
5 Okay? You've referred to cauda equina syndrome as
6 a very rare and unusual syndrome, correct?
7    A. Yes.
8    Q. And that's your opinion today?
9    A. Yes. That's the opinion of the medical
10 literature, I might add.
11    Q. Okay. Let's look at some of the medical
12 literature that you've provided to us.
13    A. Okay.
14    Q. If you can look at -- maybe you're going
15 to need the exhibit because they're numbered.
16 RUT 408. Yeah. That's the one.
17    A. Okay. I'm sorry. What page was it?
18    Q. 408. It states right after the word
19 introduction, Cauda equina syndrome from lumbar
20 disc herniation accounts for up to 2 to 3 percent
21 of all disc herniations. Do you agree with that
22 statement?
23    A. No, not at all.
24    Q. You've included this in your report?
25    A. I don't agree with everything that's in

1 these articles. 47 patients does not a study
2 make. You need to look at a bigger picture. 47
3 patients, you know, is an interesting way of
4 looking and they do a good job I think of looking
5 at when they did surgery and what happened, but to
6 take 47 patients and say 2 to 3 percent of them
7 are cauda equina syndrome is statistically
8 insignificant.
9    I've done thousands and thousands of back
10 and neck operations in my career, and I've seen
11 personally about 10 cauda equina syndromes. Three
12 that I remember quite vividly. So three out of
13 tens of thousands does not represent even 2
14 percent. It doesn't represent 1 percent. So I
15 would quibble with that. I disagree with that.
16    Q. All right. If, in fact, the finding is
17 correct and that you're quibbling with it is
18 incorrect, would you agree that 2 to 3 percent of
19 all disc herniations constituting cauda equina
20 syndrome would not constitute it as a very -- let
21 me see how did you refer to it. As a --
22    A. Rare.
23    Q. Very rare. I have to find the right term
24 here.
25    A. It is very rare and unusual. I've been

1 doing this 30 years. Trust me.
2    Q. A very rare and unusual syndrome?
3    A. Right. Right.
4    Q. 2 to 3 percent you would agree is very
5 rare and unusual?
6    A. I would refer you to the Queen's Medical
7 Center article in the Emergency Journal on page, I
8 guess, 400 in which they look at cauda equina
9 syndrome. Cauda equina is a rare but serious
10 consequence of lumbar disc prolapse, and I would
11 agree totally with that.
12    Q. Is there a difference between rare and
13 very rare and unusual?
14    MS. CLARK: Oh, good Lord. I object to
15 the form.
16    A. No. I've done probably 10,000 spinal
17 operations, Counselor; and if it was 2 to 3
18 percent, that would mean I would have seen 200 to
19 300 cauda equina syndromes. It's an
20 impossibility.
21    I don't know of any friends that have
22 seen more than two or three. You know, people who
23 have done this as long if not longer than I have.
24 So that's an inaccurate number. When you take a
25 small sample, you're subject to tremendous

1 statistical error.
2    Q. So your testimony today is that you don't
3 necessarily agree with everything that's in the
4 materials that you've provided to us in your
5 report, correct?
6    A. Exactly. And I can specifically tell you
7 based on my experience --
8    Q. Doctor, I haven't asked you a question
9 about that. I've asked you whether or not --
10    MR. SCHWAB: Please --
11    Q. -- your testimony today is that you do
12 not agree with everything that is in your --
13    MR. SCHWAB: -- keep your voice down.
14    MR. KEOGH: Can we confirm which counsel
15 is going to be posing objections here at this
16 point?
17    MS. CLARK: I am. I think he was
18 discussing your manners.
19    MR. SCHWAB: I'm closer to you. You're
20 yelling.
21    MR. KEOGH: I'm not yelling. I am
22 discussing with Dr. Meriwether his opinions,
23 which are being voiced to me for the first
24 time today.
25    MS. CLARK: We're going to take another

33 (Pages 126 to 129)

1  break and let everybody get their party
2  manners back on, please.
3      MR. KEOGH: Counsel, your party manners
4  are quite offensive and quite obnoxious
5  frankly. Your behavior here has been
6  considerably disrespectful; and your voice and
7  your tone is quite obnoxious, for the record.
8      MS. CLARK: Thank you.
9      MR. KEOGH: You're welcome.
10     MS. CLARK: We're going to take a break.
11     MR. KEOGH: Now we are continuing with
12 this deposition. We started 35 minutes late,
13 and we're going to continue, correct?
14     THE DEPONENT: I'm going to take a pee
15 break. Excuse me, because I got to go.
16     (Brief recess.)
17     MR. KEOGH: Are we ready?
18     THE DEPONENT: Yeah.
19 BY MR. KEOGH:
20     Q.  Doctor, referring to Exhibit 12, do you
21 have that available to you? I think that's
22 Exhibit 12.
23     A.  That's it? Okay.
24     Q.  Again, back to the orthopedic referral --
25     A.  Right.

1      Q.  -- that was made on August 17, am I
2  correct in my understanding that on August 27, ten
3  days later, Dr. Douglas Duncan made the -- he's
4  an orthopedic surgeon -- made the diagnosis that
5  Mrs. Rutledge had been suffering from
6  long-standing cauda equina syndrome, correct?
7      A.  Yes, he did. I would quibble with the
8  word long-standing, but he made the proper
9  diagnosis.
10     Q.  And, in fact, the records of his
11 diagnosis of his clinical review, actually he
12 states that the -- he refines the long-standing as
13 constituting three weeks? Three weeks in
14 duration, correct?
15     A.  Three weeks? He said it was three
16 weeks?
17     Q.  Yes.
18     A.  Yeah. I would quibble with that. He did
19 say that.
20     Q.  Now, your quibbling with that, is that
21 contained anywhere in your report?
22     A.  No. It's my quibbling with you here
23 today.
24     Q.  So the first time you're quibbling with
25 that as far as this case is concerned is here

1  today?
2      A.  No, not at all. Here today it is, but
3  not at all the first time.
4      MS. CLARK: I'm going to object to the
5  form, if it was a question.
6      THE DEPONENT: Is it a question?
7      MS. CLARK: Or the statement. Whatever.
8  BY MR. KEOGH:
9      Q.  The first time that you have expressed to
10 me your quibbling over that finding is today,
11 correct?
12     A.  Yes, sir.
13     Q.  Are you familiar with the American
14 Association of Orthopedic Surgeons?
15     A.  Yes.
16     Q.  Have you ever visited their Website?
17     A.  I don't think I ever have.
18     Q.  I'd like to refer you to an August 2006
19 report from the American Association of Orthopedic
20 Surgeons that contains the following two
21 statements: As a post-operative complication,
22 cauda equina syndrome is a rare problem with an
23 occurrence of 0.002 percent to 0.3 percent after
24 lumbar spine surgery.
25     Is that a statement you can agree with?

1      A.  Absolutely.
2      Q.  And then it continues on to say, Cauda
3  equina syndrome has an incidence of 2.2 percent to
4  3.2 percent following lumbar disc herniation.
5      Is that a statement you can agree with?
6      A.  I would say only depending upon the cause
7  of the lumbar disc herniation. For example,
8  severe trauma. Motorcycle accident or some
9  unusual trauma that would cause a serious spinal
10 dislocation or a disc rupture.
11     Q.  Does 2.2 percent to 3.2 percent
12 constitute a rare condition in your opinion?
13     A.  Well, as stated earlier, I don't agree
14 with the fact that it's 2.2 percent or 3.2 percent
15 or whatever. I think it's much more rare than
16 that, and I think that if you look at large series
17 of patients and my own personal experience, it's a
18 very unusual and rare condition.
19     Q.  All right. Doctor, listen to the
20 question that I'm asking. Except for the purpose
21 of this discussion that the 2.2 percent to 3.2
22 percent is accurate, if 2.2 percent to 3.2 percent
23 is accurate, does that constitute a rare finding
24 in your opinion?
25     MS. CLARK: Object to the form of the

34  (Pages 130 to 133)

1    question.
2    A. I would say no. It's an unusual finding,
3  but I disagree with it.
4  BY MR. KEOGH:
5    Q. I understand, but is it correct if 2.2 to
6  3.2 percent is correct as this report states, then
7  it is not rare, correct?
8    MS. CLARK: Object to the form of the
9  question. Asked and answered.
10    A. If it's theoretically correct, then it's
11  theoretically not rare.
12  BY MR. KEOGH:
13    Q. Okay. I'd like to go through the medical
14  literature that you provided to us; and can I ask
15  you if you read everything that's contained in the
16  literature you provided to us in anticipation
17  and preparation of your report?
18    A. I've read probably 90 to 95 percent of
19  it. There are some that are experimental articles
20  that I looked at the abstract in rat studies, for
21  example, that I didn't feel had any relation to
22  this case. Articles like that I didn't.
23    Q. I didn't see any rat studies. I saw a
24  dog study, but --
25    A. I got a rat right in front of me here.

1    Q. What page is that?
2    A. It's on page --
3    Q. Can you look at the exhibit instead of --
4    A. I've got it on the first page of my --
5  yeah. Here's one on page 428 in alpha receptor 1
6  deficient mice, but that's not the one I was
7  referring to. There's some others here.
8    Q. Well, that's not important. Let's move
9  on to --
10    A. Here's another one on page 427. Again,
11  neonatal mouse spinal cord. You know, on and on
12  It's a waste of time to look at that stuff.
13    Q. You didn't read that?
14    A. No.
15    Q. All right. Let's go to the beginning.
16  Page 399.
17    A. Okay.
18    Q. All right. Now, you've said that there
19  are some things in these reports that you don't
20  agree with, correct?
21    A. Right.
22    Q. Looking at the report on page 399, it
23  states in the discussion, Most patients do not
24  present with all the characteristic features of
25  CES, which is cauda equina syndrome, right?

1    A. Right.
2    Q. Sacral sensory loss is a sensitive and
3  relatively specific sign for diagnosing cauda
4  equina syndrome.
5    Do you agree or disagree with that
6  statement?
7    A. I would agree with that as a finding, not
8  a symptom. In other words, if the patient
9  actually has it, not that they complain about it.
10    Q. But sacral sensory loss in your view is a
11  sensitive and relatively specific sign for
12  diagnosing cauda equina syndrome, right?
13    A. Yes. As a finding on physical exam.
14  Absolutely.
15    Q. Turning to page 400 down on the last line
16  of that report, it states, Patients who have had
17  cauda equina syndrome do not return to a normal
18  status.
19    Do you agree or disagree with that
20  statement?
21    A. Well, I think there is other literature
22  that would dispute that; and it depends on what
23  you mean normal. Normal bladder, normal bowel,
24  normal motor, normal sensory functions. It's a
25  blanket statement. So I can't agree with it the

1  way it's stated as a blanket statement.
2    Q. So you disagree with it?
3    A. I do.
4    Q. Would you agree that it's patient to
5  patient? It's on a patient-to-patient basis --
6    A. Yes, sir.
7    Q. -- how the outcome is?
8    A. Yes, sir, I would.
9    Q. The next page on page 401, it states that
10  in the discussion, Most patients do not present
11  with all the characteristic features of cauda
12  equina syndrome. Again, sacral sensory loss is a
13  sensitive and relatively specific finding for
14  diagnosis of cauda equina syndrome.
15    This seems to be the same statement as
16  the prior study, correct?
17    A. It's the same article.
18    Q. You've included the same article twice?
19    A. Evidently. Saint Mary's Hospital in
20  London. Yes. Same article.
21    Q. You would agree that one of them is
22  entitled or numbered Bates stamped RUT 399 and the
23  other one RUT 401?
24    MS. CLARK: Do you know what a Bates
25  stamp is, Doctor?

1    THE DEPONENT: What?
2    MS. CLARK: When he says Bates stamped,
3  he's talking about that number there.
4    THE DEPONENT: Yeah. Uh-huh. It's the
5  same article.
6  BY MR. KEOGH:
7    Q. So you included the same article twice?
8    A. Evidently.
9    Q. All right. Turning to page 404.
10   A. I have it.
11   Q. All right. The conclusion of that report
12  that you provided is, Because it is impossible in
13  a significant proportion of patients to exclude
14  the diagnosis of prolapsed intervertebral disc in
15  the context of referral with suspected cauda
16  equina compromise the authors recommend urgent MRI
17  assessment in all patients who present with new
18  onset urinary symptoms in the context of lumbar
19  back pain or sciatica.
20     Do you agree or disagree with that
21  statement?
22   A. I would agree with that.
23   Q. Do you agree that urgent MRI assessment
24  in all patients who present with new onset urinary
25  symptoms is the approach to take?

1    A. Yes.
2    Q. Turning to page 407. All right. The
3  conclusion states that data strongly support the
4  management of cauda equina syndrome from lumbar
5  disc herniation as a diagnostic and surgical
6  emergency.
7      Do you agree with that?
8    A. Yes.
9    Q. Okay. Turning to page 409, that's one of
10  the dog studies, correct?
11   A. Yeah. Appears to be.
12   Q. Is that one that you didn't read?
13   A. If this is printed out with the abstract,
14  I read it. Again, it's dog. So it's not
15  exactly -- they're mammals, but they're not
16  exactly like us.
17   Q. Turning to page 411, about a little over
18  halfway down in the discussion there, it states,
19  Post-operatively, six patients (44 percent) were
20  normal, four (28 percent) had chronic pain and
21  numbness, and four (28 percent) had persistent
22  incontinence and weakness.
23     Do you have any reason to dispute those
24  findings?
25   A. No.

1    Q. And you would agree once again that on a
2  case-by-case basis, some patients develop normally
3  after cauda equina surgery; and some patients
4  continue to have chronic pain and numbness or
5  persistent incontinence and weakness?
6    A. Yes. And I, of course, would point out
7  this is fourteen patients. Makes the finding
8  statistically suspect. Actually, two of the
9  patients had a very rare condition underneath the
10  herniation called a tethered cord. So that
11  predisposes one to have a cauda equina even with
12  small herniated disc.
13   Q. This is a report that you included in
14  your report, correct?
15   A. Right. And to show that an existing
16  small number of patients who still can have
17  recovery, but the data is skewed, you know, by two
18  of them having a tethered cord.
19   Q. But the point being that some patients
20  recover normal functions and some patients
21  continue to have chronic pain and numbness or
22  persistent incontinence and weakness on a
23  patient-by-patient basis, correct?
24   A. Yes. And the reason that all these are
25  included in here is that this is such a rare

1  condition there is not a lot written about it and
2  studied in the literature. I'm including a number
3  of studies including obviously some animal
4  studies, but it's a rare condition.
5    Q. Turning to page 412 --
6    A. Yes.
7    Q. -- where it states in the second sentence
8  of the background, Early operative decompression
9  is advocated, but may not always restore the
10  bladder function.
11     Do you agree with that statement?
12   A. I do. I also agree with their
13  conclusion; that even if short-term recovery of
14  bladder function is poor after lumbar disc surgery
15  for cauda equina syndrome, the long-term outcome
16  is not necessarily so in that same article.
17   Q. And again, that's on a patient-by-patient
18  basis, correct?
19   A. Yes.
20   Q. The best way to determine a particular
21  patient's outcome is to examine and test that
22  patient, correct?
23   A. And follow the patient over potentially
24  years.
25   Q. All right. Starting on page 415, these

36  (Pages 138 to 141)

1  are just titles of studies or clinical studies of
2  some kind, correct?
3      A.  Yes.
4      Q.  And it states that you have on the first
5  page, on 415 here, items 1 through 20 of 103.
6  Different studies.  Was this some kind of Internet
7  search that you did?
8      A.  Yes.  And these were perused to see their
9  applicability.  Some of them are pretty unusual.
10  Lumbar fractures, Tarlov's cysts, unusual causes
11  of cauda equina syndrome.  So they're not as
12  useful or applicable.  Assault-related injuries
13  among women presenting to the emergency
14  department.
15     Q.  Not related to Mrs. Rutledge's situation
16  at all?
17     A.  No, sir.  Not directly.
18     Q.  Did you read all 103 of these abstracts?
19     A.  No, but I read -- oh, the abstracts?
20  Yes.  I reviewed all the abstracts.  Did I read
21  all the articles and their statistical data and
22  all?  No.
23     Q.  You've read 103 of these?
24     A.  Absolutely.
25     Q.  You provided us up to page 426 up to 80?

1      A.  You want more?
2      Q.  I'm asking you 80 through 103, you didn't
3  provide us?
4      A.  Well, I have three different collections
5  of them.  I have 60 here, and I have about another
6  15 in this pile.  So 80 and 60 is 120.  That's
7  about 15.  So that's 135.  What number were you
8  looking for?
9      Q.  I'm not looking for a number.  I'm asking
10  you, Doctor, what you reviewed in preparation of
11  your report?
12     A.  I told you.
13     Q.  You've given us 60 -- I'm sorry -- 80 of
14  103 abstracts.  Did you not bother reviewing any
15  further past 80?
16     A.  No.  I have another 60 here that were
17  reviewed.
18     Q.  Are they included in your report?
19     A.  If they were relevant, they were.
20     Q.  Can you look at Exhibit 2 and tell us
21  whether they were included in your report?
22     A.  Well, I've given you one, for example,
23  that's not.
24     Q.  Doctor, can you look at your report and
25  tell us whether or not the 60 that you're talking

1  about were contained in your report?
2      A.  The report is generalized, and it is not
3  specific referring to the general condition of
4  cauda equina syndrome.  I don't refer in the
5  report to direct articles.  So I can't do that.
6      Q.  Well, maybe we're misunderstanding the
7  term report.  The report I'm talking about is
8  Exhibit 2 that you have in your left land, which
9  was provided to us on May 21, 2007.
10     A.  Yeah.  Okay.  And what about it?
11     Q.  I'm asking you whether or not you
12  included the 80 through 103 in your Exhibit 2
13  which I refer to as your report?
14         MS. CLARK:  You mean the computer
15     printout?  The attachment?  Is that what
16     you're asking him?
17  BY MR. KEOGH:
18     Q.  Doctor, can you answer the question?
19     A.  I don't understand your question.
20     Q.  You provided on page 415 through 426 a
21  blurb, if you will, a little statement of articles
22  that you included as part of your report.  I'm
23  trying to find out whether you reviewed these,
24  whether you read these or not.
25     A.  I think I answered that already.

1      Q.  You told me that you reviewed 103, and
2  I'm trying to find out what happened to 81 through
3  103.
4      A.  Well, I couldn't tell you.  I'm looking
5  at another 40 here that are experimental data that
6  has no bearing on this case.
7      Q.  Can you look at page 427?
8      A.  Yes.  I have it.
9      Q.  All right.  This is again a printout of
10  what appears to be 1 through 20 of 3,531 articles
11  Did you review 3,531 articles in advance in
12  preparation of your report?
13     A.  No.
14     Q.  Did you review the 60 out of the 3,531
15  that you provided in your -- as an attachment to
16  your report?
17     A.  I think it was more like between 80 and
18  120 that I reviewed as well as my personal
19  experience.
20     Q.  I'm discussing the articles that you
21  attached to your report.
22         MS. CLARK:  And he answered your
23     question.
24  BY MR. KEOGH:
25     Q.  If you'll look at pages 427 through

**37  (Pages 142 to 145)**

1  435 --
2    A.  Uh-huh.
3    Q.  -- would you agree that that contains 60
4  out of 3,531 reports?
5    A.  Yes, I would.
6    Q.  And you reviewed the 60 and stopped
7  there, correct?
8    A.  The second group of 60?  Yes.  The second
9  group having 60 in it, yes, but if you'll notice,
10  many of them are rat or dog articles or they're
11  tumor articles; and they not related to our
12  present case.  So they did not appear in my
13  considerations for this lady's case.
14    Q.  But, Doctor, you attached these to your
15  report.  Nobody else did.  That's why I'm asking
16  you why you attached these to your report.  First,
17  whether or not you reviewed them.
18    A.  Okay.  I did review them.  That's about
19  the third time.  I'm not going to answer that
20  anymore.  Do we understand each other?  I'm not
21  going to answer that question anymore.  The second
22  reason is to show the scope to which I actually
23  reviewed this whole syndrome.
24    Q.  All right.
25    A.  And how many things can cause cauda

1  equina syndrome.
2       MR. KEOGH:  Can we let the record reflect
3  that Dr. Meriwether is now the one yelling?
4       MS. CLARK:  No.  We will not let the
5  record reflect that.
6       MR. KEOGH:  Yes, we will.
7       THE DEPONENT:  I can do more of it.
8  Trust me.
9       MS. CLARK:  Please, let's --
10       MR. KEOGH:  I believe it.
11       MS. CLARK:  Hang on a second.  Just hang
12  on.  This man is here as an expert witness to
13  answer your questions, but I believe you have
14  an obligation to ask questions that are
15  pertinent and relevant to this case and not
16  get into a bickering contest about how many
17  entries on are on a printed page.
18       MR. KEOGH:  That objection is noted.
19  BY MR. KEOGH:
20    Q.  Doctor, are you prepared to proceed?
21    A.  I'm waiting.
22    Q.  You agree with me then that some of the
23  entries that you've attached to your report are
24  not relevant to Mrs. Rutledge's situation,
25  correct?

1    A.  Yes.  Let me amplify that.  They are not
2  what she has as her condition, but the fact that
3  they were related to cauda equina syndrome are
4  relevant to her diagnosis.  She did not have a
5  tumor.  She did not have a spinal fracture, et
6  cetera, et cetera.
7    Q.  Going back to your report on page 393
8  which is the third page of your report --
9    A.  Yes.
10    Q.  -- you state in paragraph number 2 that
11  the eventual failure of treatment by her August
12  17, 2004 medical clinic revisit led to specialty
13  referral to orthopedics.
14       Can you describe for me the treatment
15  Mrs. Rutledge received between July 27 and
16  August 17?
17    A.  She received medication.  She received
18  back exercises.  She was recommended to undergo
19  physical therapy.  That was the treatment.
20    Q.  So the treatment consisted of analgesics,
21  correct?
22    A.  I think they used anti-inflammatories.
23  They were against opiates and against steroids.
24    Q.  Okay.  And muscle relaxants, correct?
25    A.  Right.

1    Q.  And she was referred to physical therapy,
2  correct?
3    A.  Right.
4    Q.  Physical therapy never happened, though,
5  correct?
6    A.  I don't know.  She was given back
7  exercises I know to do according to the report.
8    Q.  So the only treatment was medication and
9  back exercises?
10    A.  And rest.
11    Q.  All right.  You state in paragraph number
12  6 of your report, No further documentation of
13  bowel/bladder regression has been provided
14  medically, correct?
15    A.  Right.
16    Q.  At the time you prepared your report, you
17  did not -- did you not review the records of a
18  Dr. Charles Morgan?
19    A.  No.
20    Q.  Did you review any of the records of a
21  Dr. Philip Mosca?
22    A.  I don't think so at that time.
23    Q.  Did you review any of the records of a
24  doctor whose name is spelled two different ways
25  Barone?

All Florida Reporting, Inc.
800-898-7373

1    A.  Barone?  No.
2    Q.  Prior to preparing your report, did you
3  review the October 2006 report of Dr. John Steele?
4    A.  I believe I did review Dr. Steele's
5  report.
6    Q.  Can you tell me where in paragraph 2 of
7  your report you reference having reviewed a report
8  of Dr. John Steele prior to preparing your report?
9    A.  Paragraph 2?
10    Q.  Roman numeral II?
11    A.  Roman numeral II?  Okay.  No.  I don't
12  see his report listed here or a deposition.
13    Q.  If it's not listed there, is it -- am I
14  correct in my understanding that you did not
15  review it?
16    A.  It was an interview on a DVD that I
17  reviewed with Dr. Steele; and it was not a
18  deposition; but I can't recall the particulars of
19  it at this time.
20    Q.  And you reviewed it before preparing your
21  report?
22    A.  I don't know.  It may have been
23  afterwards.
24    Q.  Referring to paragraph 8, numbered 8 of
25  your report, you've given the opinion -- and this

1  is one of the opinions that you will testify to at
2  trial -- that recovery can continue for several
3  years; is that correct?
4    A.  Right.
5    Q.  And is generally expected to do so?
6    A.  Yes.
7    Q.  You further state that the -- when you
8  say several years, can you refine several years?
9    A.  One of the studies I looked at from Japan
10  was four to six years in terms of recovery.
11    Q.  Is there a period after which that
12  recovery, would you agree, begins to slow down?
13    A.  Well, I think it slows down in most
14  patients reasonably soon, but everyone's different
15  as you noted yourself.
16    Q.  What do you mean by reasonably soon?
17    A.  Well, within a number of months.  She had
18  a normal bladder function in January basically of
19  '05 which would indicate that if she had
20  detrimental loss of bladder function after that
21  that it was due to some other reason, such as
22  scarring around the surgical site or scarring
23  within the cord.  Something that happens with any
24  back operation, whether people have cauda equina
25  syndrome or not.

1    So I think that long-term follow-up often
2  is fraught with things that are not related to the
3  original diagnosis, but really to the surgery.
4    Q.  All right.  The slow down of the recovery
5  is what I'm trying to focus on here.  Would you
6  agree that what recovery is going to happen is
7  most likely going to occur within a two-year
8  period?
9    A.  I wouldn't agree with that.  I mean, it
10  certainly has been shown certainly in this one
11  article from Japan that four to six years later
12  people had recovery of bladder function, et
13  cetera.  So. . .
14    Q.  Can you give us an estimate of how much
15  time you think it will be for Mrs. Rutledge to
16  continue to recover?
17    A.  No.
18    Q.  Are you estimating her disability at all?
19    A.  No.
20    Q.  Are you willing to give an estimate of
21  whether her disability or her condition would be
22  different if her diagnosis had been recognized on
23  July 27, 2004?
24    MS. CLARK:  I'm sorry.  An estimate why
25  what?

1    A.  I don't see how it would be when you come
2  in with back pain.  I wouldn't have MRI'd someone
3  at that point.
4  BY MR. KEOGH:
5    Q.  If it had been recognized at that point,
6  would her disability be different?
7    A.  I don't think it existed at that point.
8  I think she may have had a bulging disc, but I
9  think that two days before she saw Dr. Duncan when
10  she had fecal incontinence, and God knows why she
11  didn't seek medical attention for those two days,
12  but the two days prior to the 27th visit with
13  Dr. Duncan were probably when this thing herniated
14  out, extruded outside the disc space where it was
15  found on the MRI scan and subsequently had
16  surgery; and I think that's what constituted her
17  cauda equina syndrome.
18    Q.  But to answer the question, if it had
19  been recognized and properly diagnosed on August
20  27 and surgical intervention was done at that
21  time, can you estimate what her disability would
22  be now?
23    MS. CLARK:  Let me object to the form of
24  the question on several grounds.  First of
25  all, this witness has testified that he

1  doesn't do disability examinations. He
2  certainly doesn't do disability -- to quote
3  you -- estimates. So I think your question in
4  that regard is improper. Secondly, he's
5  already answered it.
6      A. I don't think you meant -- you meant July
7  27; and you said August 27.
8  BY MR. KEOGH:
9      Q. I said -- July 27th is what I meant.
10     A. What you meant was July. Yeah. No. I
11  don't think she had it then. I think she had a
12  disc problem.
13     Q. Taking Counsel Clark's objection to mind,
14  am I correct that you are not providing us with
15  any disability assessments with respect to
16  Mrs. Rutledge?
17     A. No. I've never seen her.
18     Q. So it's correct you are not giving us a
19  disability assessment?
20     A. How could I if I've never seen the
21  patient?
22     Q. Would you just answer the question yes or
23  no? Are you giving --
24     A. No.
25     MS. CLARK: Objection. He has answered.

1      THE DEPONENT: Make sure I don't have
2  some of yours here. I think this -- you got
3  all your stuff there, I think.
4      MS. CLARK: Yeah. Everything with the
5  yellow sticker stays.
6      THE DEPONENT: Make sure I didn't pick
7  something up here. Okay.
8      MR. SCHWAB: We're done.
9      MR. KEOGH: I don't wish to use up
10  transcript time for discussion of
11  depositions.
12     MS. CLARK: I think it's important
13  that we do because there's so many
14  misunderstandings in this case.
15     MR. KEOGH: You're going to pay for the
16  transcript from this point on?
17     MS. CLARK: I think we both need to buy
18  copy, but if you don't want to buy a copy of
19  the deposition of the expert, that's up to
20  you, but what we need to talk about -- and I
21  think we need it documented by the court
22  reporter because of the history of problems in
23  this case. We need to confirm scheduling of
24  your experts' depositions.
25     When we were in California, you and I

1      THE DEPONENT: Are you going to ask it
2  again? Let me answer it no again. Okay?
3      MS. CLARK: He's answered the question.
4      MR. KEOGH: All right. I'd like to take
5  a break for a few minutes and review my
6  records and see if there's anything further I
7  want to ask. Otherwise, we'll conclude.
8      MS. CLARK: Okey-dokey.
9      (Brief recess.)
10     MR. KEOGH: I have no further questions.
11     MS. CLARK: All right. Thanks.
12     MR. SCHWAB: Did we go back on the record
13  for that? Was that back on the record?
14     THE COURT REPORTER: Yes.
15     MR. SCHWAB: Do we need to talk about
16  depos?
17     MS. CLARK: Yes, we do.
18     MR. SCHWAB: We need that on the record,
19  too.
20     THE COURT REPORTER: On the record?
21     MS. CLARK: Yes.
22     MR. SCHWAB: On the record, please.
23     MR. KEOGH: We're finished with
24  Dr. Meriwether at this point. No questions.
25     MS. CLARK: Okay.

1  attempted to discuss it and apparently
2  somewhere between our discussion and the
3  paralegal's trying to schedule it, there's
4  been misunderstandings. So we just need to
5  make sure that we're all on the same page.
6      MR. KEOGH: What's the misunderstanding?
7      MS. CLARK: Do you have your calendar?
8      MR. KEOGH: No. I haven't been back to
9  my office since we were in California.
10     MS. CLARK: Well, we need to schedule the
11  deposition of Dr. Steele. We need to schedule
12  the deposition of -- is it Mr. Hiles?
13     MR. KEOGH: Uh-huh.
14     MS. CLARK: And we have a discovery
15  cutoff date of September 30th; and we've made
16  multiple efforts to confirm scheduling those
17  with you; and so I'm sitting here now ready,
18  willing and able to confirm those depositions
19  with you.
20     MR. KEOGH: I don't have my calendar with
21  me, but my understanding is that they're
22  confirmed through my staff and your office
23  staff.
24     MR. SCHWAB: I think we have a 6:00 a.m.
25  on two different dates.

All Florida Reporting, Inc.
800-898-7373