EXHIBIT "D"

1          IN THE UNITED STATES DISTRICT COURT

2               FOR THE DISTRICT OF GUAM          **CERTIFIED**
                                                   **COPY**
3

4

5

6    DEBORAH K. RUTLEDGE and            )

7    THOMAS R. RUTLEDGE,                )

8                      Plaintiffs,      )

9         vs.                          )   Civil Case No.

10   UNITED STATES OF AMERICA,          )   06-00008

11                      Defendant.      )

12   _____   )

13

14

15

16

17   DEPOSITION OF:

18          THOMAS R. RUTLEDGE

19          WEDNESDAY, JANUARY 10, 2007

20          9:10 A.M.

21

22

23   Reported by:

24          Kathleen E. McCarthy

25          CSR No. 4483

          MERRILL   LEGAL   SOLUTIONS
800-826-0277  818-593-2300  Fax 818-593-2301  www.merrillcorp.com

Case 1:06-cv-00008    Document 40-6    Filed 01/10/2008    Page 2 of 46

```
 1          Deposition of THOMAS R. RUTLEDGE, the witness, taken

 2     on behalf of the Defendant, on Wednesday, January 10,

 3     2007, 9:10 a.m., at 1817 North Sepulveda Boulevard,

 4     Manhattan Beach, California, before Kathleen E. McCarthy,

 5     CSR No. 4483, pursuant to Notice and consent.

 6

 7     APPEARANCES OF COUNSEL:

 8          FOR PLAINTIFFS:

 9               LAW OFFICE OF ROBERT KEOGH

10               BY:   ROBERT L. KEOGH, ESQ.

11               251 Martyr Street

12               Suite 105

13               C & A Building

14               Hagatna, Guam   96910

15               (671) 472-6895

16

17

18

19

20

21

22

23

24

25
```

2

Case 1:06-cv-00008   Document 40-6   Filed 01/10/2008   Page 3 of 46

```
 1    APPEARANCES OF COUNSEL (Continued):

 2       FOR DEFENDANT:

 3              U.S. DEPARTMENT OF JUSTICE

 4              UNITED STATES ATTORNEY'S OFFICE

 5              BY:  MIKEL W. SCHWAB, ESQ.

 6              ASSISTANT UNITED STATES ATTORNEY

 7              CIVIL CHIEF

 8              108 Hernan Cortez Avenue

 9              Sirena Plaza Suite 500

10              Hagatna, Guam  96910

11              (671) 472-7332

12                   and

13              KATHARYNE CLARK, ATTORNEY AT LAW

14              TRIPLER ARMY MEDICAL CENTER

15              CENTER JUDGE ADVOCATE OFFICE

16              1 Jarrett White Road

17              Honolulu, Hawaii  96859

18              (808) 433-4968

19

20       ALSO PRESENT:  DEBORAH RUTLEDGE

21

22

23

24

25
```

MERRILL   LEGAL   SOLUTIONS
800-826-0277  818-593-2300  Fax 818-593-2301  www.merrillcorp.com

```
 1                    ●          INDEX         ●

 2    WITNESS              EXAMINATION              PAGE

 3    THOMAS R. RUTLEDGE

 4                         Ms. Clark            5

 5

 6                         EXHIBITS

 7    NO.        PAGE           DESCRIPTION

 8                         (None)

 9

10              INSTRUCTIONS  NOT  TO  ANSWER

11                    PAGE      LINE

12                         (None)

13

14              INFORMATION  REQUESTED

15                    PAGE      LINE

16                         (None)

17

18

19

20

21

22

23

24

25
```

MERRILL   LEGAL   SOLUTIONS
800-826-0277   818-593-2300   Fax 818-593-2301   www.merrillcorp.com

```
 1        A.   Okay.

 2        Q.   Good enough?

 3             And I guess the last rule is I need you to answer

 4   with your voice.  I'm sitting here and we can see each

 5   other across the table and shaking heads and whatnot, but

 6   only lawyers' heads make enough noise when they move for

 7   the court reporter to take it down.  So you need to use

 8   your voice.  Okay?

 9        A.   Okay.

10        Q.   Great.

11             Can you just state your full name for the record,

12   please.

13        A.   Thomas Ray Rutledge.

14        Q.   Have you ever used any other names?

15        A.   No.

16        Q.   Is there a Junior, Senior, III, or --

17        A.   No.

18        Q.   What is your present address?

19        A.   2410 County Road 1198, Tuttle, Oklahoma, 73089.

20        Q.   Tuttle, Oklahoma.  Would that be in Tinker Air

21   Force Base's neck of the woods?

22        A.   That's 30 miles southwest of Tinker.

23        Q.   Okay.  Are you attached to Tinker right now?

24        A.   We are not attached to Tinker.  They are our

25   support base.
```

7

EXHIBIT "E"

US Attorney's Office
Districts of Guam & NMI

JUL 24 2007

Time _____
Receiving name _____
Date keyed in Dbase _____
Entered into Dbase by: _____

1

LAW OFFICE OF
**ROBERT L. KEOGH**
POST OFFICE BOX GZ
HAGATÑA, GUAM 96932
TELEPHONE (671) 472-6895

2

3

4

5   Attorneys for Plaintiffs

6

7                    **IN THE DISTRICT COURT OF GUAM**

8   DEBORAH K. RUTLEDGE and THOMAS        CIVIL CASE NO. CIV06-00008
    R. RUTLEDGE,

9                    Plaintiffs,

10       vs.                              **PLAINTIFFS' RULE 26(a)(2)
                                          DISCLOSURE OF EXPERT TESTIMONY**

11  UNITED STATES OF AMERICA,

12                   Defendant.

13

14

15       Pursuant to the requirements of Rule 26(a)(2) of the Federal

16  Rules of Civil Procedure, plaintiffs hereby disclose their expert

17  testimony by submitting herewith the following documents:

18

19       1.    Expert report of Dr. Gary M. Towle, disclosure statement

20             and Curriculum Vitae.

21

22                                        **LAW OFFICE OF ROBERT L. KEOGH**
                                          Attorneys for Plaintiffs

23

24

25  DATE: ___7/24/07___                   By: _____
                                              ROBERT L. KEOGH

26

27

28

8300 Niessen Way
Fair Oaks, California 95628
July 20, 2007

Robert Keogh, Esq.
Suite 105, C&A Professional Building
251 Martyr Street
Hagatna, Guam 96910

Dear Mr. Keogh:

Thank you for asking me to review the case of Deborah Rutledge vs. United States of America. In order to prepare this report I have reviewed the following materials:

1. Ms. Rutledge's medical records from the Andersen AFB Clinic in Guam, U.S. Naval Hospital in Guam, Tripler AMC in Hawaii, and the NNMC in Bethesda, Maryland, from July, 2004, until April, 2006.
2. Written narrative concerning the incidences under review signed by Ms. Rutledge but undated.
3. Deposition of Deborah Rutledge.
4. Deposition of Thomas Rutledge.
5. Deposition of Major Natalie Giscombe.
6. Deposition of Captain Steven Rau.
7. Deposition of Dr. Jablonski.
8. Deposition of Dr. McSwain.
9. Deposition of Dr. Duncan.
10. Deposition of Dr. Orchowski.
11. Report of Dr. Meriwether.

Case Summary:

Deborah Rutledge was 43 years old on July 27, 2004, when she presented at the Andersen Clinic complaining of a 4-5 day history of low back pain that was worse at night and was associated with a loss of sensation in the groin area and a new urine or stool problem. She was seen and evaluated by Major Giscombe, a nurse practitioner. The pain was located on the right side and was described as constant and dull and was a 7/10 in severity. Ms. Rutledge was unable to sleep well as she had difficulty getting comfortable at night. She denied any history of injury. Her exam demonstrated posterior-lateral sensory changes (tingling) down the right leg to just above the knee. The patient was felt to have right-sided sciatica and was treated conservatively with ice/heat, anti-inflammatories, muscle relaxants, and analgesics.

Ms. Rutledge's symptoms did not improve with conservative treatment and she returned to Andersen Clinic on August 2, 2004, and saw Captain Rau, a physician assistant. She still had back pain with loss of sensation in the groin area. She told Captain Rau that the right side of her back was numb and tingling and that it was taking her longer to use the bathroom. Captain Rau made a note that her pain was significant

and was shooting down both legs. It was graded a 7-8/10 in severity by the patient. Captain Rau noted that Ms. Rutledge had numbness in the right gluteus (buttocks) and pain radiating down the left leg to her calf. His exam demonstrated that Ms. Rutledge had pain with greater than 30 degrees of flexion of her back. Captain Rau diagnosed Ms. Rutledge's symptoms as musculoskeletal back pain. He obtained an x-ray of her back and noted some minor chronic changes of the upper lumbar spine. Valium was added to Ms. Rutledge's drug regimen. She was told to follow-up as needed if she failed to improve. Physical therapy consultation was also ordered.

Ms. Rutledge's symptoms worsened over the next couple weeks and she returned to the Andersen Clinic on August 17, 2004, and saw Major Giscombe again. She complained of slight numbness to the peritoneal (sic) area as well as numbness to the right gluteal area and right thigh. Deborah also had numbness in her left lower leg to her foot. Her range of motion was limited by pain and she was limping. An examination revealed a guarded, slow gait and diminished ability to flex her back secondary to pain. She had also developed tenderness to the lumbosacral area. Major Giscombe made a note that the x-ray report revealed degenerative disc disease at the L5-S1 area. Major Giscombe diagnosed (1) low back pain and (2) degenerative disc disease of the lumbar spine with radiculopathy. Her plan was to refer Ms. Rutledge to an orthopedist and consider an MRI.

On August 27, 2004, Deborah Rutledge saw Dr. Douglas Duncan, an orthopedist at the Naval Hospital. Dr. Duncan noted that Ms. Rutledge had numbness of the perineal area and difficulty urinating for 3 weeks. He also remarked that Ms. Rutledge had been unable to control her bowels for two days and was a "routine referral from Andersen AFB." He also noted that the patient had been emptying her bladder by squeezing it for an extended period of time as she had been accustomed to doing the past three weeks. Dr. Duncan found saddle anesthesia and diagnosed Ms. Rutledge as having had cauda equina syndrome for 3 weeks. He immediately made arrangements for her to be transferred to Tripler AMC in Hawaii for emergent surgery and decompression.

Discussion:

Ms. Rutledge presented to Andersen AFB three separate times with symptoms consistent with cauda equina syndrome. Her symptoms were inconsistent with sciatica or musculoskeletal back pain. Three red flags that should have alerted her care providers that a serious disease process was progressing were (1) her perineal (groin) sensory changes, (2) the presence of bilateral symptoms, and (3) the new onset of urinary dysfunction (needing to press on her bladder to void). I am also concerned that even after an MRI was suggested by the radiologist because of the nature of Ms. Rutledge's symptoms that no MRI was done and only a routine referral to an orthopedist was made for ten days later. Major Giscombe saw the x-ray report and signed it August 17, 2004. It would appear from the review of the available materials that neither Captain Rau nor Major Giscombe identified themselves as midlevel providers. It is standard procedure for midlevels to make it clear to patients that they are not physicians. In her narrative Ms. Rutledge referred to Dr. Giscombe and Dr. Rau. Finally, even though cauda equina syndrome is relatively rare, the midlevel providers should have at least recognized that

Ms. Rutledge did not have routine low back pain or even routine sciatica and should have had a physician evaluate Deborah Rutledge promptly.

I disagree with Dr. Meriwether's conclusions is several areas. Firstly, Deborah Rutledge's early presentation was not consistent with a "lumbar strain". Secondly, her early presentation was indeed consistent with lumbar disc disease with cauda equina syndrome, not typical sciatica. Also, contrary to Dr. Meriwether's comment, there is an MRI machine on Guam that was available for imaging of Ms. Rutledge.

Conclusions (To a reasonable degree of medical certainty):

1. There was an unacceptable delay in the diagnosis of Deborah Rutledge's cauda equina syndrome.
2. This delay caused her unnecessary pain and suffering and contributed significantly to her slow recovery and poor long-term prognosis.
3. The care rendered to Deborah Rutledge by Major Giscombe and Captain Rau on July 27, August 2, and August 17, 2004, was below the Standard of Care.

If I can be of any further assistance to you, please do not hesitate to call.

Sincerely,

Gary Towle, M.D.

Publications in the last ten years:
    None

Depositions and Court Appearances in the last ten years:
    1. December, 2003. Deposition. Attorney- Tim Tyler (Illinois).
    Case- Smith vs. Little Company of Mary Hospital.
    2. December, 2003. Deposition. Attorney- Keven Meek (Montana).
    Case- Farinas vs. City of Havre.
    3. March, 2004. Court Appearance. Attorney- Peggy Wu (California).
    Case- Marla Williams vs. ?.
    4. May, 2004. Deposition. Attorney- Jeff Cook (Guam).
    Case- Carbullido vs. Guam Memorial Hospital Authority.
    5. December, 2004. Deposition. Attorney- Anthony Ontiveros (California).
    Case- Jeremy Dir vs. Dr. Janki Amin.
    6. October, 2005. Deposition. Attorney- Tom Kolpacoff (California).
    Case- Grandstaff vs. Dr. Shankerman and Barton Memorial Hospital.

Compensation:
    1. Study, review, reports, and report generation- $200/hour.
    2. Testimony
        a. Depositions- $400/hour.
        b. Trial- $2000/ half day.
        c. Trial- $4000/full day.

# Curriculum Vitae

Gary L. Towle, M.D.

## Personal

| | |
|---|---|
| November 27, 1946 | Born in Portland, Maine |
| June 15, 1980 | Married to Mary Anderson |
| August 28, 1982 | Daughter Morgan born |
| August 26, 1984 | Twin sons Robbie and Troy born |

## Educational Background

| | |
|---|---|
| 1964-1968 | Bowdoin College, Brunswick, Maine |
| 1968-1972 | University of Vermont College of Medicine, Burlington, Vermont |
| 1972-1973 | Rotating Internship, San Joaquin General Hospital, French Camp, California |

## Professional Experience

| | |
|---|---|
| 1973-1975 | Staff Emergency Department Physician, San Joaquin General Hospital, French Camp, California |
| 1973-1975 | Staff Emergency Department Physician, Doctors Hospital of Manteca, Manteca, California |
| 1974-1975 | Staff Emergency Department Physician, Dameron Hospital, Stockton, California |
| 1975-present | Staff Emergency Department Physician, Roseville Community Hospital (now Sutter Roseville Medical Center) Roseville, California (presently honorary status) |
| 1973-present | Staff Emergency Department Physician, Lodi Memorial Hospital, Lodi, California |

| 1996-2002 | Staff Emergency Department Physician, St. Dominic's Hospital, Manteca, California |
| 1996-2003 | Staff Emergency Department Physician, Mark Twain St. Joseph's Hospital, San Andreas, California |
| 1975-1978 | Emergency Department Medical Director, Lodi Memorial Hospital, Lodi, California |
| 1984-1985 | Family Practice, Oakridge Medical Group, Roseville, California |
| 1987-2001 | Emergency Department Medical Director, Lodi Memorial Hospital, Lodi, California |
| 1994-2000 | President, Helix Physicians Medical Group, Inc., Lodi, California |
| 2000-present | Attending Physician, Yosemite Medical Clinic, Yosemite National Park, California |
| 2002-present | Medical Director, Yosemite Medical Clinic, Yosemite National Park, California |
| 1994-present | Medical-legal Consultant |

## Certification

| 1988-1998 | Board Certified, American Board of Emergency Medicine |
| 1998-present | Recertified, American Board of Emergency Medicine |
| 1995-present | Certified, Medical Board of California, Expert Medical Reviewer |

## Other Activities

| 1978-present | Trustee and Treasurer, Western States 100 Mile Endurance Run |
| 1984-2000 | President, Gary Towle Investment Corporation |

EXHIBIT "F"

LAW OFFICE OF
# ROBERT L. KEOGH
SUITE 105, C& A PROFESSIONAL BUILDING
251 MARTYR STREET
HAGATÑA, GUAM 96910
TELEPHONE (671) 472-6895 • FACSIMILE (671) 472-6929
email address: rlk@netpci.com

October 19, 2006

Mikel W. Schwab
Assistant U. S. Attorney
District of Guam
Sirena Plaza, Suite 500
108 Hernan Cortez Avenue
Hagatña, Guam 96910

RE:   **Rutledge v. United States**
      **District Court of Guam**
      **Civil Case NO. 06-00008**

Dear Mikel:

Enclosed is the expert opinion report of Dr. John C. Steele.
Dr. Steele is an expert witness that plaintiffs intend to call as
a witness at trial of this case to provide opinion testimony with
respect to the issue of damages.

The materials delivered at this time include the report of Dr.
Steele dated June 2, 2006, materials Dr. Steele relied upon in
reaching his opinions, a DVD of an interview of Dr. Steele with
Mrs. Rutledge, Dr. Steele's CV and the bill of Dr. Steele for
providing the enclosed report. Although Dr. Steel has testified as
an expert at trials and depositions in the past, he informs me that
he has not done so in the past four years.

This report is being presented pursuant to the terms of
Federal Rule of Civil Procedure 26(a)(2). If you wish to discuss
this matter further please call me.

Sincerely,

ROBERT L. KEOGH

RLK/tbm

US Attorney's Office
Districts of Guam & NMI

OCT 19 2006

Time
Receiving name
Date keyed in Dbase
Entered into Dbase by:

# JOHN C. STEELE, M.D., FACP(C)

NEUROLOGIST
FELLOW, AMERICAN COLLEGE OF PHYSICIANS

Office Tel/Fax:  (671) 633-1828

June 2, 2006

Robert L. Keogh
Suite 105, C&A Professional Bldg.
251 Martyr's St.
Hagatna, Guam 96910

RECEIVED

SEP 2 5 2006
*[handwritten] 4:47 pm*
LAW OFFICE OF
ROBERT L. KEOGH

Dear Attorney Keogh:

## MEDICAL-LEGAL CONSULTATION

| | |
|---|---|
| **Patient:** | Rutledge, Deborah K. |
| **Address:** | 5106B Lahm Court |
| | Andrews Air Force Base, Maryland 20762 |
| **Tel #:** | (301) 219-0951 (cell) |
| **DOB:** | December 29, 1960 |
| **Future Address:** | 2410 County Road 1198 |
| | Tuttle, OK 73089 |

## SUMMARY

I was pleased to interview and examine this 45-year-old Caucasian female who is the wife of an Air Force serviceman in New York City at the Washington Square Hotel on June 2, 2006.

She was accompanied by her husband.  You are representing her in a medical malpractice suit against the Federal Government. They were kind enough to travel from their home in Maryland to New York to permit this meeting, so I could directly assess the extent of her current medical disability.

She suffers residual severe disabilities of bowel and bladder dysfunction, painful sensory impairment, weakness of the legs, and gait disorder, 21 months after the failure to diagnose and promptly treat a herniated lumbar intervertebral disc that was causing an acute cauda equina syndrome in August 2004.

I anticipate her current symptoms and disabilities will continue for the rest of her life.

515 Alupang Cove • 241 Condo Lane
Tamuning, Guam 96913
Residence Tel: (671) 646-7220
E-mail:  jsteele@kuentos.guam.net

## PAST HEALTH

Her past health has been excellent and throughout her life was well and extremely active without serious illness or disease. She has enjoyed diverse physical activities that include bowling, and gardening. She enjoys shopping, care of her home, and she has particularly liked to iron.

She slept normally through the night and also liked to nap in the afternoon.

## FAMILY HISTORY

The patient's mother, age 68, is well and active. She suffers minor osteoarthritis of her fingers. Her father died when age 65 of bone cancer. She is the fourth born in a sibship of five. Her elder brother experienced back problems and had surgery to correct it in his 40s. No other family member is known to have difficulty with the spine or with herniated disks. A sister has chronic lung disease (COPD) which is attributed to factory work and smoking.

## PERSONAL HISTORY

She was born in Georgia. She graduated from high school and then worked at Wendy's Restaurant and was promoted to be a general manager. She married in June 2001. Her husband is a Master Sergeant and Senior Air Traffic Control Training and Standardization Manager who has been with U.S Air Force for 20 years. She has a child, age 23, who is well and healthy.

She ceased smoking in January 2004. She rarely drinks alcohol.

## HISTORY OF PRESENT ILLNESS

In October 2003, her husband and she were assigned to Guam.

In April 2004, because she had gained weight, she began a program of exercise classes at Andersen Air Force Base. These were conducted three times a week and involved weight lifting, squats, and lunges. She continued those classes during April and May. She had no symptoms during them, and she does not recall any incident of strain or injury.

Because her family was visiting, she stopped attending the exercise classes in May.

In the third week of July 2004, she began to experience mild low back pain. This was the first time she had experienced such discomfort and its onset was spontaneous. She applied thermal pads in the area of discomfort, and these improved her pain.

7 to 10 days after this discomfort began, on June 27, she awoke one morning unable to feel the right side of her labia and vagina. She describes the change as a heavy and dead feeling. She also experienced an urgency to void that same morning. There was no alteration in her back pain and no other symptomatology at that time.

Recognizing the newness and potential seriousness of these symptoms, she called the Andersen Air Force Base Medical Clinic Appointment Desk that same morning to request an appointment. She asked that she be examined by a physician. Initially the Appointment Desk scheduler was reluctant to give her an appointment and it was necessary that she insist she be seen that day. That afternoon she was examined by Major Giscombe at the Andersen Air Force Base Clinic. Her appointment was for 15 minutes.

Major Giscombe tested her walking and also the range in movement of her hips [i.e. straight leg raising]. She did not examine her in other ways nor did she test her sensation in the genital region or in the legs. She told Mrs. Rutledge she had "pinched nerve". Because her symptoms seemed unusual, Mrs. Rutledge asked if she was entirely certain of this diagnosis. Major Giscombe assured her she was quite certain of it. She prescribed Naproxen, Flexeril, and Vicodin. No x-rays or other tests were recommended or felt to be necessary. She was sent home to take her and she was sent home. She was not given a return appointment by Major Giscombe, and no instruction was given regarding follow-up or symptoms she should look for and report.

During the next several days, her sensory symptoms progressed and worsened. She began to experience a "weird" feeling down the backs of both legs and into the feet. She had increasing difficulty in voiding and emptying her bladder. She needed to press firmly on the lower abdomen to express her urine. But despite abdominal pressure, she was able to express only a small amount of urine and it usually dribbled. She also began to experience numbness of the left labia, as had begun on the right, and her walking and gait were less certain so she was off balance.

On August 2, 5 days after her first symptoms and medical examination, and because of her steadily worsening symptoms, she phoned the Appointment Desk at Andersen Air Force Base to ask that she be seen again. She is quite certain she specified that she wished to be examined by an M.D. physician. Again, the Appointment Desk scheduler attempted to postpone an appointment for a week, and it was again only by her insistence that she was seen later that day by Captain Rau. He wore an identification tag that indicated he was a Captain, but it did not indicate his medical qualification. Mrs. Rutledge assumed, as she had also assumed with Major Griscombe that both were MD physicians.

This was her first contact with medical practioners at the Anderson Air Force Base Clinic. When she had previously been cared for in other Air Force Clinics, the practioners had been MD physicians. But this was not the case at AAFB though it was only much later that she came to know that Major Griscombe and Captain Rau were actually Physician Assistant Nurse Practitioners, and not MDs.

Captain Rau listened to the symptoms that Mrs. Rutledge related. She emphasized they were progressing and worsening. He ordered x-rays of the spine which were taken immediately. He looked at them in her presence and remarked "it looks like there is something there". But he then said to her that it was not something that affected her lower back nor did he think it was relative to her symptoms. He concluded by saying he would refer her to the Physiotherapy Department at U.S. Naval Hospital and that he would send the x-rays to the Naval Hospital to be interpreted. He said this would take 10-12 days for him to receive this radiological report.

She left that appointment understanding that Captain Rau would report the result of the x-rays to her and that he would make an appointment with the Physiotherapy Department at the Naval Hospital. He advised that she continue the medication she was already taking and he also added Diazepam. He confirmed the earlier diagnosis by Major Griscombe of a "pinched nerve" and he did this repeatedly on three occasions when Mrs. Rutledge questioned him about his certainty of that.

Captain Rau did not arrange a follow-up visit with her. He did not ask that she contact him if her symptoms continued to advance or alter.

Later that day, she called the Physiotherapy Department at US Navy Hospital as she had been instructed to do by Captain Rau but she was informed no appointment had been requested or was made for her. She then called the AAFB Appointment Desk and left a message with Maria, the appointment secretary/scheduler to remind Captain Rau to request the PT appointment. But she did not hear anything further about this from either, or anyone else at AAFB or USNH.

She began taking the Diazepam as Captain Rau had instructed, in addition to the Naproxen, Flexeril, and Vicodin which had been given by Major Griscombe on July 27. With all four medications she was extremely somnolent and slept more than 20 hours a day.

She continued to have numbness of her legs which was often painful despite her multiple medications, and to experience difficulty in voiding.

On August 17 because of continuing ill health and symptomatology, she phoned yet again to the Appointment Desk asking for a referral to the U.S. Naval Hospital for another medical opinion.

Though her request was to be assessed at Navy Hospital, she was seen that day by Major Griscombe at the AAFB Clinic because it was necessary that a staff member there make her referral to the Navy facility.

Major Griscombe explained to Mrs. Rutledge that it looked like she had a herniated disk which was seen on the X-ray of August 2. Though Captain Rau had assured Mrs. Rutledge that he would let her know the result of that x-ray and arrange a physiotherapy appointment for her, he had not followed up with her and neither he nor the Appointment Desk had ever contacted her about either matter. So August 7 was the first time Mrs. Rutledge learned of that radiological abnormality and diagnosis. Major Griscombe read the x-ray report from the computer screen and though we now know the report recommended an MRI study, Major Griscombe made no mention of that recommendation to Mrs. Rutledge.

Mrs. Rutledge emphasized to Major Griscombe that she felt "something is seriously wrong with me" and insisted that she be referred to the Naval Hospital for another opinion. In response, Major Griscombe typed up a referral form on the computer. Mrs. Rutledge subsequently has learned that this referral was for routine consultation rather than urgent consultation as she requested.

Mrs. Rutledge was having more back pain now than previously and Major Griscombe added Viox for pain management.

She was sent home to await the Navy Hospital consultation.

On August 20, she was called by the U.S. Naval Hospital and given an appointment for consultation on August 23. However, on August 22, she was called again and that appointment was postponed because of closure of USNH Clinics due to threatening typhoon. She was assured the appointment would be rescheduled by that Wednesday since she was the first on that day's list. But she was not subsequently contacted by USNH to confirm that new appointment date and time.

On August 25, when she abruptly began to have bowel incontinence, she called again to the Naval Hospital asking for the date of her appointment. When she spoke with the Appointment Desk, the scheduler proposed an appointment for August 30. Mrs Rutledge insisted that the appointment be sooner and by her insistence she was finally given an appointment for Friday, August 27.

On August 27, she was examined and interviewed at the U.S. Naval Hospital by Orthopedic Surgeon Duncan. This was in the mid morning. He examined her in detail, placed a catheter into her bladder and found large residual urine.

He recognized the urgency of her medical condition and immediately contacted the Chief of Surgical Staff at Tripler Hospital in Honolulu Hawaii to arrange emergency medical evacuation for decompression of the spine that same day.

She left Guam that evening on a MEDIVAC flight, reached Tripler Hospital, and immediately had an emergency MRI which showed a herniated disk and compression of the cauda equina that accounted for her progressive symptomatology.

That same day, August 27 at Tripler Hospital, Dr. Orchowski performed a decompression laminectomy and diskectomy at L5-S1.

She tolerated that procedure well and her hospital course of five days was uncomplicated.

During the recovery phase, she ambulated using a walker. She was to have begun physiotherapy while still at Tripler Hospital but this was deferred until October when she returned to Guam. It was conducted at the U.S. Naval Hospital three times a week.

She inquired about the whereabouts of her medical records on her return, but was told that those from Andersen Air Force Base had been "lost".

In October 2004, she and her husband filed a complaint with the Patient Advocacy Office at Andersen Air Force Base. They have since been told that an internal investigation was conducted, but the report is confidential and they do not have access to it.

The AAFB medical records were subsequently found and have been made available to her.

In the summer of 2005 when attending the AAFB Health and Wellness Clinic, she was recognized by Captain Rau. He took her aside and privately apologized for his "misdiagnosis".

## CURRENT STATUS

She has a number of symptoms relating to residual and persisting neurological disabilities. Because it is now almost 2 years since their occurrence, it is likely they will persist and will not alter.

**Bowel Symptoms**: Bowel dysfunction is a major concern, inconvenience, disability.

She has no rectal or anal sensation, but she knows she will need to have a bowel evacuation when she experiences "deep cramps in the abdomen". It takes from 5 to 60 minutes for her to complete an evacuation and she is unaware of passage of stool. Sometimes the stool is loose and on other occasions, it is formed. Often, there is persistent fecal material after the movement, and she needs to use many wipes to clean herself. She is having 1-3 bowel movements per day and, as yet, she has not been able to establish a regular routine for bowel evacuation.

She now eats foods with high fiber content and bulk to promote a formed stool. She notes that she is prone to constipation. She is also trying to drink larger amounts of fluid each day and estimates now she takes at least six glasses of fluid each day which includes sodas, water, milk, cranberry juice, and hot tea.

The inconvenience of her bowel dysfunction is considerable and, by example, when she and her husband were here in New York City last evening, on two occasions she experienced abdominal cramps and they had to stop what they were doing and return to their hotel room so she could have a bowel evacuation. On both occasions, the stool was loose and each of the movements took 15-20 minutes. She observes "it takes a lot of time out of my day".

**Bladder Function**: She says "my bladder is messed up".

She knows she needs to void when she experiences "a weird sensation" in the abdomen. She has no urethral sensation and she knows she is voiding only because of the sound of the urine in the bowl. She knows she has finished voiding when she stops hearing the sound of her urine in the bowl. She needs to tighten her stomach muscles to void. She usually voids twice in an hour and each time requires 5-10 minutes though she may sit and wait for up to 15 minutes to complete and empty the bladder. Sometimes she will immediately need to void again. She is attempting to train herself so that she voids less frequently. She is sometimes incontinent of urine when she strains. By example when she vomited yesterday, she had urinary incontinence as she retched.

She wears pads to keep her dry and for the accidents which occur with both bowel and bladder accidents from incontinence.

**Sexual Function**:

Prior to this incident, she and her husband enjoyed an active sexual life with normal and satisfying intercourse 2-4 times a week. But since the illness, she has no vaginal sensation, and they have intercourse no more often than once every 3-4 months.

**Paraparesis:**
Both of her legs are weak and she has particular difficulty in lifting them at the hip. She does exercises and stretches for an hour each day and also uses a treadmill and a recumbent bicycle for additional exercises. Therapists had emphasized how important it is for her to remain active and she is following their advice conscientiously. But despite her activity program, she has had limited recovery. She does feel her gait has improved by perhaps as much as 25% and she now no longer sways as she did before.

She is able to walk independently and without an assistive device, but she has difficulty in getting up because of proximal weakness of the hips and proximal leg muscles.

She and her husband say that she walks now like someone who is pregnant so that her legs are far apart and her stomach protrudes.

**Sensory Symptoms:**
Her most prominent and distressing symptom is the sensory abnormality of the legs and neuropathic pain that she has experienced since August 2004. She describes it as a burning pain like a "hot poker". At times it affects her feet and prevents her walking because the pressure of walking worsens it. It affects the backs of her thighs, it can occur in the vagina, and it may also occur in the rectum. At times the pain is very sharp and knife-like. The pain occurs spontaneously anywhere and at any time though it may worsen with activity. It is more prominent when she is fatigued. It usually is of brief duration and it occurs several times each day. She has been given Neurontin (i.e. gabapentin] to mitigate this symptom. Though she is now taking a high dose of 1500 mg, this has had little benefit. The last neurologist she saw said the dose might need to be increased further. However, its use is associated with the significant side effect of nausea.

**Other symptoms**
She makes a number of other observations about her limitations and disabilities which include:
(1) She must squat to pick things up from the floor and she is unable to bend over. She now needs to use a "grabber" as an assistive device for reaching. She has difficulty in tying her shoes and her husband often needs to help her with this. She has loss in flexibility, particularly of the trunk and of the proximal leg muscles. She uses a cane occasionally when she is tired but she does not need a walker. She and her husband have recently bought a truck because it is more comfortable for her to ride in than a car, which is low for her and difficult to enter.

(2) She is unable to sit or to stand for long periods and she cannot lift weights of more than 10 lbs. She is unable to drive a car because of her motor disability with the legs and also because of difficulty in turning to see behind. She is also groggy as a result of all the medications that she remains on.

(3) She is continuing to have pain in the back and in the hips. Her husband also emphasizes and re-emphasizes the considerable pain that she has in her feet which keeps her from walking.

(4) Her normal weight was between 155 and 160 before August 2004. By four months after the surgery it had risen to 180 lbs. Since then, she has struggled to reduce her weight and it is currently 169 lbs. She maintains an active program of exercises as described above but she is not dieting at the present.

## Medications and management

She experiences constant discomfort and pain in the hips. This has been since the time of the neurologic illness. In April 2006, the hips were injected with steroid but this only worsened the pain in the left hip and did not improve it on the right so she has not returned to have that procedure repeated.

The muscles of her legs are "tight" and she is on several medications to reduce that and prevent the pain and sensory disturbance that come from that. Her medications include Flexeril twice a day to relieve muscle spasm and cramps in the calves, Neurontin [gabapentin] 1500 mg each evening for neuropathic pain, Ultram for analgesia, and Elavil 50 mg each night as a hypnotic for sleeping. But she experiences nausea as a side effect of gabapentin and insomnia as a side effect of ultram.

She takes her medications in the evening. They are extremely toxic to her and they cause her to be dizzy, to be groggy, and to feel off balance. She usually takes them about 11 o'clock in the evening but she is unable to sleep until 2 or 3 o'clock in the morning. Thereafter, when she does sleep, she rouses readily when she hears the least noise. She wakens when her husband gets up to work in the morning. They speak together and then she returns to sleep, awakening again about 9 in the morning. She sometimes stays in bed until 10:30 when she feels well enough to be rested and to get up. She does not feel entirely herself until about noon when the effects of the medications have worn off.

## NEUROLOGICAL EXAMINATION

On examination, she is an alert, very pleasant, middle aged woman who gives her history in a clear and consistent fashion. She has a fine spirit and attitude, and there is no overt disorder in mood or indication of significant depression or anxiety.

External ocular movement is full. There is no facial asymmetry or weakness. Her hearing is normal. Speech and articulation are normal. The tongue protrudes in the midline and the tongue rises centrally. There is no weakness of the neck muscles. Tone, power, and coordination of the upper limbs are normal. The deep tendon reflexes are symmetrical and sensation is normal for all modalities.

She has a linear midline incision over the lower lumbar and upper sacral vertebra at the site of Lumbar 5 and Sacral 1 laminectomy and diskectomy in August 2004. It is well healed.

She sits preferring to be slightly to one or other side. She often needs to shift her position to find one of comfort. There is considerable restless movement of the legs. She needs to move her legs because of constant feeling of discomfort and cramping in the legs and calves. This movement causes them to be more comfortable and the condition has been diagnosed as "restless legs". She has been given Requip in an attempt to improve the movement, but it was not beneficial and is now discontinued. It was also felt that Elavil might be helpful to relieve the movement but hat too has not helped.

As she gets up from sitting, she leans to one side and pushes herself up with her hands. She walks slowly but with certainty. She exhibits proximal weakness of the hips and muscles of both legs but distal power is well maintained in dorsi and plantar flexion at the ankles. She has considerable discomfort when the legs are straightened at the knees, or extended and raised at the hips. She is very sensitive to these maneuvers which are painful to her.

The knee reflexes are both brisk as is the right ankle jerk, but the left ankle jerk is absent even with reinforcement. The plantar response is bilaterally flexor.

Tests of sensation including pinprick, temperature, and light touch are impaired in the sacral regions from S-1 in the feet to S-5 in the perianal region. She does have feeling in those regions but it is diminished by contrast with levels above L-5.

Vibration and position sense at the great toes is normal.

## DISABILITY RATINGS BY AMA GUIDELINES

We have looked at the AMA Guidelines for disability together and I explained them to her.

I gave her the guidelines that are relevant to her disabilities, she will write an account of her symptoms, and from them I will determine the AMA level of severity for each disability. I will then come up with a total impairment of the whole person by these national guidelines.

## OVERALL SUMMARY AND CONCLUSIONS

Two years ago, this 45-year-old dependent wife of an active duty Air Force Master Sergeant suffered a cauda equina syndrome which was delayed in diagnosis and treatment. She now suffers persisting and serious disabilities in consequences of nerve root compression from a herniated disk at L5-S1.

Her residual symptoms include bowel and bladder dysfunction, sexual dysfunction, severe neuropathic pain, and motor dysfunction with paraparesis.

Despite a vigorous program of physiotherapy, she has had little recovery in function nor would further recovery be anticipated given that it is now 21 months since the incident.

Her disability by AMA Guidelines is between 76 and 97% impairment of the whole person.

At the end of this examination, I took video photographs to document her neurological examination. This consultation was dictated with us all together after the interview and the examination.

I have provided the AMA Guidelines for her disabilities and she will describe her symptoms in each category so I can calculate a precise overall disability score for impairment of the whole person. I will also send her this report to review and correct so I am certain it is comprehensive, and accurate, and reflects exactly what occurred and what she is now experiencing.

I will discuss my evaluation and the further help I can provide to you when I return to Guam later this month.

Yours sincerely,

John C. Steele, M.D., FACP(C)

July 26, 2006

## ADDENDUM 1:
## REVIEW OF CONSULTATION BY DEBORAH RUTLEDGE AND HER DISABILITY RATING BY AMA GUIDELINES

Mrs Rutledge has read my consultation report and sent me suggestions for change. I agree with these and have made corrections so the report is now entirely accurate.

After my examination on June 2, 2006 in New York City, I provided her with the American Medical Association (AMA) Guidelines for the five categories of disability she suffers. I asked that she provide written comment about her symptoms of disability in each category. Based on her assessments and my evaluation, this addendum provides a rating of her overall disability from the 5th Edition (2002) of AMA guidelines for the evaluation of permanent disability.

The five categories of Deborah Rutledge's disability.

1. Criteria for rating impairments due to station and gait disorders [Table 13-15, Page 336].

There are four classes of impairment.

**Table 13-15** Criteria for Rating Impairments Due to Station and Gait Disorders

| Class 1<br>1%-9% Impairment of the<br>Whole Person | Class 2<br>10%-19% Impairment of the<br>Whole Person | Class 3<br>20%-39% Impairment of the<br>Whole Person | Class 4<br>40%-60% Impairment of the<br>Whole Person |
|---|---|---|---|
| Rises to standing position; walks, but has difficulty with elevations, grades, stairs, deep chairs, and long distances | Rises to standing position; walks some distance with difficulty and without assistance, but is limited to level surfaces | Rises and maintains standing position with difficulty; cannot walk without assistance | Cannot stand without help, mechanical support, and/or an assistive device |

Mrs. Rutledge writes "I can walk by myself; however, if I stand up or walk too long, my feet and hips will begin to hurt. I have difficulty with stairs, distances, deep chairs, and elevations. I walk with a wide gait and occasionally I limp due to pain".

She rates her disability between Class 1 and 2. The range of impairment between 1 and 19%.

2. Criteria for rating neurological impairment of the bladder [Table 13-19, Page 341].

There are four classes of impairment in this category.

**Table 13-19** Criteria for Rating Neurologic Impairment of the Bladder

| Class 1<br>1%-9% Impairment of the<br>Whole Person | Class 2<br>10%-24% Impairment of the<br>Whole Person | Class 3<br>25%-39% Impairment of the<br>Whole Person | Class 4<br>40%-60% Impairment of the<br>Whole Person |
|---|---|---|---|
| Individual has some degree of voluntary control but is impaired by urgency or intermittent incontinence | Individual has good bladder reflex activity, limited capacity, and intermittent emptying without voluntary control | Individual has poor bladder reflex activity, intermittent dribbling, and no voluntary control | Individual has no reflex or voluntary control of bladder |

Mrs. Rutledge writes "I have difficulty emptying my bladder. There is no feeling when I void so I go by the sound of it (her urine) hitting the water. I need to concentrate to start the flow and really squeeze my stomach muscles to keep it going. However, it usually takes a lot of stop and go to make sure I've emptied my bladder fully. [In New York, I was sick and vomiting and at the same time voiding on myself with no control during stress]".

She rates her impairment between Class 2 and Class 3. The range of impairment is between 10 and 39%.

3. Criteria for rating neurological anorectal impairment [Table 13-20, Page 342].

There are three classes of impairment in this category.

**Table 13-20** Criteria for Rating Neurologic Anorectal Impairment

| Class 1<br>1%-19% Impairment of the<br>Whole Person | Class 2<br>20%-39% Impairment of the<br>Whole Person | Class 3<br>40%-50% Impairment of the<br>Whole Person |
|---|---|---|
| Individual has reflex regulation but only limited voluntary control | Individual has reflex regulation but no voluntary control | Individual has no reflex regulation or voluntary control |

Mrs. Rutledge writes "I can't tell if I have to go or if I'm finished. I know I need to go when I start having abdominal cramps. I never know when I have finished so I always use wipes to clean myself up. I have no regular routine. I'm often constipated."

She rates her impairment of function between Class 2 and 3. The range of impairment is between 20 and 50%.

4. Criteria for rating neurologic sexual impairment [Table 13-21, Page 342].

There are three classes of impairment in this category.

**Table 13-21** Criteria for Rating Neurologic Sexual Impairment

| Class 1<br>1%-9% Impairment of the<br>Whole Person | Class 2<br>10%-19% Impairment of the<br>Whole Person | Class 3<br>20% Impairment of the<br>Whole Person |
|---|---|---|
| Sexual functioning is possible, but with difficulty of erection or ejaculation in men or lack of awareness, excitement, or lubrication in either sex | Reflex sexual functioning is possible, but there is no awareness | No sexual functioning |

Mrs. Rutledge writes "My husband I have sex about once every four months. This is because I have no feeling. I do not feel anything during the sexual act."

She rates her impairment as Class 2. The range of impairment is between 10 and 19%.

5. Classification and procedure for determining impairment due to pain or sensory deficit resulting from peripheral nerve disorders [Table 13-23, Page 346].

There are six classes of impairment in this category.

**Table 13-23** Classification and Procedure for Determining Impairment Due to Pain or
Sensory Deficit Resulting From Peripheral Nerve Disorders

| Classification | | | |
|---|---|---|---|
| **Class 1**<br>**0% Sensory Impairment** | **Class 2**<br>**1%-10% Sensory Impairment** | **Class 3**<br>**11%-25% Sensory Impairment** | **Class 4**<br>**26%-60% Sensory Impairment** |
| No loss of sensation, abnormal sensation, or pain | Normal sensation except for pain, or decreased sensation with or without pain, forgotten during activity | Normal sensation except for pain, or decreased sensation with or without pain, present during activity | Decreased sensation with or without pain, interfering with activity |

| **Class 5**<br>**61%-80% Sensory Impairment** | **Class 6**<br>**81%-95% Sensory Impairment** |
|---|---|
| Decreased sensation with or without pain or minor causalgia that may prevent activity | Decreased sensation with severe pain or major causalgia that pre-vents activity |

Mrs. Rutledge writes "I can be doing something when all of a sudden I get a burning sensation like a hot poker which stops whatever I am doing and I never know where or when they will appear [very painful]. There is always some pain.

I have decreased feeling down the back of my legs. There is no feeling in my vaginal area and my butt feels like dead weight. I am limited to what I can lift. My hips and feet hurt to where I limit my activities and prefer to stay home."

She ranks her disability in this category as Class 5. The range in disability rating is 61 to 80%.

**COMMENT AND CONCLUSIONS**
I have compared her assessments and evaluations of disability with the information I obtained by history and physical examination. I entirely agree with her assessment and rating of disability in each category.

By these assessments, her total minimal disability score is 102% and the maximum disability score is 207%.

The AMA Guidelines combine the individual values to give an overall value of percent impairment of the whole person. By the conversion scale [Pages 604 to 606]; she suffers 76 to 96 % whole body impairment.

Her disabilities and the AMA rating of them are not likely to improve in years ahead and should be considered as permanent.

I will be pleased to discuss these values further with you so we agree that the estimates and range are correct and appropriate for her overall disability.

Yours sincerely,

**John C. Steele, M.D., FRCP(C)**

## JOHN C. STEELE, M.D., F.R.C.P. (C)
## NEUROLOGIST
## FELLOW AMERICAN COLLEGE OF PHYSICIANS

## BIOGRAPHICAL SKETCH

DATE OF BIRTH: September 3 1934
BIRTHPLACE: Toronto, Canada
CITIZENSHIP: Canadian (by birth)
        American (by naturalization, 1997)

EDUCATION:

University of Toronto (medical school), Toronto, Canada 1952-59
University of Toronto (postgraduate training) 1959-66
Queen Square, U.K. and Marseille, France 1966-67
University of London, U.K. 1977-78

RECEIVED

[OCT 18 2006

LAW OFFICE OF
ROBERT L. KEOGH

| YEAR | FIELD OF STUDY | DEGREE |
|------|----------------|--------|
| 1959 | Medicine | M.D. |
| 1965 | Neurology/Neuropathology | F.R.C.P. (C) |
| 1978 | Tropical Medicine | M.Sc. |

CERTIFICATION and LICENSURE

1959     L.M.C.C.
1983     FLEX
Licenses to practice Medicine in
        Territory of Guam (current #M-950: granted 1989)
        CNMI (current #0180: granted 1995)
        Hawaii (current #4808: granted 1983)
        New York (#154277-1 granted in 1983, inactive since 1985)
        Ontario (#17828 granted in 1959, inactive since 1985)

OFFICE: SKILLED NURSING FACILITY: GUAM MEMORIAL HOSPITAL
Barrigada Heights, GUAM 96911
TEL (671) 633-1800 FAX 633-1828
Email <jsteele@ite.net>

## MEMBERSHIPS and AFFILIATIONS

GMH STAFF PHYSICIAN (NEUROLOGY), DEPARTMENT OF MEDICINE, 1988

COURTESY STAFF, US Naval Regional Medical Center

CONSULTANT NEUROLOGIST, Family Health Plan, 1988

MEDICAL CONSULTANT, GOG Retirement Fund, 2000

CLINICAL PROFESSOR OF MEDICINE, Division of NEUROLOGY, John A. Burns School of Medicine, Honolulu, Hawaii, 1978

FELLOW, Royal College of Physicians and Surgeons of Canada, 1965

FELLOW, American Academy of Neurology, 1967

FELLOW, American College of Physicians, 1982

HONORARY CHAIRMAN, Society for Progressive Supranuclear Palsy, 1990

MEMBER, Canadian Neurological Society, 1965

MEMBER, Guam Medical Society, 1983

MEMBER, Guam Board of Medical Examiners, 1995

## EXPERIENCE:

GUAM, MARIANA ISLANDS (1983- to present)

| | |
|---|---|
| 1988-now | PHYSICIAN-DIRECTOR, Skilled Nursing Facility,GMH |
| | CONSULTANT NEUROLOGIST, GMH and FHP |
| | COUTESTY STAFF MEMBER, U.S. Naval Regional Medical Center |
| 1983-88 | DIRECTOR, VA Medical Clinic, Guam |
| | CONSULTANT NEUROLOGIST, U.S. Naval Regional Medical Center |

Research positions

| | |
|---|---|
| 1996-now | SCIENTIFIC DIRECTOR, Micronesian Health Study II |
| 1992-96 | SENIOR NEUROLOGIST, Micronesian Health Study I |
| 1990-92 | CORE DIRECTOR, Micronesian Health Study I |
| 1985-90 | PROJECT DIRECTOR, NINCDS Longitudinal Study, Guam |

PONAPE, TTPI (1978-1983)

| | |
|---|---|
| 1978-83 | DIRECTOR EDUCATION AND TRAINING |
| | TTPI Health Manpower and Training Program, |
| | Ponape, Eastern Caroline Islands, Micronesia |
| | CHIEF OF STAFF, Ponape Hospital |

LONDON, UK (1977-1978)

LONDON SCHOOL OF HYGIENE AND TROPICAL MEDICINE (1977-1978)

| | |
|---|---|
| 1977-78 | M.Sc. FELLOWSHIP in Clinical Tropical Medicine |
| | London School of Hygiene and Tropical Medicine (LSHTM) |
| | University of London, U.K. under auspices of the |
| | Canadian International Research and Development Center |

MARSHALL ISLANDS, TTPI (1972-1977)
1972-77     STAFF PHYSICIAN, Majuro Hospital, Majuro, Marshall
            Islands, Micronesia
            CONSULTANT NEUROLOGIST Trust Territory Pacific
            Islands (TTPI) Health Service

TORONTO, CANADA (1968-1972)
THE HOSPITAL FOR SICK CHILDREN
1968-72     PEDIATRIC NEUROLOGIST, Department of Pediatrics
            The Hospital for Sick Children, Toronto, Canada

BANGKOK, THAILAND (1968)
1968        NEUROLOGICAL ADVISOR to the Prasat Neurological
            Hospital and Research Institute, Bangkok, Thailand
            under auspices of the Canadian International
            Development Agency

LONDON, UK AND MARSEILLE, FRANCE (1966-1977)
1966-67     McLAUGHLEN FELLOW, National Hospital
            Neurological Disease, Queen Square, London, U.K.
            and Department of Neurophysiology, Marseille, France

TORONTO, CANADA (1959-1966)
1959-66     POST   GRADUATE   TRAINING   in   INTERNAL   MEDICINE,
            NEUROLOGY, NEUROPATHOLOGY, University of Toronto

updated October 2006

RESIDENCE: 515 Alupang Cove, 241 Condo Lane
Tamuning, Guam 96911
TEL (671) 646-7220

CHRONOLOGICAL LISTING OF PUBLICATIONS

2006
Capparos-Lefebvre D, Steele J, Kotaka Y, Ohta S. Geographic isolates of atypical parkinsonism and tauopathy in the tropics: possible synergy of neurotoxins. Movement Disorders Journal August 2006.

2005
Steele JC. The Parkinsonism-dementia complex of Guam. Movement Disorders Journal March 2005 20 suppl2 S99-107.

Caparros-Lefebvre D, Steele J. Atypical parkinsonism on Guadeloupe, comparison with the parkinsonism-dementia complex of Guam, and environmental toxic hypotheses. Environmental Toxicology and Pharmacology 2005 19 407-413.

2004
Morris HR, Steele JC, Crook R, Wavrant de-Vrieze F, Omstead L, Gwinn-Hardy K, Wood NW, Farrer M, Lees AJ, Siddique T, Hardy J, Perez-Tur J. Genome wide analysis of the parkinsonism-dementia complex of Guam. Arch Neurolo 2004 61 1880-1897.

Murch SJ, Cox PA, Banack SA, Steele JC, Sacks QW. Occurrence of b-methylamino-L-alanine (BMAA) in ALS/PDC patients from Guam. Accepted for publication in Acta Neurol Scand 2004 April.

2002
Steele JC, Caparros-Lefebvre D, Lees AJ, Sacks OW. Progressive supranuclear palsy and its relation to pacific foci of the parkinsonism-dementia complex and Guadeloupean parkinsonism. Parkinsonism and Related Disorders 2002 9 39-54.

2001
Morris HR, Al-Sarrah S, Schwab C, Gwinn-Hardy K, Perez-Tur J, Wood NW, Hardy J, Lees AJ, McGeer PL, Damiel SE, Steele JC. A clinical and pathological study of motor neurone disease on Guam. Brain 2001 124 2215-2222.

1999
Perez-Tur J, Buee L, Morris HR, Waring S, Onstead L, Wavrant-De Vrieze F, Crook R, Buee-Scherrer V, Hof PR, Petersen R, McGeer PL, Delacourte A, Hutton M, Siddique T, Ahlskog JE, Hardy J, Steele JC. The lesion in neurodegenerative diseases of Guam is not in the TAU gene. Neurology 1999 53 411-413.

1998
Schwab, C., Steele, J. C., McGeer, P.L.: Pyramidal neuron loss is

matched by increasing numbers of ghost tangles in Guam parkinson-dementia. Acta Neuropathologica. 1998 96(4) 409-416.

1997
McGeer, P.L., Schwab, C., McGeer, E.G., Haddock, R.L., Steele, J. C.: Familial nature and continuing morbitity of the amyotrophic lateral sclerosis-parkinsonism dementia complex of Guam. Neurology 1997 49 400-409.

Schwab, C., Steele, J. C., McGeer, P.L.: Dystrophic neurites are associated with the majority of early stage extracellular neurofibrillary tangles in parkinsonism-dementia complex of Guam. Acta Neuropathologica 1997 94 486-492.

1996
Schwab C, Steele JC, McGeer PL. Neurofibrillary tangles of Guam parkinsonism-dementia are associated with reactive microglia and complement proteins. Brain Research 1996 707 196-205.

Yasuhara O, Schwab C, Matsuo A, Kim SU, Steele JC, Akiguchi I, Kimura J, McGeer EG, McGeer PL. Midkine-like immunoreactivity in extracellular neurofibrillary tangles in brains of patients with parkinsonism-dementia complex of Guam. Neuroscience Letters 1996 205 107-110.

Schwab C, Steele JC, Akiyama H, McGeer PL Distinct distribution of ApoE and b-amyloid immunoreactivity in the hippocampus of the parkinson-dementia complex of Guam.. Acta Neuropathol 1996 92 378-385.

1995
Schwab C, Steele JC, Akiyama H, McGeer E, McGeer PL. Relationship of amyloid b/A4 protein to the neurofibrillary tangles in Guamanian parkinsonism-dementia. Acta Neuropathol 1995 90 287-298.

Steele JC, Williams DB. Calcium and aluminum in the Chamorro diet: Unlikely causes of Alzheimer-type neurofibrillary degeneration on Guam. Motor Neuron Disease, Biology and Management, eds Swash and Leigh. Springer-Verlag London 1995 189-198.

Steele JC. Alternating hemiplegia of childhood: A historical introduction and an account of the earliest observations. Introductory Chapter in Alternating Hemiplegia of Childhood, eds Vigevano, Aicardi, Andermann. Raven Press 1995 xx1-xx111.

1994
Steele   JC. Historical notes. Progressive supranuclear palsy: Diagnosis, pathology and therapy, eds Tolosa, Duvoisin and Cruz-Sanchez. Journal of Neural Transmission 1994 Supplementum 42 3-14.

1993

Steele JC. Guam seaweed poisoning: Common marine toxins. Micronesica 1993 26 11-18.

Glosser G, Wolfe N, Albert ML, Lavine L, Steele JC, Calne DB, Schoenberg BS. Cross-cultural cognitive examination: Validation of a dementia screening instrument for neuroepidemiological research. JAGS 1993 41 931-939.

Campbell RJ, Steele JC, Cox TA, Loerzel AJ, Belli M, Belli DD, Kurland LT. Pathological findings in the retinal pigment epitheliopathy associated with the amyotrophic lateral sclerosis/parkinsonism-dementia complex of Guam. Ophthalmology 1993 100 1 37-42.

Hanlon SD, Steele JC, An unusual retinal pigment epitheliopathy endemic to the island of Guam. Optometry and Visual Science 1993 70 10 854-859.

1992

Steele JC. Introduction. Chapter 1 Progressive supranuclear palsy: Clinical and research approaches, eds Agid and Litman. Oxford University Press 1992.

Armon C, Kurland LT, Smith G, Steele JC. Sporadic and Western Pacific amyotrophic lateral sclerosis: Epidemiological implications. Chapter 5 in Handbook of ALS, ed Smith. Marcel Dekker NY 1992

1991

Perl DP, Steele JC, Loerzel A, Kurland LT. Amyotrophic lateral sclerosis-parkinsonism dementia complex of Guam as a model of Alzheimer's disease. In Alzheimer's Disease: Basic mechanisms, diagnosis and therapeutic strategies. Edited by K. Iqbal, D. R. C. McLachlan, B. Winblad and H. M. Wisniewski. 1991 John Wiley and Sons Ltd.

Doty RL, Perl DP, Steele JC, Chen KM, Pierce JD, Reyes P, Kurland LT. Odor identification deficit of the parkinsonism-dementia complex of Guam: Equivalence to that of Alzheimer's and idiopathic Parkinson's disease. Neurology 1991 41(Suppl2) 77-81.

Lavine L, Steele JC, Wolfe N, Calne DB, O'Brien PC, Williams DB, Kurland LT, Schoenberg BS. Amyotrophic lateral sclerosis/parkinsonism-dementia complex in southern Guam: Is it disappearing? Chapter 23 Advances in Neurology, Vol 56: Amyotrophic lateral sclerosis and other motor neuron diseases, ed Rowland. Raven Press 1991.

1990

Steele J, Quinata-Guzman T. The Chamorro diet: An unlikely cause of neurofibrillary degeneration on Guam. Chapter 12 Amyotrophic lateral sclerosis:

New advances in toxicology and epidemiology, ed Rose and Norris. Smith-Gordon and Co UK 1990.

Bergeron C, Steele JC. Guam parkinsonism-dementia complex and amyotrophic lateral sclerosis. A clinico-pathological study of seven cases. Chapter 13 Amyotrophic lateral sclerosis: New advances in toxicology and epidemiology, ed Rose and Norris. Smith-Gordon and Co UK 1990.

Perl DP, Steele JC, Purohit D. Amyotrophic lateral sclerosis in a Caucasian mainland US-born long term resident on Guam- a case report including neuropathologic examination. Chapter 14 Amyotrophic lateral sclerosis: New advances in toxicology and epidemiology, ed Rose and Norris. Smith-Gordon and Co UK 1990.

Steele J, Guzman TQ, Driver MG, Zolan W, Heitz LF, Kilmer FH, Parker CM, Standal BR, Pobutsky AM, Crapper McLachlan D. Nutritional factors in ALS on Guam: Observations from Umatac. Chapter in Amyotrophic lateral sclerosis: Current clinical and pathophysiological evidence for differences in etiology, ed Hudson, University of Toronto Press 1990 193-223.

Duncan MW, Steele JC, Kopin IJ, Markey SP. 2-amino-3-(methylamino)-propanoic acid (BMAA) in cycad flour: An unlikely cause of amyotrophic lateral sclerosis and parkinsonism-dementia of Guam. Neurology 1990 40 5 767-772.

Snow BJ, Peppard RF, Guttman M, Okada J, Wayne Martin WR, Steele JC, Eisen A, Carr G, Schoenberg B, Calne D. Positron emission tomographic scanning demonstrates a presynaptic dopaminergic lesion in lytico-bodig: The amyotrophic lateral sclerosis-parkinsonism-dementia complex of Guam. Arch Neurol 1990 47 870-874.

Peppard RF, Martin WRW, Guttman M, Grochoswki E, Okada J, McGeer PL, Carr GD, Phillips AG, Steele JC, Tsui JKC, Calne DB. Cerebral glucose metabolism in Parkinson's disease and the PD complex of Guam. Chapter 53 445-452.


1989
Cox T, McDarby J, Lavine L, Steele J, Calne D. A retinopathy on Guam with high prevalence in lytico-bodig. Ophthalmology 1989 96 12 1731-1735.

Steele JC, Ballendorf DA. Federico: A health hazard? Guam and Micronesia 1989 2 4-11.

Crapper McLachlan D, McLachlan C, Krishnan B, Krishnan S, Dalton A, Steele J. Aluminum and calcium in Guam, Palau and Jamaica: Implications for

amyotrophic lateral sclerosis and parkinsonism-dementia syndromes on Guam. Environmental Geochemistry and Health 1989 112 45-53.

1988
Lepore F, Steele J, Cox T, Tillson G, Calne D, Duvoisin R. Supranuclear disturbances of ocular mobility in lytico-bodig. Neurology 1988 38 1849-53.

1987
Steele J, Guzman T. Amyotrophic lateral sclerosis and parkinsonism-dementia in Guam: An Update. Recent developments in Parkinson's disease Volume II eds Fahn, Marsden, Calne, Goldstein, Macmillan Health Care Information 1987 53-57.

Steele J, Guzman T. Observations about amyotrophic lateral sclerosis and the parkinsonism-dementia complex of Guam with regard to epidemiology and etiology. Can J Neurol Sci 1987 14 3 (supplement)358-362.

1984
Steele J. Micronesia: Health status and neurological diseases. Amyotrophic lateral sclerosis in Asia and Oceania, eds Chen and Yase, National Taiwan University 1984 173-183.

1983
Steele J. Medical diseases of the American Pacific. Office of the Dean, University of Hawaii Medical School 1983 1-217.

PUBLISHED ABSTRACTS

Schwab, C., Steele, J. C., Schulzer, M., McGeer, P.L.: On the possible lifetime of a tangled neuron in the Parkinson dementia complex of Guam. Sixth International Conference on Alzheimer's Disease and Related Disorders. 18-23 July, 1998 Amsterdam, The Netherlands.

Schwab, C., Steele, J. C., McGeer, P.L.: Pyramidal neuron loss is
matched by increasing numbers of ghost tangles in Parkinson dementia of Guam. Soc. Neuroscience Abstracts 1997 Vol. 23/2 640.12.

Schwab, C., McGeer, P.L., Steele, J.: Tangle associated amyloid deposits in Parkinson Dementia ALS complex of Guam. Soc. Neuroscience Abstracts 1995 Vol. 21/1 199.10.

SELECTED REFERENCES PRIOR TO 1983

Steele J. Progressive supranuclear palsy. Handbook of Clinical Neurology, eds Vinken and Bruyn 1975 22 217-229.

Steele J. Progressive supranuclear palsy. Brain 1972 95 693-704.

Steele JC, Richardson JC, Olszewski J. Progressive supranuclear palsy; A heterogeneous degeneration involving the brain stem, basal ganglia and cerebellum with vertical gaze and pseudobulbar palsy, nuchal dystonia and dementia. Arch Neurol 1964 10 333-359.

## ADDITINAL REFERENCES

Watson P, Steele JC. Paroxysmal dysequilibrium in the migraine syndrome of childhood. Arch Otolaryngol 1974 99 177-179.

Hachinski VC, Porchawka J, Steele JC. Visual symptoms in the migraine syndrome. Neurology 1973 23 570-579.

Steele JC, Gladstone RM, Thanasophon S, Fleming PC. Mycoplasma pneumoniae as a determinant of the Guillain-Barre syndrome. Lancet 1972 II 710-714.

Steele JC, Gladstone RM, Thanasophon S, Fleming PC. Acute cerebellar ataxia and concomitant infection with Mycoplasma pneumoniae. J Pediatr 1972 80 467-469.

Verret S, Steele JC. Alternating hemiplegia in childhood: A report of eight patients with complicated migraine beginning in infancy. Pediatrics 1971 47 675-680.

Steele JC, Vasuvat A. Recurrent multiple cranial nerve palsies: A distinctive syndrome of cranial polyneuropathy. J Neurol Neurosurg Psychiat 1970 33 828-832.

EXHIBIT "G"

US Attorney's Office
District of Guam & NMI

JUL 24 2007  4:10p

Time _____
Receiving name _____
Date keyed in Dbase _____
Entered into Dbase by: _____

1

LAW OFFICE OF
**ROBERT L. KEOGH**
POST OFFICE BOX GZ
HAGÁTÑA, GUAM 96932
TELEPHONE (671) 472-6895

2

3

4

5  Attorneys for Plaintiffs

6

7                    **IN THE DISTRICT COURT OF GUAM**

8  **DEBORAH K. RUTLEDGE and THOMAS**       **CIVIL CASE NO. CIV06-00008**
   **R. RUTLEDGE,**

9                       Plaintiffs,

10        vs.                                **PLAINTIFFS' RULE 26(a)(2)**
                                             **DISCLOSURE OF EXPERT TESTIMONY**

11  **UNITED STATES OF AMERICA,**

12                       Defendant.

13

14       Pursuant to the requirements of Rule 26(a)(2) of the Federal

15  Rules of Civil Procedure, plaintiffs hereby disclose their expert

16  testimony by submitting herewith the following documents:

17

18       1.    Supplemental Expert Report of Dr. John Steele.  Dr.

19             Steele's Curriculum Vitae was provided with the initial

20             report on October 19, 2006.  Dr. Steele has charged his

21             time for preparation of this report at $300.00 per hour.

22             There have been no new occasions of testimony at trials

23             or depositions since the prior submission in October,

24             2006.

25                                    **LAW OFFICE OF ROBERT L. KEOGH**
                                      Attorneys for Plaintiffs
26

27  DATE:  _7/24/07_          By: _____
                                      **ROBERT L. KEOGH**
28

# JOHN C. STEELE, M.D., FACP(C)

NEUROLOGIST
FELLOW, AMERICAN COLLEGE OF PHYSICIANS

Office Tel/Fax: (671) 633-1828

July 23, 2007

Robert L. Keogh
Suite 105, Angela Flores Bldg.
243 Martyr Street
Hagatna, Guam 96910

Dear Attorney Keogh:

## MEDICAL-LEGAL CONSULTATION

**Patient:**  Rutledge, Deborah K.
**DOB:**  December 29, 1960

As you recently requested, I am submitting this supplemental report which provides my opinions to a reasonable degree of medical certainty about the disabilities Mrs. Rutledge is likely to have suffered had she been correctly diagnosed and appropriately treated when she sought care at the Anderson Air Force Base Medical Clinic on July 27, August 2, and 17, 2004.

Consultation with an M.D. physician was not achieved until August 27, by which time she had a full blown cauda equina syndrome with urinary retention, bowel incontinence, pain and leg weakness. Despite immediate diagnosis and emergency decompression then, her nerve damage did not reverse and she remains permanently and totally disabled by guidelines of the American Medical Association.

In preparing this supplemental report I have reviewed and relied upon the following:

1.   Deposition transcript of Deborah K. Rutledge.
2.   Personal examination and interview with Deborah Rutledge.
3.   Deposition transcript of Natalie Y. Giscombe.
4.   Deposition transcript of Steven D. Rau.
5.   Deposition transcripts of Douglas Duncan.
6.   Report and attachments of Dr. Meriwether.
7.   Medical records of Deborah Rutledge from Andersen Air Force Base Clinic, Guam Naval Hospital, Tripler Army Hospital, Hawaii, NNMC Bethesda Maryland and private consultations in Oklahoma from July, 2004 until May, 2007.

PROGNOSIS HAD HER CONDITION BEEN CORRECTLY DIAGNOSED JULY 27, 2004

HISTORY

In April 2004, because she had gained weight, she began a program of exercise classes at Andersen Air Force Base. These were conducted three times a week and involved weight lifting, squats, and lunges. She continued those classes during April and May. She had no symptoms during them, and she does not recall any incident of strain or injury.

Because her family was visiting, she stopped attending the exercise classes in May.

In the third week of July 2004, she began to experience mild low back pain. This was the first time she had experienced such discomfort and its onset was spontaneous. She applied thermal pads in the area of discomfort, and these improved her pain.

7 to 10 days after this discomfort began, on July 27, she awoke that morning unable to feel the right side of her labia and vagina. She describes the change as a heavy and dead feeling. She also experienced an urgency to void that same morning. There was no alteration in her back pain and no other symptomatology at that time.

Recognizing the newness and potential seriousness of these symptoms, she called the Andersen Air Force Base Medical Clinic Appointment Desk that same morning to request an appointment. She asked that she be examined by a physician. Initially the Appointment Desk scheduler was reluctant to give her an appointment and it was necessary that she insist she be seen that day. That afternoon she was examined by Major Giscombe at the Andersen Air Force Base Clinic. Her appointment was for about 15 minutes.

Major Giscombe tested her walking and also the range in movement of her hips [i.e. straight leg raising]. She did not examine her in other ways nor did she test her sensation in the genital region or in the legs. She told Mrs. Rutledge she had a "pinched nerve". Because her symptoms seemed unusual, Mrs. Rutledge asked if she was entirely certain of this diagnosis. Major Giscombe assured her she was quite certain of it. She prescribed Naproxen, Flexeril, and Vicodin. No x-rays or other tests were recommended or felt to be necessary. She was sent home to take these medications. She was not given a return appointment by Major Giscombe, and no instruction was given regarding follow-up or symptoms she should look for and report.

OPINION

Although her symptom of back pain was minor and her range in back movement and straight leg raising were not impaired, she gave alarming symptoms of unilateral genital sensory impairment and altered urination which should have alerted the nurse practitioner and led to a referral to a physician for further evaluation.

Had she had x-rays of the back and an MRI on Guam at that time, the herniated L5-S1 disc would have been identified and promptly operated on at an off island neurosurgical center.

It is unlikely she would have had any permanent disability.

2

PROGNOSIS HAD HER CONDITION BEEN CORRECTLY DIAGNOSED AUGUST 2, 2004, 6 DAYS LATER

## HISTORY

During the next several days, her sensory symptoms progressed and worsened. She began to experience a "weird" feeling down the backs of both legs and into the feet. She had increasing difficulty in voiding and emptying her bladder. She needed to press firmly on the lower abdomen to express her urine. But despite abdominal pressure, she was able to express only a small amount of urine and it usually dribbled. She also began to experience numbness of the left labia, as had begun on the right, and her walking and gait were less certain so she was off balance.

On August 2, 6 days after her first medical examination, and because of her steadily worsening symptoms, she phoned the Appointment Desk at Andersen Air Force Base to ask that she be seen again. She is quite certain she specified that she wished to be examined by an M.D. physician. Again, the Appointment Desk scheduler attempted to postpone an appointment for a week, and it was again only by her insistence that she was seen later that day by Captain Rau. He wore an identification tag that indicated he was a Captain, but it did not indicate his medical qualification. Mrs. Rutledge assumed, as she had also assumed with Major Giscombe that both were MD physicians.

This was her first contact with medical practitioners at the Anderson Air Force Base Clinic. When she had previously been cared for in other Air Force Clinics, the practitioners had been MD physicians. But this was not the case at AAFB though it was only much later that she came to know that Major Giscombe and Captain Rau were actually Nurse Practitioner/Physician Assistants, and not MDs.

Captain Rau listened to the symptoms that Mrs. Rutledge related. She emphasized they were progressing and worsening. He ordered x-rays of the spine which were taken immediately. He looked at them in her presence and remarked "it looks like there is something there". But he then said to her that it was not something that affected her lower back nor did he think it was relative to her symptoms. He concluded by saying he would refer her to the Physiotherapy Department at U.S. Naval Hospital and that he would send the x-rays to the Naval Hospital to be interpreted. He said this would take 10-12 days for him to receive this radiological report.

She left that appointment understanding that Captain Rau would report the result of the x-rays to her and that he would make an appointment with the Physiotherapy Department at the Naval Hospital. He advised that she continue the medication she was already taking and he also added Diazepam. He confirmed the earlier diagnosis by Major Giscombe of a "pinched nerve" and he did this repeatedly on three occasions when Mrs. Rutledge questioned him about his certainty of that.

## OPINION

After only 6 days and by August 2 her symptoms had dramatically worsened. Her voiding was more difficult, sensory impairment was now bilateral, and her walking was impaired. An x-ray of the back was taken by Physician Assistant Rau but he did not immediately review it with a physician, or arrange for its emergency reporting by a radiologist.

3

The finding of the radiologist was degenerative disc disease at L5-S1 and specifically stated "given the patient's symptoms, MRI of the lumbar spine is suggested for further evaluation."

Had the x-ray been evaluated by either, and correlated with her advancing symptoms, an immediate MRI would have been recommended and could have been promptly performed. It would have shown the L5-S1 disc herniation and led to urgent arrangements for its removal.

Although her symptoms were steadily advancing, and now included prominent urinary dysfunction, bilateral loss of genital sensation and gait instability, there is a reasonable degree of medical certainty that she would have had only minor urinary symptoms, if the diagnosis of cauda equina syndrome had been recognized at this second examination and the compression relieved.

PROGNOSIS HAD HER CONDITION BEEN CORRECTLY DIAGNOSED AUGUST 17, 2004

HISTORY

At the August 2nd meeting, Captain Rau did not arrange a follow-up visit with her. He did not ask that she contact him if her symptoms continued to advance or alter.

She continued to have numbness of her legs which was often painful despite her multiple medications, and to experience difficulty in voiding.

On August 17 because of continuing ill health and symptomatology, she phoned yet again to the Appointment Desk asking for a referral to the U.S. Naval Hospital for another medical opinion.

Though her request was to be assessed at Navy Hospital, she was seen that day by Major Giscombe at the AAFB Clinic because it was necessary that a staff member there make her referral to the Navy facility.

Major Giscombe explained to Mrs. Rutledge that it looked like she had a herniated disc which was seen on the x-ray of August 2. Though Captain Rau had assured Mrs. Rutledge that he would let her know the result of that x-ray and arrange a physiotherapy appointment for her, he had not followed up with her and neither he nor the Appointment Desk had ever contacted her about either matter. So August 17 was the first time Mrs. Rutledge learned of that radiological abnormality and diagnosis. Major Giscombe read the x-ray report from the computer screen and though we now know the report recommended an MRI study, Major Giscombe made no mention of that recommendation to Mrs. Rutledge.

Mrs. Rutledge emphasized to Major Giscombe that she felt "something is seriously wrong with me" and insisted that she be referred to the Naval Hospital for another opinion. In response, Major Giscombe typed up a referral form on the computer. Mrs. Rutledge subsequently has learned that this referral was for routine consultation rather than urgent consultation as she requested.

4

Mrs. Rutledge was having more back pain now than previously and Major Giscombe added Vioxx for pain management.

She was sent home to await the Navy Hospital consultation.

OPINION

During the 15 days after August 2, painful numbness of both legs and difficulty in urinating became worse. August 17th Nurse Practitioner Giscombe knew of the X-ray report of the back and its recommendation of an MRI. Had she or an AAFB physician requested that the recommended MRI to be done, the L5-S1 disc herniation would have been identified. Though the disc would have been larger at this time, there is a reasonable degree of medical certainty that its removal and the relief of pressure on the nerves of the cauda equina, even then, would have likely resulted in a good return of function without significant disability. The pain and numbness of the legs are likely to have completely resolved. And although she might have suffered residual symptoms of urinary retention and overflow incontinence, she would not have had bowel incontinence, and is unlikely to have had significant leg weakness, gait abnormality, or painful paraesthesiae.

PROGNOSIS ONCE SHE DEVELOPED BOWEL INCONTINENCE AUGUST 25, 2004

HISTORY

On August 20, she was called by the U.S. Naval Hospital and given an appointment for consultation on August 23. However, on August 22, she was called again and that appointment was postponed because of closure of USNH Clinics due to a threatening typhoon. She was assured the appointment would be rescheduled by that Wednesday since she was the first on that day's list. But she was not subsequently contacted by USNH to confirm that new appointment date and time.

On August 25, when she abruptly began to have bowel incontinence, she called again to the Naval Hospital asking for the date of her appointment. When she spoke with the Appointment Desk, the scheduler proposed an appointment for August 30. Mrs. Rutledge insisted that the appointment be sooner and by her insistence she was finally given an appointment for Friday, August 27.

On August 27, she was examined and interviewed at the U.S. Naval Hospital by Orthopedic Surgeon Duncan. This was in the mid morning. He examined her in detail, placed a catheter into her bladder and found a large amount of residual urine.

He recognized the urgency of her medical condition and immediately contacted the Chief of Surgical Staff at Tripler Hospital in Honolulu, Hawaii to arrange emergency medical evacuation for decompression of the spine that same day.

She left Guam that evening on a MEDIVAC flight, reached Tripler Hospital, and immediately had an emergency MRI which showed a herniated disc and compression of the cauda equina that accounted for her progressive symptomatology.

5

That same day, August 27 at Tripler Hospital, Dr. Orchowski performed a decompression laminectomy and diskectomy at L5-S1.

OPINION

Her crucial symptom which indicated irreversible damage to the cauda equina and the likelihood of permanent disability occurred on August 25th when she became incontinent of bowel. This sentinel symptom occurred 8 days after her final visit at the Anderson Air Force Medical Clinic and while she was awaiting orthopedic consultation at the US Naval Hospital.

Had she been seen by Orthopedic Surgeon Duncan before August 25, it is highly likely he would have identified the correct diagnosis and intervened urgently as he did August 27th. Her residual symptoms might still have been minimal.

But by the time he saw her, 2 days after the onset of bowel incontinence with a lax rectal sphincter and urinary retention, irreversible damage had occurred to the nerves of the cauda equina.

Her situation is unlikely to alter, and she will always suffer painful paraesthesiae of the legs, instability of walking, urinary and bowel incontinence, and sexual dysfunction from vaginal insensitivity.

Yours sincerely,

John C. Steele M.D, FACP©©
Neurologist