# FILED
**DISTRICT COURT OF GUAM**

JAN 18 2008

**JEANNE G. QUINATA**
**Clerk of Court**

LAW OFFICE OF
**ROBERT L. KEOGH**
POST OFFICE BOX GZ
HAGÅTÑA, GUAM 96932
TELEPHONE (671) 472-6895

Attorneys for Plaintiffs

## IN THE DISTRICT COURT OF GUAM

| | |
|---|---|
| **DEBORAH K. RUTLEDGE and THOMAS R. RUTLEDGE,** | **CIVIL CASE NO. CIV06-00008** |
| Plaintiffs, | |
| vs. | |
| **UNITED STATES OF AMERICA,** | |
| Defendant. | |

# PLAINTIFFS' TRIAL BRIEF;
# CERTIFICATE OF SERVICE

# TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . iii

I.   INTRODUCTION . . . . . . . . . . . . . . . . . . . . . 1

II.  FACTUAL CONTENTIONS . . . . . . . . . . . . . . . . . 1

III. LEGAL BRIEF . . . . . . . . . . . . . . . . . . . . . 4

    A.   Issues of Law . . . . . . . . . . . . . . . . . . 4

        1.   Jurisdiction and venue . . . . . . . . . . . 4

        2.   The Federal Tort Claims Act and the
             applicability of Guam substantive law . . . . . 5

        3.   Statutory duty of care . . . . . . . . . . . . 5

        4.   Breach of duty of care . . . . . . . . . . . . 8

            a.   Defendant repeatedly breached
                 its statutory duty of care to
                 properly diagnose Deborah Rutledge
                 or at the very least consult with
                 their supervising physicians . . . . . . . 8

            b.   Major Giscombe and Caption Rau
                 breached their statutory duty
                 to properly identify themselves to
                 their patient Deborah Rutledge as
                 midlevel providers and not physicians . . 10

            c.   Defendant breached its statutory duty
                 of proper supervision of its midlevel
                 providers . . . . . . . . . . . . . . . . 11

        5.   Plaintiffs are entitled to fair damages . . . 12

    B.   Evidentiary Problems . . . . . . . . . . . . . . 17

        1.   Defendant should not be allowed to
             present the expert testimony of
             Dr. Michael Meriwether . . . . . . . . . . . 17

-i-

IV.  ATTORNEY'S FEES . . . . . . . . . . . . . . . . . . . . . . 18

V.   ABANDONMENT OF ISSUES . . . . . . . . . . . . . . . . . . 18

VI.  CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . 18

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . 19

-ii-

# TABLE OF AUTHORITIES

**Cases**                                                       **Page(s)**

Agravante v. Japan Airlines Int'l Co., Ltd.,
2007 WL 2026494, *6 (D.Guam, 2007) . . . . . . . . . . . . . 14

Barnes v. Outlaw,
964 P.2d 484, 487 (Ariz. 1998) . . . . . . . . . . . . . . . 14

Barris v. County of Los Angeles,
20 Cal.4th 101, 108,
83 Cal.Rptr.2d 145, 972 P.2d 966 (Cal.1999) . . . . . . . . . 7

Brock v. United States,
601 F.2d 976, 978 (9th Cir.1979) . . . . . . . . . . . . . . 5

District of Columbia v. Wilson,
721 A. 2d 591, 597 (D.C. 1998) . . . . . . . . . . . . . . . 6

Duenas v. Department of Public Works, Government of Guam,
1992 WL 97213, *1, 5 (D. Guam App. Div.1992) . . . . . . . . 14

Fetter v. United States,
649 F. Supp. 1097, 1101-02 (S. D. Cal. 1986) . . . . . . . . 15

Gray v. Kieger,
27 Mass. App. 583,
540 N.E. 2d 1344, 1347-48 (1989),
review denied, 405 Mass. 1205, 545 N.E. 2d 43 (1989) . . . . . 8

Jimerson v. United States of America,
2003 WL 251950 (W.D.N.Y.) . . . . . . . . . . . . . . . . . . 9, 10

Landeros v. Flood,
17 Cal.3d.399, 408,
131 Cal.Rptr. 69, 551 P.2d 389 (1976) . . . . . . . . . . . . 7

Lawson v. Inited States,
454 F. Supp. 2d 373, 424 (D. Md. 2006) . . . . . . . . . . . 16

Mitchell v. United States,
141 F. 3d 8, 13 (1st Cir. 1998) . . . . . . . . . . . . . . . 7

Ogden v. J.M. Steel Erecting, Inc.,
201 Ariz. 32, 31 P.3d 806, (2001) . . . . . . . . . . . . . . 14

-iii-

**Cases**                                                              **Page(s)**

Overly v. Ingalls Shipbuilding, Inc.,
74 Cal. App. 4th 164, 171, 87 Cal. Rptr. 2d 626 (1999)   . . . 15

People v. Muria,
999 F. 2d 397, 399 n.1 (9th Cir. 1993)   . . . . . . . . . . . . 7

Rodriquez v. Norman Engineering Co.,
87 Cal. App. 3d 626, 151 Cal. Rptr. 399 (1978)   . . . . . . . 16

Rolon-Alvarado v. Municipality of San Juan,
1 F. 3d 74, 77-78 (1st Cir. 1993) . . . . . . . . . . . . . . . 6

Scott v. U.S.,
88 F.2d. 1280 (9th Cir. 1989)   . . . . . . . . . . . . . . . 14

Smith v. Brown-Forman Distillers Corp.,
196 Cal App. 3d 503, 518-19,
241 Cal. Rptr. 916, 924 (1987)   . . . . . . . . . . . . . . 15

Taber v. Maine,
45 F. 3d 598 (2d Cir. 1995) . . . . . . . . . . . . . . . . . 7

Warren v. U.S.,
999 F.2d. 546 (9th Cir. 1993) . . . . . . . . . . . . . . . . 5


**Federal Statutes**

28 U.S.C. §1346 . . . . . . . . . . . . . . . . . . . . . . . 4

28 U.S.C. § 1346(b) . . . . . . . . . . . . . . . . . . . . . 5

28 U.S.C. §1402(d)   . . . . . . . . . . . . . . . . . . . . . 4

28 U.S.C. §2671, et. seq. . . . . . . . . . . . . . . . . . . 4

28 U.S.C. §2674 . . . . . . . . . . . . . . . . . . . . . . . 5


**Guam Statutes**

7  G.C.A. §16102(a) and (c) . . . . . . . . . . . . . . . . 13

10 G.C.A. §10106   . . . . . . . . . . . . . . . . . . . . . 5

**Guam Statutes, cont'd.**

10 G.C.A. §10131 . . . . . . . . . . . . . . . . . . . . . . . 12

10 G.C.A. §11102(c) . . . . . . . . . . . . . . . . . . . . . . 8

10 G.C.A. §121606(a) and (c) . . . . . . . . . . . . . . . . . 7

10 G.C.A. §121607(a) and (b) . . . . . . . . . . . . . . . . . 8


**Local Rules**

LR 16.7(b) . . . . . . . . . . . . . . . . . . . . . . . . . . 1

GR 4.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16


**Treatise**

61 Am. Jur. 2d <u>Physicians, Surgeons and Other Healers</u>,
§189 (2002) . . . . . . . . . . . . . . . . . . . . . . . . 5, 6


**Attachments**

23 Cal. Jur. 3d §66 (2000) . . . . . . . . . . . . . . . . . 16

Witkin Summary of California Law,
10th ed., §1667(3)(a)(2005) . . . . . . . . . . . . . . . . . 16

Case 1:06-cv-00008    Document 46    Filed 01/18/2008    Page 6 of 39

## I. INTRODUCTION

Plaintiffs submit the following trial brief pursuant to LR 16.7(b).

## II. FACTUAL CONTENTIONS

Plaintiffs will establish the following general factual background at trial:

Plaintiff Deborah Rutledge is a military dependent as the wife of Air Force Master Sergeant, plaintiff Thomas R. Rutledge. On July 27, 2004 Mrs. Rutledge presented herself to the Andersen Air Force Base Clinic on Guam complaining of low back pain, numbness in her buttocks and vaginal area and an inability to urinate. She was seen by a Nurse Practitioner, diagnosed with "sciatica", given medication and sent home. The Nurse Practitioner did not advise Mrs. Rutledge that she was not a doctor and the clinic staff led Mrs. Rutledge to believe she was being seen by a doctor.

On August 2, 2004, her symptoms having worsened, Mrs. Rutledge returned to the AAFB Clinic. She continued to complain of low back pain, shooting pain down both legs, numbness and tingling in her buttocks and groin area and continued inability to urinate. She was seen this time by a Physician's Assistant who, again, was not identified to Mrs. Rutledge as not being a doctor. This time an x-ray was taken. Mrs. Rutledge was diagnosed with "musculoskeletal back pain," had her medications increased and was told to return to the clinic if she did not improve. Mrs. Rutledge was told it would

take 10 to 12 days for the x-ray to be interpreted by a radiologist.

By August 17, 2004, Mrs. Rutledge had not heard from the Clinic about the x-ray result. Her symptoms had continued to worsen and she returned to the Clinic once again. She was seen by the same Nurse Practitioner who saw her on July 27 and again was not advised she was not being seen by a doctor. She complained of continued worsening low back pain radiating down her legs, numbness to her buttocks and vaginal area, and that she walked with a limp. She was observed to have a guarded and slow gait. The x-ray result was reviewed at the clinic for the first time and the radiologist had recommended that given Mrs. Rutledge's symptoms an MRI scan should be done. Mrs. Rutledge was diagnosed by the Nurse Practitioner as having low back pain and degenerative disc disease. She was given a routine, non-emergent referral to the Naval Hospital orthopedic department. An MRI was not ordered. MRI examinations are available on Guam at MR Imaging which regularly performs such examinations for the Navy and Air Force.

Mrs. Rutledge was given an appointment with the Naval Hospital orthopedic department for August 23, 2004. The appointment was cancelled by the hospital and re-scheduled due to a passing storm. On August 27, 2004, at the Guam Naval Hospital Mrs. Rutledge was seen for the first time by a physician. She was diagnosed with long standing Cauda Equina Syndrome for 3 weeks. She was

- 2 -

immediately placed on a medevac flight to Hawaii and underwent emergency spinal surgery the next day.

Plaintiffs will present the testimony of various fact and expert witnesses. They will prove that the AAFB Clinic was negligent in their failure to diagnose Mrs. Rutledge's Cauda Equina Syndrome on three separate occasions. The plaintiffs themselves will testify in person. Various Air Force and Navy treating medical care providers will be presented either through deposition testimony or in person if they appear on Guam at the time of trial. Dr. Gary Towle, a Board Certified physician in Emergency Medicine retained by plaintiffs, will testify about the standard of care of emergency medical personnel and the failure of the AAFB Clinic personnel to act within that standard of care. Dr. John Steele, a renowned neurologist, also retained by plaintiffs, will testify about disability findings after his examination of Mrs. Rutledge and will present his opinion that had Mrs. Rutledge been properly diagnosed during any of the opportunities at the Andersen Clinic she would not be suffering any deficit today.

The plaintiffs will further prove that the AAFB Clinic was negligent in their failure to make a timely referral of Mrs. Rutledge to an appropriate specialist and when such a referral was finally made it was made as a "routine" rather than emergency referral. The Clinic was also negligent by failing to advise Mrs. Rutledge that she was being seen by midlevel providers rather than

- 3 -

doctors. The AAFB Clinic midlevel providers were negligent in failing to consult with their preceptor or obtain physician review of Mrs. Rutledge's case when several "Red Flag" symptoms were present. They were further negligent in failing to order an MRI when both the symptoms presented and the radiologist's recommendation called for one.

As a direct and proximate result of the negligence of the AAFB Clinic, Mrs. Rutledge is seriously and permanently disabled in the form of various neurological deficits including, but not limited to, numbness in her vaginal and buttock area, numbness down her legs, bladder and bowel dysfunction and intermittent neuropathic pain. As a result of her permanent disability she has suffered and continues to suffer economic and noneconomic damages.

## III. LEGAL BRIEF

### A. Issues of Law

#### 1. Jurisdiction and venue

This action was brought pursuant to the Federal Tort Claims Act, 28 U.S.C. §2671, et. seq. where jurisdiction is conferred upon this court by Title 28 U.S.C. §1346. Venue in the District Court of Guam is proper under Title 28 U.S.C. §1402(d) because this is a civil action brought against the United States of America for the negligent acts and omissions of its agents in the Andersen Air Force Base Medical Clinic in Yigo, Guam. No party to this action has questioned jurisdiction or venue.

- 4 -

## 2. **The Federal Tort Claims Act and the applicability of Guam substantive law**

The Federal Tort Claims Act provides that the United States shall be liable in tort in the same manner and to the same extent as a private individual under like circumstances. 28 U.S.C. §2674. For actions brought under section 1346(b) of the Federal Tort Claims Act, the federal district court applies the law of the state in which the alleged negligent act occurred. Warren v. U.S., 999 F.2d. 546 (9th Cir. 1993) citing Brock v. United States, 601 F.2d 976, 978 (9th Cir.1979). All the negligent acts and omissions at issue in this case happened on Guam. Therefore, Guam law applies.

## 3. **Statutory duty of care**

Defendant owed a duty to diagnose and treat plaintiff Deborah Rutledge with the requisite care and skill. "A physician has the duty to use reasonable care and skill in diagnosis and treatment, and she is liable to her patients for a failure to exercise the requisite skill and care." 61 Am. Jur. 2d Physicians, Surgeons and Other Healers, §189 (2002) (footnote omitted). Guam's Medical Malpractice statute defines this duty of care as "the prevailing standard of duty, practice, or care by a reasonable physician in the same field practicing medicine in the community at the time of the alleged malpractice shall be the standard applied ...." 10 G.C.A. §10106.

Defendant may argue that physicians in island communities should be held to lowered local standards. Plaintiffs note that

- 5 -

there is a modern trend to hold physicians to a more broadly based and more national standard. 61 Am. Jur. 2d <u>Physicians, Surgeons and Other Healers</u>, §202 (2002). See also, e.g., <u>District of Columbia v. Wilson</u>, 721 A. 2d 591, 597 (D.C. 1998). Given improvements in communications such as the internet and videoconferencing, as well as the fact that defendant's physicians usually practice in many different locations throughout their military service, a national or even global standard of care makes sense.

Plaintiffs further note the First Circuit Court of Appeals' description of the legal standard in one island territory:

> In 1973, Puerto Rico jettisoned the so-called "locality" or "community standard" rule in favor of a more universal, less parochial approach to establishing the standard of acceptable care for purposes of a medical malpractice suit. . . . Today, a physician is expected to possess, and use, that level of knowledge and skill prevalent in his or her speciality generally, not simply the knowledge and skill commonly displayed in the community or immediate geographic region where the treatment is administered. . . . In other words, a health-care provider has a duty to use the same degree of expertise as could reasonably be expected of a typically competent practitioner in the identical speciality under the same or similar circumstances, regardless of regional variations in professional acumen or level of care.

<u>Rolon-Alvarado v. Municipality of San Juan</u>, 1 F. 3d 74, 77-78 (1st Cir. 1993) (citations omitted).

- 6 -

In the absence of controlling law from Guam, the courts look to California decisional law for guidance. <u>People v. Muria</u>, 999 F. 2d 397, 399 n.1 (9th Cir. 1993)("As a general rule, we refer to California law in resolving unsettled questions of Guam law."). Accord, <u>Taber v. Maine</u>, 45 F. 3d 598 (2d Cir. 1995). In California, courts have applied the standard of care in medical malpractice cases as that "degree of skill, knowledge and care ordinarily possessed and exercised by members of their profession under similar circumstances." <u>Barris v. County of Los Angeles</u>, 20 Cal.4th 101, 108, 83 Cal.Rptr.2d 145, 972 P.2d 966 (Cal.1999); <u>Landeros v. Flood</u>, 17 Cal.3d.399, 408, 131 Cal.Rptr. 69, 551 P.2d 389 (1976). A physician is held to the standard of care and skill of the average practitioner in his field. <u>Mitchell v. United States</u>, 141 F. 3d 8, 13 (1st Cir. 1998).

Guam law also imposes a duty upon physician assistants, while working, to "wear or display appropriate identification, clearly indicating that he or she is a physician assistant" and "not advertise him or herself in any manner that would mislead the patients of the supervising physician or the public." See 10 G.C.A. §121606(a) and (c). Guam law further imposes a duty upon physicians who supervise physician assistants in that "tasks performed by the physician assistant must be under the supervision of a registered supervising physician" and that "**all** medical records must be reviewed and co-signed by the approved supervising

physician within seven (7) days. 10 G.C.A. §121607(a) and §121607(b). (Emphasis provided).

The standard of care required of the medical treating personnel of the AAFB Clinic, including Physician Assistants and Nurse Practitioners, is thus established by Guam law. The treatment provided to Deborah Rutledge by the defendant fell below that standard of care.

## 4. **Breach of duty of care**

### a. **Defendant repeatedly breached its statutory duty of care to properly diagnose Deborah Rutledge or at the very least consult with their supervising physicians.**

10 G.C.A. § 11102(c) states that "Malpractice means any tort or breach of contract based on health care or professional services rendered or which should have been rendered, by a health professional or health care institution to a patient." A defendant physician may be liable for malpractice when his failure to properly diagnose an illness or injury results in a delay in treatment and resulting harm to the patient. Gray v. Kieger, 27 Mass. App. 583, 540 N.E. 2d 1344, 1347-48 (1989), review denied, 405 Mass. 1205, 545 N.E. 2d 43 (1989).

The AAFB Clinic personnel negligently failed to diagnose Mrs. Rutledge's emergent Cauda Equina Syndrome. The midlevel providers repeatedly failed to consult with their supervising physician or

- 8 -

refer her to be seen by a supervising physician when "Red Flag" symptoms were identified on her intake forms. They repeatedly failed to consult with their supervising physicians or refer her to the appropriate specialist for follow-up evaluation when she returned for the same complaints with no resolution of symptoms and even worse, showed signs of worsening symptoms. They failed to review the radiologists report on the only x-ray taken for a period of two weeks and then failed to act upon the recommendation of the reviewing radiologist that, in light of Mrs. Rutledge's symptoms, an MRI be performed. When a referral was finally made for specialist review on August 17, 2004, the referral was made as a "routine" referral rather than an emergency referral and as a result Mrs. Rutledge was not see by the specialist for another ten (10) days. Throughout her treatment at the AAFB Clinic Mrs. Rutledge's condition was repeatedly treated as non-emergent when her symptoms cried out for emergency treatment.

Jimerson v. United States of America, 2003 WL 251950 (W.D.N.Y.) is an interesting opinion that will certainly help shed light on what the AAFB Clinic care providers should have done when Mrs. Rutledge presented herself on three separate occasions with severe neurological symptoms. In Jimerson, the plaintiff was a patient at an Indian reservation health clinic run by the United States. He sued under the FTCA for medical malpractice for failure to properly diagnose Cauda Equina Syndrome.

- 9 -

The _Jimerson_ decision is useful on a number of levels. First the opinion contains a discussion of the nature of Cauda Equina Syndrome. It also provides a judicial determination on the standard of care involved in the diagnosis and treatment of Cauda Equina Syndrome.

In _Jimerson_, although the reservation clinic failed to diagnose the plaintiff's Cauda Equina syndrome during his first visit, the clinic did arrange for an MRI examination which was done within 24 hours and which did result in a correct diagnosis. This 24 hour MRI evaluation was found to be within the standard of care. Here, Deborah Rutledge was seen at the AAFB Clinic on three separate occasions over a three week period presenting each time with "Red Flag" symptoms of Cauda Equina Syndrome. A standard x-ray was done on the second visit and although it recommended that an MRI be done, and even though MRI scans were readily and promptly available on Guam for the military medical care providers, Mrs. Rutledge never received an MRI screening until she was medevaced to Hawaii. The Andersen Clinic's treatment of Mrs. Rutledge fell way below the standard of care and hence constituted malpractice.

> **b.** **Major Giscombe and Caption Rau breached their statutory duty to properly identify themselves to their patient Deborah Rutledge as midlevel providers and not physicians.**

Major Giscombe and Captain Rau breached their duty to plaintiff Deborah Rutledge by failing to make her aware that they

- 10 -

were midlevel providers and not medical doctors. Mrs. Rutledge will testify at trial that at the time she was seen at the AAFB Clinic, she was seen and treated by Major Giscombe and Captain Rau who wore identification tags that merely stated their rank and name. They introduced themselves to Mrs. Deborah Rutledge as "Major Giscombe" and "Captain Rau", respectively. The Clinic staff led Mrs. Rutledge to believe she was being seen by a doctor. Dr. Towle in his expert report states that "It would appear from the review of the available materials that neither Captain Rau nor Major Giscombe identified themselves as midlevel providers. It is standard procedure for midlevels to make it clear to patients that they are not physicians." Consequently, Mrs. Deborah Rutledge at all relevant times herein was under the mistaken belief that she was under the care of medical physicians. Mrs. Rutledge relied upon this mistaken belief to her detriment.

### c. **Defendant breached its statutory duty of proper supervision of its midlevel providers.**

The AAFB medical records of Deborah Rutledge dated July 27, 2004, August 2, 2004 and August 17, 2004 by themselves show that there were no countersignatures of any supervising physician at any time, contrary to the duty imposed by Guam law upon physicians who supervise physician assistants and by association, other midlevel providers such as nurse practitioners. In fact, there was practically no supervision of physician assistants and other midlevel healthcare providers at the AAFB Medical Clinic.

- 11 -

As Captain Steven D. Rau testified in his deposition:

Q:  All right. Did you, as a physician assistant and primary health care provider, have to report to either Dr. Scalzin (phonetic) or Dr. Deitman (phonetic) or some other doctor assigned to that clinic?

A:  Could you clarify "report to"?

Q:  Was your work supervised by them?

A:  The -- how the supervision of physician assistants is done in the Air Force is, on a monthly basis, they have what's called a peer review in which the doctors would evaluate or review approximately 10 to 20 of our medical charts or records from that month. But there's no recording immediately after every patient.

Q:  And no reporting at the end of each day for example

A:  No, sir.

Q:  How about the end of each week?

A:  No, sir.

The duties established under Guam law, as discussed above, have established the standard of care to be applied in this proceeding. Defendant's treatment of plaintiff Deborah Rutledge fell below that standard of care.

## 5. **Plaintiffs are entitled to fair damages.**

Under Guam law, there is no limit to the amount of damages that can be awarded to plaintiffs in a medical malpractice case. 10 G.C.A. §10131 specifically states that "damages shall be monetary only and shall be without limitation as to nature or amount unless otherwise provided by law." Thus, plaintiffs may

- 12 -

recover economic and non-economic losses suffered as a result of the negligence or medical malpractice of defendant herein.

7 G.C.A. §16102(a) and (c) defines economic and non-economic losses as follows:

> "(a) Economic loss shall mean any pecuniary loss resulting from harm, including the loss of earnings or other benefits related to employment, medical expense loss, replacement services loss, loss due to death, burial costs, and loss of business or employment opportunities, to the extent recovery for such loss is allowed under applicable local law."

> "(c) Non-economic loss shall mean loss for physical and emotional pain, suffering, inconvenience, physical impairment, mental anguish, disfigurement, loss of enjoyment of life, loss of society and companionship; loss of consortium, other than loss of domestic service; hedonic damages; injury to reputation and all other non-pecuniary losses of any kind or nature.

Under Guam law, plaintiffs may recover non-economic damages for (1) physical pain, (2) emotional pain, (3) suffering, (4) inconvenience, (5) physical impairment, (6) mental anguish, (7) disfigurement, (8) loss of enjoyment of life, (9) loss of society and companionship; (10) loss of consortium, other than loss of domestic service; (11) hedonic damages; (12) injury to reputation and (12) all other non-pecuniary losses of any kind or nature.

An award to plaintiffs for each component itemized above is not considered duplicative. Thus, in awarding damages, the court

- 13 -

in <u>Scott v. U.S.</u>, 88 F.2d. 1280 (9th Cir. 1989) held that damage awarded for physical impairment and damage awarded for loss of enjoyment of life was not duplicative.  Likewise, in <u>Ogden v. J.M. Steel Erecting, Inc.</u>, 201 Ariz. 32, 31 P.3d 806, (2001), the court held that "hedonic damages can be a component of a general damages claim, distinguishable from, and not duplicative of, damages for pain and suffering."

Plaintiffs will present evidence at trial of each of the above statutory components of both economic and non-economic loss.  This will also include evidence pertaining to the loss of consortium claim of plaintiff Thomas Rutledge. See for example, <u>Agravante v. Japan Airlines Int'l Co., Ltd.</u>, 2007 WL 2026494, *6 (D.Guam, 2007), citing <u>Duenas v. Department of Public Works, Government of Guam</u>, 1992 WL 97213, *1, 5 (D. Guam App. Div.1992) and <u>Barnes v. Outlaw</u>, 964 P.2d 484, 487 (Ariz. 1998).

One of the several elements of the economic damages Deborah Rutledge has suffered is her loss of income.  Plaintiffs will present the testimony of Gary Hiles, the Chief Economist for the Department of Labor, Government of Guam, on this issue.  Mr. Hiles will quantify Deborah Rutledge's lost past and future income based upon his analysis of her past income earning history and her lost future income earning capacity.  Mr. Hiles's report on this issue was originally prepared for the November 5, 2007 trial date.  The report will be up-dated to reflect the date change.

- 14 -

Defendant is also expected to present the testimony of an economist, Dr. Laura Taylor, who will testify about Mrs. Rutledge's lost income. Presumably Dr. Taylor's report will also be updated to reflect the change in trial date. While both economists used basically the same approach to calculating lost income, plaintiffs will show at trial how Dr. Taylor did everything in her power to come up with as low a figure as possible.

For example, Dr. Taylor reduced Mrs. Rutledge's expected future work life by 24% based in part on her assumption that as a military dependent she would be out of work for periods of time during re-locations. She failed to recognize that Mr. Rutledge is soon due to retire from the military and that most if not all of such voluntary removal from the workforce had already occurred for Mrs. Rutledge. In addition, while Dr. Taylor did include the value of fringe benefits in her calculation as she is required to do by law, Fetter v. United States, 649 F. Supp. 1097, 1101-02 (S. D. Cal. 1986), her calculation was also reduced by the across the board 24% reduction in work life expectancy. Dr. Taylor also refused to give any consideration to lost Social Security benefits based upon some shockingly inapt citations to ancient Supreme Court decisions and ignoring modern case law establishing that lost Social Security benefits are indeed compensable. See, Overly v. Ingalls Shipbuilding, Inc., 74 Cal. App. 4th 164, 171, 87 Cal. Rptr. 2d 626 (1999). Accord, Smith v. Brown-Forman Distillers Corp., 196 Cal App. 3d 503, 518-19, 241 Cal. Rptr. 916, 924 (1987).

- 15 -

Other dramatic differences between the two economists approaches will also be explored at trial. For example, both economists utilized a "discount rate" to compute a present value of the future lost income of Mrs. Rutledge. Mr. Hiles used a 4% rate which is supported by Guam law as well as generally acceptable case precedent. See for example, Lawson v. Inited States, 454 F. Supp. 2d 373, 424 (D. Md. 2006). Dr. Taylor utilized a 5.03% discount rate which resulted in a significantly greater reduction of the present value calculation. Mr. Hiles used an income trend line based upon Mrs. Rutledge's actual 25 year history of earnings to calculate her income earning capacity whereas Dr. Taylor selected national earning figures in three general types of employment that she determined Mrs. Rutledge was likely to seek.

In Rodriquez v. Norman Engineering Co., 87 Cal. App. 3d 626, 151 Cal. Rptr. 399 (1978), the court held that it is the reduction of one's earning capacity that is compensable. "In short, the test is not what the plaintiff would have earned, but what he could have earned." Id. at 87 Cal. App. 3d 656. See also, pages from 23 Cal. Jur. 3d §66 (2000) and Witkin summary of California Law, 10th ed., §1667(3)(a)(2005) attached hereto pursuant to GR 4.1.

Plaintiffs submit that the trial testimony will demonstrate that Mr. Hiles's opinion comes closest to compensating Mrs. Rutledge for her lost earning capacity. Dr. Taylor's approaches are designed to minimize the recovery of Mrs. Rutledge,

- 16 -

## B. **Evidentiary Problems**

### 1. **Defendant should not be allowed to present the expert testimony of Dr. Michael Meriwether.**

Defendant has identified Dr. Michael Meriwether, a neurosurgeon, as an expert medical witness. A neurosurgeon is not an appropriate expert to testify on any of the issues presented in this case. A neurosurgeon is not qualified to testify on issues pertaining to urgent care or emergency medicine. Indeed, defendant has not established that Dr. Michael Meriwether has any qualifications pertaining to the standard of care in emergency medicine or as a supervising physician of midlevel healthcare providers. Furthermore, neither the correct, albeit delayed, diagnosis of Deborah Rutledge's Cauda Equina Syndrome by Orthopedist Dr. Duncan on August 27, 2004, nor the successful spinal decompression surgery performed by Dr. Orchowski the following day in Honolulu, Hawaii, are in dispute in this case.

The striking of Dr. Meriwether's testimony at trial is currently the subject of a motion in limine already filed by plaintiffs which also addresses the Rule 26(a)(2) deficiencies in defendant's disclosures. Plaintiffs reserve for the record their objection to the proposed testimony of Dr. Meriwether. Other evidentiary issues will be addressed at trial as they arise or in further in limine motions.

- 17 -

## IV.  ATTORNEY'S FEES

There are no attorney's fees issues presented in this case.

## V.  ABANDONMENT OF ISSUES

There are no issues that have been abandoned.

## VI.  CONCLUSION

For the foregoing reasons, judgment should be entered in plaintiffs' favor for such amount as the Court deems just and reasonable based upon the evidence presented.

Respectfully submitted,

**LAW OFFICE OF ROBERT L. KEOGH**
Attorneys for Plaintiffs

DATE: _1/18/08_

By: _____
**ROBERT L. KEOGH**

- 18 -

1

# CERTIFICATE OF SERVICE

2

3    I, Robert L. Keogh, hereby certify that on the 18th day of

4  January 2008, I caused to be served via hand delivery, a true and

5  correct copy of this document entitled **PLAINTIFFS' TRIAL BRIEF;**

6  **CERTIFICATE OF SERVICE** in the above-captioned matter upon the

7  following office as set forth below:

8

9        Mikel W. Schwab
         Assistant U. S. Attorney
10       District of Guam
         Sirena Plaza, Suite 500
11       108 Hernan Cortez Avenue
         Hagatña, Guam 96910
12

13

                              **LAW OFFICE OF ROBERT L. KEOGH**
14                            Attorneys for Plaintiffs

15

16  DATE: __1|18|08__                By: _____
17                                         **ROBERT L. KEOGH**

18

19

20

21

22

23

24

25

26

27

28                              - 19 -

VOLUME 23
THIRD EDITION

# CAL
# JUR
# III

**DAMAGES**

to

**DEATH AND**

**GENERATION-SKIPPING**

**TRANSFER TAXES**

**2000**



**WEST** GROUP

Bancroft-Whitney • Clark Boardman Callaghan
Lawyers Cooperative Publishing • The Rutter Group™
WESTLAW® • West Publishing

and his or her "keep" or maintenance, in contradistinction to compensation of employees generally through the medium of wages alone, the rule against recovery of double damages cannot be applied so as to reduce an award of damages to an injured sailor for a loss of wages through inability to engage in employment by the total amount of sums paid by the defendant to the plaintiff for his or her keep and maintenance after the occurrence of the injury.[7] A jury is not compelled to conclude from testimony given by the plaintiff with respect to time lost from employment, that such a loss of time was, in fact, the necessary and proximate result of the plaintiff's injury.[8]

### § 66. Impairment of earning capacity

Where the plaintiff's earning capacity has been permanently impaired as a result of an injury inflicted on him or her by the defendant, the plaintiff may recover compensation for the impairment,[9] despite the fact that the plaintiff may not have been employed at the time of the injury.[10] Moreover, the fact that the plaintiff was earning a lesser amount at the time of the injury than at the date of the trial of the action does not conclusively show that his or her earn-

partnership prior to his injury. The damages to which he was entitled were those that represented the value of his services in conducting the business. *Hoffmann v. Lane* (1936) 11 Cal.App.2d 655, 54 P.2d 477.

**7.** *Anderson v. Matson Nav. Co.* (1932) 125 Cal.App. 447, 13 P.2d 1041.

**8.** *Caulfield v. Market St. Ry. Co.* (1937) 20 Cal.App.2d 220, 66 P.2d 752.

**9.** *Kline v. Santa Barbara Consol. Ry. Co.* (1907) 150 Cal. 741, 90 P. 125.

If it appears that the effects of an injury will extend beyond the date on which the complaint was filed, the jury may consider any period of time beyond that date in making an award. *Sheean v. Foster* (1926) 80 Cal.App. 56, 251 P. 235.

**Annotations:** Proof of prospective earning capacity of student or trainee, or of its loss, in action for personal injury or death, 15 A.L.R.2d 418.

**10.** *Kline v. Santa Barbara Consol. Ry. Co.* (1907) 150 Cal. 741, 90 P. 125; *Germ v. City and County of San Francisco* (1950) 99 Cal.App.2d 404, 222 P.2d 122; *Hilliard v. A. H. Robins Co.* (1983) 148 Cal.App.3d 374, 196 Cal.Rptr. 117.

A married woman may recover damages for an impairment of her earning capacity, regardless of whether she has previously been engaged in household duties only or has earned a salary in commercial employment. *Davis v. Renton* (1931) 113 Cal.App. 561, 298 P. 834; *Marshall v. Smith* (1933) 131 Cal.App. 258, 21 P.2d 117.

Case 1:06-cv-00008    Document 46    Filed 01/18/2008    Page 28 of 39

ing capacity has not been impaired by the defendant's tortious act.[11] Loss of earning power is an element of general damages which can be inferred from the nature of the injury, without proof of actual earnings or income either before or after the injury,[12] because it is the impairment of the plaintiff's ability to earn money, rather than the record of his or her past earnings, that is important.[13] Consequently, the plaintiff may show, under an allegation of general damages, the wages, salary, or other emoluments which the plaintiff, but for the impairment of his or her earning capacity, would be able to earn or

---

**11.** *Ostertag v. Bethlehem Shipbuilding Corp.* (1944) 65 Cal.App.2d 795, 151 P.2d 647.

**12.** *Connolly v. Pre-Mixed Concrete Co.* (1957) 49 Cal.2d 483, 319 P.2d 343; *Robison v. Atchison, T. & S.F. Ry. Co.* (1962) 211 Cal.App.2d 280, 27 Cal.Rptr. 260; *Handelman v. Victor Equipment Co.* (1971) 21 Cal.App.3d 902, 99 Cal.Rptr. 90; *Neumann v. Bishop* (1976) 59 Cal.App.3d 451, 130 Cal.Rptr. 786; *Rodriguez v. McDonnel Douglas Corp.* (1978) 87 Cal.App.3d 626, 151 Cal.Rptr. 399; *Hilliard v. A. H. Robins Co.* (1983) 148 Cal.App.3d 374, 196 Cal.Rptr. 117; *Gargir v. Akiva* (1998) 66 Cal.App.4th 1269, 78 Cal.Rptr.2d 557. But see *Tornell v. Munson* (1947) 80 Cal.App.2d 123, 181 P.2d 112 (stating that damages for impairment of earning capacity are special).

Loss of earning power is an element of damages even in the absence of any evidence that plaintiff was ever gainfully employed. *Ridley v. Grifall Trucking Co.* (1955) 136 Cal.App.2d 682, 289 P.2d 31.

There is no requirement that a plaintiff seeking compensatory damages, which include damages for pain and suffering and for loss of future earning capacity, must prove actual special damages, such as medical expenses and loss of earnings.

*Hilliard v. A. H. Robins Co.* (1983) 148 Cal.App.3d 374, 196 Cal.Rptr. 117.

**13.** *Hicks v. Ocean Shore R.R.* (1941) 18 Cal.2d 773, 117 P.2d 850; *Connolly v. Pre-Mixed Concrete Co.* (1957) 49 Cal.2d 483, 319 P.2d 343; *Robison v. Atchison, T. & S.F. Ry. Co.* (1962) 211 Cal.App.2d 280, 27 Cal.Rptr. 260; *Neumann v. Bishop* (1976) 59 Cal.App.3d 451, 130 Cal.Rptr. 786.

Impairment of earning capacity as an element of damages is not the same as actual and established loss of wages between the occurrence of an injury and the date of trial; such loss of wages can be proved with reasonable certainty and is recoverable as special damages. *Handelman v. Victor Equipment Co.* (1971) 21 Cal.App.3d 902, 99 Cal.Rptr. 90.

The test is not what plaintiff earned, but what he or she could have earned. *Rodriguez v. McDonnel Douglas Corp.* (1978) 87 Cal.App.3d 626, 151 Cal.Rptr. 399.

As to lost earnings before the time of trial as an element of damages, see § 65.

**Annotations:** Admissibility, in personal injury or death action, of evidence as to injured party's intention to enter occupation other than that engaged in at time of injury or death, 23 A.L.R.3d 1189.

---

Case 1:06-cv-00008    Document 46    Filed 01/18/2008    Page 29 of 39

receive.[14] And this amount should not be reduced by the period of time by which the plaintiff's life expectancy is diminished as a result of the defendant's negligence. A tort victim suing for damages for permanent injuries is permitted to base his or her recovery on his or her prospective earnings for the balance of his or her life expectancy at the time of the injury, undiminished by any shortening of that expectancy as a result of the injury. Recovery of such damages is consistent with the general rule permitting an award based on the loss of future earnings the plaintiff is likely to suffer because of inability to work for as long a period of time in the future as the plaintiff could have done had he or she not sustained the injury.[15]

Evidence of the plaintiff's income previous to the injury is admis-

---

**14.** *Zibbell v. Southern Pac. Co.* (1911) 160 Cal. 237, 116 P. 513; *Perry v. McLaughlin* (1931) 212 Cal. 1, 297 P. 554; *Wilcox v. Sway* (1945) 69 Cal.App.2d 560, 160 P.2d 154.

The right to continue in one's employment until the time fixed for retirement, and to receive a pension at the date of such retirement, is somewhat analogous to the right of a person to work and earn money in the future. *Groat v. Walkup Drayage & Warehouse Co.* (1936) 14 Cal.App.2d 350, 58 P.2d 200.

In a personal injury action, the trial court properly refused to admit evidence of future tax consequences to affect the determination of the amount of the award to plaintiffs for lost future earnings. *Rodriguez v. McDonnel Douglas Corp.* (1978) 87 Cal.App.3d 626, 151 Cal.Rptr. 399.

As to recovery of future damages generally, see §§ 35 et seq.

**15.** *Fein v. Permanente Medical Group* (1985) 38 Cal.3d 137, 211 Cal.Rptr. 368, 695 P.2d 665, app. dism. (1985) 474 U.S. 892, 106 S.Ct. 214, 88 L.Ed.2d 215 and (rejected by *Waggoner v. Gibson* (N.D. Tex. 1986) 647 F.Supp. 1102 (rejected by *Lucas v. U.S.* (5th Cir. 1986) 807 F.2d 414)).

In a negligence and strict liability action brought by a ship engineer and his wife against the owner of a shipyard seeking damages from asbestos exposure, which plaintiffs alleged caused the engineer to contract mesothelioma, a fatal form of cancer, the trial court did not err in permitting the jury, which found defendant negligent, to award plaintiffs for loss of future economic benefits that the engineer would have earned during the period by which his life expectancy was shortened in the form of pension, Social Security, and household services benefits. Defendant waived this issue by failing to preserve the issue at trial. However, even if the issue had been preserved, a tort victim suing for damages for permanent injuries is permitted to base recovery on prospective earnings for the balance of his or her life expectancy at the time of the injury undiminished by any shortening of that expectancy as a result of the injury. Further, no deduction is made for the injured party's expected living expenses during the lost years. *Overly v. Ingalls Shipbuilding, Inc.* (1999) 74 Cal.App.4th 164, 87 Cal.Rptr.2d 626.

In a personal injury action against the operator of a camp brought by a teenaged camp counselor after she seriously injured her knee while skiing for the first

Case 1:06-cv-00008 Document 46 Filed 01/18/2008 Page 30 of 39

sible to show the extent to which his or her earning capacity may have been impaired,[16] but a jury cannot, in the absence of any evidence tending to show an actual impairment of his or her earning capacity, compensate the plaintiff for its alleged loss.[17] The detriment to be compensated for is the loss actually sustained by the plaintiff,

time during a skiing trip organized by defendant, in which plaintiff alleged that defendant had negligently failed to supervise and control the group of teenagers, many of whom were novice skiers, the trial court did not err in instructing the jury regarding plaintiff's right to recover damages for loss of future earning capacity (BAJI No. 14.12). Plaintiff was not required to present expert testimony about the loss of future earnings. Loss of earning power is an element of general damages that may be inferred from the nature of the injury, with or without proof of actual earnings or income either before or after the injury. The evidence presented warranted the submission of the instruction. Plaintiff intended to pursue a career teaching young children with mental or physical disabilities, a career that by necessity would require physical dexterity and mobility. Plaintiff's knee injury as well as the possibility of future surgeries would impair her ability to effectively function in her chosen career. These physical restrictions created a reasonable inference that plaintiff's future earning capacity would be impaired. One's earning capacity is not a matter of actual earnings. The impairment of the power to work is an injury wholly apart from any pecuniary benefit the exercise of such power may bring, and if the injury has lessened this power, the plaintiff is entitled to recover. The test is not what the plaintiff would have earned, but what he or she could have earned. This distinction is particularly applicable when the plaintiff is a student or an apprentice. *Gargir v. Akiva* (1998)

66 Cal.App.4th 1269, 78 Cal.Rptr.2d 557.

**16.** *Bonneau v. North Shore R. Co.* (1907) 152 Cal. 406, 93 P. 106; *Shaw v. Southern Pac. R. Co.* (1910) 157 Cal. 240, 107 P. 108; *Hoffmann v. Lane* (1936) 11 Cal.App.2d 655, 54 P.2d 477; *Tornell v. Munson* (1947) 80 Cal.App.2d 123, 181 P.2d 112; *Germ v. City and County of San Francisco* (1950) 99 Cal.App.2d 404, 222 P.2d 122; *Ridley v. Grifall Trucking Co.* (1955) 136 Cal.App.2d 682, 289 P.2d 31.

Evidence that plaintiff once held positions of trust in several financial and other corporations was relevant to show his earning capacity, and the fact that he had ceased to hold those positions when injured affected only the weight of the evidence. *Storrs v. Los Angeles Traction Co.* (1901) 134 Cal. 91, 66 P. 72.

**Annotations:** Admissibility, as against objection of remoteness, of evidence as to past earnings, upon issue as to amount of damages in an action for personal injury or death, 81 A.L.R.2d 733; Admissibility of evidence of plaintiff's or decedent's drawings from partnership or other business as evidence of earning capacity, in action for personal injury or death, 82 A.L.R.2d 679.

**17.** *Lindemann v. San Joaquin Cotton Oil Co.* (1936) 5 Cal.2d 480, 55 P.2d 870.

The extent of impairment of earning capacity is a question of fact. *Harris v. Los Angeles Transit Lines* (1952) 111 Cal.App.2d 593, 245 P.2d 35.

Case 1:06-cv-00008    Document 46    Filed 01/18/2008    Page 31 of 39

and not that which would result to the average person from a similar injury.[18] And evidence of both previous and subsequent earnings must concern the plaintiff's usual and ordinary business, and not exceptional profits from particular transactions.[19]

Expert testimony may provide a reasonable basis for determining future loss of earning capacity,[20] although an expert's estimate of such damages cannot be deemed to be precise.[21] Moreover, it is not necessary to produce an expert witness on the subject of future earning capacity.[22]

**18.** *Shaw v. Southern Pac. R. Co.* (1910) 157 Cal. 240, 107 P. 108 (noting that the standard of the average person is resorted to only when specific evidence is lacking concerning the loss sustained by the plaintiff, and where past experience reveals that some loss from the plaintiff's injury must have occurred).

Because an individual who enters this country illegally is subject to deportation, the question of the immigration status of a plaintiff who sued for damages sustained in a traffic accident, and who admitted to being an illegal alien, unquestionably bore on the amount of his anticipated future earnings, and was thus relevant to a determination of damages. *Rodriguez v. Kline* (1986) 186 Cal.App.3d 1145, 232 Cal.Rptr. 157.

**19.** *Shaw v. Southern Pac. R. Co.* (1910) 157 Cal. 240, 107 P. 108.

**Annotations:** Profits of business as factor in determining loss of earnings or earning capacity in action for personal injury or death. 45 A.L.R.3d 345.

**20.** *Connolly v. Pre-Mixed Concrete Co.* (1957) 49 Cal.2d 483, 319 P.2d 343; *Markley v. Beagle* (1967) 66 Cal.2d 951, 59 Cal.Rptr. 809, 429 P.2d 129.

In an action for damages for personal injuries sustained by a woman in an automobile accident, the questions of whether or not plaintiff would have enjoyed continuous employment until age 65 but for the accident, and whether or not other employment would be available for her when she recovered her health, despite her age, were questions of fact for the jury's decision, and any economic data bearing on the determination of the probabilities was relevant and proper. Accordingly, it was not error for the trial court to admit expert evidence concerning plaintiff's earning capacity, and the then present condition of her health and a need for further remedial surgery, where the evidence was not speculative in the sense that it called on the expert's expertise to make mathematical computations or express an opinion as to future economic conditions, nor in the sense that it was not predicated on hypotheses that were unwarranted by the evidence. *Neumann v. Bishop* (1976) 59 Cal.App.3d 451, 130 Cal.Rptr. 786.

**Annotations:** Admissibility of testimony of actuary or mathematician as to present value of loss or impairment of injured person's general earning capacity. 79 A.L.R.2d 275.

**21.** *Markley v. Beagle* (1967) 66 Cal.2d 951, 59 Cal.Rptr. 809, 429 P.2d 129.

**22.** *Paxton v. Alameda County* (1953) 119 Cal.App.2d 393, 259 P.2d 934.

Case 1:06-cv-00008    Document 46    Filed 01/18/2008    Page 32 of 39

The trial judge can correct an erroneous computation with respect to the prospective loss of a certain sum as the result of an impaired earning capacity, and the corrected sum may not be deemed to be a suggestion by the trial judge that that sum is the proper amount to be awarded to the plaintiff.[23]

### § 67. Increased living expenses

Where the plaintiff's living expenses have increased by reason of his or her injury, the plaintiff is entitled to damages for the additional financial burden thus imposed on him or her.[24] Accordingly, where as a result of an injury the plaintiff is required to obtain a different position involving employment away from his or her family, the plaintiff may recover damages for the extra expense of maintaining himself or herself in one location and of supporting his or her family in another location.[25] And the plaintiff may recover the expense of securing a third party to perform personal and domestic duties with respect to his or her daily care.[26] However, if the plaintiff's general cost-of-living expenses have not increased by reason of the inflicted injury, he or she cannot recover damages for sums he or she paid for board during the period of the disability. An allowance of such sums as compensatory damages would constitute a double recovery.[27]

### 3. INJURY TO PROPERTY [§§ 68–73]

(See General References preceding § 59.)

§ 68. In general
§ 69. Personal property

**Annotations:** Sufficiency of evidence, in personal injury action, to prove impairment of earning capacity and to warrant instructions to jury thereon, 18 A.L.R.3d 88.

23. *Sullivan v. City and County of San Francisco* (1950) 95 Cal.App.2d 745, 214 P.2d 82.

24. *Irrgang v. Ott* (1908) 9 Cal.App. 440, 99 P. 528.

25. *Humble v. Union Pac. R. Co.*

(1949) 90 Cal.App.2d 276, 202 P.2d 791.

26. *Kline v. Santa Barbara Consol. Ry. Co.* (1907) 150 Cal. 741, 90 P. 125.

**Annotations:** Cost of hiring substitute or assistant during incapacity of injured party as item of damages in action for personal injury, 37 A.L.R.2d 364.

27. *Graeber v. Derwin* (1872) 43 Cal. 495.

**144**

# SUMMARY OF CALIFORNIA LAW

## Tenth Edition

by B. E. WITKIN

*and members of the*

WITKIN LEGAL INSTITUTE

Volume 6



*2005*

### 3. Impairment of Future Earning Capacity.

#### (a) [§1667] In General.

The plaintiff may recover damages for the impairment of his or her earning capacity, based upon the present value of the earnings for the probable period of disability, which may be the plaintiff's life expectancy if the disability is permanent. (See *Bonneau v. North Shore R. Co.* (1907) 152 C. 406, 413, 93 P. 106; *Shaw v. Southern Pac. R. Co.* (1910) 157 C. 240, 242, 107 P. 108; *Zibbell v. Southern Pac. Co.* (1911) 160 C. 237, 254, 116 P. 513; *Kircher v. Atchison, Topeka & Santa Fe Ry. Co.* (1948) 32 C.2d 176, 186, 195 P.2d 427 {air cadet, age 23, left hand nearly severed; jury could consider youth, university education, training as physical instructor, military future]; *Connolly v. Pre-Mixed Concrete Co.* (1957) 49 C.2d 483, 488, 319 P.2d 343 [20-year-old champion tennis player, $95,000 for injured leg, on evidence of probable earnings from tours]; *Ostertag v. Bethlehem Shipbuilding Corp.* (1944) 65 C.A.2d 795, 807, 151 P.2d 647; *McChristian v. Popkin* (1946) 75 C.A.2d 249, 262, 171 P.2d 85 [assault and battery]; *Rodriguez v. McDonnell Douglas Corp.* (1978) 87 C.A.3d 626, 656, 151 C.R. 399; *Heiner v. Kmart Corp.* (2000) 84 C.A.4th 335, 344, 100 C.R.2d 854 [evidence was admissible regarding plaintiff dentist's lost profits as result of injury, despite his noncompliance with certain licensing requirements, where plaintiff's expert testified that plaintiff could easily have brought his practice into compliance had he been able to continue as dentist]; Rest.2d, Torts §924, Comment d; 22 Am.Jur.2d (2003 ed.), Damages §§144, 146, 148, 712; 29 Proof of Facts 3d 259 [lost earning capacity]; C.E.B., Tort Damages 2d, §1.41 et seq.; 12 U.C. Davis L. Rev. 797 [criticism of inadequate awards to children]; 15 A.L.R.2d 418 [earning capacity of student or trainee, or its loss]; 18 A.L.R.3d 88 [impairment of earning capacity and instructions]; 23 A.L.R.3d 1189 [intent to change occupation]; BAJI, No. 14.12.)

"Loss of earning power is an element of general damages that may be inferred from the nature of the injury, with or without proof of actual earnings or income either before or after the injury." The test is not what the plaintiff would have earned in the future but what he or she could have earned; and the plaintiff may recover even where he or she was not working and earned nothing. (*Hilliard v. A.H. Robins Co.* (1983) 148 C.A.3d 374, 412, 196 C.R. 117; see *Gargir v. B'Nei Akiva* (1998) 66 C.A.4th 1269, 1280, 78 C.R.2d 557 [proper to give BAJI, No. 14.12 on loss of earning power, where nature of injury justified conclusion that plaintiff's earning ability had been impaired; plaintiff could present expert testimony about amount she would have earned but she was not required to do so]; CACI, No. 3903D.)

1186

Case 1:06-cv-00008   Document 46   Filed 01/18/2008   Page 36 of 39

In determining the life expectancy, it is the customary practice to offer in evidence the standard mortality tables, compiled by life insurance companies from their experience, showing the probable life expectancy of a normally healthy person (a life insurance risk) of a particular age. (See *Murphy v. National Ice Cream Co.* (1931) 114 C.A. 482, 486, 300 P. 91; 3 Proof of Facts 491 [damages]; 50 A.L.R.2d 419 [mortality tables as dependent upon showing of permanency of injury]; 79 A.L.R.2d 275 [testimony of actuary or mathematician]; 1 *Cal. Evidence* (4th), *Hearsay*, §294.)

#### (b) [§1668] Plaintiff's Lost Years.

In *Fein v. Permanente Med. Group* (1985) 38 C.3d 137, 211 C.R. 368, 695 P.2d 665, plaintiff recovered judgment against defendants for failure to make a timely diagnosis of an impending heart attack. Defendant contended that the trial judge erred in instructing the jury that damages could be awarded for loss of earnings attributable to plaintiff's "lost years"—the period of time by which his life expectancy was diminished as a result of defendant's negligence. *Held,* recovery of these damages is consistent with the general rule permitting an award based on loss of future earnings "because of inability to work for as long a period of time in the future as he could have done had he not sustained the accident." (38 C.3d 153, quoting *Robison v. Atchison, Topeka & Santa Fe Ry. Co.* (1962) 211 C.A.2d 280, 288, 27 C.R. 260, and citing *Sea-Land Services v. Gaudet* (1974) 414 U.S. 573, 94 S.Ct. 806, 39 L.Ed.2d 9, 2 *Summary* (10th), *Workers' Compensation*, §145.) (See *Overly v. Ingalls Shipbuilding* (1999) 74 C.A.4th 164, 171, 87 C.R.2d 626 [*Fein* reasoning applied where lost years' damages were in form of pension, Social Security, and "household services" benefits; these damages are not reduced to account for plaintiff's personal consumption during lost years]; Rest.2d, Torts §924, Comments d, e; 50 Cal. L. Rev. 598.)

Recovery for lost years will not subject the defendant to double payment in the event the plaintiff's heirs sue for wrongful death; in a wrongful death action, the jury will be instructed that it should consider the amount the decedent had obtained from the defendant in an earlier judgment as compensation for impairment of his or her future earning capacity. (*Fein v. Permanente Med. Group*, supra, 38 C.3d 153, 154, citing *Blackwell v. American Film Co.* (1922) 189 C. 689, 700, 209 P. 999.)

#### (c) [§1669] Illegal Alien Subject to Deportation.

In *Rodriguez v. Kline* (1986) 186 C.A.3d 1145, 232 C.R. 157, the court, in a case of first impression, laid down guidelines for determining

1187

f. THE AWARD OF COMPENSATORY DAMAGES WAS NOT EXCESSIVE.

The final contention of error by Robins is that the $600,000 award to plaintiff for compensatory damages was excessive. Defendant Robins tells us that plaintiff failed in two ways to submit evidence to support this award. First, plaintiff presented no evidence as to special damages. Second, a substantial part of plaintiff's injury was due to elective voluntary surgery, her therapeutic abortion and a hysterectomy.

We reject defendant's contentions. There is no convenient yard stick to determine whether a jury's damage award is excessive, too little, or just right. The legal test is one of reasonable compensation. (Civ. Code, § 3359.) The jury in the case at bar was instructed with BAJI No. 14.00 which told them that damages are to provide reasonable compensation. They were also instructed that they could award damages for loss of earning capacity (BAJI No. 14.12) and for pain and suffering (BAJI No. 14.13).

Defendant claims that plaintiff must present proof of special damages or monetary loss to justify a compensatory damage award of $600,000. This is not a correct statement of the law. **(31)** There is no requirement in California law that a plaintiff seeking compensatory damages which include damages for pain and suffering and for loss of future earning capacity must prove actual special damages such as medical expenses and loss of earnings. Civil Code section 3333 provides that for torts, ". . . the measure of damages . . . is the amount which will compensate for all the detriment proximately caused. . . ."

**(32)** Loss of earning power is an element of general damages that may be inferred from the nature of the injury, with or without proof of actual earnings or income either before or after the injury. (*Connolly* v. *Pre-Mixed Concrete Co.* (1957) 49 Cal.2d 483, 489 [319 P.2d 343]; *Neumann* v. *Bishop* (1976) 59 Cal.App.3d 451, 462 [130 Cal.Rptr. 786].) The test is not what the plaintiff would have earned in the future but what she could have earned. This is an element of general compensatory damages. Such damages are ". . . awarded for the purpose of *compensating* the plaintiff for injury suffered, i.e., restoring . . . [her] as nearly as possible to . . . [her] former position, or giving . . . [her] some pecuniary equivalent. (See Rest, Torts, §§ 901, 903, 905, 906; C.C. 3333; 54 Cal. L.Rev. 1559; 19 Hastings L.J. 1071; 22 Am. Jur.2d, Damages, §§ 11 et seq., 80 et seq.; BAJI (5th ed.) Nos. 14.00, 14.01.)" (Italics in the original.) (4 Witkin, Summary of California Law (8th ed) Torts, § 842, pp. 3137-3138.) Impairment of the capacity or power to work is an injury separate from the actual loss of earnings. (*Rodriguez* v. *McDonnell Douglas Corp.* (1978) 87 Cal.App.3d 626, 656 [151 Cal.Rptr. 399].) The plaintiff may recover even where she was

not working and earned nothing. (*Tornell* v. *Munson* (1947) 80 Cal.App.2d 123, 125 [181 P.2d 112].)

**(33)** Plaintiff is entitled to recover damages for physical pain and for mental suffering from her physical injury. These injuries constitute the principal elements of tort personal injury damage. An award failing to compensate an injured plaintiff where pain and suffering was present is inadequate as a matter of law. (*Capelouto* v. *Kaiser Foundation Hospitals* (1972) 7 Cal.3d 889, 893 [103 Cal.Rptr. 856, 500 P.2d 880].) Pain and suffering are detriment factors for which an injured plaintiff must be compensated if these detriment factors are caused by defendant's tort. (Civ. Code, § 3333.) The absence of medical bills or medical testimony will not foreclose a recovery for pain and suffering. (See *Capelouto* v. *Kaiser Foundation Hospitals*, *supra*, 7 Cal.3d 889, 895.) "Moreover, even in the absence of any explicit evidence showing pain, the jury may infer . . . pain, if the injury is such that the jury in its common experience knows it is normally accompanied by pain." (Citation.) (*Id.*, at p. 896.) The ordeal of plaintiff Hilliard from the time the Dalkon Shield was inserted into her uterus to her hysterectomy was substantial evidence permitting the jury to infer pain even if she had not testified to her pain. Her calamitous experiences to the date of the trial were such that the jury could infer great mental anguish, pain, and suffering.

**(34)** The plaintiff's election to voluntarily have the abortion in 1973, and the second abortion and the hysterectomy as her final surgery does not detract from, or discredit the damage award. These medical procedures were directly or proximately caused by the presence of the Robins' IUD in her pelvic cavity outside the uterus and the damage that it had caused to her female reproductive system and to other organs in her pelvic cavity. These injuries continued to cause her severe problems even after the IUD was removed. The device, in a part of plaintiff's body where it was not supposed to be, caused plaintiff unusual pain, weakness, and discomfort during her 1973 pregnancy even though neither she nor her doctors were sure of the cause or source of the pain at the time of the first abortion. These feelings of plaintiff, caused by the Dalkon Shield, compelled plaintiff to make the first abortion election.

Her fears of an abnormal birth or a defective child in her last pregnancy were the result of the pain, the discomfort and the mental anguish she suffered. The fears were heightened by her numerous major abdominal surgeries.

The subject of defendant's claims about the voluntary surgeries were questions of fact for the jury. The jury had to consider the elective medical

Case 1:06-cv-00008   Document 46   Filed 01/18/2008   Page 39 of 39