ORIGINAL

FILED
DISTRICT COURT OF GUAM
JAN 24 2008 
JEANNE G. QUINATA
Clerk of Court

LEONARDO M. RAPADAS
United States Attorney
MIKEL W. SCHWAB
Assistant U.S. Attorney
KATHARYNE CLARK
Special Assistant U.S. Attorney
Sirena Plaza, Suite 500
108 Hernan Cortez Avenue
Hagatna, Guam 96910
Tel: (671) 472-7332
Fax: (671) 472-7215

Attorneys for United States of America

DISTRICT COURT OF GUAM
TERRITORY OF GUAM

| | |
|---|---|
| DEBORAH K. RUTLEDGE and THOMAS R. RUTLEDGE<br><br>Plaintiff,<br><br>vs.<br><br>UNITED STATES OF AMERICA<br><br>Defendant. | CIVIL CASE NO. 06-00008<br><br>RESPONSE TO MOTION IN LIMINE TO EXCLUDE OR LIMIT TESTIMONY OF DR. MERIWETHER AT TRIAL |

The United States hereby submits this Opposition to Plaintiff's Motion in Limine, filed January 10, 2008, seeking to exclude, or in the alternative, limit the testimony of Defendant's expert witness Dr. Michael Meriwether.

As discussed more fully below, Plaintiffs' Motion is poorly taken and should be denied. Dr. Meriwether is a Board-certified neurosurgeon in private practice and is highly qualified by education, training, and experience as an expert in his field. His testimony is relevant, and it will assist the trier of fact in determining the central issue in this case, namely, whether a delay in diagnosis of Plaintiff's cauda equina syndrome occurred. His methodology is sound and established as the way physicians analyze medical issues.

Further, contrary to Plaintiffs' assertions, Dr. Meriwether provided a written expert report in accordance with Rule 26. Plaintiffs' counsel further had the opportunity to depose Dr. Meriwether in order to understand the medical facts underlying his opinions, but chose instead to abruptly end the deposition and limit his inquiry. Accordingly, Plaintiffs' motion to limit the testimony of Dr. Meriwether on claim of surprise and prejudice is without sound basis and should be dismissed.

Finally, Plaintiffs' assertion that Dr. Meriwether is in some way "the wrong expert," and thus his opinion should be excluded, simply borders on the foolish. Dr. Meriwether is a Board certified neurosurgeon. He alone among the experts retained to educate the Court about the disease processes in this case has actually diagnosed and treated patients with cauda equina syndrome. Plaintiffs' experts each admitted he has not ever had that opportunity, because the treatment of cauda equina is within the province of the neurosurgeon and not the emergency room physician or the neurologist.

### 1. Dr. Meriwether's Testimony is Relevant and His Methodology is Sound, Well Established and Reliable

Plaintiffs seem to argue that the testimony of neurosurgeon Dr. Michael Meriwether is neither relevant nor reliable, and therefore should be excluded, because Dr. Meriwether did not base his opinion on deposition testimony obtained by Plaintiffs' counsel. (Pl.'s Mem. P. & A. Mot. Limine 5 - 8). Even if it may be assumed, *arguendo,* that relevant information may be contained in the referenced depositions taken by Plaintiffs' counsel; such an argument ignores the plain fact that Dr. Meriwether obtained the necessary information upon which to base his opinion from a superior source.

First, Dr. Meriwether exhaustively reviewed the medical records of Plaintiff's treatment which is at issue in the instant case. A review of medical records is the long established and accepted methodology by which physicians gain information and facts, and fully complies with the *Daubert* requirements of relevance and reliability. Dr. Meriwether also possesses vast information based on his education, training, and experience as a neurosurgeon. Further, he

conducted an exhaustive review of the peer reviewed literature relevant to cauda equina syndrome to augment his own experience. In short, Dr. Meriwether possessed abundant information from which to base his expert opinions, and his methodology comports with the *Daubert* standards of relevance and reliability.

### a) Analysis of Controlling law: <u>Federal Rule of Evidence 702 and the *Daubert* Standard</u>

This issue is controlled by <u>Federal Rule of Evidence 702</u>, which provides:

> if scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

<u>F.R.E. 702</u>.

The United States Supreme Court abandoned the old "Frye Test" with the advent of <u>*Daubert* v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 589, 113 S. Ct. 2786,125 L. Ed. 2d 469 (1993)</u>.

*Frye* directed the courts as follows: "Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while the courts will go a long way in admitting experimental testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs." <u>293 F. 1013 (D.C. Cir 1923)</u>.

In *Daubert,* the Supreme Court held that Rule 702 imposed a special gate keeping obligation upon a trial judge to make a preliminary assessment of the admissibility of expert scientific

testimony. Specifically, the Court held that under Rule 702, "the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Id.* In making this determination, the trial court engages in a two-part inquiry. First, the court must determine whether the expert's testimony reflects "scientific knowledge," that is, "whether their findings are 'derived by scientific method' and whether their work product amounts to 'good science.'" *Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1315 (9th Cir. 1995) ("Daubert II").

Second, the court must determine whether the proffered expert testimony is relevant, "i.e., that it logically advances a material aspect of the proposing party's case." *Id.* Essentially, under *Daubert,* the trial court's task "is to analyze not what the experts say, but what basis they have for saying it." *Id.* at 1316. In so doing, the Court must determine the witness' qualification as expert. "The question of admissibility only arises if it is first established that the individuals whose testimony is being proffered are experts in a particular . . . field." *Id.* at 1315. Thus, as an initial matter, the trial court must determine whether the proffered witness is qualified as an expert by "knowledge, skill, experience, training or education." Fed. R. Evid. 702.

To satisfy this standard, it is essential that "the proposed witness' qualifying training or experience, and resultant specialized knowledge, are sufficiently related to the issues and evidence before the trier of fact [such] that the witness's proposed testimony will be of assistance to the trier of fact." Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence,* P 702[04][1][b], at 702-45 (citing *United States v. Chang,* 207 F.3d 1169, 1173 (9th Cir. 2000)).

In the instant case, the issue of negligence raised by Plaintiffs is whether there was a delay in diagnosis of the onset of Plaintiff Deborah Rutledge's cauda equina syndrome, a surgical condition of the spinal cord. Clearly, scientific medical evidence will be helpful to Your Honor. There can be no realistic argument that the testimony of a neurosurgeon is not relevant or helpful in this inquiry.

Your Honor's next inquiry is whether Dr. Meriwether's opinions are relevant and reliable, i.e. was proper scientific methodology followed, and whether this expert is qualified to

reach an opinion by utilization of scientific methodology. Plaintiffs seem to argue that Dr. Meriwether's analysis does not reflect appropriate scientific methodology for lack of reading all the depositions obtained by Plaintiffs' counsel prior to writing his report. Plaintiffs' analysis of this matter is incorrect.

The evidence is undisputed that Dr. Meriwether is a highly qualified, Board-certified neurosurgeon. He has been engaged in the practice of medicine since graduation from medical school in 1975. Following an internship year at National Naval Medical Center, Bethesda, Md., he completed a four year neurosurgical residency from 1976 to 1980, also at NNMC Bethesda. Dr. Meriwether then served as an attending neurosurgeon in the U.S. Navy until 1984. After leaving the Navy in 1984, Dr. Meriwether entered the private practice of neurosurgery in Sarasota, Florida.

In addition to caring for his own patients, Dr. Meriwether served as Chief of Staff, Vice Chief of Staff, and Chief of Surgery at HCA Doctor's Hospital, Sarasota, Florida. Dr. Meriwether also serves the Labor Board of Florida as a consultant in workers' compensation matters. (Meriwether, Curriculum Vitae 1 - 4) (Attached as Exhibit 1).

Clearly, Dr. Meriwether is qualified as an expert by education, training, and experience to offer scientific opinions as to the standard of care in the evaluation of complaints of back pain, neurological complaints, and the diagnosis, treatment, and prognosis of cauda equina syndrome.

Your Honor must next evaluate whether the proffered expert testimony is reliable. Generally, to satisfy Rule 702's reliability requirement, "the party presenting the expert must show that the expert's findings are based on sound science, and this will require some objective, independent validation of the expert's methodology." _Daubert II_, 43 F.3d at 1316. Toward this end, the Supreme Court in _Daubert_ set forth the following factors for the trial court to consider when assessing the reliability of proffered expert testimony.

First, "a key question to be answered in determining whether a theory or technique is . . . knowledge that will assist the trier of fact will be whether it can be (and has been) tested." 509 U.S. at 593.

Second, the Court looks at whether the theory or technique has been subjected to peer review and publication. *Id.* Because publication in a peer-reviewed journal increases the likelihood that substantive flaws in the technique will be detected, "[t]he fact of publication (or lack thereof) . . . will be a relevant, though not dispositive, consideration in assessing the scientific validity of a particular technique or methodology on which an opinion in premised." *Id.* at 594.

Third, "in the case of a particular scientific technique, the court ordinarily should consider the known or potential rate of error . . . and the existence and maintenance of standards controlling the technique's operation." *Id.*

Fourth, the Court considers the degree of acceptance of the method or technique within the relevant scientific community. *Id.*

Finally, in engaging in this analysis, the trial court should be mindful that:

The inquiry envisioned by Rule 702 is . . . a flexible one. Its overarching subject is the scientific validity -- and thus the evidentiary relevance and reliability -- of the principles that underlie a proposed submission. The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate.

*Id.* at 594-95 (footnotes omitted).

In the instant case, Your Honor's analysis is a simple one. Dr. Meriwether is a highly qualified, credentialed neurosurgeon who has spent the last 33 years treating neurosurgical patients. He is offering an opinion about a neurosurgical issue. His methodology - reading the patient's medical records and reviewing the peer reviewed literature about the topic at issue - is certainly not a novel or untested approach to solving a medical diagnostic problem. Quite to the contrary, it is what doctors do, both in practice when actually caring for their patients, and in forming their expert medical opinions in the litigation context.

Plaintiffs' argument that, because Dr. Meriwether did not read all discovery depositions obtained by Plaintiffs' counsel, his testimony "violates fundamental principles of science and

*Daubert's* requirements" (Pl.'s Mem. 7) is meritless. Further, the cases cited by Plaintiffs are easily distinguished from the instant case.

In Plaintiff's Memorandum of Points and Authorities in Support of Plaintiff's Motion in Limine to Exclude or Limit Expert Testimony of Dr. Meriwether at Trial, Plaintiffs mischaracterize the holding of <u>United Phosphorus Ltd. v. Midland Fumigant</u> 173 F.R.D. 675 (D. Kan. 1997) in suggesting that the expert's testimony was excluded because the expert did not read all the depositions (Pl.'s Mem. 7-8). In *United Phosphorus*, the parties retained economist experts to offer an opinion about the value of a trademark. A critical part of the methodology employed in performing an expert economic analysis of the value of the trademark involved the expert's knowledge of the amount previously paid to acquire the trademark. <u>Id.</u> at 683. This piece of information was only available to the opposing expert from a reading of the depositions of the corporate officers. The expert rendered his opinion of the present value of the trademark without gaining the necessary information about past value of the trademark. *Id.*

The court found that the lack of this specific, vital piece of information was fatal to finding the expert used sound methodology. The Court noted: "Consequently, he was required to evaluate the Quick-Phos trademark with little knowledge about the facts of the case, and no knowledge about the underlying admissions from Midland's president and sales managers. The court finds that such ignorance of undisputed facts violates *Daubert's* requirement that an expert report and opinions must be based on "scientific knowledge." <u>Id.</u> at 683. Contrary to the assertions of Plaintiffs in the instant case, the court excluded the report of the expert, not because of a mechanical requirement that he read all depositions, but because his failure to read depositions of certain corporate officers meant he did not have information necessary to utilize appropriate methodology to conduct a proper scientific analysis of the problem. *Id.*
Plaintiffs attempt to inject another red herring into Your Honor's analysis by stating that Dr. Meriwether "incorrectly assumed a key element of his expert opinion," that a MRI scan was not available on Guam. (Pl.'s Mem. 8). Dr. Meriwether's written opinion states: Plaintiff's

presentation through August 17, 2004 was consistent with lumbar disc herniation and radiculopathy. (Meriwether, M.D., Ph.D. Expert Report 3, ¶2.) (Attached as Exhibit 2).

Dr. Meriwether testified he would not have done an MRI based on Plaintiff's presentation at that time. (Meriwether Dep. 153: 1-3, Sept. 7, 2007.) (Attached as Exhibit 3). The presence or absence of a MRI on Guam is not a relevant factor in the analysis, and Plaintiffs in-artfully attempt to assert some sort of internal inconsistency by Dr. Meriwether.

Similarly, Plaintiffs seem to assert that because Dr. Meriwether relied on his training, experience, and education as a neurosurgeon, his own personal experience treating patients with cauda equina syndrome, and review of published peer reviewed articles regarding prognostic features of cauda equina syndrome, rather than reliance on Plaintiffs' hired expert's exam, or on insisting on examining her himself, that somehow his conclusions are called into question. This argument is disingenuous. Information notably omitted by Plaintiffs in their brief is that Dr. Meriwether is the only physician among the experts expected to testify in this case, including Dr. Steele, who has himself ever diagnosed or treated a patient with cauda equina syndrome! Indeed, Dr. Steele himself admitted in deposition that the treatment of cauda equina syndrome is in the province of a neurosurgeon, not a neurologist such as him. (Steele, M.D. Dep. 63:25 – 64:15, Sept. 25, 2007.) (Attached as Exhibit 4).

In summary, in the instant case, Dr. Meriwether possessed the necessary information to render an opinion from sources far superior to the depositions obtained by Plaintiffs' counsel. Dr. Meriwether read the patient's medical records, and further made an exhaustive review of the peer- reviewed literature to augment his own knowledge acquired through education, training, and experience as a neurosurgeon. On the basis of these well established methods, Dr. Meriwether formed an opinion regarding the proper evaluation of a patient with low back pain in the outpatient setting and diagnosis and prognosis of cauda equina syndrome as it relates to the case of Deborah Rutledge.

Simply put, scientific methodology does not always require abstract formulas and exotic machines! Contrary to Plaintiffs' assertion, sometimes scientific analysis is as simple as a

properly educated, trained, and experienced person reading the patient's medical records. Dr. Meriwether's methodology is scientifically sound, his testimony is relevant and reliable and very helpful – indeed, critical – to the trier of fact. Plaintiffs' motion should be denied.

### 2. Dr. Meriwether's Report is In Compliance with Rule 26

Plaintiffs ask the Court to exercise its discretion to exclude the expert report and testimony of Dr. Meriwether, a Board certified neurosurgeon, claiming his report violates Rule 26(a)(2)(B) and thus they are surprised and prejudiced.

Plaintiffs attempt to claim that Dr. Meriwether's report does not contain his opinions. Defendant submits that Plaintiffs' attempt to suppress the medical knowledge necessary to understand cauda equina syndrome, a crucial understanding for the Court in deciding this case, is no more than an effort to keep from Your Honor critical information vital to the Court's determination of the liabilities of this case.

Plaintiffs apparently urge an interpretation of Rule 26 as requiring that an expert must write in terms of "bullet points" or at an elementary school level. Rule 26 imposes no such requirement. Rule 26, consistent with the notice pleading of the Federal Rules of Civil Procedure, requires that the expert provide his opinion such that the opposing party is not surprised, or prejudiced by surprise. *Yeti by Molly v. Deckers Outdoor Corp.*, 259 F.3d 1101 (9th Cir. 2001).

Dr. Meriwether's report is in compliance with Rule 26. In his report, Dr. Meriwether states, with the scalpel precision of a practicing neurosurgeon, that:

1. The presentation of Mrs. Deborah Rutledge on 7/27/04 was consistent with a diagnosis of lumbar strain/lumbar disc disease.
2. Eventual failure of treatment of her 8/17/04 medical clinic revisit led to specialty referral to orthopedics, Naval Hospital, Guam. Her diagnosis was still consistent with a lumbar disc herniation with radiculopathy.
3. Between 8/17/04 and 8/28/04 signs and symptoms more indicative of cauda equina syndrome led to orthopedics evaluation correctly diagnosing this very rare

and unusual syndrome, and making urgent airevac referral to Tripler Army
Hospital where the proper diagnostic tool, an MRI scan, was available, and
immediate surgery was successfully performed.

(Meriwether, Rep. 3.) (Exhibit 2).

Plaintiffs, in briefing this issue, are quite vague as to what opinion(s) they feel may surprise and prejudice their case. Defendant suspects Plaintiff is attempting to prevent Dr. Meriwether from offering the opinion that Plaintiff's cauda equina syndrome actually began at the time her lumbar disc ruptured, and that this rupture occurred between 8/17/04 and 8/28/04.

Plaintiff was provided this information in Conclusion No. 3 of Dr. Meriwether's report. Further, in response to questioning by Plaintiff's counsel, Dr. Meriwether elaborated on Conclusion Number 3 at deposition:

```
20  Q.  Are you willing to give an estimate of
21  whether her disability or her condition would be
22  different if her diagnosis had been recognized on
23  July 27, 2004?
24  MS. CLARK: I'm sorry. An estimate of
25  what?
```
(p. 153)
```
1  A.  I don't see how it would be when you come
2  in with back pain. I wouldn't have MRI'd someone
3  at that point.
4  BY MR. KEOGH:
5  Q.  If it had been recognized at that point,
6  would her disability be different?
7  A.  I don't think it existed at that point.
8  I think she may have had a bulging disc, but I
9  think that two days before she saw Dr. Duncan when
```

> 10  she had fecal incontinence, and God knows why she
> 11  didn't seek medical attention for those two days,
> 12  but the two days prior to the 27th visit with
> 13  Dr. Duncan were probably when this thing herniated
> 14  out, extruded outside the disc space where it was
> 15  found on the MRI scan and subsequently had
> 16  surgery; and I think that's what constituted her
> 17  cauda equina syndrome.

(Meriwether Dep. 152 – 153.)

The evidence, including the medical records, the testimony of the health care providers, and Plaintiff's own testimony, will show that when Plaintiff was seen at Andersen Clinic, she had complaints of back and leg pain consistent with radiculopathy. However, as of the dates of her treatment at Andersen, she had not yet developed signs of cauda equina syndrome. Plaintiff claims the failure to diagnose cauda equina syndrome between July 27 and August 27 was negligence. Dr. Meriwether's opinion explains this seeming mystery. *Plaintiff was not diagnosed with cauda equina syndrome at Andersen because she had not developed cauda equina compression at that time.*

Despite the information contained in Dr. Meriwether's report, and despite a very blunt and plain language explanation offered at deposition, Plaintiffs' counsel declined to inquire further, and simply concluded the deposition:

> 18  Q.  But to answer the question, if it had
> 19  been recognized and properly diagnosed on August
> 20  27 and surgical intervention was done at that
> 21  time, can you estimate what her disability would
> 22  be now?
> 23  MS. CLARK:  Let me object to the form of
> 24  the question on several grounds.  First of

25  all, this witness has testified that he

(p. 154)

1  doesn't do disability examinations. He
2  certainly doesn't do disability -- to quote
3  you -- estimates. So I think your question in
4  that regard is improper. Secondly, he's
5  already answered it.
6  A.  I don't think you meant -- you meant July
7  27; and you said August 27.
8  BY MR. KEOGH:
9  Q.  I said -- July 27th is what I meant.
10 A.  What you meant was July. Yeah. No. I
11 don't think she had it then. I think she had a
12 disc problem.
13 Q.  Taking Counsel Clark's objection to mind,
14 am I correct that you are not providing us with
15 any disability assessments with respect to
16 Mrs. Rutledge?
17 A.  No. I've never seen her.
18 Q.  So it's correct you are not giving us a
19 disability assessment?
20 A.  How could I if I've never seen the
21 patient?
22 Q.  Would you just answer the question yes or
23 no? Are you giving --
24 A.  No.
25 **MS. CLARK:** Objection. He has answered.

(p. 155)

1  **THE DEPONENT:** Are you going to ask it
2  again? Let me answer it no again. Okay?
3  **MS. CLARK:** He's answered the question.
4  **MR. KEOGH:** All right. I'd like to take
5  a break for a few minutes and review my
6  records and see if there's anything further I
7  want to ask. Otherwise, we'll conclude.
8  **MS. CLARK:** Okey-dokey.
9  (Brief recess.)
10 **MR. KEOGH:** I have no further questions.
11 **MS. CLARK:** All right. Thanks.
12 **MR. SCHWAB:** Did we go back on the record
13 for that? Was that back on the record?

(Meriwether Dep. 153 – 155.)

The Court should further note that Plaintiffs' counsel insisted that he obtain Dr. Meriwether's deposition in his home city of Sarasota, Florida, for the stated reason that Dr. Meriwether's records would be there. Indeed, Plaintiffs' counsel declined to obtain Dr. Meriwether's deposition at a more central location that would be more convenient for all concerned. (See Exhibit 5, Correspondence of Counsel). Plaintiffs, until the instant Motion in Limine, never expressed any reservation that Dr. Meriwether intended to offer "surprise" opinions. Indeed, Plaintiffs' counsel's insistence on deposing Dr. Meriwether near his office caused Defendant to believe he wanted to examine additional documents, or perhaps texts and journals, to further investigate Dr. Meriwether's opinion. Certainly the opportunity to do so was made available.

Thus, Plaintiffs' claims of surprise and prejudice are poorly taken, and at best, any surprise comes from Plaintiffs' counsel's own omissions, whether deliberate or not, and not from any defect in Dr. Meriwether's report or from any lack of opportunity to gain information and avoid surprise. Exclusion of Dr. Meriwether's report is not founded in fact or law, and Plaintiffs' motion should be denied.

In asking the Court to exclude, Plaintiff cites case authority that does not support such a sanction in this case. Plaintiff relies on the case of Yeti by Molly v. Deckers Outdoor Corp., 259 F.3d 1101 (9th Cir. 2001), to support the request for exclusion. In that case, the Court exercised its discretion to exclude an expert report that was provided just before trial after delaying for two and a half years. There is no question, in this case, that Dr. Meriwether's report was timely.

In Yeti the Court noted that the report could not be rebutted due to the delay. There is no question, in this case, that Plaintiff has already hired experts and worked to rebut. Throughout the discovery period, Plaintiff has verbally wrestled with every fact witness, including each of the medical professionals who treated the patient at the Andersen Clinic, to argue that individual items in the medical records at the clinic point to a conclusion that she had Cauda Equina from her first visit to the Clinic. Each of the medical providers has disputed that. Plaintiff's experts, on the other hand, have mimicked Plaintiff's assertion that she had Cauda Equina from the beginning.

Plaintiff also relies on Jacobsen v. Dessert Book Co., 287 F.3d 936 (10th Cir.), *cert. denied,* 537 US 1066 (2002), a case involving a copyright infringement. The expert's report was challenged because it was a general report on the calculation of profits and did not address what profits would specifically be attributed to the particular infringements. In weighing whether the Court should impose the sanction of exclusion, the Court stated the following factors: "(1) the prejudice or surprise to the party against whom the testimony is offered; (2) the ability of the party to cure the prejudice; (3) the extent to which introducing such testimony would disrupt the trial; and (4) the moving party's bad faith or willfulness." 287 F.3d at 19.

Doctor Meriwether's report does, in fact, contradict Plaintiff's assertion that Plaintiff had developed cauda equina compression during her three visits to the Andersen Clinic. This is no surprise to Plaintiff. In fact, it is the essence of the dispute before this Court. Counsel, to the extent that a prejudice is perceived, has had every opportunity to explore, contradict and challenge the report. There would be no disruption of trial and there is no allegation of bad faith. Although Jacobsen is cited by the Plaintiff, the elements of that case weigh against any sanction of exclusion under Rule 26(a)(2)(B).

Finally, Plaintiff relies on the case of Sylla-Sawdon v. Uniroyal Goodrich Tire Co., 47 F.3d 277 (8th Cir.), *cert. denied*, 516 US 822 (1995), a products liability action focused on the failure of auto tires. The Court excluded an expert report where the attached curriculum vitae did not divulge any experience with tire manufacturing or tire failure analysis. In contrast, Dr. Meriwether has attached his curriculum vitae, which shows extensive experience in brain and spinal surgery.

None of the cases cited by Plaintiff support the sanction of exclusion in this case. Dr. Meriwether's report is in substantial compliance with the requirements of Rule 26.

Dr. Meriwether has succinctly stated his opinion of Plaintiff's presentation and the adequacy of her treatment at Andersen Clinic. He goes on to state that she subsequently developed cauda equina syndrome, was appropriately treated for that, and that there was no negligence. Dr. Meriwether's opinions, worded as a surgeon rather than as an attorney, are clear.

In order to succeed in this case, Plaintiff desperately needs to limit the medical knowledge available to the Court in understanding the underlying disease process. In contrast, the United States asserts that the Court will need as much information as possible and should have the benefit of both sides' experts to make an informed decision on Plaintiff's claim of negligence.

//
//
//

### 3. Dr. Meriwether's Education, Training, and Experience Precisely Qualify Him as an Appropriate and Helpful Expert in This Case

Finally, Plaintiffs allege that a Board certified neurosurgeon is not a proper expert because Plaintiffs do not allege negligence in the surgical treatment. This claim is frivolous. Plaintiffs allege a delay in diagnosis of a neurosurgical disorder. Plaintiffs' own expert Dr. Steele, acknowledged in deposition that "her whole illness was a surgical illness," (Steele Dep. 43: 13.) (Exhibit 4). Dr. Steele, a neurologist, admits he has never been the treating physician diagnosing a patient with cauda equina syndrome. (Steele Dep. 58: 15-18.) (Exhibit 4).

In summary, Dr. Meriwether has provided a report setting forth his opinions, which was prepared based on the standard methodology utilized by practicing physicians, and provided deposition testimony. Plaintiffs obtuse claims of "prejudice" and "surprise" are no more than a mask for a request that Your Honor exclude any and all evidence not favorable to their version of the facts. Plaintiffs' motion should be denied.

Respectfully submitted this 24th day of January 2008.

LEONARDO M. RAPADAS
United States Attorney
Districts of Guam and NMI

BY: /s/
MIKEL W. SCHWAB
Assistant U.S. Attorney
KATHARYNE P. CLARK
Special Assistant U.S. Attorney