

LAW OFFICE OF
**ROBERT L. KEOGH**
POST OFFICE BOX GZ
HAGATÑA, GUAM 96932
TELEPHONE (671) 472-6895

Attorneys for Plaintiffs

## IN THE DISTRICT COURT OF GUAM

| | |
|---|---|
| **DEBORAH K. RUTLEDGE and THOMAS R. RUTLEDGE,** | **CIVIL CASE NO. CIV06-00008** |
| Plaintiffs, | |
| vs. | **PLAINTIFFS' DISCOVERY MATERIAL DESIGNATION** |
| **UNITED STATES OF AMERICA,** | |
| Defendant. | |

Pursuant to LR 16.7(d)(2), plaintiffs designate and file a copy of the transcript of the deposition of Hugh McSwain taken on May 22, 2007. Plaintiffs are not in possession of the original transcript of this deposition which is in the possession of defendant United States of America.

**LAW OFFICE OF ROBERT L. KEOGH**
Attorneys for Plaintiffs

DATE: 2/5/08

By: ROBERT L. KEOGH

# ORIGINAL

IN THE UNITED STATES DISTRICT COURT
FOR THE TERRITORY OF GUAM

DEBORAH K. RUTLEDGE and THOMAS ) CIVIL CASE NO. 06-00008
R. RUTLEDGE,                    )
                Plaintiff,      )
                                )
        vs.                     )
                                )
UNITED STATES OF AMERICA,       )
                                )
                Defendants.     )
_____ )


VIDEO TELECONFERENCE
DEPOSITION TRANSCRIPT

OF

# HUGH McSWAIN

May 22, 2007
(Guam Time)




**COPY**

PREPARED BY:        GEORGE B. CASTRO
                    **DEPO RESOURCES**
                    #49 Anacoco Lane
                    Nimitz Hill Estates
                    Piti, Guam 96915
                    Tel:(671)688-**DEPO** * Fax:(671)472-3094

IN THE UNITED STATES DISTRICT COURT
FOR THE TERRITORY OF GUAM

DEBORAH K. RUTLEDGE and THOMAS ) CIVIL CASE NO. 06-00008
R. RUTLEDGE,                    )
            Plaintiff,          )
                                )
        vs.                     )
                                )
UNITED STATES OF AMERICA,       )
                                )
            Defendants.         )
_____)

     Video Teleconference Deposition of **Hugh McSwain**, taken on Tuesday, May 22, 2007, at the hour of 6:16 a.m. (Guam time), at the U.S. Attorney's Office, District of Guam, Sirena Plaza, 108 Hernan Cortez Avenue, Hagatna, Guam before George B. Castro, pursuant to Notice.  That at said time and place there transpired the following:

### APPEARANCES

For the Plaintiffs          LAW OFFICE OF ROBERT L. KEOGH
                            By:  **Robert L. Keogh, Esq.**

For the Defendant           OFFICE OF THE U.S. ATTORNEY
                            GENERAL, DISTRICT OF GUAM
                            By:  **Mikel W. Schwab, Esq.**

                            DEPARTMENT OF DEFENSE
                            By:  **Kathyarne Clark, Esq.**
                                 *(via phone line)*

Case 1:06-cv-00008     Document 56     Filed 02/05/2008     Page 3 of 63

## INDEX

**DIRECT EXAMINATION**

BY MIKEL W. SCHWAB                    4

**CROSS EXAMINATION**

BY ROBERT L. KEOGH                   10

**RE-DIRECT EXAMINATION**

BY MIKEL W. SCHWAB                   47

**RE-CROSS EXAMINATION**

BY ROBERT L. KEOGH                   51

## E X H I B I T S

**(None)**

1  **HAGATNA, GUAM, TUESDAY, MAY 22, 2007: 6:16 A.M.**

2

3      COURT REPORTER:   Let me go on record first

4  to state that today is Tuesday, May 22, 2007;

5  the time is 6:16 a.m. here on Guam.   We are

6  here at the U.S. Attorney's Office, District of

7  Guam, Sirena Plaza, 108 Hernan Cortez Avenue,

8  Hagatna, Guam.

9      We have the deponent, Dr. Hugh McSwain.   We

10 have present in the room here on Guam Attorney

11 Robert Keogh and Attorney Mikel Schwab.   Also

12 present via video conference is Attorney

13 Kathyarne Clark in Hawaii.   At this time, I'll

14 just swear in Dr. McSwain.

15

16

17                    **Hugh McSwain**

18 being duly sworn, was examined and testified as

19 follows:

20

21               **DIRECT EXAMINATION**

22 BY MR. SCHWAB:

23     Q   Good morning, doctor.   I appreciate you

24 getting together with us here long distance.   I

25 know we're inconveniencing you.   Have you ever

1  taken a deposition before?

2      A   No.

3      Q   Okay.   Then,  let  me  tell  you  this.

4  It's  a  written  record  that  we  take  of  your

5  testimony.      And   this   is   a   perpetuation

6  deposition,  so  we  do  anticipate  that  you  will

7  not   be   available,   at   least   that's   our

8  information  at  this  time,  for  the  trial.   So,

9  we're  going  to  do  our  best  to  do  this  as  though

10 we  were  at  trial  because  your  testimony  will

11 have  to  be  submitted  there  as  we  take  it  today.

12      It's  a  written  record  as  we  go  along,

13 so   it's   a   little   different   than   normal

14 conversation,  in  that  in  normal  conversation

15 sometimes  we  substitute  hand  gestures  or  use

16 shortcuts  that  we  don't  use  in  a  deposition

17 because  we're  trying  to  create  a  written  record

18 that  is  coherent.

19      Also,  we  try  not  to  talk  over  each

20 other  where  we  try  to  give  the  court  reporter  a

21 chance  to  make  sure  everything  gets  recorded

22 and  written  down  properly.

23      You're  under  oath  and  this  is  just  like

24 testimony  in  court,  so  you've  been  sworn  in.

25 And  we'd  ask  also  that  anytime  you  have  a

1   question about anything you've been asked, if
2   the question is not clear, if it's anything
3   confusing, please feel free to say so.
4          And when this testimony is all over,
5   you'll get a written transcript of it. You
6   have an opportunity at that time to make some
7   corrections. If the corrections are
8   substantial, the other attorney may comment on
9   that, but for the most part you'll have a
10  chance to look at everything and correct any
11  mistakes, any misspellings, and clear up
12  anything that you think needs to be cleared up
13  at that time. But again, I'd encourage you to
14  ask us questions if you think anything is
15  confusing. Also, we'd ask you not to
16  speculate. We're asking for things that you
17  know.
18         And I think I'll start off by just
19  asking you a little bit about your background.
20  What your specialty is, so that the court can
21  know who you are and what your education is and
22  what your specialty is. And then I'll turn it
23  over to Mr. Keogh for some questions. So, if I
24  may --
25         MS. CLARK: I'm sorry to interrupt.

1          MR. SCHWAB:  Certainly.

2          MS. CLARK:  I can't see the witness --

3    now, okay.

4          MR. SCHWAB:  You can now?

5          MS. CLARK:  I can see him now.

6          MR. SCHWAB:  Okay.

7          MS. CLARK:  I can now.  Thanks.

8          MR. SCHWAB:  Good.

9    BY MR. SCHWAB:

10         Q  So, if it's okay with you, I'll start

11   off by asking you what has been your education

12   starting with graduating from high school?

13         A  I began college at a state college in

14   Colorado.   I received a bachelor's degree

15   there.   I went to Stanford for a Masters of

16   Science in Chemistry over there in 1993.   I

17   attended USUS, Uniformed Services University of

18   the Health Sciences in Bethesda, Maryland.

19         Q  Uh-huh.

20         A  I graduated in May of 1997 with an M.D.

21   From there I went to Naval Medical Center in

22   San Diego for my internship, which consisted of

23   one year.   In 1998, I started the diagnostic

24   radiology program at Naval Medical Center, San

25   Diego.   I started three years of staff

1   radiology there. And in 2005, I began a
2   neuroradiology fellowship at University of
3   California, San Francisco which were completed
4   December 2006. I am currently on staff at
5   Naval Medical Center, San Diego as a
6   neuroradiologist.

7   Q   So, a neuroradiologist, is that your
8   title?

9   A   Yes.

10  Q   And what is your rank?

11  A   Lieutenant Commander.

12  Q   Lieutenant Commander. And if you
13  could, just tell us a little bit about
14  neuroradiologists. How common is that? How
15  specialized is that?

16  A   It's a subspecialty of radiology. It
17  receives training in reading M.R.'s, C.T.'s of
18  the head, neck, and spine.

19  Q   Okay. At this time I'm going to turn
20  you over for questioning by Mr. Keogh who is
21  the plaintiff's attorney.

22      MR. KEOGH: I cannot see him.

23  A   I can see you though. I can see and
24  hear you.

25      MR. SCHWAB: We can't see you anymore.

1    A    All right.    Let me put this on pause
2 and --
3         MR. SCHWAB:    That's all right, no, no.
4 We'll get our guy here to -- (pauses).    Yeah,
5 it's the wonders of technology which are great,
6 but you have to expect, I guess, some of these
7 glitches.    Actually, no.    I can -- we can
8 almost see you.    It's like a shadow of you,
9 which means that there's prob- --
10    A    The lights went dim in here.
11         MR. SCHWAB:    Oh, there we go.    So, with
12 the lights on --
13         MS. CLARK:    He's a doctor.
14         MR. SCHWAB:    Now, all we could see is
15 eyes and hair and the -- so, there must be
16 something.    Is the lighting different than it
17 was before?
18    A    It went off and it came back on.    I'm
19 not sure that it's particularly different,
20 though.
21         MR. SCHWAB:    Might be a matter of some
22 sort of setting.
23    A    Let me see if I could flip the light
24 switches here.
25         MR. KEOGH:    That's good.

1          MR. SCHWAB:  Ah, now you look normal
2     again.

3          MR. KEOGH:   No.

4          MR. SCHWAB:  No, by the -- there we go.
5     That's it.   That looks much better.   I think
6     that's pretty good.  What do you think?

7          MR. KEOGH:   Yeah, it's okay.

8      A   Okay?

9          MR. SCHWAB:  Okay.   Then I'm going to
10    ask Mr. Keogh if he'll ask you questions at
11    this time.

12     A   Okay.

13

14                    **CROSS EXAMINATION**

15    BY MR. KEOGH:

16     Q   Dr. McSwain, my name is Robert Keogh.
17    We have a better video now.

18         MR. SCHWAB:  He had to play with some
19    light in the room.   We're seeing a shadow and
20    then --

21         MS. CLARK:   Yeah, I -- this is Hawaii.
22    I can't see anybody but Mikel -- well, now,
23    there he is again.   Okay.

24         MR. SCHWAB:  (laughs)

25         MS. CLARK:   (laughs) I was going to say

1  I can't see anything but Mikel and Robert. I
2  want my money back.
3          MR. SCHWAB: Would I get enough of --
4          MR. KEOGH: This isn't going to be very
5  good as far as presentation at trial. I think
6  we need to close this one now, maybe it's part
7  of that.
8          MR. SCHWAB: Oh, we're fine. No, no.
9  Look, our visuals fine. It's the lighting in
10 his place. We need to call a technician on
11 that side to see if he can --
12         TECHNICIAN: Yeah, sir, is there a
13 window open there by any chance? Do you have
14 light coming in, in a window?
15    A    No. I am in a completely closed off
16 room.
17         TECHNICIAN: With only one light?
18    A    It's the main switch. How's that?
19 Better?
20         MR. KEOGH: It's about the same, but
21 it's okay.
22         MR. SCHWAB: Maybe what you can do is
23 call that technician and see if he can just
24 step in the room and see if his lighting is --
25         TECHNICIAN: Okay.

Case 1:06-cv-00008    Document 56    Filed 02/05/2008    Page 12 of 63

1    MR. SCHWAB: Other than that, we're

2 okay? We're good enough. We can do this.

3 Okay. Mr. Keogh?

4    MR. KEOGH: Okay.

5 BY MR. KEOGH:

6    Q  Dr. McSwain, I noticed that you're

7 sitting there and you don't have any papers

8 with you. Do you have any documents with you

9 this morning or this afternoon?

10    A  I do not. This was left here for me,

11 some paperwork. I'm not sure what this is.

12 This is the IP address. So, no, I do not have

13 any paperwork with me this morning.

14    Q  In preparation for this deposition,

15 have you reviewed any paperwork?

16    A  They sent me the report of the film I

17 read.

18    Q  All right. I thought he was going to -

19 - excuse me for one minute.

20    MR. KEOGH: I thought he was going to

21 have these things (indicating).

22    MR. SCHWAB: I did too. I probably --

23 I sent it to him, so that he'd have it. But I

24 assume he's looked at them and understands

25 them.

1        MR. KEOGH: Well, but I have specific

2   questions about these documents, that I'm --

3        MR. SCHWAB: Do you want to get a fax

4   number and fax them over? I mean, usually

5   people bring their documents that we send them.

6      A   Well, normal circumstances, I probably

7   would've paid a little bit better attention,

8   but unfortunately I've been a little bit

9   distracted.

10       MR. SCHWAB: Oh, I can understand.

11     A   So, I apologize for that.

12       MR. SCHWAB: Hey, the lighting just got

13  perfect, by the way. Yeah, so you want me to

14  fax those?

15       MR. KEOGH: Let me see what we can do

16  here.

17       MR. SCHWAB: Okay.

18  BY MR. KEOGH:

19     Q   Do you have a copy of your report

20  available there?

21     A   Not with me, no.

22     Q   All right. Well, let me -- but you

23  reviewed it as recently as when?

24     A   Within the past -- whenever it was sent

25  to me, three to four weeks.

1  Q My understanding is that you're about

2 to deploy somewhere away from San Diego; is

3 that correct?

4  A Some place unsafe, yes.

5  Q Okay. How soon is that going to be?

6  A It's within the next week or so.

7  Q All right. Well, let me see what I can

8 do with this. My understanding is that your

9 only involvement with this treatment of Mrs.

10 Rutledge was having read an x-ray; is that

11 correct?

12  A That is correct.

13  Q And I'm correct that you've never

14 actually met Mrs. Rutledge?

15  A That is correct.

16  Q Other than reading and giving a report

17 on an x-ray, have you done any other medically

18 related treatment or services for Mrs.

19 Rutledge?

20  A No, I have not.

21  Q Can you tell us from having read the x-

22 ray what your report was, what your findings

23 were?

24  A As I recall, to the best of my

25 knowledge, that there were minimal, if any,

1  degenerative changes with no acute fractures or
2  dislocations.

3      Q    All    right.    You've    used    the    word
4  "minimal", did you refer to the minimal in the
5  written    report    that    you    prepared?    Do    you
6  recall?

7      A    I'm    sorry.    Can    you    clarify    the
8  question please?

9      Q    Yeah.    I'm looking at what would appear
10 to be the radiologist report from -- (pauses).

11     MS.    CLARK:    May I make a suggestion,
12 Mr. Keogh?    If doctor has something take notes
13 with, we can certainly read his report to him.
14 BY MR. KEOGH:

15     Q    I'm looking at a report dated August 2,
16 2004, which has an impression stated, Number 1,
17 Degenerative Disk disease at L5-S1.    Given the
18 patient symptoms, MRI of the lumbar spine is
19 suggested for further evaluation.    Does that
20 sound like the report that you prepared with
21 respect to this matter?

22     A    Can you refresh me on the brief history
23 for the given report?

24     Q    All    right.    It states, History:    43-
25 year-old female with two-week progressive lower

1  back  pain,  with  no  bowel  or  bladder

2  incontinence.  The  patient  graduation  of  pain

3  to  foot  on  left  and  to  inferior  aspect  of  the

4  right  gluteus  region.

5  Findings:  Five  views  of  the  lumbar

6  spine  demonstrate  degenerative  changes  at  L5-S1

7  with  disk  space  narrowing  and  facet  sclerosis.

8  On  the  oblique  views,  there  is  a  prominence  of

9  the  left  pedicular  region  which  maybe  due  to

10 partial  sacralization  of  the  L5  vertebral  body.

11 There  is  Grade  1  anterolisthesis  of  L2  on  L1.

12 There  is  otherwise  normal  height  and  alignment

13 of  the  lumbar  vertebral  bodies.  There  are  mild

14 osteoarthritic  changes  at  L1-2  with  anterior

15 osteophytes.  The  remaining  bones  and  soft

16 tissues  were  unremarkable.

17 MR.  KEOGH:  Now  we  lost  him.  Now  we

18 don't  see  you  anymore.

19 MR.  SCHWAB:  Actually  we  could  see  you

20 like  a  shadow.

21 A  Let  me  turn  on  --  (pauses).

22 MR.  SCWAB:  There  you  go.

23 MR.  KEOGH:  Okay.

24 A  Okay.

25 BY  MR.  KEOGH:

1    Q    Then it's --

2    A    Now, what was --

3    Q    Then it has impression, degenerative

4 disk disease at L5-S1.    Given the patient

5 symptoms, MRI of the lumbar spine is suggested

6 for further evaluation.    And then it has

7 dictated by Hue McSwain.    And then it says,

8 DOD, 5 August 2004; DOT, 6 August of 2004.

9 Transcription date and time, 9 August 2004 at

10 9:35.    And then it has interpreted by your name

11 and then approved by your name, 9 August 2004

12 at the 12:17.    Does that help refresh your

13 recollection about his report?

14    A    Yes, it does.

15    Q    All right.    Am I correct that you were

16 on Guam at the time that you read this x-ray?

17    A    Yes.

18    Q    And you were stationed at the Naval

19 Hospital; is that correct?

20    A    I was on a temporary additional duty at

21 the Naval Hospital.

22    Q    Can you describe temporary duty for me

23 please?

24    A    When you are sent somewhere remote from

25 your primary duty station, at that time it was

1   Naval Medical Hospital, San Diego, in order to

2   provide coverage in your specialty at another

3   location.

4       Q   And how long was the assignment to Guam

5   at this time?

6       A   I don't remember the exact number of

7   days but it was on the range of two weeks.

8       Q   Are you familiar with the computerized

9   record keeping process at the Naval Hospital?

10      A   Which one would that be?

11      Q   I don't know.

12      A   I know of CHCS.

13      Q   What is CHCS?

14      A   It's Composite Health Care System.

15  It's where we verify our reports and where our

16  reports go to. The provider can look up labs,

17  radiology reports. That's the extent of my

18  knowledge.

19      Q   And this is the system that was

20  available when you were on Guam?

21      A   Yes.

22      Q   If you can help me understand, when you

23  prepare the written report that I've just read

24  to you from, was that inputted into the CHCS

25  system?

1    A    After it was transcribed, yes.    I

2 dictate into a microphone and it goes off site,

3 the transcriptions transcribes it, and the time

4 that you saw the transcription is when it

5 became available on CHCS, I believe.

6    Q    All right.    Let me go through these

7 dates.    The documents states that it was from

8 an x-ray.    It says exam date, August 2, 2004.

9 Is that the date that the actual x-ray was

10 taken?

11    A    It should be.    I can't answer that.

12 I'm not an expert in entering exams into CHCS,

13 but that's when it was at least ordered.

14    Q    Now, see, that causes some confusion

15 for me.    "Ordered" means the date that the

16 treating physician or medical personnel

17 actually requested that the x-ray be done?

18    A    This is stepping outside my bounds of

19 expertise.    I'm sorry, but I can't comment.    My

20 supposition would be that the date of exam

21 would be the date the patient was examined.

22 But going into the aspects of CHCS, that's

23 outside of my boundaries of expertise.

24    Q    All right.    When you say the patient

25 was examined, does that mean examined in the

1  sense of having the actual x-ray taken?

2  A  When I say the patient, the date of

3  exam, to me, that means the date the x-ray was

4  performed on.

5  Q  Okay.  And the terms, the initials, DOD

6  and DOT with dates after them, what do those

7  refer to?

8  A  I am unsure about that.  Again, that's

9  getting outside my level of expertise.  The

10 CHCS person who would be better suited to do

11 the exact meaning of those.

12 Q  All right.  What's stated on this

13 report here is, DOD, 5 August 2004, would that

14 be Date of Dictation?

15 A  It could be.

16 Q  All right.  When you review or

17 interpret or reviewed -- in your performing

18 services, do you actually review the written

19 report that comes out of the process?

20 A  Yes.

21 Q  You know, it would certainly be easier

22 if we could have these documents in front of

23 you so that we could be looking at them.

24   MR. KEOGH:  Do you want to try and fax

25 something to him?

1          MR. SCHWAB:  You want to do that?  I'll

2   be glad to do it.

3          MR. KEOGH:  All right.  I think we're

4   going to try and fax something to you, doctor,

5   so that we have these there.

6      A   Okay.  That would be helpful.

7          MR. SCHWAB:  Okay.  Let's -- if you

8   don't mind, do you have a fax number for the

9   person there or do you know where the person

10  there is located so we could ask for a fax

11  number.

12     A   The contact number I have for Jim

13  Heckman --

14         MR. SCHWAB:  Yeah.

15     A   -- is 619 --

16         MR. SCHWAB:  Yeah.

17     A   -- 557-7130.

18         MR. SCHWAB:  Okay, great.  I'll call

19  him right now and tell him or find out a fax

20  number from him.  So, we're going to go off the

21  record?

22         MR. KEOGH:  Yes.

23         MR. SCHWAB:  Okay.

24         (Off the record from 6:37 p.m. to 6:53

25  p.m.)

1        MR. SCHWAB:  All right, we're back on
2   the record after faxing three pages to Dr.
3   McSwain.  And the three pages are all the same;
4   is that my understanding?

5        MR. KEOGH:  Well, there are some minor
6   differences.  Let me --
7   BY MR. KEOGH:

8        Q   Dr. McSwain, have you had a chance to
9   review what we faxed to you?

10       A   Yes, I have reviewed this.

11       Q   All right.  If you can look down on the
12  lower right portion of each of the documents,
13  there is a stamped letters RUT and then a
14  number.  One's 38- -- 038, 040, and 306.  Do
15  you see those?

16       A   I have -- yes, RUT 038, RUT 040, and
17  RUT 306.

18       Q   All right.  Am I correct in my
19  understanding that all three of these documents
20  are the same report?

21       A   They appear to be so, yes.

22       Q   All right.  Let me focus first on RUT
23  306.  Do you have that in front of you?

24       A   I have this in front of me.

25       Q   All right.  This is the version that I

1    read to you from a little while ago. And this
2    is where I was looking in the upper right-hand
3    corner. It states: Exam date, 2 August 2004
4    at 11:24. Am I correct then in my
5    understanding that that's the date that the x-
6    ray was taken? The actual film was taken?

7       A   I can't answer that. That's what the
8    exam date is. Again, I'm not an expert in
9    CHCS, if there's every any discrepancies
10   between the exam dates listed up there and exam
11   stamped on the films. I can't answer that. I
12   can tell you that from looking at this, the
13   date of transcription was 9 August 2004. And I
14   approved it on 9 August 2004.

15      Q   All right. Then down where -- in the,
16   under your impression portion, it has dictated
17   by Hugh McSwain, and that's where it has the
18   DOD, 5 August 2004. Do you know what that's
19   referring to?

20      A   I would be guessing at that. If you
21   would like for me to speculate, I would say it
22   was date of dictation. But again, I'm not an
23   expert in CHCS or their acronyms thereof.

24      Q   All right. When you review -- when you
25   do a report, do you then review the document

1 that's in front of you, RUT 306?

2 A    Yes.    At the bottom you will see

3 approved by McSwain, Hugh, 09 August 2004 at

4 12:17.    That indicates that I reviewed the

5 report and signed it.

6 Q    All right.    When you were on Guam for

7 this temporary duty, are the systems on Guam

8 different from the systems that you are used to

9 in San Diego?

10 A    In what way?

11 Q    Reporting of reports and review and

12 transcription of reports, approval of reports?

13 A    The transcription, I can't speak to.    I

14 can tell you that the CHCS used for reviewing

15 reports, whether it's for us or providers, is

16 basically the same.    So, the process for

17 reviewing our reports before we approve them is

18 pretty much the same.

19 Q    All right.    Is there a time limit

20 specified or required for the time from which

21 an x-ray is actually taken and the time that it

22 is read and then transcribed and reviewed, or

23 approved?

24 A    It terms of time limit, do you mean a

25 certain specified amount of time elapsed?    The

answer would be, no. When we dictate out a film, that is the day that it comes to us. What happens between the time that's taken to the time it comes to us, I can't account for. Sometimes films get lost. Sometimes films gets shuttled to the different places.

I can tell you that when a film comes to us, we read it the same day and we dictate it the same day. Then it goes to transcription. Transcription will transcribe it. How soon they transcribe it, I can't answer. There are certain delays, sometimes they get backed up. When they transcribe it, in which you can see at the bottom of the page, Transcription: 09 August 2004, less than three hours later, I had approved and verified that report.

Q  Okay. Is a period of time from, say, 2nd of August 2004 up to the 9th of August 2004, a typical amount of time that it would take for an x-ray to be taken, reviewed, transcribed, and then approved?

A  At which location you are you referring to?

Q  Guam.

1    A    That, I can't say.  I wasn't there long

2  enough to know what the time force is.

3    Q    All right.    What location could you

4  speak to?

5    A    I    can    speak    to    the    Naval    Medical

6  Center, San Diego.

7    Q    And    what    would    your    answer    be    with

8  respect to Naval Center San Diego?

9    A    We    have    a    digital    packs,    which    means

10  there    are    no    loose    films.    Everything    that's

11  gets    shot    get    sent    to    the    computer    and    read    on

12  the    same    day.    However,    that    being    said,    there

13  are    no    films    there.    All    it    is,    is    digital

14  computer    system.    So,    you    can    be    comparing

15  apples    and    oranges    comparing    Naval    Medical

16  Center, San Diego to Guam.

17    Q    All    right.    Looking    at    the    RUT    38

18  document, do you have that?

19    A    I have this in front of me.

20    Q    All    right.    Am    I    correct    in    my

21  understanding    that    the    only    difference    between

22  these    two    documents    is    that    there    is    a    stamp

23  and    a    --    looks    like    a    signature    of    Natalie    Y.

24  Giscombe    in    the    lower-right    corner    of    RUT    38?

25    A    Part    of    my    form    is    cut    off    on    the    left-

1 hand aspect, but to side-by-side comparison
2 what I can see, that does look like the only
3 difference.

4    Q   All right.  Do you have any way of
5 telling from either your experience or from
6 looking at these documents when that stamp and
7 signature was placed on this document?  When it
8 was placed?

9    A   There's no way I can know when that
10 stamp was placed on this document.

11    Q  When you review an x-ray film and do a
12 report, do you have an expectation of the time
13 within which it will transcribed and then
14 presented back to you for approval?

15    A   Well, that's -- define my expectation.
16 All radiologist would like to have their
17 reports dictated and transcribed within a
18 matter of minutes, but that's unrealistic.  As
19 far as expectations, no.  Some exams are more
20 urgent than others, but -- you know, like I
21 said, my expectation based on Naval Medical
22 Center, San Diego, are different from what I
23 experienced at Guam Naval Hospital, which has a
24 different system as well as less resources.

25    Q   All right.  What would your expectation

1   -- what was your expectation when you were on

2   Guam?

3      A   My expectation would be that the

4   studies would get transcribed. I didn't have a

5   set time period. My own personal was that,

6   they will get transcribed before I left, so I

7   can verify my reports and that somebody else

8   wouldn't have to do that. Again, I can't speak

9   to the transcription capabilities there, but I

10   was never told that they were backed up or this

11   was unusual. Other than that, I'd be

12   speculating.

13      Q   Okay. You mentioned the term, what's

14   realistic. Did you find it when you were in

15   Guam that it was unrealistic to expect an x-ray

16   to be transcribed any quicker than say from,

17   for a seven-day period?

18      A   I don't recall anything abnormal or

19   that I felt that the transcription was beyond

20   what I would have expected. I did not -- there

21   were never cases that, to my recollection, I

22   came back and I said, this is completely

23   unacceptable. So, the answer would be, no, I

24   don't recall anything that would remark the

25   transcription was taking too long.

1    Q    When you were on Guam for a temporary
2    duty, why were you assigned there for a two-
3    week period?
4    A    Because they needed coverage from
5    additional radiologist.
6    Q    Do you know why that was?
7    A    There were two people there and one was
8    leaving.
9    Q    When you --
10   A    And the next person who --
11   Q    Sorry, go ahead.
12   A    The next person who was going to
13   relieve the person who was leaving would not be
14   there for several months.
15   Q    When you were on Guam then, you were
16   one of two radiologists at the Naval Hospital?
17   A    That is correct.
18   Q    And you mentioned the term 'urgent'
19   when you were describing a process for
20   reviewing certain films.  Did you or do you now
21   consider this process of reviewing this film
22   and reporting on it as having been an urgent
23   matter?
24   A    Looking at the history, I would read
25   this out, the same way this time, and I would

1   put the, use the same terminology and I would
2   put the same level of urgency on this. This --
3   we see, multiple, multiple films. There are a
4   lot of people who get lumbar spine films who
5   have similar symptoms.

6       So, looking at this, hindsight is
7   always 20/20, but looking at this in a vacuum,
8   I wouldn't place the same level of urgency on
9   this. I would read the film was same way and I
10  would use the same terminology for the report.

11      Q   And what is the level of urgency that
12  you applied to this one?

13      A   It's not emergent or urgent in terms of
14  the next day or the same day. This is
15  something that, again, we see a lot of, and we
16  leave it up to the clinical provider. I can't
17  speak as to how the urgent this was that this
18  get further imaging studies. That would be the
19  clinical exam and diagnosis. All I can go on
20  is the history.

21      And the history says, no bowel bladder
22  incontinence. And to me, that does not -- that
23  is very indicative of something that is not
24  emergent. This is actually a very good history
25  given to us. We are not always so lucky with

1 the histories we are given from providers. And
2 the lack of bowel or bladder incontinence on
3 the request would denote to me that this is not
4 an emergent process.

5     Q   And is that the way you treated it back
6 on August of 2004, that it was not an urgent or
7 emergent matter?

8     A   I read this film out and I think my
9 reports stands by it. I put it in and I put my
10 recommendations in. I could not tell, looking
11 at a plain film, whether or not the patient has
12 an impending disk rupture or whether they have
13 a disk rupture. All I can assess for, is for
14 the bones and gross soft tissue abnormalities.
15 It is up to the clinician who sees the patient
16 to assess for emergency. I cannot examine a
17 patient. All I can tell you is what's on the
18 film.

19     Q   All right. And your recommendation
20 then was that a further evaluation with an MRI
21 be done; is that correct?

22     A   I suggested it. I did not recommend
23 it.

24     Q   What's the difference between suggested
25 and recommended?

1    A    Recommended    means    that    if    --    let's
2   change  the  history  around  and  say  the  patient
3   has  bowel  or  bladder  incontinence.   Had  that
4   changed, I would recommend an MRI, meaning that
5   this   should   be   done   and   I   would   call   the
6   provider and say this should be done.

7        A   suggestion   means   that   this   is
8   something that will likely benefit the patient
9   in  their  diagnosis.   However,  since  I  haven't
10  examined  the  patient,  I  cannot  say  what  the
11  level  of  emergency  is.   I  can't  even  vouch  that
12  the  patient  is  in  pain  or  not.   All  I  can  read
13  is a lumbar spine series.

14        Given   the   history,   I   could   not   say
15  whether  or  not  there  is  a  disk.   Could  the
16  patient  have  a  disk  that  is  not  visible  on  a
17  plain  film,  yes.   So,  when  I  say  suggested,  it
18  means   that   something   that   the   referring
19  provider should consider.

20   Q    All  right.   And  the  defining  factor
21  seems   to   be   here   between   suggestion   and
22  recommendation.    I   gather   recommendation   is
23  stronger than suggestion, correct?

24   A    That is correct.

25   Q    Is  there  something  even  stronger  that

1  recommendation?

2      A    Not that I use.

3      Q    All right.  And the defining difference

4  then from your view point of whether this is,

5  was an urgent matter that needed to go from

6  suggestion to recommendation was that the

7  history said that there was no bowel or bladder

8  incontinence; is that correct?

9      A    That, in the radiculopathy, yes.

10     Q    All right.  Can you define bowel or

11  bladder incontinence for us, please?

12     A    In terms of -- can you clarify the

13  question?  I mean that's -- to me, loss of

14  bowel or bladder function is incontinence,

15  whether or not that is a technical medical

16  definition.    I'm not sure that's the    --

17  (pauses).

18     Q    All right.  I'd like you to help me

19  though understand the term as you're using it

20  here in your report, what it meant to you.

21     A    Well, I'm not using it in my report.

22  It was placed into the history.  To me, when I

23  hear bowel or bladder incontinence, that means

24  an involuntary loss of function.

25     Q    Okay.    When you review, when you

1 reviewed this history, the statement of no

2 bowel or bladder incontinence was already there

3 on the documents that you were reviewing; is

4 that correct?

5     A   Yes.

6     Q  And when you say, that means

7 involuntary loss of bladder or bowel function,

8 can you describe for me what that means to you?

9     A  Describe what bowel or bladder, loss of

10 bowel bladder function means? Is that the --

11 I'm sorry, can you clarify the question please?

12     Q  Yes. You used the term involuntary

13 loss of, we'll say bladder function, what does

14 that describe for you or what does that mean to

15 you?

16     A  That in terms of, for a radiologist,

17 means that there would be concern for spinal

18 cord or nerve root compression.

19     Q  All right. What I'm trying to get,

20 what is the -- what does it mean to human being

21 that's having that problem, involuntary loss of

22 bladder function?

23     A  I can't answer what it means to the

24 person who's having it. I know it's -- that's

25 a better question for somebody who is dealing

1  with physical exam of patients, I believe. I'm

2  stepping outside my bounds on that one.

3      Q    From your understanding of the term,

4  involuntary loss of bladder function, how does

5  that manifest itself in a person?

6      A    Again, I think that's a better, a

7  better question for someone who does physical

8  exams and takes histories on a daily basis.

9      Q    But, doctor, you're saying that this is

10 a factor that you consider in whether or not

11 determining a particular report is urgent or

12 not urgent. I'm trying to find out what you're

13 interpretation of these terms is when you're

14 reviewing them. There is a -- can you explain

15 to me what it means to you when you read in a

16 history that it says 'no loss of bladder

17 incontinence' as opposed to what you've said

18 involuntarily loss of bladder function?

19     A    Involuntary loss of bladder function or

20 bowel function can be caused by many things.

21 That is not specific for any one thing. When

22 somebody orders a lumbar spine film, with

23 regard to that particular study that I'm

24 reading, that is concerning for a compression

25 of the spinal cord, in that particular context

1 of reading the lumbar spine film. However,
2 there are causes of loss of bowel or bladder
3 function, yes.

4     Q   All right. Doctor, I'm sorry, I'm not
5 asking for the cause of it, I'm asking what it
6 means to you. Loss of bladder function. Does
7 that mean that the patient is urinating when
8 they don't want to urinate?

9     A   It means that they are incontinent,
10 yes. That it is involuntary bowel or bladder
11 function, yes.

12     Q   And that means that they are urinating
13 when they don't want to urinate; is that
14 correct?

15     A   It means that it may have some leakage,
16 yes.

17     Q   All right. Is there a different term
18 that would describe for you a condition of a
19 patient where they cannot urinate when they
20 want to urinate?

21         MS. CLARK: Excuse me. This physician
22 is a radiologist. He's here as fact witness.

23         MR. KEOGH: I'd like to clarify for the
24 record what Ms. Clark's position in --

25         MR. SCHWAB: Okay.

1    MR. KEOGH:    --    function    in    this
2    deposition is?

3    MR. SCHWAB:    Then I'll make the formal
4    objection.    This person has testified that he
5    is not an urologist.    He is the fact witness
6    for what he read and what he saw in his report.
7    So,    you're    asking    him    to    start    making
8    definitions that are outside his expertise and
9    he's    testified    that    they're    outside    his
10   expertise.

11   MR. KEOGH:    All right.    That objection
12   is noted.

13   BY MR. KEOGH:

14   Q    I'd    like    to    ask    you,    doctor,    and    I'm
15   not asking you for opinions outside your area
16   of    expertise,    I'm    asking    you    of    what    these
17   terms mean to you when you were reviewing them
18   back in August of 2004.    Okay?

19   What    I'm    asking    you    is,    the    report
20   gives    a    history    of    no    bowel    or    bladder
21   incontinence.    I'm    asking    you    if    there    was
22   another term that would have signified to you -
23   - well, let me back up.    You've described that
24   as    meaning    a    person    would    have    leakage    or
25   urinate when they are not intending or wanting

1 to.

2     MR. SCHWAB: I'm going to object

3 because I don't know that that was the

4 testimony. He's testified that this is not his

5 area of expertise.

6     MR. KEOGH: All right. Your objection

7 is noted.

8 BY MR. KEOGH:

9     Q Doctor, am I correct in my

10 understanding that your interpretation of the

11 words in the history of no bowel or bladder

12 incontinence, is that the patient would not

13 have been having leakage or urination when they

14 did not want to?

15     A By reading that history, I would say,

16 to me, that means the patient is not having

17 involuntary loss of bowel and bladder symptoms.

18     Q Okay. Would there have been a term

19 that could have described for you a condition

20 in a patient where they are not able to urinate

21 when they want to?

22     A None that I can't think of off hand.

23 This is -- (pauses).

24     Q I'm sorry, did you want to continue?

25     A No. I'm saying again that's outside my

**DEPO RESOURCES**
George B. Castro
**Court Reporter**
Tel.(671)688-DEPO * Fax(671)472-3094

1    area of expertise. The urologist or the person
2    doing the physical exam would be a much better
3    person to ask about that. But for myself, no,
4    no term comes to mind.
5        Q   Okay. If there were a description in
6    the history that said that the patient was
7    having difficulty urinating, would that have
8    given you a different view of how to interpret
9    this x-ray?
10       A   Well, the history doesn't change the
11   interpretation of the x-ray. The x-ray is what
12   it is. It's, you know -- that's why we have a
13   finding section. The history does not change
14   our interpretation of an x-ray.
15       Q   All right. But the history does affect
16   whether you consider the matter to be urgent or
17   not urgent; correct?
18       A   Yes.
19       Q   All right. So with respect to a
20   determination of urgency, if the history had
21   said the patient was not able to urinate when
22   they wanted to, would that have affected your
23   determination of whether this was an urgent or
24   not urgent matter?
25            MR. SCHWAB:   I'm not sure if I

1 understand the questions. So, I'm going to

2 object on just lack of clarity.

3 BY MR. KEOGH:

4     Q   Do  you  understand  the  question,  Dr.

5 McSwain?

6     A   No, I don't.

7     Q   From  the  standpoint  of  whether  you

8 determined  something  --  to  whether  you  have

9 determined  this  to  have  been  urgent  or  emergent

10 matter,  if  the  history  had  said,  instead  of  no

11 bowel  or  bladder  incontinence,  the  history  had

12 said  the  patient  is  having  difficulty  or  is

13 unable  to  urinate  voluntarily,  would  that  have

14 changed  your  determination  of  whether  this  is

15 urgent or not urgent?

16     MR.   SCHWAB:    I'm  going  to  object

17 because  it  calls  for  the  witness  to  speculate.

18 He's  the  fact  witness.   So,  that  puts  in  facts

19 that  were  not  in  place  at  the  time  that  he  did

20 this reading.

21 BY MR. KEOGH:

22     Q   You  can  go  ahead  and  answer  the

23 question, doctor.

24     A   The  history  is  not  classic  for

25 something  that  would  become  an  urgent  matter

1    for me.

2        Q    Which history are you talking about?

3        A    When you have -- ask me to speculate on

4    whether or not if the history had said, unable

5    to voluntarily urinate, involuntary urination.

6    That is something that is not classic for me

7    that would make this an urgent matter.

8        Q    When you were on Guam in 2004, were you

9    familiar with the availability of MRI screening

10   on the island at that time?

11       A    Limited.  Limited familiarity.

12       Q    And what was your familiarity?

13       A    That there was no MRI that was property

14   of U.S. Navy.  That if someone needed an MRI,

15   they would have to be disengaged to a civilian

16   MRI present on Guam.  And that's the extent of

17   my familiarity.

18       Q    All  right.  Does  your  familiarity

19   include whether or not that was something that

20   could  be  done,  disengaged  to  a  civilian

21   facility?

22       A    That, I did not ever do while I was

23   there, so I can't speculate as to whether or

24   not how available that was.

25       Q    Okay.  When you suggest that a treating

1  physician do a further MRI evaluation, do you
2  suggest that with an expectation that it would
3  be followed?

4      A   No.  If I want something followed and I
5  don't want to leave any room for kind of not
6  having it done, I will say, recommend MRI for
7  further evaluation.

8          In this case, a suggestion means -- we
9  as the radiologists are not privy to the entire
10 clinical history.  I can't tell you whether or
11 not this patient had a reason for not getting
12 an MRI.  Only the clinician who has examined
13 has.  So, when I say suggested, that means that
14 I'm suggesting it.  It doesn't mean that you
15 have to do this, simply because I do not know
16 all the clinical factors of the patient.  We
17 rely on the judgment of the clinician who is
18 performing the exam and ordering the history
19 for that.

20     Q   When you review an x-ray and then
21 interpret it, you dictate a report; is that
22 correct?

23     A   That is correct.

24     Q   I'm talking about on Guam now in 2004.
25 How does that -- do you then enter the report

1  into a computer database?

2  A   No.   When it's transcribed, it goes

3  automatically into the computer database.

4  Q   And is there any way that you know of

5  from your knowledge of the computer database of

6  telling if and when the requesting medical care

7  provider actually reviews your transcription?

8  A   Not to my knowledge.

9  Q   Is there an expectation that you have

10 as   a   radiologist   when   performing

11 interpretations and transcriptions of x-rays of

12 when it's going to be reviewed?

13 A   No, I don't have any expectations.

14 That's the -- it falls back on the person who

15 ordered the study.   When it gets dictated and

16 transcribed, then it's on the responsibility of

17 the clinician to review the report.

18 Q   And then you have no expectation or

19 concern about when or even if it ever gets

20 reviewed; is that correct?

21 A   Well, that's an inflammatory saying I

22 have no concern about that, because it implies

23 that I don't care about patients.   And I will

24 tell you that, if there's something that I feel

25 is in the patient's best interest, I have no

1 problems with calling a provider. So, that
2 doesn't obviate them from giving their reports.
3 But my expectations are that they review their
4 reports on a timely manner. What a timely
5 manner is to them, I can't say.

6     Q   All right. I wasn't suggesting you
7 didn't care about your patients, doctor. I'm
8 sorry if that's the interpretation you got from
9 that question. Did you at all speak with the
10 requesting medical care provider with respect
11 to this x-ray?

12     A   To be honest I don't recall this
13 particular case other than just reading the
14 film and afterwards. But I can tell you that,
15 when I do talk to providers about their
16 patients whom which they were to the study, I
17 put a notation in the documented report. I do
18 not see one here.

19     Q   And where would that notation appear on
20 this typewritten document?

21     A   I can tell you where I usually dictate
22 it, and that's after the impression. So, in my
23 standard dictation for people, I use the same
24 history, findings, impression and then I'll
25 have a new paragraph and say these findings

1   were discussed with Doctor So-and-so, via
2   phone, on such-and-such a date and such-and-
3   such a time. That's my standard manner of
4   reading out films.

5   Q   And I'm correct that there is no such
6   indication or notation on this report?

7   A   I do not see any notation on this
8   report.

9   Q   Is there any other way that you can
10  help us determine from looking at this report
11  as to when the actual x-ray was taken of the
12  patient?

13  A   I cannot. Again, that is something
14  that -- there maybe new ones of the computer
15  system they actually have an exam date and a
16  time the x-ray was performed at two different
17  times. The time that would be best be suited
18  on a film would be the time/date stamp that is
19  on each film.

20  Q   And where are the films actually kept?

21  A   That, I can't say. I got -- that's a
22  better question for the Department of Radiology
23  in Guam.

24  Q   All right. Thank you, doctor. I don't
25  have any other questions.

1    MR. SCHWAB: Okay. We're going to
2 take a 10-minute break. And, doctor, what's
3 your phone number there so I can talk to you?
4    A    (pauses)
5    MR. SCHWAB: Do you have a cell phone
6 or are you, you're on hard line?
7    A    Let me see. I can get you one. I can
8 you give my -- let me see if I could get a
9 phone number here. That's 6497.
10    MR. SCHWAB: All right. That would put
11 us at 619-557. That's there on the room with
12 you?
13    A    Yes.
14    MR. SCHWAB: Okay.
15    A    This is on the room with me.
16    MR. KEOGH: Are we still on the record?
17    MR. SCHWAB: On the record for one
18 second.
19    COURT REPORTER: Okay. Go ahead.
20    MR. KEOGH: I just want to, since this
21 is a perpetuation deposition, I'm going to note
22 an objection to counsel talking to the witness
23 during the break.
24    MR. SCHWAB: That's a problem with you?
25    MR. KEOGH: I just put it on, an

1    objection on the record.

2            MR. SCHWAB:    Maybe  I  won't  do  it.

3    Okay.   We're going to take a 10-minute break.

4    Thanks.

5            (Off the record from 7:27 p.m. to 7:41

6    p.m.)

7

8                    **RE-DIRECT EXAMINATION**

9    BY MR. SCHWAB:

10       Q    Okay.   We're back on the record after a

11   break.    I'm going to ask you some questions,

12   doctor.   You're a neuroradiologist, correct?

13       A    Yes.

14       Q    And  can  you  tell  us  again  what  that

15   entails?

16       A    Neuroradiology    fellowship    involves

17   training  with  particular  specialization  within

18   reading  films  of  the  brain,  head,  neck  and

19   spine.

20       Q    You  said  a  fellowship.    What  is  a

21   fellowship?

22       A    A  fellowship  is  training  beyond  my

23   primary  training  in  radiology.    So,  it's  an

24   additional,  in  this  case,  an  18  months  of

25   additional training beyond radiology residency.

**DEPO RESOURCES**
George B. Castro
**Court Reporter**
Tel.(671)688-DEPO * Fax(671)472-3094

1    Q    Where did you serve your fellowship?

2    A    At    University    of    California,    San

3    Francisco.

4    Q    And    what    happens    during    this

5    fellowship?

6    A    The    fellowship    is    similar    to    the

7    residency    for    medical    training    and    structure.

8    You're    supervised    by    people    who    have    been

9    reading    films    for    20-30    years.    And    you    read

10   films under their supervision.

11   Q    So, this gives you a specialty not only

12   in    radiology    but    specifically    in

13   neuroradiology?

14   A    Yes, that is my subspecialty.

15   Q    Does    this    give    you    a    significant

16   understanding of the spine in particular?

17   A    Well, all pretty areas should be equal.

18   But, yes it's a -- I consider myself to have

19   more experience than the average radiologist in

20   the area of the head, neck and spine.

21   Q .  And    is    there    some    sort    of    board

22   certification for this?

23   A    Yes,    you    take    a,    what's    called    a

24   Certificate of Additional Qualification, which

25   means you are then listed as a board-certified

1    neuroradiologist.

2        Q    And when you were board certified?

3        A    I was board certified for diagnostic

4    radiology in 2002.  I was scheduled to take my

5    neuroradiology     Certificate     of     Added

6    Qualification in this November.

7        Q    Okay.  And what is a disk narrowing?

8        A    Disk  narrowing  means  that  there  is

9    narrowing of the space between the vertebral

10   bodies.  We cannot see intervertebral disks on

11   plain films.  All we can do is infer what is

12   happening to them by the vertebral bodies.  In

13   this case, when I say disk space narrowing, it

14   means that the two vertebral bodies are closer

15   to one another.

16       Q    Uh-huh.  And that's what you found in

17   this case?

18       A    Yes, I mentioned that L5-S1 there's

19   disk space narrowing and that goes along with

20   degenerative disk disease.

21       Q    And is that fairly common?

22       A    Yes.

23       Q    Is that something that everyone might

24   suffer from over time as a process of age?

25       A    Reading all the films I have, which

1   numbers well onto the thousands and more likely

2   ten thousands, there is a large preponderance

3   of degenerative disk disease in the United

4   States.

5       Q    And is this what -- is one of the

6   symptoms of this, some back pain?

7       A    Define back pain for me.   It's a local

8   pain in the back?

9       Q    Yes.

10      A    Yes, that can cause back pain.

11      Q    Okay.   And that you testified that Guam

12  was a remote location?

13      A    It is not one of the Navy's major

14  medical centers.   It is classified as Guam

15  Naval Hospital.   So it is, I guess, in that

16  regard, if your definition of remote would be

17  that it is.

18      Q    And you stated that you where slated

19  for November for your board certification?

20      A    Exam.

21      Q    Exam.

22      A    I am fellowship-trained, which some

23  people do not even take the exam course,

24  Certificate of Added Qualification.   It's

25  something that is not necessary to call

1  yourself a neuroradiologist.

2     Q   But you're not going to be available

3  for that in November, are you?

4     A   No, I'm not.

5        MR. SCHWAB:   I want to just say that on

6  behalf of all of us, I'm sure I express it for

7  everyone, that we're really appreciate where

8  you're going and what you're doing for our

9  country.   And I want to thank you for the

10 trouble you've taken today to come and speak

11 with us.   I think that's my only questions,

12 unless Mr. Keogh has a follow-up.

13        MR. KEOGH:   I do.

14        MR. SCHWAB:   Okay.

15

16              **RE-CROSS EXAMINATION**

17 BY MR. KEOGH:

18    Q   Just to follow-up on your discussion of

19 the term "remote" as you apply it to Guam.

20 When you were testifying when I was questioning

21 you about being assigned to a remote location,

22 did you consider Guam to be remote because it

23 was somewhere other than your assigned place or

24 because it was something specific about Guam

25 that characterized it as remote?

1    A    I would stand by my earlier definition,
2  if we want to use the same term a remote.    The
3  Naval Medical Center, San Diego, as well as the
4  National Naval Medical Center in Bethesda, and
5  Naval   Medical   Center   in   Portsmith   are
6  considered primary medical centers.    Everything
7  else   that   the   Navy   has   is   designated   as   a
8  United   States   Naval   Hospital,   which   implies
9  there's   some   level   of   care   which   is   not
10  necessarily the same as with the major medical
11  centers.
12          In   this   case,   Guam   does   not   --   the
13  Naval Hospital does not have an MRI.    It also
14  does   not   have   the   same   support   staff   or   the
15  same   imaging   modalities   as   National   Naval
16  Medical   Center   or   Naval   Medical   Center,   San
17  Diego.    So, by my definition and my definition
18  as it was explained, Guam is remote.
19    Q    All   right.    Now   my   understanding   is
20  that   the   Guam   Hospital   is   referred   to   as   a
21  Naval Regional Medical Center, Guam.    Does that
22  designation indicate anywhere its remoteness?
23    A    Again,   we're   going   based   on   my
24  definition of remote.    And I was not aware that
25  it was classified as a Regional Medical Center.

1 The way I've always heard it expressed is, U.S.
2 Naval Hospital, Guam. So, I can't answer as to
3 matter of semantics, Regional Medical Center
4 versus Naval Hospital.

5 Q All right. From your understanding,
6 referring to Guam as being remote, is it your
7 understanding that the standard of care, the
8 medical care, that's provided at the Guam Naval
9 Hospital is less than the standard of care that
10 is provided elsewhere in the Naval Hospital
11 system?

12 MR. SCHWAB: Objection. That's an
13 unfair question.

14 BY MR. KEOGH:

15 Q You can answer it, doctor.

16 A I would not say that the standard of
17 care at Guam is less than for Naval Medical
18 Center Guam or Naval Regional Medical Center,
19 however you would like to call it, Guam, is any
20 less than at Naval Medical Center. You're
21 getting people who were trained at these
22 institutions going out to this. They care
23 certainly no less about patient or no less
24 about doing their job than anybody at the major
25 medical centers. The standard of care, I

1 believe, is maintained because they are Navy

2 physicians there.

3        Is some of the equipment different?

4 Yes, it is. Are some of the access to

5 different pieces of equipment different? Yes.

6     Q So, you would agree then that the

7 standard of care provided at the Guam Naval

8 Hospital is equivalent to the standard of care

9 provided elsewhere at Naval Hospitals with the

10 exception that you've said certain equipment

11 may not be available; is that correct?

12     A Let me -- let me --

13        MS. CLARK Again, Mr. Keogh, on behalf

14 of the Department of Defense, this is a fact

15 witness, not an expert witness and Naval

16 regulations prohibit him from offering an

17 opinion as to the standard of care?

18        MR. KEOGH: Can I ask for Ms. Clark's

19 position in this deposition once again?

20        MR. SCHWAB: She's my co-counsel.

21        MS. CLARK: Yes, again, on behalf of the

22 Department of Defense, the problem gaiters of

23 Naval Regulations as to what Naval physicians

24 may testify to. And he --

25        MR. SCHWAB: That there are --

1      MS. CLARK: -- can't testify to an
2 expert opinion.

3      MR. SCHWAB: There are federal
4 regulations that state a person shouldn't be
5 giving an expert opinion unless -- if he's a
6 fact witness, unless he's called as an expert
7 witness. So, the Department of Defense would
8 object to that and that makes perfect sense for
9 him, too.

10 BY MR. KEOGH:

11      Q    All right. With that objection noted,
12 doctor, I'm not asking you for an expert
13 opinion. I'm asking you from your observations
14 of the Naval Hospital as being remote, which
15 you characterized it, as compared to the Naval
16 Hospital in San Diego that you were assigned to
17 at the time of your temporary post here on
18 Guam. Would you agree that the standard of
19 care provided at the Naval Hospital on Guam is
20 as high as the standard of care provided at the
21 Naval Hospital in San Diego, from your
22 observation, from your experience, with the
23 exception of the absence of certain equipment
24 that you've described?

25      MR. SCHWAB: Objection, asked an

1 answered.

2     A    May I clarify that?

3 BY MR. KEOGH:

4     Q    Sure, Please do.

5     A    I have --

6     Q    Go ahead.

7     A    You said with regards to -- you said

8 with regards to certain equipment. I'd like to

9 clarify that and know that there is not certain

10 medical specialties there available on Guam.

11 And that's all I can add to that.

12     Q    All right. Doctor, the reason that

13 this has as become a question for me, is that

14 you're describing Guam as remote. And the

15 implication in that seems to be that the

16 treatment that a patient would get at the

17 remote facility is somehow lesser than the

18 treatment that would be provided at a non-

19 remote facility. And I'm just trying to

20 clarify --

21     MR. SCHWAB: Objection, that --

22 BY MR. KEOGH:

23     Q    -- that point.

24     MR. SCHWAB: Objection, that

25 mischaracterizes the testimony referred here

1  today.

2  BY MR. KEOGH:

3      Q   Do you understand what my question is

4  with respect to classifying Guam as remote?

5  Does that signify in your mind when you

6  classified it as remote as signifying that a

7  lesser standard of care is provided to the

8  patients there than in a non-remote location?

9          MR. SCHWAB:  Objection, asked an

10  answered, not relevant and it is not posed as a

11  question.

12  BY MR. KEOGH:

13      Q   Doctor, are you able to answer the

14  question?

15      A   May I answer the question?

16      Q   Yes, please.

17      A   I think that the term remote is not one

18  that I am able -- you used the term

19  classification.  I do not have the ability to

20  classify any hospital, whether in the Navy or

21  anywhere else, as to what their capabilities

22  are.  I work in a very focused area in

23  radiology.  I cannot answer as to what the rest

24  of the hospital on Guam had capabilities for.

25      Q   All right.  With respect to radiology,

1 when you refer to Guam as being a remote

2 location, does that signify that the standard

3 of care at the Guam Hospital is lower than the

4 standard of care at, for example, San Diego

5 Hospital?

6       MR. SCHWAB: Objection, that's an

7 outrageous question.

8 BY MR. KEOGH:

9   Q  You may answer the question, doctor.

10   A  I'm sorry, can I get the question

11 repeated please?

12   Q  Yes. With respect to radiology, which

13 is your specialty, when you classified or when

14 you described that Guam Hospital as being

15 remote, where you specifying or indicating that

16 the standard of care in radiology at the Guam

17 Hospital is lower or lesser than the standard

18 of care provided at the Naval Hospital in San

19 Diego?

20   A  I cannot make a blanket statement on

21 that for radiology. There are differences for

22 -- (pauses).

23   Q  Go ahead.

24   A  I cannot make a blanket statement

25 regarding the standard of care for radiology.

1 Are there certain things can -- the same person

2 who is reading films, whether in San Diego or

3 in Guam. And to me that means the standard of

4 care is the same. But, that's my definition of

5 standard of care.

6      MR. KEOGH: Thank you, doctor. That's

7 what I want to have you explain for us. That's

8 all I have.

9      MR. SCHWAB: Doctor, I just want to say

10 our thoughts are with you over the next year

11 and thank you so much of for what you're doing.

12 And thank you for what you've done here today

13 and the time and attention you've given us.

14 And we really appreciate all your service.

15 Thank you.

16    A  Thank you. We are concluded?

17      MS. CLARK: You made your fair win in

18 following (unintelligible). You take care.

19    A  Thank you.

20

21    (Deposition concluded at 7:54 a.m.)

22   **HAGATNA, GUAM, TUESDAY, MAY 22, 2007 (GUAM TIME)**

23

24

25

# CERTIFICATE OF WITNESS

I, **Hugh McSwain**, the deponent herein, do hereby certify that I have read, or had read to me, the foregoing typewritten pages 1 through 60 inclusive. My changes thereof, if any, have been noted on a separate sheet of paper, which I have signed, and which I understand will be appended to and made a part of this deposition. I certify that the same is now a true and correct transcript of my testimony.

_____

Hugh McSwain

Dated: _____

**DEPO RESOURCES**
George B. Castro
**Court Reporter**
Tel.(671)688-DEPO * Fax(671)472-3094

## REPORTER'S CERTIFICATE

I, **George B. Castro**, Court Reporter, do hereby certify the foregoing 59 pages to be a true and correct transcript of the audio recording made by me in the within-entitled and numbered case at the time and place as set forth herein.

I do hereby certify that prior to examination the deponent was duly sworn upon oath; that thereafter the transcript was prepared by me or under my supervision.

I further certify that I am not a direct relative, employee, attorney or counsel of any of the parties, nor a direct relative or employee of such attorney or counsel, and that I am not directly or indirectly interested in the matters in controversy.

In testimony whereof, I have hereunto set my hand and seal of Court this 4th day of June, 2007.

**COPY**

_____

George B. Castro

**DEPO RESOURCES**
George B. Castro
**Court Reporter**
Tel.(671)688-DEPO * Fax(671)472-3094

CHANGES TO TRANSCRIPTION

By Deponent:

**Hugh McSwain**

Page        Change                                    Initial

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

**DEPO RESOURCES**
George B. Castro
**Court Reporter**
Tel.(671)688-**DEPO** * Fax(671)472-3094