
LAW OFFICE OF
**ROBERT L. KEOGH**
POST OFFICE BOX GZ
HAGATÑA, GUAM 96932
TELEPHONE (671) 472-6895

Attorneys for Plaintiffs

## IN THE DISTRICT COURT OF GUAM

| | |
|---|---|
| DEBORAH K. RUTLEDGE and THOMAS R. RUTLEDGE, | CIVIL CASE NO. CIV06-00008 |
| Plaintiffs, | |
| vs. | **PLAINTIFFS' DISCOVERY MATERIAL DESIGNATION** |
| UNITED STATES OF AMERICA, | |
| Defendant. | |

Pursuant to LR 16.7(d)(2), plaintiffs designate and file a copy of the transcript of the deposition of Dr. James Leon Jablonski taken on November 18, 2006. Plaintiffs are not in possession of the original transcript of this deposition which is in the possession of defendant United States of America.

**LAW OFFICE OF ROBERT L. KEOGH**
Attorneys for Plaintiffs

DATE: _2/26/08_        By: _____
ROBERT L. KEOGH

# ORIGINAL

IN THE UNITED STATES DISTRICT COURT
FOR THE TERRITORY OF GUAM

| | |
|---|---|
| DEBORAH K. RUTLEDGE and, ) | CIVIL CASE NO. 06-00008 |
| THOMAS RUTLEDGE, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| vs. ) | |
| ) | |
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Defendant. ) | |
| _____) | |

VIDEO TELECONFERENCE
DEPOSITION TRANSCRIPT

OF

# DR. JAMES LEON JABLONSKI

November 18, 2006
(Guam Time)

# ORIGINAL

PREPARED BY:     GEORGE B. CASTRO
                 **DEPO RESOURCES**
                 #49 Anacoco Lane
                 Nimitz Hill Estates
                 Piti, Guam 96915
                 Tel:(671)688-**DEPO** * Fax:(671)472-3094

IN THE UNITED STATES DISTRICT COURT
FOR THE TERRITORY OF GUAM

| | |
|---|---|
| DEBORAH K. RUTLEDGE and, THOMAS RUTLEDGE, | ) CIVIL CASE NO. 06-00008 |
| Plaintiffs, | ) |
| vs. | ) |
| UNITED STATES OF AMERICA, | ) |
| Defendant. | ) |

Video Teleconference Deposition of **Dr. James Leon Jablonski**, taken on Saturday, November 18, 2006, at the hour of 7:24 a.m. (Guam time), at the U.S. Attorney's Office, District of Guam, Sirena Plaza, 108 Hernan Cortez Avenue, Hagatna, Guam before George B. Castro, pursuant to Notice. That at said time and place there transpired the following:

### APPEARANCES

For the Plaintiffs   LAW OFFICE OF ROBERT L. KEOGH
          By: **Robert L. Keogh, Esq.**

For the Defendant   OFFICE OF THE U.S. ATTORNEY
          GENERAL, DISTRICT OF GUAM
          By: **Mikel W. Schwab, Esq.**

## INDEX

### DIRECT EXAMINATION

BY ROBERT L. KEOGH                                5

### CROSS EXAMINATION

BY MIKEL W. SCHWAB                               68

### RE-DIRECT EXAMINATION

BY ROBERT L. KEOGH                               77

### E X H I B I T S
(none)

**DEPO RESOURCES**
George B. Castro
**Court Reporter**
Tel:(671)688-**DEPO** (3376) * Fax:(671)472-3094

1     **HAGATNA, GUAM, SATURDAY, NOVEMBER 18, 2006:**

2

3     COURT REPORTER: Let me go on record to

4     state that today is Saturday, November 18,

5     2006. We are here at the U.S. Attorney's

6     office, District of Guam, Sirena Plaza,

7     Hagatna, Guam.

8     Present in the room is Attorney Mikel W.

9     Schwab and Attorney Robert Keogh. At this

10    time, I'll just swear in the Deponent.

11

12            **DR. JAMES LEON JABLONSKI**

13    being duly sworn, was examined and testified as

14    follows:

15

16    MR. SCHWAB: Doctor, this is a video

17    deposition and just for the record, state where

18    you are located right now.

19    DR. JABLONSKI: I'm located in Fairview

20    Heights, Illinois.

21    MR. SCHWAB: Excellent. We are here in

22    Guam and I'm going to very quickly turn this

23    over to Mr. Keogh for questioning. If you have

24    any need to speak to me or any questions,

25    please feel free and of course if you do not

1  understand the question, speak up and say that.
2  If you ask for someone to repeat the question
3  or explain something, that's a good thing to
4  do.  So I'll turn you over to Mr. Robert Keogh
5  who is the Attorney for the plaintiff.
6
7                    **DIRECT EXAMINATION**
8  BY MR. KEOGH:
9      Q    Thank you.  Colonel Jablonski, you are
10 a Lieutenant Colonel in the Air Force, is that
11 correct?
12     A    That is correct.
13     Q    You are also a medical doctor, is that
14 correct?
15     A    That's correct.
16     Q    You prefer I call you Colonel or
17 Doctor?
18     A    Whichever you prefer.
19     Q    Okay, all right.  Have you ever given a
20 deposition before?
21     A    Just one.
22     Q    And what type of proceeding was that?
23     A    That was a civil proceeding, an
24 insurance claim issue.
25     Q    All right.  Were you participating on

1 behalf of the Air Force in that proceeding?

2     A   I was not.

3     Q   Were you a plaintiff in that case? Let

4 me ask you this, what was your role?

5     A   I was playing the role of the treating

6 physician for the member that was filing for

7 the insurance claim.

8     Q   All right. We're going to try and get

9 this finished before the end of your day which

10 gives us about an hour and a half, so I'm going

11 to go through these instructions fairly quickly

12 even though you've given a deposition before,

13 I'm just going to say to remind you that we're

14 recording this both by written transcript and a

15 video.

16     So, I'm going to ask if you please try

17 and be as conscious as you can of the fact that

18 we are recording this proceeding and the

19 overriding rule of that is going to be that we

20 both can't talk at the same time. So if you

21 could please wait until I completely finish my

22 question before you start to answer and I will

23 try and wait until you completely finish your

24 answer before I start asking the next question.

25 Is that all right?

1    A    Sounds great.

2    Q    Okay, if you don't understand the
3  question that I asked, please ask me to repeat
4  it or rephrase it, I'd be happy to do that.  If
5  you need to take a break at some point let us
6  know, although we are kind of time-pressed in
7  this proceeding today.  Any questions about
8  those brief instructions today?

9    A    None.

10    Q    All right.  Let me just start with a
11  few background questions.  Your educational
12  training, where did you receive that?  Starting
13  with college.

14    A    I did my undergraduate at the United
15  States Air Force Academy.  I did my medical
16  school at USUHS which is the Armed Forces
17  Medical School of Bethesda, Maryland.  I did my
18  residency training in Family medicine at Eglin
19  Air Force Base in Florida.

20    Q    And when did you complete your United
21  States Air Force Academy education, what year?

22    A    1989.

23    Q    And then medical school was completed
24  in what year?

25    A    1993.

**DEPO RESOURCES**
George B. Castro
**Court Reporter**
Tel.(671)688-DEPO * Fax(671)472-3094

1      Q    And your family medicine residency was
2   for how long?

3      A    That was three years, completed in
4   1996.

5      Q    When were you on -- were you stationed
6   on Guam at some point?

7      A    I've been stationed there twice
8   actually.

9      Q    Can you tell me the years that you were
10  stationed on Guam?

11     A    I was stationed there in 1997 to 1999
12  and then 2003 to 2005.

13     Q    And both times you were a medical
14  doctor when you were stationed there?

15     A    That's correct.

16     Q    I say "there", we are "here" but for
17  you it's "there".  Your first tour of duty,
18  what was your role in that tour?

19     A    First tour, the first year I was in the
20  Family Medicine Clinic.  Second year, I was in
21  the Flight Medicine Clinic.

22     Q    Is the Family Medicine Clinic the same
23  as what we refer to as the Andersen Air Force
24  Base Clinic?

25     A    They both are within the Andersen Air

1  Force Base Clinic. They're just different
2  clinics within the same facility.
3     Q   All right, and then the 2003, 2005
4  tour, what were your duties then?
5     A   For the first, approximately 14 months,
6  I was the 613th CRG Flight Surgeon and for the
7  remainder of my tour I was the Chief of Medical
8  Services at Andersen Air Force Base.
9     Q   Can you tell me what your duties were
10 on or about July and August of 2004?
11    A   I was serving a dual role at that time;
12 I was the CRG Flight Surgeon and I was also the
13 interim Chief of Medical Services.
14    Q   Why were you serving a dual function at
15 that time?
16    A   I was serving a dual function because
17 my replacement at the 613th for Flight Medicine
18 was at the Aerospace Medicine primary course
19 getting his training to come back and replace
20 me as a flight surgeon.
21    Q   Can you tell me what the duties of the
22 Chief Medical Services officer at the Andersen
23 Air Force Base Clinic?  What the duties are?
24    A   The duties are twofold.  I'm the Chief
25 of Professional Staff.  So I served in a

1 capacity of credentialing and monitoring the
2 professional behavior of the providers at
3 Andersen Air Force Base. The SGH or Chief of
4 Medical Services also advises the commander on
5 matters relating to patient care.

6 Q When you refer to monitoring of
7 professional behavior of -- I think you said
8 medical care providers. I'm not sure if I got
9 the terms right. Who does that include? Who
10 would that include?

11 A That would include anybody that
12 provides -- any licensed provider that provides
13 care for patients, to include the dentist,
14 nurse practitioners, physician assistants and
15 physicians stationed at Andersen.

16 Q Are you able to tell me in the July-
17 August 2004 time frame, how many medical care
18 providers there were at the Andersen Air Force
19 Base Clinic?

20 A Not with exact precision, we did have
21 two family practitioners, two physician
22 assistants, one women's heath practitioner --
23 nurse practitioner. And then over in the
24 Flight Medicine Clinic, I think at the time we
25 just had a navy flight surgeon and one other

1  air force flight surgeon and myself; and the
2  number of dentists I'm not sure on. We also
3  had an optometrist.

4      Q  All right. You've referred to the
5  flight section as having a navy flight surgeon,
6  another flight surgeon and yourself. The other
7  section that had the two family practitioners,
8  the two physician assistants and the one nurse
9  practitioner, is that the Family Medicine
10 Clinic?

11     A  Yes, that is.

12     Q  So, are there essentially two separate
13 sections of the Andersen Air Force Base Clinic,
14 the Family Medicine Clinic and the Flight
15 Surgeon Clinic?

16     A  That's correct. There's also a Life
17 Skills Section that usually has two providers
18 and that usually is a psychologist or social
19 workers depending on our mix at that time.

20     Q  And then is there a separate section
21 for the optometrist and a separate section for
22 the dentist?

23     A  There is a separate section for the
24 dentist, and the optometrist kind of works over
25 in the Family Medicine Clinic area, same

1  hallway.  Although they have a new clinic so
2  I'm not sure of the hallways anymore.

3      Q    And am I correct in my understanding
4  that in July and August of 2004, your duties
5  included supervision of all of those people
6  that you just mentioned?

7      A    That is correct.

8      Q    How did the dual function of being
9  Chief of Medical Services and the -- and I
10  guess a flight surgeon.  I'm not sure exactly
11  what's your dual functions were.  How did they
12  interrelate and how did you handle those?

13      A    They are related very well.  The main
14  duality to it is just that I was working as a
15  flight surgeon when I was in clinic and when I
16  was doing chief of medical services, that was
17  for the whole facility.  So I didn't do a lot
18  of clinic in the Family Medicine Clinic during
19  that time frame until my replacement came back
20  from training.  Although I could work in either
21  section because it's a small clinic.

22      Q    When did you go off and do training and
23  then come back and have just a sole role as
24  Chief of Medical Services?

25      A    I did go to the intermediate executive

1 skill support in October, which was at Sheppard
2 Air Force Base, and when I returned from that
3 training, then I became full-time Chief of
4 Medical Services.

5      Q    How long was that training?

6      A    It was two weeks.

7      Q    And is this October of 2004?

8      A    That would be October 2004, correct.
9 Maybe -- they have a fall and a winter course
10 for Chief of Medical Services. So, the October
11 -- I believe I went to the October course but I
12 have to actually look back to see which course
13 I went to. But around that October, first time
14 frame was when I became full time Chief of
15 medical services. That's when Wesley Palmer,
16 the flight surgeon that was training, had
17 returned from the States.

18      Q    Can you describe for me in the --
19 again, focusing on the July-August 2004 time
20 frame, how you would execute the duties of
21 supervising nurse practitioners and physician
22 assistants.

23      A    Well, as the Chief of Medical Services,
24 it was just my duty to make sure that there was
25 oversight in the clinic so each of the

1  physician assistants and nurse practitioners
2  were assigned Family Medicine preceptors over
3  in the clinic there at Andersen Air Force Base.
4  And they were supposed to be able to get into
5  questions and they would also do each other's
6  chart reviews to check for documentation and
7  quality of care. Then I was the oversight for
8  the reviews to make sure those were recorded
9  and turned in.

10 Q    Who were the preceptors in that July-
11 August time frame?

12 A    The chief physicians I believe were
13 there at the time were Shane Deitman I know he
14 was there. I think Kirin Madden was in place
15 by that time frame also. She came from Canada
16 Air Force base.

17 Q    Can you spell that name, please?

18 A    First name is K-I-R-I-N and then Madden
19 M-A-D-D-E-N.

20 Q    And they're both medical doctors?

21 A    They are both family medicine
22 physicians, correct.

23 Q    Is there a manual of some kind that
24 describes the duties and the policies of the
25 Family Medicine Clinic at Andersen Air Force

1  Base?

2      A    Could you repeat the question again?

3      Q    Yes, certainly. Is there some kind of

4  a written policy manual or standard operating

5  procedure manual -- I don't know if I'm

6  describing it correctly, so I'm going to try

7  and make it as broadly as possible. Something

8  in writing that describes the policies and

9  procedures of the Family Medicine Clinic at the

10  Andersen Air Force Base Clinic?

11     A    Manual procedures and operating

12  instruction, a medgroup of operating

13  instructions that outlines the need to have the

14  physician oversight of the mid-level providers.

15  I don't remember the exact number of it on the

16  top of my head; but it's an operating

17  instruction there at the Andersen Air Force

18  Base. One of the main medical group OI's.

19     Q    An OI is an operating instruction?

20     A    That's correct.

21     Q    If I were to request a copy of it, I

22  could identify it as the Medical Group

23  Operating Instruction for Andersen Air Force

24  Base Clinic and would that sufficiently

25  describe it?

1     A    That wouldn't be its title. But if you

2 ask the Chief for Medical Services at Andersen

3 Air Force Base, describing it the way you

4 described it to me, he'd be able to come up

5 with the correct title OI for you.

6     Q    And, and --

7     A    And maybe the OI's for chronicle care I

8 think is its title.

9     Q    How large a document is it?

10     A    Somewhere between 20 and 40 pages, so

11 it's not that large.

12     Q    All right. Can you tell me what the

13 role of the preceptors would be vis-à-vis, the

14 nurse practitioners and physician assistants,

15 again in this July/August time frame?

16     A    Correct, the preceptors are available

17 for consultation from the nurse practitioners

18 or PA's so if they had questions about the

19 patient or physical exam finding, they can go

20 to their physician preceptor and ask that

21 question and get the consultation from them.

22     Q    Is that something that the nurse

23 practitioner or physician assistant would have

24 to initiate?

25     A    Correct.

1    Q   Was there any kind of periodic review

2  that was initiated by the preceptors as opposed

3  to the nurse practitioners and physician

4  assistants of the cases that they were

5  handling?

6    A   Just the chart reviews that were

7  ongoing at the time. Typically we were

8  reviewing 10 charts per provider per month,

9  that's what we're supposed to be reviewing on

10  each other. So the preceptors are supposed to

11  review 10 of their assigned mid-levels, charts

12  or patient encounter as per month.

13    Q   How many charts per month would a

14  typical physician assistant or nurse

15  practitioner handle?

16    A   They're seeing between 15-20 patients a

17  day, up to 20 clinics per month, I'd have to do

18  the math to come up with the number there.

19  Somewhere less than 400, somewhere probably

20  around greater than 200, less than 400.

21    Q   How would the charts for review be

22  selected?

23    A   The charts for review would be selected

24  either by -- it depended on the preceptor and

25  their preferences. So there are a variety of

1   ways we could do that. But even the individual
2   themselves could just give the charts to their
3   preceptor for review, or their preceptor can
4   have a random number of charts pulled from that
5   particular month. And later on, I had taken up
6   the chart review process myself, because we're
7   getting ready for a JCAHO inspection. And I
8   want to standardize our reviews so from about
9   the October time-frame forward I was doing all
10  the reviews for a period of about 4 months.

11  Q   When you took over the reviews, was
12  there a different procedure put in place at
13  that time?

14  A   I did. I had turned in one chart per
15  day per provider. That way we didn't get them
16  all from one clinic, kind of got a good
17  sampling.

18  Q   So that would have been from October
19  on, that would have been a more comprehensive
20  review than what was happening before. Is that
21  correct?

22  A   To be a more uniform review because it
23  was single reviewer, so less variants because I
24  was doing the reviews myself, looking
25  specifically for JCAHO items.

1    Q    What's JCAHO?  Can you tell me that?

2    A    That's    a    Joint    Commission    for

3  Accreditation    for    Health    Organizations,

4  actually it's a joint commission, sorry.  You

5  get so used to calling them by their acronym

6  and you forget what it stands for.

7    Q    I understand.  How often is a JCAHO

8  accreditation    done    at    the    clinic    such    as

9  Andersen?

10    A    Typical is about every three years.

11  They can do a no-notice inspection at any time

12  but on average it's about every three years.

13    Q    Do you know if -- you know when the --

14  or when was the JCAHO inspection done that you

15  were preparing for starting in October?

16    A    The inspectors didn't arrive after I

17  left Guam, so it's July or August of 2005.

18    Q    Do you know when the last inspection

19  was prior to that?

20    A    It would have been in 2002, but I'm not

21  sure of the month.

22    Q    Are there reports issued from these

23  inspections?

24    A    There are certificates of compliance.

25  I'm not sure about written reports.  But I'm

1  sure that you can get those from the Joint
2  Commission. You can find those things on Joint
3  Commission online.
4      Q   Can you help me, tell me where I would
5  find that?
6      A   I can't, not off the top of my head.
7  Sorry.
8      Q   Well, can you --
9      A   I'll have to Google it.
10     Q   Yeah, I want to Google it too.   What
11  would I Google, Joint Commission, what would I
12  call it?
13     A   Probably just Google "JCAHO" and that
14  would probably get you to their homepage.
15     Q   How are you spelling JCAHO?
16     A   J-C-A-H-O.
17     Q   And whatever I find there would have
18  whatever reports or certifications are issued
19  for all clinics then that would include the
20  Andersen Air Force Base Clinic?
21     A   Well that -- one site will get you to
22  the public domain where you can see what
23  information that you have about Andersen.   I
24  haven't gone there to look to see if you can
25  see if they have passed, or when their next

1  inspection is.   And that's probably all they
2  have on the website now.
3       Q    All right.   Do you know whether or not
4  the Andersen Clinic passed in the July-August
5  2005 inspection?
6       A    They did.
7       Q    How   about   in   the   previous   2002
8  inspection?
9       A    They passed that one also.
10      Q    Is there a policy or was there a policy
11  in the July-August 2004 time frame with respect
12  to advising patients as to whether they are
13  being seen by a physician assistant or nurse
14  practitioner or a doctor?
15      A    I don't know that there was a written
16  policy, for most of us introduce ourselves by
17  our titles when we talk to our patients, but I
18  don't know that there was a written policy that
19  stated that you had to tell the patient of your
20  title on each visit.
21      Q    By title would you be referring to rank
22  or   doctor,   nurse   practitioner,   physician
23  assistant?
24      A    Correct, doctor or nurse practitioner
25  or physician assistant and being a military

1  instillation, a lot of the providers do
2  introduce themselves by rank. So that's more
3  generic, you wouldn't know by my rank, which of
4  those I was practicing as.

5     Q   But as far as you know there was no
6  written policy with respect to identifying
7  nurse practitioners and physician assistants as
8  opposed to doctors?

9     A   I don't recall that there was a written
10  policy requiring that.

11     Q   Had that ever been discussed in any of
12  your supervisory meetings that you may have had
13  about identifying oneself as -- by their type
14  of practice?

15     A   There -- not that I recall. Most of
16  the patients coming into the facility would
17  either ask their provider or they were told at
18  the time of their appointment who they were
19  seeing and most of the -- Andersen being a
20  small base, most of us knew who was what, as
21  far as physicians, PAs, and nurse practitioners
22  and it's also on the providers, some of them
23  had it on their coats, on their lab coats, or
24  on their name tags that they were required to
25  wear.

**DEPO RESOURCES**
George B. Castro
**Court Reporter**
Tel.(671)688-DEPO * Fax(671)472-3094

1    Q   If someone were new to the island, they

2  would not know who the nurse practitioners, as

3  opposed to doctors are; am I correct?

4    A   That is correct.  But when you came in

5  for your appointment it'd be something that

6  would be fairly easy to ascertain.  And usually

7  when they would be booked for appointments they

8  will be told whether they were seeing one of

9  the doctors or one of the PA's in general.

10    Q   If a patient were -- I'm sorry, go

11  ahead.

12    A   I'm sure that that did not happen 100%

13  of the time but I could say it was fairly -- it

14  wasn't a big secret or anything.

15    Q   If a patient were to ask to see a

16  doctor as opposed to a physician assistant,

17  would that request be routinely granted?

18    A   It would be if there was access

19  available with the physician.  There was only 2

20  physicians over in that Family Medicine Clinic

21  and if one of them were on leave or ill, and

22  the other one was booked, then we would have to

23  book patients into one of the other providers

24  that had availability for that day.  That

25  happens more often with acute appointments than

1  it would with something routine.

2     Q   Let me just follow up on that. If a

3  patient there -- present in the clinic on an

4  acute appointment were to ask for a doctor, as

5  opposed to a physician assistant, is that a

6  request that would be again routinely or

7  automatically granted, availability considered?

8     A   If the availability was there, then

9  yes.

10     Q   How about if a patient were to request

11  a referral to the Naval Hospital -- again I'm

12  describing a patient in an acute situation,

13  were to request a referral to the Naval

14  Hospital, is that something that would or

15  should be automatically or routinely granted?

16     A   It would be -- that would be more case-

17  specific. It would depend on what the provider

18  seeing the patient was seeing and felt was

19  appropriate. But they can always ask for a

20  second opinion as a consult down to somebody at

21  Naval Hospital. That would be my --

22     Q   And if someone were to ask that for

23  referral or second opinion at the Naval

24  Hospital, is there a process that then has to

25  take place of making the referral?

1     A     There is, we had to enter the consult
2  into -- at that time CHCS, which is the
3  computer system that both Naval Hospital and
4  Andersen Air Force Base use.  The referral
5  would then be transferred to Naval Hospital to
6  the appropriate clinic for review and the
7  patient would, on their way out of the clinic,
8  have to stop by the referral's office that we
9  had, referral management office, to help
10 coordinate setting up the appointment for that
11 particular specialty.

12     And they could, for routine consults,
13 maybe a week before somebody got back with them
14 for something acute -- say I saw somebody that
15 had a broken arm and I want him to go see
16 Orthopedic Surgery that day because I couldn't
17 send it myself.  That's a provider-to-provider
18 consult.  I'd have to raise them on the phone
19 and talk to him about what I had and then
20 arrange appropriate care.

21     Q     And that is something that can be done
22 on an immediate/same-day kind of basis?  I'm
23 talking about the provider-to-provider consult.

24     A     Yes.     Provider-to-provider consult,
25 yes, as long as the provider being requested at

1  Naval Hospital is available and on island.

2      There are occasions for conferences and
3  deployment reasons where there may not be that
4  specialist available.

5      Q   Is a nurse practitioner and a physician
6  assistant, are they in a position to be able to
7  make this provider-to-provider type of consult?

8      A   They should be.   There have been
9  occasions  when  the  nurse  practitioners  or
10 physician  assistants  would  like  to  make
11 referrals and the physician on the other end
12 wasn't sure if the referral is appropriate or
13 not.   They would ask for a physician to call
14 them back instead of the mid-level provider.
15 So sometimes there's extra step required in
16 there.

17     Q   But the extra step is available to the
18 physician assistant, nurse practitioner to be
19 able to get a physician to review if requested
20 and make this provider-to-provider consult?

21     A   That's correct.

22     Q   And is this something that is within
23 the judgment and discretion of the nurse
24 practitioner and physician assistant?

25     A   That's correct also.   So if they felt

1 uncomfortable of what they were seeing, they
2 were free to ask one of the physicians at the
3 Andersen Air Force Base Clinic for a second
4 opinion and if in our judgment it was deemed
5 that this person really didn't need to be seen
6 by the specialist then it was on our -- it was
7 our responsibility to make sure that we do make
8 the case to the provider at the other end.
9 Then it's up to the consulting physician at
10 Naval Hospital to determine the appropriate
11 time frame to see that particular complaint in.
12     Q   Are there records kept of how many
13 patients the Andersen Air Force Base Clinic,
14 the Family practice clinic, sees on a daily
15 basis?
16     A   Yes, there is. It's usually aggregated
17 by month, by the Resource Management Office
18 there at Andersen Air Force Base. But it can
19 be broken out to more granular detail, by week
20 or by day.
21     Q   Do you have an idea as to how many
22 patients that were being seen at the Andersen
23 Air Force Base Clinic -- Family Practice Clinic
24 in that July-August '04 time frame on a daily
25 basis?

**DEPO RESOURCES**
George B. Castro
**Court Reporter**
Tel.(671)688-**DEPO** * Fax(671)472-3094

1    A    Not off the top of my head.    I can't
2  give you a hard number because it depends on
3  the number of providers in the clinic each day.
4  The average provider is seeing between 15 and
5  20 patients per day.    So, if you have to take a
6  big guess, just on a given day, about a hundred
7  of patients would come to the clinic.    But if
8  we   had   everybody   --   all   the   providers
9  available, then we can obviously see more than
10  that.

11    Q    And the office that keeps those records
12  is   referred   to   as   the   Resource   Management
13  Office of the Andersen Air Force Base Clinic?

14    A    That's   the   office   that   keeps   those
15  records   or   to   generate   those   reports.    And
16  because   we   share   a   joint   system,   the   Naval
17  Hospital   Resource   Management   Office   which   is
18  probably   named   something   different,   can
19  generate   the   same   sort   of   reports.    It's   an
20  army -- or army, navy, air force thing, they
21  have   to   have   different   names   for   the   same
22  offices.

23    Q    Can   you   tell   me   why   the   Andersen   Air
24  Force   Base   Clinic   utilized   the   services   of
25  physician assistants and nurse practitioners?

1   A   Absolutely.   The   physician   assistants
2  and   nurse   practitioners   are   used   as   physician
3  extenders.   Much   of   what   is   seen   in   an   overseas
4  military   clinic   can   be   rather   routine.   We   do   a
5  family   screening,   prior   to   family   members   being
6  able   to   PCS   or   move   to   an   overseas   environment
7  which   screens   out   a   lot   of   our   product   and   high
8  acuity   illness.

9   So   much   of   what   is   seen   in   clinics   is
10  routine.   In   order   to   see   routine   care,   the
11  mid-level   providers   like   physician   assistants
12  and   nurse   practitioners   provide   a   fine   service
13  and   they   are   able   to   care   for   the   majority   of
14  patient   needs   that   allows   other   clinics   where
15  there   is   higher   acuity   or   higher   deployment
16  demands   to   keep   some   of   the   medical   doctors
17  which   are   limited   resource   like   anything   else
18  more   gainfully   employed.   So,   it   just   helps   us
19  to   see   more   patients   with   the   same   number   of
20  physicians,   essentially.

21   Q   Do   you   know   if   it's   ever   been   described
22  or   discussed   that   there   is   a   physician   shortage
23  in   the   Air   Force?

24   A   Absolutely.   Right   now,   this   year   we're
25  on   the   order   of   about   a   hundred   Family   Medicine

1   Physician short in the Air Force. Each year it
2   varies a little bit, but we've been short on
3   Family Medicine and Flight Medicine both in the
4   Air Force for several years.

5       Q   And that would include dating back to
6   the mid-2004 time frame?

7       A   Absolutely.   I think we were about 75
8   short that year.

9       Q   Can you say whether or not that
10  shortage affected the Andersen Air Force Base
11  Clinic back in that 2004 time frame?

12      A   We had all of our Family Medicine
13  billets filled in 2004.   So, we were only
14  authorized the two Family Medicine billets and
15  the Family Medicine Clinic during that time
16  frame.

17      Q   And what is the patient population, if
18  you will, that those two Family Practice
19  physicians provided service for?

20      A   Well, the enrolled population at
21  Andersen Air Force Base during that time frame
22  was somewhere around 7,000 total patients.   A
23  portion of them -- there's something called
24  enrollment.   And a portion of them were
25  enrolled to the Flight Medicine Clinic, most of

1  HC-5 and 613th were enrolled over there and
2  that's about 800 patients or so. So about
3  6,200 patients were then enrolled to the two
4  Family Medicine Physicians and the PA's -- we
5  had two PA's and a nurse practitioner over in
6  the Family Medicine Clinic. And the Women's
7  Health practitioner was not directly enrolled
8  to, she just took care of women annual exams
9  and did a lot of the routine OB care for the
10 base.

11 Q    Of the 6,200 number, does that include
12 dependents as well as active duty military?

13 A    Absolutely. Yeah, that's everybody:
14 retirees, active duty, dependents' and
15 dependents of retirees.

16 Q    We've taken the depositions of both
17 nurse practitioner Giscombe and physician
18 assistant Rau in this proceeding previously.
19 Before today, did you have an opportunity to
20 review either of those transcripts?

21 A    I did not.

22 Q    I think it was nurse practitioner
23 Giscombe who mentioned a document called the
24 Woodke Protocol. Are you familiar with what
25 that is?

1    A   I am not.

2    Q   I think she spelled that as W-O-O-D-K-E

3  protocol. Have you ever heard of that?

4    A   I don't recall that I have. But

5  there's a -- in medicine there are many

6  protocols, so I may have seen it under a

7  different name. I'd have to see it written

8  out, to see if I have reviewed that one before.

9    Q   Okay. Dr. Jablonski, just to ask you a

10  more specific question with relation to this

11  case. Can you tell me now sitting here today,

12  whether you know what the term Cauda Equina

13  syndrome refers to?

14    A   Oh, absolutely.

15    Q   All right. Can you describe what it

16  refers to?

17    A   Cauda Equina Syndrome describes a

18  complex of symptoms that can be seen with

19  compression of the Cauda Equina nerve roots

20  which is part of a conus medullaris. It's the

21  part of our spinal cord that actually exists

22  below the level of L1, L2. Below L1, L2

23  there's no spinal cord per se, just this

24  complex of nerve roots.

25        Cauda Equina means "horse's tail" and

1  that's kind of what the conus medullaris looks
2  like when you open it up and do the anatomy.
3  Cauda Equina syndrome are those symptoms that
4  can be seen with compression of that nerve root
5  complex to a point that can cause neuro and
6  vascular compromise to those nerve roots. And
7  it can be a complex of symptoms, they could be
8  subtle: to include some of the red flag
9  symptoms. Red flag symptoms are not consistent
10 from one document to another for this syndrome
11 but saddle anesthesia, urinary incontinence or
12 retention, can have fecal incontinence also.
13 So it's more symptoms related to the sacral
14 nerve distribution than to other peripheral
15 nerves. Although, back pain and some sciatic
16 type of pain can be part of the syndrome.

17     Q    Thank you. That's been a very helpful
18 description. Is that something that Cauda
19 Equina syndrome, something that you knew about
20 or had learned of prior to July of 2004?

21     A    It is, it's a rare condition that the
22 last time I had talked about it was in the
23 residency at Eglin Air Force Base, although I
24 have never seen a case prior to 2004. And I
25 didn't see that case either. I just heard

1 about it.

2 Q So, it is something that you had
3 studied in medical school and in residency?

4 A That's correct. It's a complication.
5 A rare complication of low back pain.

6 Q You have used two different terms with
7 respect to urination. You referred to urine
8 incontinence, and then you referred to urine
9 retention. They are two specific things,
10 aren't they?

11 A Correct. So, incontinence would be the
12 involuntary loss of urine. Retention would be
13 the inability to urinate.

14 Q And either one of them would be
15 considered part of the complex of symptoms of
16 the Cauda Equina syndrome?

17 A Either one of those could be, yes.

18 Q If a patient were to describe to you
19 that along with back pain, numbness in the
20 vaginal area, numbness and tingling bilaterally
21 down her legs, and having to press on her
22 abdomen or her bladder in order to urinate,
23 would those symptoms red flag for you the
24 possibility of Cauda Equina syndrome?

25 MR. SCHWAB: I'm just going to put an

1  objection on the record as to the vagueness and
2  the hypotheticalness, but go ahead and answer.

3      A    If I were to see a patient in my office
4  today that had that complex of symptoms, I
5  would be curious as to whether I might be
6  looking at the case of Cauda Equina syndrome as
7  a possibility in my differential. Because
8  that's not a -- that's not a normal complex of
9  symptoms for somebody with low back pain that
10 comes in to see me.

11 BY MR. KEOGH:

12     Q    The symptoms are more expansive than
13 the common or normal low back pain symptoms?

14     A    For normal low back pain symptoms, 98%
15 of which, typically resolves within six weeks
16 would be described by somebody coming in and
17 being able to describe an event that set off
18 the complex of pain in their low back, usually
19 associated with muscle spasms and the pain
20 could radiate down to their knees or maybe all
21 the way to their toes, and they'd be able to
22 tell me in a really bad case which toe was numb
23 or hurting at the time that they came in. That
24 would be more of a typical complex of symptoms
25 for mechanical low back pain.

1  Q  And adding to those typical symptoms,
2  numbness in the vaginal area, and what, I guess
3  could be described as urine retention in that
4  having to press on the bladder, is that what
5  would put it over and create the red flags if
6  you will, to put it into a Cauda Equina
7  consideration?

8  A  That would put it outside of my realm
9  of normal, so I would definitely have to expand
10 my differential at that point.

11 Q  And if you had those symptoms presented
12 to you, what would you do?

13 A  I'll do a physical exam of the patient
14 to see if I can confirm with some objective
15 measures the symptoms that the patient is
16 experiencing, look for weakness, look for
17 numbness.  Numbness is difficult to gauge.
18 There's not a thermometer for numbness.  So
19 it'll be sharp -- discrimination, may be light
20 touch in the areas that the patient was
21 complaining of, those type of sensations and
22 see if I could confirm that on exam.  And I
23 could also check the rectal tone, just as a
24 rough check of Cauda Equina function or those
25 nerve root functions because you should have

1   good    rectal    tone    unless    something    is
2   interfering   with   those   nerve   roots   going   to
3   that area.

4       Q    And is that a manual check that you do
5   for rectal tone?

6       A    It is.   And then if my physical exam
7   confirmed my suspicion that something might be
8   going on that I want to closer look at, then I
9   would try to order radiographic study of the
10  low spine, just to take a look and see what's
11  going on.    And my exam of choice for the
12  radiograph would depend on what's available.
13  So   I   doubt   the   deployed   setting   may   have
14  nothing   available.    May   have   plain   films
15  available   in   the   facility,   regular   x-rays.
16  From working at St. Elizabeth's Hospital where
17  I work currently, I'd be more likely to go into
18  something like a CAT scan or an MRI just
19  because I can get those as quickly as a plain
20  film.

21      Q    What about at Andersen Clinic, what did
22  you have available in '04?

23      A    We   had   a   plain   film   radiography
24  available.

25          MR. SCHWAB:   I'm sorry, what?

1    A    And then if I wanted a CAT scan, we
2  could refer patients to Naval Hospital for
3  that.   There was one MRI unit available on the
4  Island of Guam.   It was in a trailer near GMH
5  Hospital at the time.   And that was a little
6  bit more difficult to access because of demand
7  for the machine.
8  BY MR. KEOGH:
9    Q    Is that MRI the machine that was at the
10 private company called MR Imaging?
11   A    That's the one.   So, that was not
12 routinely available for me to get studies done.
13 It took -- we had to get approval to get the
14 MRI then we had to schedule with the company to
15 be able to get the patient in.
16   Q    Was there a process in place for doing
17 that kind of referral for an MRI?
18   A    There's a process for routine
19 referrals.   We had to write a request for the
20 study that we're looking for.   The Chief of
21 Medical Services, which in that time frame
22 would have been myself, would've had to approve
23 the study and then we would have had to use the
24 referral office to book the procedure itself.
25   Q    Was there a process for a more acute as

1  opposed to a routine referral?

2      A    Not through my clinic.

3      Q    Can you explain to me why there

4  wouldn't be a process in place for acute

5  situations from your clinic?

6      A    Mostly related to the fact that some of

7  those more acute studies would be in conditions

8  where the patient would be more ill, they

9  wouldn't remain at Andersen Air Force Base

10 Clinic. They would have been transferred down

11 to either GMH Hospital or over to Naval

12 Hospital. So, those providers would be the

13 ones ordering the studies. And I'm not sure

14 what they have available as far as their

15 process to get expedited studies.

16     Q    So, if a patient is considered to be

17 ill enough, for lack of a better description of

18 it, you can refer them to GMH or to Naval

19 Hospital for immediate acute care. Isn't that

20 correct?

21     A    Absolutely. Both of those facilities

22 have emergency rooms and we can transport

23 patients to the emergency rooms on either of

24 those facilities.

25     Q    Would a diagnosis of Cauda Equina

1 syndrome be something that would be considered
2 urgent and needing of immediate attention?

3 A If I was looking at the patient and
4 that was my suspicion, then yes. So, it's one
5 of those conditions that when you identify it,
6 it's an emergent situation, but there in lies
7 the difficulty. It's a condition that's not
8 often seen and even when you're looking at a
9 case of it, you may not recognize it
10 immediately.

11 Q Is Cauda Equina syndrome something that
12 a nurse practitioner or a physician assistant
13 ought to have heard of or had studied in their
14 training?

15 A They may have heard about it in their
16 training with -- depending on the specific
17 training program they went through. But it
18 would have been one of a thousand processes
19 that they heard of during their training. They
20 don't spend a -- none of the primary care
21 specialties spend a lot of time talking
22 specifically about Cauda Equina syndrome.

23 Q Okay. The question I asked you was
24 perhaps a little bit different than what you
25 answered. I think my question is designed at

1 finding out whether or not a physician
2 assistant in an Air Force context of what we're
3 dealing with here or a nurse practitioner ought
4 to have heard about it, or to have studied or
5 have heard of this condition before?

6     A    They may have -- they would have been
7 trained on the red flag symptoms of more acute
8 low back injury, but maybe not specifically
9 Cauda Equina syndrome by name.

10     And once again, that would be a
11 training program specific -- the Air Force
12 training programs. I know that they get the
13 red flag symptoms taught to them but I don't
14 know about Cauda Equina syndrome by name. And
15 that's what I do here in St. Elizabeth's, I
16 train Family Medicine Residence for a living.
17 So, I am in academics right now, so to speak.

18     Q    All right. So, let me see if I can
19 paraphrase or confirm the answer you gave me.
20 Is that, it's your view that a physician
21 assistant or nurse practitioner should have
22 been trained or would have been trained on the
23 red flag symptoms that constitute the complex
24 of symptoms relating to Cauda Equina syndrome,
25 but they may not have been told the precise

term of the Cauda Equina syndrome?

MR. SCHWAB: I'm going to object to that because it mischaracterizes what was said by the doctor.

BY MR. KEOGH:

Q    Did I mischaracterize your testimony?

A    So, the mid-level providers would have been exposed to or taught of these in a didactic format, the red flag or more urgent symptoms of low back pain; so they would have been taught what a normal low back pain patient looks like and then things to look for in addition that may be harbingers of more serious underlying disease. For example, age greater than 50, sudden onset low back pain, fever with low back pain, weight loss with low back pain - - all those can be symptoms associated with an underlying malignancy or infection.

Q    Okay. Cauda Equina syndrome does not involve a malignancy or an infection, does it?

A    It could. Cauda Equina syndrome is simply a syndrome of nerve root compression and it's not specific to the etiology of the compression. Most commonly, it's from either a disk or bony obstruction or compression of the

Cauda Equina nerve roots, but it could be due to one of those other etiologies, even a postoperative hematoma can cause Cauda Equina syndrome.

Q Okay, thank you. Can you tell me what the hours of operation of Andersen Clinic were in July of '04?

A It changed right around then. I'm going to go out on a limb here, it was either 08 to 1530. I believe that's when we were open at that time. We started doing morning PT around that time as a group and that pushed our opening times back, so I believe it was 8:00 that we opened up. And our last patient was about 1530 in the afternoon, usually we'd be done seeing patients by 4:00 or 4:30 -- 1600, 1630.

Q I'd like to discuss for a minute the practice and procedure of obtaining x-rays and reviews of x-rays at the Andersen Clinic in the July-August 2004 time frame. You had x-ray facilities available there at the clinic, correct?

A Yes. We had a regular plain film, non-digital machine at the time that operated most