1  of the time. So, when it was operating, we had
2  those films available to us. We would shoot
3  the films -- so you would order as the provider
4  the film that you would like. The technician
5  would shoot those films -- arm, neck, leg,
6  knee, whatever you're looking at, low back.
7  The patient would bring the films back to the
8  provider and we would take a look at them
9  ourselves as an initial read and then they
10 would be sent down to the Naval Hospital to be
11 read by the radiologist who's stationed there.

12   Q    The films were physically delivered to
13 the Naval Hospital?

14   A    Correct. Since there was a non-digital
15 system, there is no way to transmit them
16 without physically taking the films down.

17   Q    And how often were those films
18 delivered to the Naval Hospital?

19   A    They're delivered daily.

20   Q    Can you tell me what the turn around
21 time was from your experience in the July-
22 August 2004 time frame?

23   A    Experience was somewhere from routine
24 plain films about a week -- from the time that
25 the film would be taken down until I've

1 received the report back on the computer of
2 CHCS. And some of that delays is related to
3 the transcription of the report and then the
4 actual typing in of the transcription.

5    Q   Once the film is read by the
6 radiologist, then the radiologist would
7 transcribe a report, correct?

8    A   Correct.

9    Q   And that report or I mean, say, he
10 would probably dictate a report and then that
11 report would get transcribed, correct?

12    A   Correct.

13    Q   And then that transcription would be
14 put into the CHCS computerized record from the
15 Naval Hospital, correct?

16    A   Correct.

17    Q   And how does the provider then know to
18 review the CHCS record?

19    A   In CHCS there's a function called
20 review new results R-N-R, this is back before
21 CHCS 2 so this was all coming through what's
22 called CHCS native and when you have logged in,
23 you'd see that you have new results to review,
24 and when you looked at those results and have
25 returned at the end of the result then it would

1   time stamp it at the time that you reviewed it.
2   Though electronically time stamped it. So once
3   the result is reviewed it gets signed off in
4   the computer.

5       Q    And that record is still in existence
6   today that we could access it at CHCS record?

7       A    Absolutely.

8       Q    And that record would show the time
9   stamp of the review, correct?

10      A    You would have to ask the CHCS folks at
11  Naval Hospital to be able to show you when it
12  was reviewed.  When you print out the reports,
13  so they go into CHCS and type the -- used my
14  hands, not supposed to do that, sorry.

15      Q    Yeah.

16      A    Go to CHCS and I'll type my report the
17  -- and I go to print one out of the computer,
18  it doesn't show me when the report was
19  reviewed.  It just simply gives me the results
20  of the report.  So, it doesn't remind me when I
21  first looked at it.  But that is available in
22  the computer system so it's able to be
23  ascertained.

24      Q    And that would be it?

25      A    I know that, because if I --

1    Q    Go ahead.

2    A    If I spend more than 30 days to look at

3  a result, I get a little nasty gram saying I've

4  got results greater than 30 days to review.

5    Q    So 30 days is the kind of time frame

6  that the computer will then alert you that

7  there is something going wrong that you haven't

8  reviewed a result?

9    A    Well, that's when reports will be

10  pushed out of the system that are then poured

11  it to the SGH as the Chief of Medical Services

12  or the Clinic Chief, to let them know they have

13  results that are greater than 30 days

14  unreviewed in the computer. That's an

15  automatic default that's typically set up. But

16  most of us are pretty good about reviewing them

17  as they come up.

18    Q    I mean clearly the best idea, the best

19  practice would be to review them immediately,

20  correct?

21    A    That would be, correct.

22    Q    Just so I understand how I can review

23  this. The CHCS records would be something that

24  we could access from somebody at Naval Hospital

25  who maintains the system? Would that be

1 correct?

2 A That's correct. It'll have to be
3 somebody that had access to the CHCS database
4 itself. So a physician or a practitioner
5 wouldn't be able to pull that out directly for
6 you.

7 Q And that database would show when a
8 particular x-ray report was reviewed by a
9 provider?

10 A It would show when it was available for
11 review and then when it was reviewed. Correct.

12 Q Do you know about Mrs. Rutledge, what
13 her condition is and was and what her treatment
14 at the Andersen Air Force Base Clinic was?

15 A Absolutely. She lived right across the
16 street from me as a matter of fact.

17 Q Okay. Did you know her personally
18 prior to July and August of 2004?

19 A Not very well. My wife and her talked
20 ·on occasion but we didn't go over for a dinner
21 or anything like that.

22 Q All right. In the July-August 2004
23 time frame -- well, let me back up a minute.
24 Have you had an opportunity prior to today's
25 deposition to review the medical records of

1  Mrs. Rutledge's treatment?

2      A    Yes, I have.

3      Q    When   did   you   first   review   those
4  records?

5      A    First   reviewed   them   after   learning   of
6  her condition, must have been about the October
7  time   frame,   after   she   had   returned   from
8  Tripler, and I think that's about the same time
9  frame that she filed the patient complaint at
10 the   clinic.    And   that's   what   triggered   the
11 review.

12     Q    Am  I  correct  that  in  my  understanding
13 that   in   July   and   August,   when   she   was   being
14 treated   at   the   Andersen   Clinic,   you   did   not
15 personally   have   any   involvement   in   either   her
16 treatment or review of her treatment?

17     A    I  did  not.    I  just  knew  that  her  dog
18 was   being   watched   by   some   of   our   neighbors
19 while she was gone.

20     Q    All  right.    That  would  have  been  after
21 August 27 when she was sent to Tripler, is that
22 correct?

23     A    That's correct.

24     Q    All  right.    I  think  I  want  to  focus
25 first on July 27 to August 27, the period when

1  she was being treated solely at the Andersen
2  Air Force Base Clinic. Did you have any
3  involvement with reviewing her chart, doing a
4  chart review with a physician assistant, or the
5  nurse practitioners, or any involvement at all
6  in her treatment at that time?

7  A    I did not.

8  Q    Do you know whether or not any other
9  physician or doctor at the Andersen Air Force
10 Base Clinic did have some involvement with
11 either chart review or treatment of Mrs.
12 Rutledge during that July 27 to August 27 time
13 frame?

14 A    I'd have to look at the record in front
15 of me. There was a phone consult, phone
16 request called in from Mrs. Rutledge that Dr.
17 Deitman reviewed to see if it needed the same-
18 day appointment, and he did give her a same-day
19 appointment after reviewing the request.

20 Q    Would it take you long to look at that
21 record and confirm for me that that would have
22 been the phone consult that took place on July
23 27, 2004?

24 A    Not too long, I'll just look back here
25 -- (reviews document). That is the phone

1   consult, 27 July 2004, page RUT031.

2     Q   What is that referring to?  The RUT031?

3     A   The pages of the document that I have

4   are numbered at the bottom.

5       MR. SCHWAB:   That's our numbering

6   system, we gave it to him.

7   BY MR. KEOGH:

8     Q   All right.  Now, is there any other

9   evidence that you have of a doctor, medical

10   doctor, treating or providing a chart review on

11   Mrs. Rutledge's treatment from July 27 to

12   August 27, other than that initial phone call

13   that Dr. Deitman reviewed?

14     A   No, I did not.  I don't see any other

15   evidence.

16     Q   Is chart reviews something that is

17   recorded or documented in some way that which

18   charts were reviewed?

19     A   There is a record that's kept --

20   because we have to provide that to JCAHO, if

21   they asked of which charts were reviewed and

22   what our findings were, because we have to be

23   able to show that we track for trends.

24     Q   Would the --

25     A   Because they're quality reviews, I'm

1 not sure if they're discoverable by chart or
2 not. The trends are. But I'm not sure about
3 the specific review sheets themselves.

4 Q Is there anything that is recorded in
5 the patient's record that would indicate that
6 his or her chart has been reviewed?

7 A No, there's not.

8 Q The July 27 phone consult from that
9 Mrs. Rutledge had and that Dr. Deitman
10 reviewed, is there any evidence or indication
11 that there was any follow-up with Dr. Deitman
12 after that initial phone consultation?

13 A No, there's none. It just says, for
14 disposition, that the patient was given a 1440
15 appointment with Major Giscombe.

16 Q Okay. I want to digress for a minute
17 and have you look right in the very next line,
18 right above that 1440 appointment with Dr.
19 Giscombe and you'll see the term there "Woodke
20 back pain". That's what I was talking about
21 before. You have any idea what that refers to?

22 A That's a telephone triage nursing
23 protocol. So, there's a Woodke protocol for
24 telephone triage that the nurse was using at
25 the time that they took down the note.

1    Q   Is that something that I would be able
2  to find or look at, and if so can you help me
3  know where I could find it and look at it?

4    A   Probably, it's something that's widely
5  available through -- like a nursing bookstore,
6  Chief Nurse from the Naval hospital or GMH
7  should be able to produce that for you.

8    Q   All right, thank you.  Am I correct,
9  that in my understanding that the first time
10 that you had occasion to review the records of
11 Mrs.  Rutledge with respect to her July-August
12 treatment at the Andersen Air Force Base Clinic
13 was in October of 2004 after she filed the
14 patient complaint?

15   A   That's correct.

16   Q   And as a result of that patient
17 complaint, I gather you did some kind of a
18 review of the treatment?

19   A   Absolutely.

20   Q   And was there a written report
21 generated from that review?

22   A   I don't remember if I -- because of
23 what Mrs.  Rutledge had, the Cauda Equina
24 syndrome.  What I did with the review is take a
25 look at areas of improvement or education need

1   for the professional staff and then
2   disseminated the information at a Pro staff
3   meeting about Cauda Equina syndrome because it
4   is such a rare condition. To make sure that
5   everybody was aware of red flags for low back
6   pain. I don't know if I did a written report
7   on this particular case. I believe that I did,
8   if I did though it's in the form of a quality
9   review up at Andersen Air Force Base.

10     Q And can you tell me what a quality
11   review is? What that entails --

12     A Sure. The quality reviews -- the
13   quality reviews are reviews of processes and
14   care that are given to patients to look for
15   areas of improvement, there are open non-
16   retribution reviews to aid a medical facility
17   to be able to take a hard look at processes and
18   care patterns to see if there are areas as a
19   system that we might be able to do better so we
20   can fix those in the future.

21     Q Are these reviews things that are open
22   to the public?

23     A They are not. They're not
24   discoverable.

25     MR. SCHWAB: Guam rules are at 417 on

1   those --

2          MR. KEOGH:   I know -- I'm just -- okay.
3   BY MR. KEOGH:

4      Q   But   from   a   military   standpoint   as
5   opposed to a Guam law or rule situation from a
6   military standpoint, those reviews are private?

7      A   They are.   So they're different than,
8   let's say, a JCAHO review for -- I'm blank on
9   the name, but the critical incident reviews is
10  called under JCAHO today -- I'm a little post-
11  call, I was in the hospital all week, taking
12  care of in-patients, I'm a little slow.

13         But   if   we   have,   say,   an   unexpected
14  death in the facility, sedations and anesthesia
15  and   they   hook   up   the   carbon   dioxide   bottle
16  instead of the oxygen bottle and the patient
17  dies secondary to that type of an event, there
18  is a mandatory reporting that has to occur and
19  that's   not   a   quality   review,   that   is
20  discoverable.   That's something that's open to
21  the public.

22     Q   All   right,   I've   heard   the   term   about
23  Morbidity and Mortality Reviews, is that a term
24  that you've used or heard of before?

25     A   Yes.

1     Q   And what does that refer to?

2     A   Morbidity and Mortality reviews (M&Ms)

3  are -- every reviewed cases has a professional

4  staff where outcomes could have been improved,

5  or we have an unexpected outcome, or even a

6  known bad outcome of a particular disease

7  process or procedure, and we present the case

8  to the group in order to be able to talk about

9  the case, what the outcome was, we might have

10  been able to prevent death to prevent that

11  particular type of outcome.  Just a kind of

12  information to get up to everybody that is

13  conveyed through the lessons learned from poor

14  outcomes or bad effects.

15     Q   Was an M&M review done in Mrs.

16  Rutledge's case?

17     A   We did a Morbidity and Mortality pro

18  staff so that's where we have professional

19  staff meeting, I'm not sure the exact month,

20  but that would be in the minutes -- the

21  professional staff minutes that were kept;

22  where we went over Cauda Equina syndrome and I

23  believe one other topic also.  That was of

24  interest to us as a Pro staff at that time.

25     Q   The M&M review, again, is that

**DEPO RESOURCES**
George B. Castro
**Court Reporter**
Tel.(671)688-DEPO * Fax(671)472-3094

1  discoverable?

2      A    I don't know that I had a written M&M

3  report done.    An M&M is more of a forum or a

4  format.    I could say unless this hospital we

5  have a monthly OB and neonatology M&M and it's

6  just the professional staff getting together

7  talking about the case.  I don't know another

8  way to keep any written documentation from

9  those.

10     Q    All right, how about the minutes of the

11  -- you referred to a pro-staff meeting and you

12  said there were minutes kept to that, are those

13  available to the public?

14     A    They should be discoverable.

15     Q    Can you help to refine the description

16  for me of what the minutes -- what minutes that

17  would be of a pro staff meeting with respect to

18  Mrs. Rutledge's treatment?

19     A    It went just -- they would mention on

20  the pro-staff minutes that her case was

21  discussed, or a case of Cauda Equina syndrome

22  was discussed and that the red flag symptoms in

23  Cauda Equina were discussed at the professional

24  staff level to those people attending the

25  meeting.  So it wouldn't be very specific.  It

1   would just be like a regular meeting minute.

2      Q   And do you know when and where that

3   meeting took place?

4      A   It took up at a place of the Andersen

5   Air Force Base.  I want to say, that was here

6   in January or February, first half.

7      Q   That was January, February '05?

8      A   January, February '05.

9      Q   Are these meetings that are done on a

10   regular basis, is this annual or semi-annual?

11      A   They were up to the Chief of Medical

12   Service.  You can have one as often as you

13   like.  The Professional Staff meetings is not a

14   committee function.  So, it's something that if

15   I wanted to as chief-of-staff I could have more

16   or less often, I typically try to have one once

17   a month.

18      Q   Are there any reports of the treatment

19   that Mrs. Rutledge received at the Andersen Air

20   Force Base clinic reviews, analysis, reports of

21   some kind other than what we discussed here now

22   that are discoverable?

23      A   Not that I'm aware of, just what's in

24   her medical records.

25      Q   Going back to the telephone consult in

1   July 27 of '04, having Dr. Deitman review this
2   and sign off on it, what's the purpose for
3   that?

4       A   As you see at the bottom, if you've got
5   it available in front of you, at the bottom of
6   the note where it says "disposition to", he
7   checked off the queued appointment, when he
8   would do that he'd hand it back to the
9   technician who would give it to the scheduler
10  to get a hold of the patient and get him booked
11  into an appointment.

12          So it was something that we felt was
13  routine as a physician that we would try to get
14  him booked into a routine appointment in the
15  next seven days.   The queued appointments
16  needed to be seen the same day.

17      Q   Was there any -- would there have been
18  any intention or plan to have Dr. Deitman
19  review the treatment record after the
20  appointment in his involvement in the telephone
21  consult?  Did that trigger something that would
22  mean he'd see it again, coming back to him
23  after the appointment?

24      A   There's not -- it's just purely
25  administrative function to help the triage

1  nurse, to decide who needed to be seen same
2  day.

3  Q  Under a circumstance such as this with
4  Mrs. Rutledge coming in for an acute
5  appointment from a telephone consult the same
6  day, would it be expected that there would be
7  some follow-up or review of the chart such as
8  this with a physician such as Dr. Deitman?

9  A  Not with the complaint as it's written
10  on the report.

11  Q  I'm sorry?

12  A  Not as -- not from the complaint as
13  it's written on the note.  Low back pain is a
14  very common complaint so as a physician review
15  on that, I wouldn't expect that I would see
16  that one back.

17  Q  Unless there were some red flag
18  symptoms, for example, that you discussed
19  before.

20  A  Unless there was something that the
21  physician assistant or nurse practitioner was
22  seeing that they wanted a consultation on at
23  the time of the visit.

24  Q  I think we've talked about this a
25  little bit before but I want to revisit it

1  again in this context of a patient coming in
2  for appointment such as what Mrs. Rutledge did.
3  If the patient requests a referral to the Naval
4  Hospital, in this situation -- in a situation
5  such as a Mrs. Rutledge's, is that something
6  that, again, the physician assistant or nurse
7  practitioner can or ought to do if they make
8  that request or refer to one of the doctors?
9  What's your view on that?

10  A   Could you clarify that question for me?
11  I'm not sure exactly what you're asking.

12  Q   All right, let me give you some of the
13  background. I believe it was said nurse
14  practitioner Giscombe who made the comment
15  during her deposition that a patient could go
16  to the Naval Hospital anytime they want to.
17  All they have to do is to ask for it, and they
18  can go. So, I'm trying to explore how easy
19  that process is and Mrs. Rutledge says she did
20  ask to go to the Naval Hospital and it wasn't
21  arranged for many days, if not weeks before she
22  got there.

23  A   So, there's two different mechanisms
24  that you're alluding to. One mechanism, as a
25  patient, if I felt that I was ill enough that I

**DEPO RESOURCES**
George B. Castro
**Court Reporter**
Tel.(671)688-DEPO * Fax(671)472-3094

1 wanted to be seen at the hospital that day, I
2 can go to the emergency room at anytime to be
3 seen, so that's one mechanism.

4 Referral mechanism, which is the other
5 way of being seen at the referring hospital,
6 would require a consult to a specific clinic or
7 function from a provider. So, if you're seeing
8 me as a patient and you say "Hey doc, I just
9 want to go see somebody at Naval Hospital",
10 well then, it's up to me as the examiner to
11 determine who that somebody would be, whether
12 it be physical therapy, orthopedics, ENT
13 pediatrics and then also to determine the time
14 frame at which the consult needs to be
15 conducted whether it'd be routine or -- there's
16 really only two different types of consults.

17 There's routine, and then there's other
18 than routine, which would require provider-to-
19 clinic or provider contact. In the computer
20 you can order them as ASAP's or STAT's but they
21 get treated the same. So, ASAP and STAT
22 functionally mean the same thing. And if I
23 don't have that provider to provide a contact
24 then I'd put in something as ASAP -- that's
25 going to get treated as a routine.

1    Q   So, let me see if I understand this.
2  There are two mechanisms, you're saying one:
3  any military member or dependent can just go to
4  the emergency room of the Naval hospital at
5  anytime that they see fit, correct?

6    A   Correct.  And I'm on this credential
7  down at the Naval hospital and work some ER
8  shifts down there.  So, anybody who came in we
9  would take a look at them and treat them
10 appropriately and then try to get them referred
11 off to whatever clinic they needed follow-up
12 in.

13   Q   All right.  And then the second
14 mechanism would be somehow up to the discretion
15 of the provider of whether or not the referral
16 gets done on an acute or emergent basis or
17 routine bases?

18   A   Correct.  So, their consult -- the
19 decision process is, which function of the
20 consult needs to go to.  So, say, I come in
21 with eye symptoms, maybe I need to see the
22 optometrist, maybe I need an ophthalmologist,
23 maybe I need an ENT doctor.  That would be up
24 to the examining provider to determine which
25 function the consult needed to go to.  And then

1    also the acuity of the consult whether it
2    needed to be a routine consult for the clinic
3    to review or same day -- meaning that I need to
4    get on a phone and talk to somebody.

5    Q   But the request to go to the Naval
6    Hospital, once it's made by a patient, is that
7    automatic that it gets there or is that with
8    that referral option within the discretion of
9    the provider as well?

10   A   The referral option is at the
11   discretion of the provider that's seen the
12   patient. But once again as a patient you can
13   always ask for a second opinion. So, if
14   there's a difference of opinion as to whether a
15   patient needs to be seen by a referral clinic
16   or not, they can always ask for a second
17   opinion.

18   Q   And is this right to request for a
19   second opinion something that is, as a matter
20   of course, explained to each patient? Or to a
21   patient?

22   A   I don't know that it's explained in any
23   public format, to every newcomer at Andersen
24   Air Force Base. But that clinic management OI
25   that we referred to earlier, should have a

1 section on it -- a section referring to second
2 opinion referrals.

3     Q   There's been some discussion again with
4 Major Giscombe during her deposition about the
5 fact that since Mrs. Rutledge was a relatively
6 new patient to the clinic that she didn't have
7 a chart or a file there yet. Can you help me
8 understand that why would -- I mean, in my
9 understanding was that when a patient comes
10 from another assignment somewhere that they
11 bring their medical charts with them. Is that
12 not the case in the Air force?

13     A   You see my frustration over the video
14 conference here for the process. Used to be
15 that patients would hand-carry the records from
16 base to base but you just can't imagine from a
17 medical legal standpoint, that would create
18 liabilities where patient's could alter or
19 remove the medical record.

20     So, there was a policy and I don't know
21 exactly when it went into effect. But
22 somewhere around the '99 time frame where
23 patients were no longer allowed to carry their
24 written records when they PCS from base to
25 base. So, the losing base would actually ship

1  the dependent records from one records room to
2  another.  So, there very often were time
3  periods during the PCS where direct record may
4  not be available from the previous base.  That
5  was one of the big pushes to go to the
6  electronic medical record that we use now,
7  because any electronic note that's in our new
8  system, from anywhere in the world, I can see.
9  Q    And when did that go into effect?
10  A    It's still being implemented across DOD
11  right now, so not all facilities are online.  I
12  think we are about 90% online right now.
13  Q    Is Andersen online now?
14  A    I don't know.  They're one of the last
15  ones to get CHCS 2, Guam was.  So I'm not sure
16  if Naval Hospital has turned it on because
17  they'd be the owners for the system.
18  Q    Okay.
19  MR. KEOGH:  We're short on time here, I
20  don't want to cut you off, Mikel, if you have
21  questions to ask, but can I have a couple more
22  minutes here?
23  MR. SCHWAB:    Sure, but I do have
24  questions after you.
25  MR. KEOGH:  Okay.

BY MR. KEOGH:

    Q    I do want to finish up on this file
process.  And it has been described that when
Mrs. Rutledge came in on July 27, there was no
chart for her, another new record had to be
created and then when she came back on August
2nd that record was not available to the second
provider and same when she came back on August
17 that that first two records weren't
available for the next provider.

        Can you address that for a minute and
tell me whether or not that's the way things
were done back then and whether that's
appropriate?

    A    That's one of the weaknesses of a
written medical record, that's why the big push
across the United States for Electronic Medical
Record documentation.  What happens when you
have a -- encounter on a loose sheet which is
what these would have been, the loose sheets
then would go back to file room to be filed and
will be placed on a stack to be bound, placed
up on the shelf in the appropriate position.
If there was no record to place the loose paper
work in, they will continue to sit on a sleeve

1  on that shelf. And if you misfile that by one
2  position then when you go back to look for it,
3  it's hard to recreate.

4      Once the record does catch up and it
5  gets filed on the shelf, then any loose
6  paperwork that's sitting on that sleeve, it
7  would then be filed in the medical record. But
8  it wouldn't be uncommon for a patient to show
9  up for me to write a note then it'd go back to
10 the file room to get filed, it gets placed in
11 the stack to be filed. I see the patient again
12 before I get into the shelf then it would be
13 very difficult to find that note, not possible,
14 but it could take -- knowing where to look,
15 maybe 20 or 30 minutes if it was available in
16 the file room at the time.

17     Q    All right, thank you.

18         MR. KEOGH: I'm going to turn the
19 questioning over to Mikel, so I can let him get
20 in and what -- before they kick us out of here.

21

22                 **CROSS EXAMINATION**

23 BY MR. SCHWAB:

24     Q    Doctor, if I could and I'm laughing at
25 hearing about these medical records, I grew up

1  in the Navy, so I just remember all of the --

2  you know, going to a new location and the

3  records catching up. But with regard to Guam

4  and its situation out here medically, you say

5  the people are screened before they are

6  stationed in a place like Guam. Can you

7  explain what that is? And where can I find

8  that documentation about that screening?

9      A    It's called -- it's the overseas

10 screening process, it's a 1466 screening,

11 that's what it's called. The Chief of Medical

12 Services, I think it's Dale Vonquartzen

13 (phonetic) up there at Andersen Air force base,

14 would be able to give you the AFI's that govern

15 that process. But essentially what happens,

16 the step -- see, I want to go back to Guam and

17 I actually do, but I want to come back there

18 and be -- take -- chief medical service again.

19      Well, as an active duty member, I

20 presumed fit for duty because of my profile

21 that I have in my chart. My family members on

22 the other hand, what we do is a screening to

23 see if my children need educational needs, if

24 there's any special medical needs, and if there

25 are, whether the facilities on Guam can handle

1 my family members or not; whether it's safe for
2 them to be there.

3 So, the screening process would be that
4 I fill out a form, take it to my doctor here.
5 They review my family members records and check
6 out whether a facility determination needs to
7 be -- whether that needs to occur or not, if
8 it's determined that there are special needs,
9 and I used to do these at Andersen Air Force
10 Base, then the Chief of Medical Services will
11 get a copy of this form and it's actually like
12 a 12-page document plus any additional
13 documentation that I would need to make a
14 determination as to whether I can care for
15 those family members or not.

16 Translation, what that does is screen
17 out a lot of what I treat down at St. Elizabeth
18 Hospital here -- chronic cardiac disease,
19 obstructive pulmonary disease, cancer, things
20 that maybe difficult to handle on Guam itself
21 and may require the family members to be gone
22 from the island for extended periods of time to
23 Tripler or back to States or Japan.

24 Q Why would it be difficult to treat on
25 Guam?

1    A    One thing that currently is difficult
2    to treat on Guam from my own understanding, if
3    I'm reading the PDN right, is cancer care on
4    Guam is difficult.

5    Q    No, what I'm asking is if -- are there
6    limitations to the alacrity with which they can
7    get to problems, medical problems on Guam?

8    A    From a DOD standpoint, yes.  So, say
9    there's surgical care, would have to occur off
10   island at Tripler or up at Japan, so if I had
11   somebody that had a known neurosurgical
12   condition that was going to need more than just
13   annual follow-up, then I'd be unlikely to
14   screen that or allow that patient to PCS to
15   Guam.

16   Q    So --

17   A    Although, there's no real authority for
18   me to stop them -- there's a little caveat
19   there --

20   Q    Is there some concern --

21   A    -- that I would recommend against.

22   Q    Is there some concern about people that
23   might need immediate care, within a certain
24   time period, not being appropriate for Guam?

25   A    Correct.  So, a good one would be

1  cardiac disease. If I knew somebody was at
2  high risk of cardiac disease who might need
3  quadruple bypass sometime in the near future,
4  I'd be unlikely to allow that person to PCS, or
5  recommend against their PCS, knowing that that
6  would be difficult to come by because we have
7  to fly him out somewhere and that that
8  transport isn't always available because of
9  typhoons. That'll be a bad time to have a
10  heart attack.

11     Q  Now, back to your knowledge of Cauda
12  Equina. What is your knowledge about how that
13  occurs, how quickly that occurs, and what
14  damage is done when it occurs?

15     A  There's two different flavors of Cauda
16  Equina syndrome: There's acute or traumatic
17  Cauda Equina syndrome -- that's what a lot of
18  the literature's on because that's easier to
19  study because it's seen in the emergency room
20  setting.

21     So let's say you're in an automobile
22  accident, have a spinal fracture down in the
23  lumbar area. You can get or you get hematoma.
24  You can get acute compression in the trauma
25  setting and that may need to be cared for

1 emergently.

2        There's chronic conditions that can
3 lead to Cauda Equina syndrome. More often they
4 lead to spinal stenosis, which is a little bit
5 different animal than Cauda Equina but that --
6 arthritic conditions of the low back, herniated
7 disk that protrudes centrally or directly ahead
8 instead of going to the side, can cause Cauda
9 Equina more of a chronic or insidious onset
10 than the traumatic Cauda Equinas. Those also
11 belong to categories of infections and neoplasm
12 or cancers over time can cause a Cauda Equina
13 syndrome.

14     Q   Now, when this occurs, is there a time
15 period when it causes the most damage?

16     A   It's not well-defined but most of the
17 body of literature would point to somewhere
18 from discovery to treatment of less than 48
19 hours had better outcomes than greater than 48
20 hours.

21     Q   And does that increase over time? Or
22 say, if you go from 28 to 48 to beyond?

23     A   It -- once again, it's difficult to
24 define the time period at which treatment needs
25 to occur. Earlier is better but earlier than

1   24 hours doesn't seem to necessarily convey a
2   benefit.    But somewhere in less than 2 days is
3   ideal.    Beyond that 2-day period, the chances
4   of recovery or full recovery of neurologic
5   function drop off precipitously.

6          So, it's very unlikely if your symptoms
7   have been there for a month or two that you're
8   ever going to get full function back.    That's
9   just related to how nerve roots themselves are
10  nourished with blood flow.

11         MR. KEOGH:  I'd like to interpose a,
12  kind of a question, in the form of an objection
13  at this point if whether or not Dr. Jablonski
14  is being converted to an expert witness at this
15  point?

16         MR. SCWAB:  No, I mean -- no more so
17  then -- these are follow-up questions to your
18  questions.    You asked about Equina and some of
19  the characteristics --

20         MR. KEOGH:  But my question --

21         MR. SCHWAB:  -- and some of the flags.

22         MR KEOGH:  My questions were directed
23  at what knowledge he had at the time of Mrs.
24  Rutledge's treatment, but anyway I just --

25         MR. SCHWAB:  Yeah, and I apologize.  I

1  could lay more of a foundation if we weren't
2  pressed for time and I --
3      MR. KEOGH:  I know.
4      MR SCHWAB:  That's why I -- if there's
5  a foundation objection I can certainly go back
6  and do that, but I'd rather not.
7      MR. KEOGH:  Okay.  I just want to know
8  whether he's going to be giving us opinions at
9  trial here.
10     MR. SCHWAB:  No, no, not that I'm aware
11 of at this time.
12     MR. KEOGH:  Okay.
13 BY MR. SCHWAB:
14     Q  Doctor, one last thing.  Are you aware
15 at all or did you have any knowledge of the
16 orientation that was given to people when they
17 came to Andersen Air Force Base?
18     A  As far as the patients?
19     Q  As far as people coming to Andersen,
20 were they told about the presence of the
21 Andersen clinic and told about the presence of
22 the emergency room at the Naval hospital?
23     A  There's a newcomers meeting that all
24 the active duty members were required to
25 participate in.  The family members can also

1  participate in that newcomers meeting where
2  this type of information is passed out to
3  newcomers.

4      Q   And this type of information being that
5  there's a -- or two places to go for medical
6  care?

7      A   Correct.   But there's -- at Andersen
8  Air Force Base we had a clinic in what our
9  services -- available services were and how to
10 access us, and that there was also an emergency
11 services and several referral services
12 available at Naval hospital.

13     Q   And doctor, let me ask you this, is
14 there anything else we've discussed today that
15 you would like to add or something that we did
16 not give you a chance to fully answer or tell
17 us about?

18     MR. KEOGH:   I'm going to interpose a
19 general objection to that, but go ahead.

20     A   Not that I can think of at the time
21 now.

22     MR. SCHWAB:   Okay.   If at anytime you
23 do come up with something that you remember
24 later, that's not uncommon for a witness to do,
25 certainly contact me and I'll let Mr. Keogh

1  know.

2     Also, you have an opportunity to look
3  at your transcript from this deposition and
4  review it before you sign it and return it to
5  the court reporter and then it will be official
6  at that point.

7     MR. KEOGH: Since we haven't been
8  kicked out yet, I just have a couple of follow
9  up questions.

10   A Absolutely.

11

12     **RE-DIRECT EXAMINATION**

13 BY MR. KEOGH:

14   Q From the questions that Mr. Schwab was
15 asking you, is it your testimony, and correct
16 me if I'm wrong on this, that the standard of
17 care of treatment that's provided on Guam is
18 below that, that maybe provided, that is
19 provided elsewhere?

20    MR. SCHWAB: I'm going to object to that
21 because I'm not sure that's the proper
22 characterization. I believe the
23 characterization was that Guam being a remote
24 location, doesn't have access to some of the
25 emergent needs that might occur in a patient.

1  BY MR. KEOGH:

2      Q   All right, that's what I'm referring

3  to, the limitations -- does that mean that the

4  --

5      A   The standard of care would be, for a

6  condition is, the standard of care, if there is

7  a   published   standard   of   care,   there   are

8  conditions that, medical conditions that occur

9  for   which   there   is   not   rapid   intervention

10 routinely available on the island of Guam.

11         That's   true   of   all   the   Micronesian

12 islands.   Guam   has   a   fairly   robust   medical

13 system   but   there   are   some   capabilities   like

14 cardiothoracic surgery.   They were still being

15 explored when I left Guam in 2005, I don't know

16 if those are now routinely available or not.

17 But   neurosurgical   intervention   was   not

18 something that was routinely available at the

19 time of this particular incident.

20     Q   But there was available -- I mean the

21 Naval   Hospital   was   available   as   a   resource.

22 Correct?

23     A   Correct.

24     Q   And   the   Naval   Hospital   is   a   fully

25 functioning quality facility.   Correct?

1    A   Correct.

2    Q   And if procedures were not capable of
3 being performed there, there are daily or maybe
4 more than daily medi-vac flights to Tripler
5 Army Medical Center in Hawaii which is about
6 seven hours away. Correct?

7    A   The medical flight -- the medi-vacs
8 were a separate issue. The medi-vacs system,
9 there is something called GPMRC that's
10 stationed here at Scotts Air Force Base that
11 coordinates patient movement throughout the
12 globe and there's also TPMRC which is the
13 Theater Patient Movements (Requirement) Center,
14 I think the one for PACAV (sic) is currently
15 located at Hickam Air Force Base in Hawaii and
16 they coordinate patient movement throughout the
17 theater. There is not a routine or daily run
18 that goes from Guam to other facilities. It's
19 on an as-needed basis.

20    Q   All right. With respect to the
21 orientation that the newcomers meeting that Mr.
22 Schwab asked you about, are there any written
23 documents that are presented at that newcomers
24 meeting that you can describe for us?

25    A   There's a general -- there are general

1  handouts from a variety of base services,
2  chapel, BX, family support center, the clinic
3  that are available for people to pick up and
4  there -- at that time there were stations or
5  booths that the members can go to, to ask
6  questions about that specific service.
7     Q   And is there an office or department or
8  division or whatever within the Air Force that
9  conducts these newcomers meetings and would
10 have these pamphlets or these handouts?
11    A   It's wing-dependent, so it's base-
12 dependent, as to what you have at your
13 newcomers meeting and what you require.
14    Q   How about at the Andersen Air Force
15 Base?
16    A   At Andersen Air Force Base, whatever is
17 available at the newcomers -- you'd be happy to
18 get, I'm sure.
19    Q   I guess, what I'm asking is where --
20    A   (over speaking)
21    Q   What I'm asking is where do I get it?
22    A   For what's available for newcomers?
23    Q   Yes.
24    A   It'd be called -- I'm not sure where
25 the POC is anymore for the newcomers to

1  coordinate it. Base Services is usually a good
2  starting point.

3      Q   What's a POC?

4          MR. SCHWAB:  Point of Contact

5      A   Point of contact, sorry.

6  BY MR. KEOGH:

7      Q   Okay, all right. When you were
8  performing the review of the medical records
9  and doing the M&M review if there was one done,
10 did you have an opportunity to interview Mrs.
11 Rutledge at all?

12     A   I had the opportunity, I did not
13 interview her directly.

14     Q   Do you know of any --

15     A   It was a little awk- --

16     Q   Go ahead.

17     A   It was a little awkward trying --
18 approaching her as a physician and being a
19 neighbor at the same time. So, I did not
20 interview her directly. I would have if she
21 would have requested, but I did not.

22     Q   Did anyone else that you know of
23 interview her?

24     A   For the purposes of those
25 presentations, no.

**DEPO RESOURCES**
George B. Castro
**Court Reporter**
Tel.(671)688-DEPO * Fax(671)472-3094

1    Q    How about in response to her patient
2  complaint?

3    A    In response to her patient complaint,
4  our patient advocate who -- I'm blanking out
5  his name.  He is Chief Master Sergeant at the
6  time, would have given her a call back in
7  response to her patient complaint to address
8  what we have done with the complaint itself.

9    Q    Would there have been a personal
10 interview of her in some form?

11   A    If she was in the clinic at the time of
12 the complaint, he would have sat her down and
13 talked with her.  Otherwise, these tend to
14 occur over the phone or by email.

15   Q    I guess what I'm driving at is, I'm
16 trying to find out if there would be any notes
17 or statements made of any interviews that --
18 statements that Mrs. Rutledge would have made
19 in connection with this incident.

20   A    I don't know that there would be
21 written statements, there'd be just the general
22 -- what the complaint was.  This is how we
23 addressed it.

24   Q    And that would be -- would that be in
25 writing somewhere by maybe this Chief Master

1  Sergeant or someone else dealing with the
2  complaint?

3      A    It should be part of the patient
4  advocates records, if records were kept. Main
5  thing that JCAHO wants to see with the patient
6  complaint process is that when patient
7  complaints are raised there's a process in
8  place to address the complaint. I don't know
9  that there's a documentation trail that has to
10 be kept with that.

11     Q    And the patient advocate, is that a
12 position within the Andersen Air Force Base
13 Clinic?

14     A    That's correct.

15     Q    All right. One last point. We have
16 taken the deposition of Captain Rau as well,
17 and Mrs. Rutledge has reported that Captain Rau
18 at one point apologized to her for the
19 treatment that was provided for her. And at
20 his deposition he described it as something
21 that he was just saying he was sorry for her
22 general outcome rather than for the treatment.
23 Did you ever have a conversation with Captain
24 Rau about this question of whether he
25 apologized or not?

1     A   He did inform me that he had talked to

2  Mrs. Rutledge and that he had said, "I'm

3  sorry". That he had apologized, it was more

4  for the general outcome that she had -- from

5  her disease process. He wished that he would

6  have been able to have done something more for

7  her. As providers we're human, things happen

8  and saying I'm sorry is part of the profession.

9     Q   All right. No, I understand that and

10  that's actually -- was something much

11  appreciated by Mrs. Rutledge. My question is

12  whether or not Captain Rau was instructed in

13  some way not to speak about this matter or to

14  change the description of his apology in any

15  way?

16     A   Absolutely not.

17     Q   At least not by you, right?

18     A   Not by me.

19     Q   Okay.

20     MR. KEOGH: That's all the questions I

21  have. Thank you so much for your time today,

22  it's been very helpful.

23     MR. SCHWAB: Doctor, I just want to

24  thank you for traveling and sitting in that

25  room and putting up with all of our questions.

1   And we just appreciate everything you are doing

2   for us and for future physicians, right now.

3   So, thank you so much.

4

5

6

7         (Deposition concluded at 9:13 a.m.)

8     **HAGATNA, GUAM, SATURDAY, NOVEMBER 18, 2006**

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**DEPO RESOURCES**
George B. Castro
**Court Reporter**
Tel.(671)688-DEPO * Fax(671)472-3094

# CERTIFICATE OF WITNESS

I, **Dr. James Leon Jablonski**, the deponent herein, do hereby certify that I have read, or had read to me, the foregoing typewritten pages 1 through 86 inclusive. My changes thereof, if any, have been noted on a separate sheet of paper, which I have signed, and which I understand will be appended to and made a part of this deposition. I certify that the same is now a true and correct transcript of my testimony.

_____
Dr. James Leon Jablonski

Dated: _____

**DEPO RESOURCES**
George B. Castro
**Court Reporter**
Tel.(671)688-**DEPO** * Fax(671)472-3094

# REPORTER'S CERTIFICATE

I, **George B. Castro**, Court Reporter, do hereby certify the foregoing 85 pages to be a true and correct transcript of the audio recording made by me in the within-entitled and numbered case at the time and place as set forth herein.

I do hereby certify that prior to examination the deponent was duly sworn upon oath; that thereafter the transcript was prepared by me or under my supervision.

I further certify that I am not a direct relative, employee, attorney or counsel of any of the parties, nor a direct relative or employee of such attorney or counsel, and that I am not directly or indirectly interested in the matters in controversy.

In testimony whereof, I have hereunto set my hand and seal of Court this 28th day of December, 2006.

George B. Castro

**DEPO RESOURCES**
George B. Castro
**Court Reporter**
Tel.(671)688-**DEPO** * Fax(671)472-3094

# CHANGES TO TRANSCRIPTION

By Deponent:

**Dr. James Leon Jablonski**

Page        Change                              Initial

1

2

3

4

5

6
_____
7
_____
8
_____
9
_____
10
_____
11
_____
12
_____
13
_____
14
_____
15
_____
16
_____
17
_____
18
_____
19
_____
20
_____
21
_____
22
_____
23
_____
24
_____
25
_____

**DEPO RESOURCES**
George B. Castro
**Court Reporter**
Tel.(671)688-DEPO * Fax(671)472-3094