
1

2

LAW OFFICE OF
**ROBERT L. KEOGH**
POST OFFICE BOX GZ
HAGÅTÑA, GUAM 96932
TELEPHONE (671) 472-6895

3

4

Attorneys for Plaintiffs

5

6

7

**IN THE DISTRICT COURT OF GUAM**

8

DEBORAH K. RUTLEDGE and THOMAS R. RUTLEDGE,

**CIVIL CASE NO. CIV06-00008**

9

Plaintiffs,

10

vs.

**PLAINTIFFS' DISCOVERY MATERIAL DESIGNATION**

11

**UNITED STATES OF AMERICA,**

12

Defendant.

13

14

15

Pursuant to LR 16.7(d)(2), plaintiffs designate and file a

16

copy of the transcript of the deposition of Joseph Orchowski, MD,

17

MAJ, MC taken on March 1, 2007. Plaintiffs are not in possession

18

of the original transcript of this deposition which is in the

19

possession of defendant United States of America.

20

21

**LAW OFFICE OF ROBERT L. KEOGH**
Attorneys for Plaintiffs

22

23

24

DATE: ___2/29/08___

By: _____

**ROBERT L. KEOGH**

25

26

27

28

**ORIGINAL**

1      IN THE UNITED STATES DISTRICT COURT OF GUAM

2           FOR THE DISTRICT OF GUAM

3

4   DEBORAH K. RUTLEDGE and THOMAS )   CIVIL CASE NO. 06-00008
    R. RUTLEDGE,                   )
5                                  )
              Plaintiffs,          )       VIDEO TELECONFERENCE
6                                  )          DEPOSITION OF
         vs.                       )       JOSEPH ORCHOWSKI,
7                                  )           MD, MAJ, MC
    United STATES OF AMERICA,      )         MARCH 1, 2007
8                                  )
              Defendant.           )
9   _____)

        🗂 COPY

10

11

12      The deposition of JOSEPH ORCHOWSKI, MD, MAJ, MC, called
    by Defendant United States of America, pursuant to Notice and
13  pursuant to the Rules of Civil Procedure, taken via video
    teleconference at the Office of the United States Attorney,
14  Sirena Plaza, Suite 500, 108 Hernan Cortez Avenue, Hagatna,
    Guam 96910,on March 1, 2007 at the hour of 8:20 o'clock a.m.
15  (Guam time).

16      That at said time and place, there transpired the
    following:

17

18

                    A P P E A R A N C E S:
19
    For the Plaintiffs          Robert L. Keogh, Esq.
20

21  For the Defendant           Leonardo M. Rapadas
                                United States Attorney
22                              By: Mikel W. Schwab
                                    and Katharyne Clark
23                              Assistants U.S. Attorney

24

25

1                          I N D E X

2                    E X A M I N A T I O N

3

4                         Direct   Cross

5      By Mr. Schwab              3

6      By Mr. Keogh                        5

7

8

9                       E X H I B I T S

10

11                        (None)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Joseph Orchowski, MD, MAJ, MC: March 1, 2007 (Guam date)

1        HAGÅTÑA, GUAM: March 1, 2007, 8:20 a.m.

2

3              Joseph Orchowski, MD, MAJ, MC

4   called to give his deposition at this time, being first duly

5   sworn, was examined and testified on his oath, as follows:

6                       DIRECT EXAMINATION

7        Q.   I'm just going to open with some preliminaries.

8   Doctor, can you state your full name for the record and spell

9   it for the court reporter?

10       A.   It's Joseph Roy Orchowski.  My last name is spelled

11  O-R-C-H-O-W-S-K-I.

12       Q.   We know that of course you are a doctor.  And do

13  you have a rank?

14       A.   I'm major promotable.

15       Q.   Your background is in neurosurgery; right?

16       A.   No, that's -- that's incorrect.  I'm an orthopaedic

17  spine surgeon.  And I have a Fellow in spine surgery from

18  Washington University, St. Louis.

19       Q.   Excellent.  Have you ever had your deposition taken

20  before?

21       A.   No.

22       Q.   Okay.  Let me just give a few pointers about

23  depositions.  Depositions are done on the record.  They are

24  testimony that could be submitted in court and it's a written

25  record so we try to be careful about using gestures and some

Joseph Orchowski, MD, MAJ, MC: March 1, 2007 (Guam date)

1  |  of the things that we might do in a normal conversation.

2  |  We're a bit more formal. We also try to talk one at a time

3  |  so the court reporter can write what we're saying. And she

4  |  may at some time ask us for clarification and if we say the

5  |  name of say a medical procedure or a drug, we might want to

6  |  spell it as well just to help the record. When this is all

7  |  over, you'll have an opportunity to look at this record and

8  |  make corrections, sign it and return it to the court

9  |  reporter.

10 |  Also, if you have any questions during the

11 |  deposition, you can speak to myself or Kathy. Any breaks you

12 |  need, this is not an endurance test, we try to be as

13 |  comfortable as possible, so if you need water, if you need to

14 |  use the restroom, that's easy to do, just speak up. If at

15 |  any time a question confuses you, feel free to ask for

16 |  clarification. And I think that's pretty much it. Kathy,

17 |  you have anything to add to that?

18 |  MS. CLARK: No, that's fine.

19 |  MR. SCHWAB: And I'm going to turn this over to

20 |  Mr. Keogh. He's the attorney for the Plaintiffs. I'm, of

21 |  course, the attorney -- actually, for the record, Mikel W.

22 |  Schwab, attorney for the United States with Kathy Clark with

23 |  me in Hawaii. And Mr. Keogh represents the Plaintiffs who

24 |  are claiming -- have a claim against the United States for

25 |  medical malpractice. Okay?

1          MR. KEOGH: Just a point of clarification.  Can

2    we determine who it is that Ms. Clark is here representing?

3    Is it the witness or the defendant?

4          MR. SCHWAB: Ms. Clark is my co-counsel and

5    she's nice enough to be on the scene since I can't be there

6    with the client to assist him.  She's my co-counsel

7    representing the United States.

8          MR. KEOGH: Again, there hasn't been an

9    appearance entered in this proceeding, that's why I asked

10   that question.  Last time that I asked that, we weren't able

11   to get an answer to that.

12         MR. SCHWAB:  Okay, I thought we did answer it,

13   but we'll be glad to put in -- I don't think we use a formal

14   appearance because attorneys for the United States can

15   represent the United States anywhere and in any court, but

16   there is a procedure for introducing yourself to the court.

17   We'll be glad to do that if that helps you to know who and

18   what and what background.

19         MR. KEOGH: Yes.

20                    CROSS EXAMINATION

21   BY MR. KEOGH:

22     Q.   Dr. Orchowski, my name is Robert Keogh.  I

23   represent Mr. & Mrs. Rutledge in this proceeding.  Before we

24   begin today, I'd like to ask you just a few preliminary

25   questions.  Can you tell me what it is, if anything, you

1  reviewed prior to this deposition today in preparation for

2  it?

3      A.    I -- I reviewed the patient's chart, in addition to

4  my operative report.

5      Q.    All right.  When you say chart, can you describe

6  what that chart consisted of?

7      A.    It consisted of her outpatient notes in addition to

8  her inpatient notes.

9      Q.    And do you have those with you today?

10             MS. CLARK: I have my copy if you want to refer

11  to its Bates stamped number.

12      Q.    (By Mr. Keogh)  You pointed to a stack of documents

13  to your left, Doctor.  Is that the documents you reviewed

14  prior to the deposition today?

15             MS. CLARK: This is my file.

16      A.    That -- that's her -- her -- Ms. Clark's file.  I

17  -- that is not the specific documents that I reviewed.

18      Q.    (By Mr. Keogh)  All right.  When you say you

19  reviewed the chart, do you know where it began and where it

20  ended?  The date that it began and the date that it ended?

21      A.    I don't know the specific dates of her first visit

22  in Guam off hand.

23      Q.    All right.  But did you review those documents from

24  Mrs. Rutledge's first visit on Guam?

25      A.    I did, yes.

Joseph Orchowski, MD, MAJ, MC: March 1, 2007 (Guam date)

1       Q.    And how recently did you review those?

2       A.    A few days ago.

3       Q.    Can you give me a description, please, of your

4    educational background starting with college?

5       A.    I went to New York University and Cooper Union for

6    two undergraduate degrees.

7       Q.    What were --

8       A.    I proceeded to medical --

9       Q.    What were they in?

10      A.    Yes.  My degree from New York University was in

11   Physics and my degree from the Cooper Union was in

12   Engineering.

13      Q.    What years did you receive those degrees?

14      A.    I graduated in 1991.

15      Q.    From NYU?

16      A.    From both.  It was a simultaneous degree.

17      Q.    All right.  And then after that, what further

18   education did you have?

19      A.    I proceeded to Albert Einstein College of Medicine

20   in the Bronx where I received an MD degree.

21      Q.    In what year?

22      A.    1995.

23      Q.    And after that?

24      A.    Then I proceeded to my internship at Walter Reed

25   Army Medical Center in Washington, D.C.  And that was

Joseph Orchowski, MD, MAJ, MC: March 1, 2007 (Guam date)

1    completed the -- in 1996.  I was utilized by the military for
2    one year in Korea and that was completed in 1997.  And then I
3    proceeded to my residency training at Walter Reed Army
4    Medical Center in Washington D.C. from 1997 to 2002.
5        Q.    And that was --
6        A.    I'm sorry, 2003.
7        Q.    And that residency was in what field?
8        A.    Orthopaedic surgery.  And then from there I
9    proceeded to my Fellowship in spine surgery from 2003 to
10   2004.
11       Q.    And where was that?
12       A.    That was Washington University, St. Louis.
13             MS. CLARK: Hang on a second.  I think he needs
14   to crunch the numbers here.
15       A.    I think that's right.
16             MS. CLARK: Do you need something to write on?
17   I can never figure out what year I did something unless I
18   think how old my kids were.
19       A.    That doesn't help.  That is correct.
20             MS. CLARK:  At least it's the best that you
21   can remember right now.
22       Q.    (By Mr. Keogh)  And then following your spine
23   surgery Fellowship, where were you next assigned?
24       A.    Then I was assigned at Tripler Army Medical Center
25   from that time on.  I did proceed to Operation Enduring

Joseph Orchowski, MD, MAJ, MC: March 1, 2007 (Guam date)

1    Freedom.  No, Iraqi Freedom for a period from 2004, 2005 for
2    a four month period.
3        Q.  Can you remember what those four months were in
4    2004?
5        A.  Yeah; September to January.
6        Q.  Am I correct in my -- if I were to assume that
7    during a portion of this educational period you were active
8    duty in the Army?
9        A.  Correct, from the beginning of my, my internship.
10   I was -- I'm a recipient of the Health Professional
11   Scholarship Program for which the Army paid my education in
12   medical school.  So I was Reserve at that time and then
13   proceeded to active duty when I entered Walter Reed.
14       Q.  So starting with the Albert Einstein course of
15   study, you were in the Army Reserve at that point?
16       A.  Correct; that's how they place the scholarship
17   recipients.
18       Q.  I don't know if in the Army they do board
19   certification, but have you received any kind of board
20   certifications?
21       A.  Yes, I have.  I am currently board certified at the
22   American Academy of Orthopaedic Surgeons and I'm also a
23   Fellow of that organization from which I just received an
24   honor.
25                  MS. CLARK: Congratulations.

Joseph Orchowski, MD, MAJ, MC: March 1, 2007 (Guam date)

1          MR. SCHWAB: Congratulations.

2      Q.   (By Mr. Keogh)  When were you board certified?

3      A.   Thank you.  I was board certified 2005, I believe.

4      Q.   Thank you for that description, Doctor.  Can you

5  tell me, if you can recall, when was the first time that you

6  met or were in any way involved with the treatment of Mrs.

7  Deborah Rutledge?

8      A.   Two days prior to her operation I was called by, I

9  believe it was Dr. Duncan in Guam stating he had a patient

10  that had a significant herniated disc and he was concerned

11  for cauda equina syndrome.  At that time, I informed him to

12  have her airevaced to Tripler.  That was, I think, the 28th of

13  August or 27th depending on where you're standing, Guam or

14  Hawaii.

15      Q.   All right.  And the telephone call, did you make

16  any notes of that telephone conversation with Dr. Duncan?

17      A.   No, not specifically.

18      Q.   And then when was the first time that you met or

19  treated Mrs. Rutledge?

20      A.   I met Ms. Rutledge on the 29th of August.

21      Q.   All right.  Is there a note that you can

22  specifically refer to as to when was the first time you

23  actually met her?

24      A.   I do not have that in front of me, I don't believe;

25  maybe I do.

Joseph Orchowski, MD, MAJ, MC: March 1, 2007 (Guam date)

1    Q.    If I may refer you for a minute.  Is the first time

2    that you saw Mrs. Rutledge, was just prior to the surgery?

3    A.    Correct.

4    Q.    Would the only notes be your operation report?

5    A.    I believe the pre-operative, pre-operative tasking

6    statement that I did write.  But, I'm looking for that.

7    Q.    Can I -

8         MS. CLARK: Mr. Keogh, let me try to clarify

9    something that will help us move along.  At the hospital,

10   what the physicians use is a computerized records system.  So

11   when they're looking at it in a hard copy, it may well be the

12   first time they'd ever seen the document in hard copy.  If

13   you can direct us to a Bates stamped page, that would be

14   very, very helpful because Dr. Orchowski is used to changing

15   screens online.

16        MR. KEOGH:  I gather that was the form of an

17   objection of some kind.  We'll note that for the record.

18        MS. CLARK:  No, I'm just trying to help you

19   out.

20        MR. KEOGH:  My conversation at this point is

21   with Dr. Orchowski.  Thank you.

22   Q.    (By Mr. Keogh)  Dr. Orchowski, the computerized

23   record that Ms. Clark just referred to, is that something

24   that is different from the documents that you have in front

25   of you now?

Joseph Orchowski, MD, MAJ, MC: March 1, 2007 (Guam date)

1        A.    No, no.

2        Q.    Is there anything contained on that computerized

3   record that --

4        A.    No, no.  Actually --

5             MS. CLARK: Let him finish his question before

6   you start your answer.

7        Q.    (By Mr. Keogh)  Is there anything on the

8   computerized record that is different from what is in front

9   of you right now?

10       A.    No.  There are lab results and so forth, but I do

11   have my first note of my encounter with Ms. Rutledge.

12       Q.    Is there a number on the bottom that starts with an

13   R-U-T on that?

14       A.    141.

15       Q.    All right.  And that's a document that's entitled

16   progress notes; correct?

17       A.    Correct; yes.

18       Q.    And is the writing on page 141, is that your

19   writing?

20       A.    The one dated 27 August 2004 is my writing and it

21   continues on to page 142.

22       Q.    All right.  Thank you.  Can you describe for us

23   what your observations, your medical observations of Ms.

24   Rutledge were when you first saw her on August 27, 2004?

25       A.    From my -- from my note, it states that she had

Joseph Orchowski, MD, MAJ, MC: March 1, 2007 (Guam date)

1    significant pain; she had something called saddle anesthesia
2    and decreased rectal tone.
3        Q.    Can you describe for us what saddle anesthesia is,
4    please?
5        A.    It means numbness in your groin.
6        Q.    All right.  And how did you determine the saddle
7    anesthesia?
8        A.    With a rectal exam.
9        Q.    All right.  And that's true for the decreased
10   rectal tone as well?
11       A.    Correct.
12       Q.    What else did you observe of Mrs. Rutledge when you
13   first saw her?
14       A.    And I do not have it documented, but I do recall
15   that she had leg pain.  Ridicular symptoms.
16       Q.    Can you explain to us what ridicular symptoms are,
17   please?
18       A.    It means pain in a distribution of a nerve root
19   that is being compressed.
20       Q.    Were these symptoms, this leg pain, was it
21   bilateral?
22       A.    I do not recall that and I had not documented that.
23       Q.    Any other conditions or symptoms that you observed
24   when you first evaluated Mrs. Rutledge?
25       A.    That's all I recall.

Joseph Orchowski, MD, MAJ, MC: March 1, 2007 (Guam date)

1     Q.   All right.  You mentioned that Dr. Duncan had said

2   that he suspected that Mrs. Rutledge was suffering from cauda

3   equina syndrome.  From your evaluation, from your examination

4   of her, did you concur with that conclusion?

5     A.   Correct.

6     Q.   And can you tell me what led you to concur with

7   that conclusion?

8             MR. SCHWAB:  I'm just going to object on your

9   calling it a conclusion.  As you've already stated, he had a

10  suspicion.

11    Q.   (By Mr. Keogh)  All right.  Did you concur with

12  that, confirm that suspicion into a diagnosis of some kind?

13    A.   Correct; and that is stated in my note on the 27th.

14    Q.   So that is the diagnosis that you made at that

15  time?

16    A.   Correct.

17    Q.   Can you describe for us what conditions or symptoms

18  led you to reach that diagnosis?

19    A.   A combination of bilateral ridicular symptoms in

20  addition to the saddle anesthesia and the decreased rectal

21  tone.

22    Q.   Are these the classic symptoms of cauda equina

23  syndrome?

24    A.   Correct.

25    Q.   Did you need other diagnostic tests to be able to

1   confirm that, or were you confident in that diagnosis from

2   your initial evaluation or examination?

3       A.   I did obtain an MRI to identify what level was

4   causing compression.

5       Q.   Had you reached the diagnosis of cauda equina

6   syndrome prior to having the MRI results?

7       A.   The -- correct.

8       Q.   And the MRI results would have, correct me if I'm

9   wrong, confirmed that diagnosis and shown you at what level

10  the compression occurred?

11      A.   Correct.

12               MR. KEOGH:  If I may ask, please, if we're

13  going to have a conference between counsel and the witness

14  that it either be done on the record or specifically stated

15  off the record that the conference is occurring.

16               MS. CLARK: Certainly.  If there's problems

17  with the audio or if the problems with the audio continue,

18  let us know.

19               MR. KEOGH: Is it your contention there's been

20  just a problem with the audio, Ms. Clark?

21               MS. CLARK: You fade in and out.

22               MR. KEOGH: I see.  Well, you were just

23  whispering --

24               MS. CLARK:  Dr. Orchowski's --

25               MR. KEOGH:  You were just whispering --

Joseph Orchowski, MD, MAJ, MC: March 1, 2007 (Guam date)

1          MS. CLARK:  Dr. Orchowski is -- I can see the

2     doctor sitting here staring intently at the screen trying to

3     hear you.  If there's technical problems, I can go get the

4     technician to fix them rather than him have to guess what's

5     going on.

6          MR. KEOGH: Okay.  If you have a technical

7     problem, please let us know.  We hear you just fine here.

8     So, Doctor if you don't hear me, please ask me to repeat the

9     question or to speak louder.  I certainly want you to be able

10    to hear what I'm asking, okay?

11              THE WITNESS: Correct.

12              MR. KEOGH: All right.

13              THE WITNESS:  Okay; yes.

14    Q.    (By Mr. Keogh) Are there any other diagnostic tests

15    that you performed or directed to be performed prior to

16    surgery?

17    A.    Not that I recall.

18    Q.    All right.  Did you reach a conclusion at that

19    first visit, or the first visit with Mrs. Rutledge that

20    surgery was appropriate?

21    A.    Yes.

22    Q.    Can you describe what it is that you determined had

23    to be done for Mrs. Rutledge?

24    A.    My conclusion was that she required a diskectomy

25    with laminectomy.

1    Q.   And are those the surgeries that you performed?

2    A.   Correct.

3    Q.   Can you describe for us, please, what those

4    procedures entail -- entailed?

5    A.   The -- the spinal canal is like a triangle and the

6    roof of the spinal canal is the lamina and removing that roof

7    of the spinal canal is called a laminectomy and so I

8    performed a laminectomy at L5.  And then in addition, the

9    disk that was extruded was removed and that's the diskectomy

10   portion of that.

11   Q.   Okay.  The roof, which side of the body is that on,

12   back, front?

13   A.   It's on the back.  So the roof is the back and the

14   disk is pressing from the front.

15   Q.   All right.  Can you describe what Mrs. Rutledge's

16   condition was?  What was her physical condition just prior to

17   the surgery?  What was causing her these symptoms?

18   A.   Her herniated disk at L5-S1 was pressing on the

19   nerve roots at that level causing the symptoms I had

20   described.

21   Q.   All right.  And can you describe for us, please,

22   what a herniated disk is?

23   A.   Between the bones in your vertebra are the -- the

24   lumbar -- the disks and between those disks can, or have an

25   outside layer called an annulus and an inner layer, or an

1    inner part called a nucleus. That nucleus can extrude or

2    herniate through that outside annulus. It's like a radial

3    tire and when that happens that mass of herniated disk can

4    irritate the nerve roots due to pressure and in addition due

5    to chemical irritants.

6         Q.    And you referred to, at one point I believe, to the

7    herniation of Mrs. Rutledge being significant. Can you

8    quantify significant as opposed to whatever else is not

9    significant?

10        A.    Herniated disks are -- that take up greater than

11   like about fifty percent of the spinal canal can be

12   considered significant.

13        Q.    All right. And do you know how much of the spinal

14   canal Mrs. Rutledge's herniated disk took up?

15        A.    It was greater than fifty percent.

16        Q.    Now help me understand that. When you say it's

17   taking up the spinal canal, the herniation, the extrusion, if

18   you will, of the disk is pressing on the spinal column; is

19   that correct? Spinal cord?

20        A.    In the lumbar spine, the -- it's -- at that level

21   it's the nerve roots that remain. The spinal cord actually

22   ends at about L1-L2, about four levels above that herniated

23   disk. So it's pressing on the neural elements within the

24   spinal canal which are at that level nerve roots.

25        Q.    Do you know what percentage of occupying of the

1    spinal canal Mrs. Rutledge's herniation was?

2        A.   I do -- I do not recall that specific number.

3        Q.   Is there anywhere on the records that it's

4    recorded?

5        A.   What I state in my records is it says, shows large

6    L5-S1 disk extrusion.

7        Q.   Where are you referring to?

8        A.   On page 141.

9        Q.   Can you just quickly read your entry on page 141 so

10   that we're sure we understand all the language that's there?

11   And it's your handwritten note; correct?

12       A.   Correct; yes.  So to my -- it says 43-year-old

13   female with symptoms consistent with cauda equina.  Patient

14   had onset of symptoms three weeks ago.  She was discussed

15   with Dr. Duncan in Guam yesterday and she was airevaced

16   today.  Physical exam showed saddle anesthesia and decreased

17   rectal tone.  MRI showed large L5-S1 disk extruded at cauda

18   equina compression.  With cauda equina compression.  Patient

19   was counseled for L5 laminectomy.  Risks and options

20   discussed in detail.  Patient demonstrated understanding of

21   these issues and she was in agreement with the proposed

22   course.  The risks of not having full return was discussed in

23   detail.

24       Q.   All right.  When you say the risks of not having

25   full return, what are you referring to there?

1        A.    The risks of full return of function.

2        Q.    What were the risks you discussed with her at that

3    time?

4        A.    Any time you go into a surgery, there's five risks

5    that I tell every patient.  There's risk of bleeding,

6    infection, neurologic damage, failure to heal and need for

7    further surgery.

8        Q.    All right.  And in addition to those, you discussed

9    with Mrs. Rutledge the potential of her failing to return to

10   full function; is that correct?

11       A.    Correct.  I -- yes, due to the cauda equina

12   compression.

13       Q.    All right.  What does the cauda equina compression

14   ... maybe you can describe first what cauda equina

15   compression is and then what it does.

16       A.    Cauda equina is the nerve roots that leave the

17   spinal cord, so that's the term.  It means horse's tail.  So

18   it's just those nerves.  And when they get compressed at the

19   level, they compress all the nerve roots leaving beyond that

20   compression.  And so that -- those nerve roots will be

21   compressed and will affect those specific levels below the

22   compression.  And so if it's at L5-S1, the remaining nerve

23   roots are the sacral nerve roots which control your -- your

24   -- your bowel and bladder function and those areas of

25   sensation that we discussed.

1      Q.   So by the disk compressing or pressing on the nerve
2   roots, it causes them to fail to perform their function; is
3   that correct?
4      A.   Correct.  A combination of the compression and the
5   irritant factors of the disk.
6      Q.   Irritant factors means rubbing on it?
7      A.   No.  There's some thought that there's irritant
8   factors like prostaglandins and things that cause irritation
9   and inflammation to tissues that also cause neuritis.
10     Q.   Can you explain to me what neuritis is?
11     A.   Well, that's irritation of any nerve root.
12     Q.   Is the amount of time of compression or irritation
13   a factor in whether or not full return of function is
14   achieved?
15     A.   There are some studies that suggest that; yes.
16     Q.   Can you describe what your understanding of those
17   studies is?
18     A.   My understahearnding is --
19              MS. CLARK: Hold on a second.  I think Mikel
20   has an objection.
21              MR. SCHWAB: No, no I don't, I don't.  I
22   apologize.  Someone else walked in the room and I just
23   watched them walk by.
24     A.   My understanding of those studies -- there's one
25   study by a Dr. Costawick (phonetic) that reported that if you

1    have cauda equina compression greater than seventy-two hours,

2    then your outcomes were decreased.

3         Q.   And what does that mean in practical terms?

4         A.   It means that if you waited more than three days to

5    address a cauda equina syndrome, then return of function is

6    not predictable.

7         Q.   When you say outcome is decreased, does that mean

8    that the chances of returning to full recovery are decreased?

9         A.   That study I do not recall the specific gradations

10   of how they measured their outcomes.  But that is correct;

11   that's my understanding of outcomes.  The return to full

12   function is decreased.

13        Q.   Well, was there another study?  You said there were

14   some studies that suggested.

15        A.   There was recently a study that suggested that,

16   they looked at -- addressing it at five hours and twenty-four

17   hours and they found that there was no difference.

18        Q.   So the difference appears to commence after

19   approximately seventy-two hours; is that what the studies are

20   suggesting?

21             MS. CLARK: Excuse me, are you asking his

22   present opinion or opinion he held at the time he treated

23   this patient?

24        Q.   (By Mr. Keogh)  At the time of treating the

25   patient.

1          A.    My understanding in my treatment of -- of Ms.

2     Rutledge was based on the fact that I was not there for her

3     presentation of her symptoms and I treated her within a

4     seventy-two hour period.  I treated her within twelve hours.

5     I'm sorry, within twenty-four hours. I'm not sure if it's

6     twelve hours.

7          Q.    I understand, Doctor, that you took immediate

8     action to perform the surgery that you determined was

9     necessary.  What I'm driving at here is the outcome that you

10    described as having the potential of decreased function that

11    you described to Mrs. Rutledge was a risk that was possible

12    from this surgery.  So I'm trying to understand what that

13    risk was as of the time that you first saw her and then

14    immediately performed the surgery.

15              MR. SCHWAB: I'm not sure I understand the

16    question.

17              THE WITNESS: Repeat the question.

18              MR. SCHWAB: I'm not sure I understand the

19    question.

20         Q.    (By Mr. Keogh)  Can you describe anything else that

21    you discussed with Mrs. Rutledge with respect to the risk of

22    decreased function from this surgery?

23         A.    Not that I recall.

24         Q.    All right. What was the procedure that you

25    performed on her?  Can you describe the procedure that you

1  performed on Mrs. Rutledge?

2      A.   Through a mid-line incision, you know, I approached

3  the L5 vertebrae.  I did a laminectomy --

4      Q.   What is that?

5      A.   -- as we described.  Removing the bone or the roof

6  of the spinal canal.  I had described that previously.  And

7  in addition, I removed the extruded disk fragment.

8      Q.   How much of the disk was removed?

9      A.   The extruded fragment.  It's difficult to estimate

10  how much disk is removed.  I removed the extruded fragment of

11  disk that is pressing on the neural structures.

12      Q.   All right.  Was that measured or weighed or

13  quantified in some way?

14      A.   No.  Well, actually I did.  I'm sorry.  I said

15  about 10 ccs.

16      Q.   And you are referring to your operation report at

17  this point?

18      A.   My operative report on, I believe it's 071.

19      Q.   Doctor, there are two operation reports that I've

20  seen.  One is on 071 and one is on 203 and 204.  Can you tell

21  me what the difference between those two reports is?

22      A.   I believe they're exactly the same.  One is -- the

23  goal when you do an operative report is to place the

24  operative report in the, in the inpatient chart as immediate

25  as possible.  So this is the original operative report placed

1    in the chart and then this is the final operative report.

2         Q.   All right.  So the one that appears on pages 70

3    through 73 was the initial operative report and the 203-204

4    is the final one that was placed in the chart?

5              MR. SCHWAB:    203?

6         A.   Correct.  The one on two thousand -- in 071 is not

7    signed by me.  The one on two thousand -- I mean 204 is

8    signed by me.

9         Q.   Okay.

10        A.   But they appear to be the same.  I believe they are

11   the same.

12        Q.   Is 10 cc of disk material, is that consistent with

13   your finding that it was a significant herniation?

14        A.   Correct.

15        Q.   Is there any way to know how many ccs a disk

16   contains?

17        A.   It would be conjecture on my part.

18        Q.   What would be your best conjecture on that?

19        A.   I -- I.  Maybe 30 ccs.

20        Q.   All right.  So the remaining -- Let's just say

21   roughly, for this discussion, that a third of the disk was

22   removed and two-thirds of it, did it remain there in Mrs.

23   Rutledge's spine?

24        A.   Correct.  When you do a diskectomy, you remove the

25   free fragments.  You don't remove all the disk.  You remove

1    the fragments that are pressing on the neural structures and

2    the free fragments.

3         Q.    And then how is it prevented that further extrusion

4    or herniation will occur?

5         A.    There is always that risk.

6         Q.    Is it sutured or somehow repaired so that the

7    herniation won't continue?

8         A.    No.  That's how the free fragments are removed.

9         Q.    Can you describe what further was done in the

10   surgery for Mrs. Rutledge?

11        A.    So then once I completed the removal of the

12   fragment, I placed a half a cc of Decadron upon the nerve

13   root.  The wounds were then irrigated and closure was begun.

14   I placed a deep drain -- no.  Yeah, deep drain was placed and

15   then closed the fascia, the skin, and subcutaneous tissues.

16        Q.    All right.  I assume that Mrs. Rutledge was under

17   general anesthesia at this time; correct?

18        A.    Correct; yes.

19        Q.    And how long did the surgery take?

20        A.    I -- I do not have that documented and I do not

21   recall.

22        Q.    Was it more than hour, less than an hour?

23        A.    Hour, hour and a half.

24        Q.    What is Decadron?

25        A.    It's a steroid.

Q.    And its function was what?

A.    To decrease inflammation around the nerve root.

Q.    All right.  I see that the operative report refers to a pre-operative diagnosis and a post-operative diagnosis as acute cauda equina syndrome with L5-S1 extruded.  That was your diagnosis both before and after the surgery; correct?

A.    Correct.

Q.    The surgery confirmed your pre-surgery diagnosis?

A.    Correct.

Q.    All right.  Can you explain to me, please, what, when you describe it as acute, what does that refer to?

A.    I -- Mrs. -- acute means it happened within a short period of time.

Q.    Can you explain that a little further?  What are you referring to happened within a short period of time?

A.    When I encountered Ms. Rutledge, all other information that was provided to me was second hand.  Her symptoms to me were consistent with cauda equina syndrome.  My -- so I'm -- my diagnosis was acute cauda equina syndrome and that's why I took her to the operating room.

Q.    All right.  I'm just trying to understand the meaning as a non-medical person of the use of the term acute.  My understanding is that acute is something as opposed to chronic; correct?

A.    Correct.

1        Q.    And can you help me understand why the term acute
2    was used in this particular diagnosis?

3        A.    Like I stated, she presented to me with these
4    symptoms.  I don't know the exact time when her symptoms
5    started because that was all second-hand knowledge to me.
6    For that reason, she has acute cauda equina syndrome.

7        Q.    All right.  So it's acute from the standpoint it
8    was a short period of time from which you first made the
9    diagnosis and the time that the surgery was performed?

10       A.    That is correct.

11       Q.    And you were not making a judgment or a decision of
12   some kind as to when the cauda equina syndrome actually
13   began?

14       A.    No.

15       Q.    From your treatment of Mrs. Rutledge from your
16   performing the surgery, are you able to determine when the
17   cauda equina syndrome actually began?

18       A.    No.

19       Q.    And why not?

20       A.    Because there's nothing in my ability to say when
21   that herniated disk occurred, scientifically. It needs proof.

22       Q.    And how would that proof be obtained from your
23   standpoint?

24       A.    A prior study.

25       Q.    Such as what?

1        A.    Prior, a prior MRI, a prior documentation

2    consistent with that.  But --

3        Q.    What kind of documentation; can you help me

4    understand that?

5        A.    Prior documentation as was stated in my -- my

6    encounter note.  Prior documentation as stated, symptoms

7    consistent with cauda equina syndrome.

8        Q.    And again, those symptoms would be what?

9        A.    The saddle anesthesia, the loss of bowel and

10   bladder retention in addition to bilateral leg symptoms.

11       Q.    Those are, am I correct, the classic symptoms of

12   cauda equina syndrome?

13       A.    Correct.

14       Q.    There's a reference in one of your reports to

15   episodes of incontinence and retention.  There's a difference

16   between those two?

17       A.    Correct.

18       Q.    Can you describe for us what the two terms refer

19   to?

20       A.    Well, incontinence can be of urine or bowel.  So

21   patients who have cauda equina syndrome get bowel

22   incontinence.  They lose their stool.  The first symptoms of

23   urinary -- of urinary symptoms are, is retention.  Your

24   bladder is unable to release the urine.  Once that -- once

25   that retention gets to be significant, it becomes overflow

1   incontinence.  And that's where you get incontinent of your
2   urine.
3       Q.   All right.  So let me see if I understand the
4   differences.  Incontinence is that you can't control it, it
5   comes out on its own; correct?
6       A.   Correct.
7       Q.   And retention is that it won't come out on its own,
8   or won't come out without -- well, what is retention?  Can
9   you explain that?
10      A.   Like you say, it won't come out.  Sometimes people
11  have to push on their bladder for the urine to come out,
12  sometimes you have to get catheterized.  And then eventually
13  your body releases via overflow incontinence.
14      Q.   So an early symptom of cauda equina syndrome is
15  retention; correct?
16      A.   It can be.
17      Q.   Bladder retention?
18      A.   Yes, it can be.
19      Q.   All right.  And a later symptom is that that
20  retention turns to incontinence; correct?
21      A.   Yes.
22      Q.   And the other symptoms, the saddle anesthesia, is
23  the numbness in the groin area you described; is that
24  correct?
25      A.   Correct; yes.

Joseph Orchowski, MD, MAJ, MC: March 1, 2007 (Guam date)

1     Q.   And then bilateral leg symptoms, meaning there's

2   pain or numbness?  What is it when you say leg numbness?

3     A.   It can be both.  It can be both pain and numbness.

4     Q.   And bilateral --

5     A.   You get both.

6     Q.   Okay.

7     A.   Right; correct.

8     Q.   And bilateral, you mean on both sides?

9     A.   Correct.

10     Q.   What was the outcome of the surgery for Mrs.

11   Rutledge?

12     A.   On post operative day number 1, I have a note

13   stating --

14     Q.   Is there a number of the page?

15     A.   Yeah, 142.

16     Q.   Okay.

17     A.   It says, patient resting comfortably, only

18   complaining of back pain.  No ridicular symptoms.  Patient

19   reports improvement of sensation.  I have my neurologic exam

20   which states, her quadriceps, hamstrings, tibia upper

21   anterior, EHL, gastro-soleus, abductors and adductors were

22   all five out of five in strength.  It's a common way of

23   measuring muscle strength.  I also note -- note that she's

24   able to feel her Foley catheter.  She reports increased

25   sensation in her groin.

Joseph Orchowski, MD, MAJ, MC: March 1, 2007 (Guam date)

1     Q.    The AP section, what does that refer to?

2     A.    That says, status post cauda equina diskectomy,

3     post-op day number 1.  Initiate PT out of bed, ambulate as

4     tolerated.  Consider advancing diet, continue pain

5     management; follow closely.

6     Q.    All right.  What further was Mrs. Rutledge's post

7     operative course then?

8     A.    I'm trying to look when she was discharged.  She

9     was advanced with her physical therapy, advanced with her

10    diet, advanced to oral pain medication.  And I believe she

11    was discharged on the 2nd of September.

12    Q.    All right.  When you say she was advanced with

13    physical therapy, what does that mean?

14    A.    She was -- she at first able to get to a chair and

15    able to ambulate and able to ambulate with assistance, then

16    able to ambulate with assistance safely, safe enough to be

17    discharged.

18    Q.    All right.  Did Mrs. Rutledge undergo actual

19    physical therapy treatment of some kind?

20    A.    Correct; yes.  They worked with her.

21    Q.    And that physical therapy was at Tripler?

22    A.    Correct.

23    Q.    Is that something that you monitor while it's going

24    on?

25    A.    From a distance.

1       Q.    You mean --

2       A.    She, she had physical while she was in the

3   hospital.  And, and I'm not sure if she had this physical

4   therapy as an outpatient while she was waiting to return to

5   Guam.  I do not know that.

6       Q.    Okay.

7       A.    I usually do not prescribe physical therapy for any

8   of my patients after they're discharged, before the first six

9   weeks, due to the risk of re-herniation.

10      Q.    All right.  And was it different in Mrs. Rutledge's

11  case?

12      A.    I do not believe so.

13      Q.    So the physical therapy would have occurred

14  sometime after six weeks or so?

15      A.    Correct.

16      Q.    When did you next see Mrs. Rutledge after your day

17  one post operative visit?

18                  MS. CLARK: Do you want a glass of water?

19                  THE WITNESS: I do.

20                  MS. CLARK: Can we take a few minutes so I can

21  get Dr. O. a bottled water or something to sit with?

22                  MR. KEOGH:  Sure.  Of course.

23                  MR. SCHWAB: Absolutely.

24                  MS. CLARK:  All right.  I've got a quarter

25  after.  Shall we meet back at 1:30?

Joseph Orchowski, MD, MAJ, MC: March 1, 2007 (Guam date)

1              MR. SCHWAB: Okay, let's have a fifteen

2     minute --

3              MS. CLARK: Or whatever time it is for you all

4     there.

5              MR. SCHWAB: Yeah, yes; okay, fifteen minutes.

6              MS. CLARK: Okay, thanks.

7              MR. SCHWAB: Thank you.

8                   (Off the record)

9                   (Back on the record)

10             MR. KEOGH: All right; are we ready to

11    proceed, Doctor?

12             MR. SCHWAB: All set?

13             THE WITNESS: Sure.

14             MR. SCHWAB: Thank you.

15             MS. CLARK: Yes.

16             MR. SCHWAB: Excellent.

17             MR. KEOGH: And you can hear me all right?

18             THE WITNESS: I can.

19             MR. KEOGH: Okay, good.  Back on the record.

20    BY MR. KEOGH (continuing):

21        Q.   The last area of inquiry I was approaching was your

22    next post operative visit with Mrs. Rutledge after your day

23    one post-op visit. When was the next time you saw her?

24        A.   I saw her every day until she was discharged.

25        Q.   All right. And are there notes of those visits in

1    the record you have before you?

2        A.    I don't write every note because I have residents

3    and interns.  I did write the note on post-op day number 1.

4    I did write the note on post-op day number 3.

5        Q.    What page are you referring to?

6        A.    134.

7        Q.    All right.  And you're referring to the 30 August

8    04 note?

9        A.    Correct.

10        Q.    And the notes that are written in between, they're

11    written by residents?

12        A.    Or interns.

13        Q.    Can you describe what Mrs. Rutledge's post

14    operative course was then?  From your visits with her.

15        A.    Well, if you can read my note on the 30th of August,

16    post-op day number 3, it says she's resting comfortably with

17    minimal complaints.  She reports improvement of her groin

18    sensation.  But she required a straight cath yesterday but

19    had sensation of need to urinate with 300 ccs. Once again, I

20    documented neurologic exam of her strength in her lower

21    extremities and -- and it says Assessment Plan, 34-year-old

22    female post-op day 3, lumbar decompression for cauda equina,

23    DC to drain, increased activities, SCD's are for DVT

24    prophylaxis or deep vein thrombosis prophylaxis and then

25    distal one or two days when passes PT.

1    Q.    What page are you referring to there?

2    A.    That's 144.

3    Q.    All right.  Any other notes since 30 August '04?

4    A.    Post-op day number 4, a note was written by the

5    intern.

6    Q.    What page are you referring to?

7    A.    That is 150.

8    Q.    Any other visits with notes by you?

9    A.    No, I don't -- not inpatient visits.

10    Q.    All right.  Is there something other than an

11   inpatient visit?

12    A.    There is -- there is a documented visit as an

13   outpatient in the front of this record.  I think my next note

14   that I can find in this chart, although I saw her a lot in

15   between that, was the 28th of January 2005.

16                MR. SCHWAB: On page?

17    Q.    (By Mr. Keogh)  What page is that?

18    A.    On page 111.

19    Q.    Is there a chart or a file on Mrs. Rutledge that

20   contains documents that's not in the record that's in front

21   of you now?

22    A.    Not that I'm aware of.  I have no personal chart or

23   records of her.

24    Q.    All right.  And the documents that are contained in

25   this record that's in front of you now would contain all of

1     the records from Tripler Hospital on Mrs. Rutledge?

2                MR. SCHWAB: Objection; I don't think he can

3     testify to that.

4        Q.   (By Mr. Keogh)  Are you able to answer that?

5        A.   I'm not able to answer that.

6        Q.   Are there records that you believe exist somewhere

7     at Tripler that are not contained in this record that's in

8     front of you?

9        A.   No.  I -- I -- like I said, I do not -- I do not

10    keep any patient charts in my clinic.  So I do not have any

11    patient charts.  Currently, all patients are presented with

12    their outpatient chart and notes are placed there within

13    those charts.  Or if their outpatient chart is unavailable at

14    that time, that note is placed to the chart room and those

15    notes are supposed to be placed accordingly.  That's beyond

16    my control.

17       Q.   All right.  My question is because you said that

18    the next outpatient record that you see in this record that's

19    before you is 20 January 05, and I thought you said that you

20    had thought you had seen her earlier than that.

21       A.   I'm sure I had -- I did.  I -- I -- she was to

22    follow-up with me after surgery on the -- on the 10th of

23    September.  I see all patients about two weeks post

24    operatively to evaluate their wounds.  And then when I'm

25    operating on patients from Guam or other islands, I tend to

1   let them follow-up with their orthopaedist at six weeks and

2   then they follow-up with me at three months and thereafter.

3       Q.   All right.  Is there a record, if you have found

4   one, of a September 10, '04 visit?

5       A.   No, but I do see in the last ortho intern note, the

6   note prior to her discharge, it says follow-up with Dr.

7   Orchowski, it's on page 153, follow-up with Dr. Orchowski on

8   9/10.

9       Q.   And it's your belief that that September 10 follow-

10  up appointment occurred?

11      A.   Yes.

12      Q.   And do you recall what took place at that time?

13      A.   That I do not know.  What I do -- what I do with

14  all patients at that time is I look at their incisions to

15  make sure they're healing appropriately.

16      Q.   And as far as you recall with Mrs. Rutledge, was

17  she healing appropriately?

18      A.   As far as I call -- recall.

19      Q.   And then am I correct that you did not see her

20  again until January 30th -- I'm sorry, January 20th of '05?

21      A.   No, that is not correct.

22      Q.   When was the next time you saw her?

23      A.   That I do not know, but I do know that I saw her

24  around six months -- somewhere between three and six months

25  post operatively.  But that's all from memory.

1    Q.   Well, would the January '05 meeting have been the

2    three to six month post operative meeting?

3    A.   No, because that's a year later.  Right?

4    Q.   No, from August --

5    A.   Oh, I'm sorry.  Oh, no.  You're right.  I'm sorry,

6    you're right.  Yeah, right, I'm sorry.  You're right.  You

7    are correct.  You are correct.  I'm sorry.

8    Q.   So the January '05 meeting would have been your

9    three to six month follow-up?

10   A.   Yes.  Yes.

11   Q.   And can you help me understand what Mrs. Rutledge's

12   condition was in January of '05 when you saw her?

13   A.   It states, 44-year-old female status post,

14   herniated nucleus pulposus incision 27 August.  Patient had

15   cauda equina syndrome.  She continues to have residual groin

16   numbness and bowel and bladder difficulties but no

17   incontinence.  On physical exam, her incisions well healed.

18   Her range of motion is limited and secondary to back pain.

19   Her strength in her lower extremities are five out of five

20   except for her gastro-soleus, which are four plus out of

21   five.

22   Q.   What is that?

23   A.   It means that five out of five strength is normal

24   strength of your muscle group.  Four plus out of five means I

25   can break the strength of the muscle group.

1    Q.   And what --

2    A.   With my strength.

3    Q.   And what muscle group was that that had the four?

4    A.   That's the calf muscles, the gastro-soleus.

5    Q.   Okay. And continuing with your findings?

6    A.   And so -- and then I got an x-ray which showed no

7    lesthesis which sometimes occurs if you take off bone; and

8    then I said -- in my -- and then I had her see urology. It

9    said, patient had urology appointment that showed continued

10   innervation of, I assume it's bladder because it's cut off.

11   And my assessment plan is prescribe Mobic, prescribe

12   Neurontin, provide lumbar stabilization and exercises through

13   physical therapy and then initiate PT in Guam and then

14   follow-up in three months.

15   Q.   Okay,k back to the urology. She was seen by a

16   urologist there at Tripler in this January time frame; is

17   that what this refers to?

18   A.   I believe she was.

19   Q.   And what was that finding as far as your

20   understanding?

21   A.   I documented that it says, bladder evaluation

22   showed continued innervation of bladder.

23   Q.   What does that mean?

24   A.   That her re-innervation of her bladder is

25   improving.

Joseph Orchowski, MD, MAJ, MC: March 1, 2007 (Guam date)

1      Q.   Okay.  Is there anything that you prescribed for

2   her to do to try and -- well, let me ask you this.  Was her

3   recovery complete at this point or still ongoing?

4      A.   Still ongoing because she had pain.  She also had

5   these complaints of bowel and bladder difficulties and

6   residual groin numbness.

7      Q.   Okay.  And the bladder, the bowel and bladder

8   difficulties, what were they; do you recall?

9      A.   I don't know.  I didn't -- I did not extrapolate in

10  my note, so I don't recall.  But I do state that she had no

11  incontinence.

12     Q.   All right.  So she's not involuntary voiding, which

13  would be the incontinence; correct?

14     A.   Correct.

15     Q.   But there is -- she did describe to you some kind

16  of bowel and bladder difficulties.  Was that, was it

17  retention that she was describing?

18     A.   I do not know.

19     Q.   Okay.  Was there further treatment that you

20  prescribed for her at this time?

21     A.   The next page, on 112, it says I prescribed Mobic.

22  I prescribed Neurontin.

23     Q.   And those are not --

24     A.   And I prescribed --

25     Q.   Those are medications that do what?

1       A.   Mobic is an anti-inflammatory.  It's spelled

2    M-O-B-I-C and it helps with pain and inflammation.

3    Neurontin, spelled N-E-U-R-O-N-T-I-N is actually an anti-

4    seizure medication that has been shown to help with nerve

5    recovery and pain.  And I prescribed it in a very low dose of

6    300 milligrams at night.

7       Q.   And further treatment for her?

8       A.   And I also state -- I also state provide lumbar

9    stabilization and exercises through physical therapy.  My

10   next statement is initiate physical therapy in Guam and then

11   follow-up in three months.

12      Q.   Was there a follow-up in three months?

13      A.   I do not see that note.  My next note is 29 August.

14      Q.   What page?

15      A.   On 119.

16      Q.   Do you recall if there was any visit between

17   January of '05 and August of '05?

18      A.   I believe there was.

19      Q.   And --

20      A.   I do, I do not remember that visit.

21      Q.   If there was a visit, there would be a note for it

22   somewhere?

23      A.   That I can't say.  I -- like I said, I would write

24   a note if she had a visit.  I can't say whether or not it's

25   in this chart.

Joseph Orchowski, MD, MAJ, MC: March 1, 2007 (Guam date)

1      Q.    Where else might it be if it's not in this record
2    here?

3      A.    Those notes go to medical records and that's beyond
4    my understanding of the system.

5      Q.    And that's the Medical Records Department at
6    Tripler?

7      A.    They do -- yes.

8      Q.    All right.  And that's where you believe the notes
9    go, to the Medical Records Department at Tripler Hospital?

10     A.    If the patient does not have their chart --

11     Q.    Otherwise they go --

12     A.    -- with them.

13     Q.    -- they go into their chart?

14     A.    Correct.

15     Q.    Can you describe the condition of Mrs. Rutledge
16   when you saw her on 29 August '05 which is a year after the
17   surgery?

18     A.    Correct.  So my note states, patient's status post
19   one year from lumbar decompression from cauda equina
20   syndrome.  Patient continues to have some difficulty with
21   bowel and bladder and continues.  Physical exam.  Decreased
22   range of motion of her back.  I state that her strength in
23   her lower extremities, reflexes, quadriceps, hamstrings,
24   tibia upper anterior, EHL, gastro-soleus, five out of five
25   bilaterally.  I document that it is an equivocal straight leg

1   raise.  That's what this squiggle plus SLR.  Right greater
2   than left.

3        Q.   What does that mean?

4        A.   That means that when I, when I straightened her leg
5   out from a seated position, she described some pain in -- in
6   that ridicular pattern; that pattern of a nerve root.  I
7   therefore obtained an MRI and I document the MRI and it says,
8   no mass effect on dural sac.  And then my assessment of the
9   plan is, 44-year-old female status post one year from lumbar
10  decompression.  Utilize the -- I prescribed again the
11  Neurontin, 300 milligrams a night; Altram, which is a non-
12  narcotic pain reliever that's supposed to not be addictive at
13  50 milligrams every four to six hours and Peroxicam, which is
14  a different anti-inflammatory.  And I believe at that time
15  they told me that they were moving to the D.C. area and I
16  felt that she should follow-up with one of my associates at
17  Walter Reed.  I say follow-up with Dr. Kuklow (phonetic) at
18  Walter Reed Army Medical Center.

19       Q.   Do you know whether there was follow-up with Dr.
20  Kuklow?

21       A.   Only from my discussion with Ms. Clark.

22       Q.   And what was that discussion?

23       A.   She said she did follow-up with Dr. Kuklow or in
24  Bethesda, somewhere in the D.C. area.

25       Q.   Have you ever spoken with Dr. Kuklow about Mrs.

1   Rutledge?

2        A.   I have not.  But I did state -- actually I did at

3   one time prior to her following up, tell him that I was

4   sending him a patient that I had operated on.

5        Q.   And you haven't spoken with him since that time

6   about Mrs. Rutledge?

7        A.   No.  No, he's out of the military at this time.

8        Q.   All right.  Since August of '05, have you ever had

9   occasion to either see or speak with Mrs. Rutledge?

10        A.   I have not.

11        Q.   Well, based upon your post operative visits with

12   Mrs. Rutledge up to and including August of '05, are you able

13   to describe a prognosis for her?

14             MS. CLARK: I'm sorry, Army Regulation 2740

15   prevents this witness from testifying as to a prognosis.

16        Q.   (By Mr. Keogh)  So are you refusing to answer the

17   question, Doctor?

18        A.   Well, yes.  Apparently I'm prevented.

19        Q.   Do you understand why it is that you're

20   prevented?

21             MS. CLARK: As I said, it's Army Regulation

22   2740.  If you have questions about it, I'll be happy to

23   forward it to you, but this witness cannot offer an expert

24   opinion including prognosis.  He can testify as to opinions

25   he held at the time he treated the patient, but he can only

Joseph Orchowski, MD, MAJ, MC: March 1, 2007 (Guam date)

1    testify as a fact witness.

2        Q.    (By Mr. Keogh)  Well, I thought I was asking you,

3    Doctor -- and let me refine the question a little bit.  Based

4    upon your examinations of Mrs. Rutledge both post operative

5    -- well, during the surgery and then your post operative

6    evaluations up to and including August 29, '05, based upon

7    that, based upon your treatment of her, did you have an

8    opinion at the time, based upon your treatment of her, of

9    what her outcome is likely to be, or was and likely to be?

10            MS. CLARK: Again, as of August 29 he can

11   testify as to his observations, but he cannot offer an expert

12   opinion in a prognosis which by definition means something in

13   the future.  He can testify as to her condition when he saw

14   her as fact witness.

15       Q.    (By Mr. Keogh)  Doctor, can you tell us what you

16   found Mrs. Rutledge's condition to be, and based upon your

17   examinations of her what you thought her outcome would be?

18            MS. CLARK: Same objection.  At the time he can

19   tell you what he saw.  He cannot tell you what he perceived

20   the future might hold.

21       Q.    (By Mr. Keogh)  So, Doctor, you're going to refuse

22   to give us a prognosis; is that correct?

23       A.    I have stated in my note at that time that she's

24   still had these complaints and that is when the last time I

25   saw her.

1        Q.    Did you do anything further to evaluate the source

2   or the cause of those complaints?

3        A.    Not that I have documented.  I -- I am unsure at

4   that time whether or not she was continuing to be followed up

5   by urology.  I'm not sure.  I think she has a note there.

6        Q.    Did you find the note or -- ?

7        A.    No, I do not see that note.  But I, you know, when

8   I obtained the MRI I saw that there was no mass effect on the

9   dural sac.  She did not have any compressive lesions at that

10  time.

11       Q.    So what did that tell you?

12       A.    It told me that her complaints are likely due to

13  compression of the nerves from her prior cauda equina

14  syndrome and nerves slowly re-innervating.

15       Q.    Is there a period of time that that re-innervation

16  can occur?

17       A.    That is very variable.

18       Q.    What are the parameters?

19       A.    I can tell you in my experience, I have patients

20  that sometimes wake-up and immediately have regained

21  strength and some patients that can take years to regain

22  strength.  It's very unpredictable.

23       Q.    So what was your impression of what Mrs. Rutledge's

24  condition was then in August of '05 when you examined her?

25       A.    She had persistent back pain and she had persistent

1   difficulties with her bowel and bladder.

2       Q.   Do you know what those difficulties -- do you
3   remember what those difficulties were again?

4       A.   I do not have that documented on this one.

5       Q.   Did you come to a conclusion as to what the cause
6   of those continued difficulties and continued pain was?

7       A.   Continued difficulties can be from her prior
8   insult, prior cauda equina syndrome. The pain can be from
9   the fact that she herniated her disk and has degenerative
10  disk disease at a level where she had a very large herniated
11  disk.

12      Q.   Are you able to tell us, Doctor, if you had seen
13  her sooner than August 27, 2004 whether or not her outcome
14  from the surgery would have been different?

15      A.   I cannot say that. I do not know that. That's
16  guesswork on my part.

17      Q.   Prior to August of 2004, you had heard of cauda
18  equina syndrome; correct?

19      A.   Yes.

20      Q.   Is this a condition that a medical care provider at
21  an urgent care facility should know about?

22           MS. CLARK: Again, sir, you're asking him for
23  an expert opinion. He can testify as to the facts that he
24  knows them in his treatment of the patient, but he can't go
25  beyond factual questions. That's Army Regulation 2740. I'll

1  be happy to send you a link to it.

2      Q.  (By Mr. Keogh)  So, Doctor, you're refusing to

3  answer that question?

4      A.  I will not answer questions on other people's care.

5      Q.  Well, I wasn't asking a question about other

6  people's care.  I was just asking a question about cauda

7  equina syndrome and from your experience whether that's

8  something that an urgent care facility care provider should

9  know about.

10         MS. CLARK:  Again, I believe 2740 prevents him

11 from offering an expert opinion as to the knowledge of other

12 providers in the field, and I'm sure you're not asking him to

13 guess or read minds.

14     Q.  (By Mr. Keogh)  So your answer to the question,

15 Doctor, is that you won't answer; is that correct?

16     A.  Correct.

17         MR. KEOGH:  I have no further questions.

18         MR. SCHWAB:  Okay, let's take five minutes just

19 so I can see if we have any further questions and we'll be

20 right back on the record.

21         MS. CLARK:  Thank you.

22              (Off the record)

23              (Back on the record)

24         MR. SCHWAB:  I don't have any further

25 questions for this witness.  And, Dr. Orchowski, I really

1   thank you and it's a pleasure to meet you even if it is by

2   video, at least we get to see each other.  And thank you for

3   taking the time and trouble to come and talk us today.

4                    THE WITNESS: Okay.

5                    MR. SCHWAB: Is that it?  Anything further?

6                    MR. KEOGH: Yeah, I just want to ask one other

7   question; that is, whether you are planning on leaving your

8   current position and transferring somewhere else or leaving

9   the military at any time soon?  What's your future plan?

10       A.    Currently I am at Tripler for three additional

11  years from this time point.

12                   MR. KEOGH: That should do.  Thank you.

13                   MR. SCHWAB: Thank you again.

14                   MS. CLARK:    Thank you all.

15                   MR. SCHWAB: And please thank the people that

16  you see there at the U.S. Attorney's Office.  This is just

17  such a tremendous service being able to see each other and do

18  this by video.  And Kathy, thank you.

19                   MS. CLARK: My pleasure.

20                   (Whereupon, at 10:20 o'clock a.m.,

21                        the deposition was concluded.)

22

23

24

25

1                     **CERTIFICATE OF WITNESS**

2       I, Joseph Orchowski, MD, MAJ, MC, the deponent herein,

3 do hereby certify that I have read, or had read to me, the

4 foregoing typewritten pages 1 through 50, inclusive.  My

5 changes thereof, if any, have been noted on a separate sheet

6 of paper, which I have signed, and which I understand will be

7 appended to and made a part of this deposition.  I certify

8 that the same is now a true and correct transcript of my

9 testimony.

10

11                              _____

12                              JOSEPH ORCHOWSKI, MD, MAJ, MC

13                              (Dated) _____

14

15

16

17

18

19

20

21

22

23

24

25

Joseph Orchowski, MD, MAJ, MC: March 1, 2007 (Guam date)

1

## REPORTER'S CERTIFICATE

2

3       I, Cecilia F. Flores, Stenotype Reporter, do hereby

4   certify the foregoing 50 pages to be a true and correct

5   transcript of the stenographic shorthand notes and audio

6   recording taken by me in the within-entitled and numbered

7   case at the time and place as set forth herein.

8       Dated at Hagåtña, Guam, this 5th day of March, 2007.

9

10                      CECILIA F. FLORES

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Joseph Orchowski, MD, MAJ, MC: March 1, 2007 (Guam date)

## CLERK'S CERTIFICATE

SUPERIOR COURT OF GUAM              ) ss

I, Cecilia F. Flores, Special Deputy Clerk, Superior Court of Guam, do hereby certify that on the 1st day of March, 2007, at the hour of 8:20 a.m. there appeared before me via vide teleconference Joseph Orchowski, MD, MAJ, MC, at the Office of the United States Attorney, Sirena Plaza, Suite 500, 108 Hernan Cortez Avenue, Hagatna, Guam 96910, the witness herein, produced to give his deposition in the within-entitled and numbered Civil Case No. 06-00008; that prior to examination the witness was by me duly sworn upon his oath; that thereafter the transcript was prepared by me or under my supervision, and the original deposition transcript was presented to Mr. Schwab's office for the deponent's review, corrections, if any, and execution.

I further certify that I am not a relative, employee, attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, and that I am not directly or indirectly interested in the matters in controversy.

In testimony whereof, I have hereunto set my hand and seal of Court this 5th day of March, 2007.

_____

SPECIAL DEPUTY CLERK, SUPERIOR COURT OF GUAM

Joseph Orchowski, MD, MAJ, MC: March 1, 2007 (Guam date)