LEONARDO M. RAPADAS
United States Attorney
MIKEL W. SCHWAB
Assistant U.S. Attorney
KATHARYNE P. CLARK
Special Assistant U.S. Attorney
Sirena Plaza, Suite 500
108 Hernan Cortez Avenue
Hagatna, Guam 96910
Tel: (671) 472-7332
Fax: (671) 472-7215

Attorneys for the United States of America

FILED
DISTRICT COURT OF GUAM

MAR 1 2 2008

JEANNE G. QUINATA
Clerk of Court

DISTRICT COURT OF GUAM

TERRITORY OF GUAM

| | |
|---|---|
| DEBORAH K. RUTLEDGE and THOMAS R. RUTLEDGE,<br><br>Plaintiffs,<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | CIVIL CASE NO. 06-00008<br><br>UNITED STATES HAS NO OUTSTANDING OBJECTIONS TO THE DEPOSITION OF DR. ORCHOWSKI |

Dr Joseph Orchowski, M.D. the Orthopedic Spine Surgeon at Tripler Army Medical Center who operated on the plaintiff in 2004, was deposed on March 1, 2007. Approximately three separate objections were raised by the United States during the deposition of Dr. Orchowski, with the final objection, regarding Army Regulation 27-40, taking place in a discussion over 4 pages. None of the objections are relevant to the entry of the deposition of Dr. Orchowski into that record at the this time, and the United States has no objection to its entry.

A review of the objections, no longer extant, is as follows:

1

The United States arranged and paid for a VTC conference with Doctor Orchowski. The U.S. Army Doctor, transmitting from Hawaii, was accompanied by his agency counsel (and co-counsel on this case), SAUSA Clark. Both AUSA Schwab and Plaintiff's attorney, Keogh, were transmitting from Guam. Due to time limitations on the facilities, the United States introduced Dr. Orchowski and then turned him over to the Plaintiff for his cross examination.

At page 14 the United States made its first objection:

KEOGH "*All right. You mentioned that Dr. Duncan had said that he suspected that Mrs. Rutledge was suffering from cauda equina syndrome. From your evaluation, from your examination of her, did you concur with that conclusion?*

SCHWAB "*I'm just going to object on your calling it a conclusion. As you've already stated, he had a suspicion.*

KEOGH "*All right. Did you concur with that, confirm that suspicion into a diagnosis of some kind?*

DOCTOR " *Correct; and that is stated in my note of the 27th.*

The next objection comes at page 36-37:

KEOGH "*Is there a chart or a file on Mrs. Rutledge that contains documents that's not in the record that's in front of you now?*

DOCTOR "*Not that I am aware of. I have no personal chart or records of her.*

KEOGH "*All right. And the documents that are contained in this record that's in front of you now would contain all of the records from Tripler Hospital on Mrs. Rutledge?*

SCHWAB "*Objection; I don't think he can testify to that.*

KEOGH "*Are you able to answer that?*

2

DOCTOR *"I am not able to answer that."*

KEOGH *"Are there records that you believe exist somewhere at Tripler that are not contained in this record that's in front of you?*

DOCTOR *"No. I - I - like I said, I do not - I do not keep any patient charts in my clinic. So I do not have any patient charts. Currently, all patient are presented with theri outpatient chart and notes are placed there within those charts. Or if their outpatient chart is unavailable at that time, that note is placed to the chart room and those notes are supposed to placed accordingly. That's beyond my control.*

On page 45 of the deposition the Plaintiff asks, *"..are you able to describe a **prognosis** for her?"* The government counsel in Hawaii raised the fact that Army Regulation 2740 has specific provisions for offering a "prognosis". ("Their testimony may not extend to expert or opinion testimony, to hypothetical questions, or to a **prognosis**." Army Regulation 27-40, Section III, 7-10 (c)(3), Attachment 1). The discussion continues to Page 46 and Plaintiff states, continuing into page 47 and 48:

KEOGH *"So, Doctor, you're going to refuse to give us a prognosis; is that correct?*

DOCTOR *"I have stated in my note at that time that she's still had these complaints and that is when the last time I saw her.*

KEOGH *" Did you do anything further to evaluate the source or the cause of those complaints?*

DOCTOR *" Not that I have documented. I - I am unsure at that time whether or not she was continuing to be followed up by urology. I'm not sure. I think she has a note there.*

KEOGH *"Did you find the note or —"*

DOCTOR *"No, I do not see that note. But I, you know, when I obtained the MRI I saw that there was no mass effect on the dural sac. She did not have any compression lesions at that*

3

Case 1:06-cv-00008 Document 125 Filed 03/12/2008 Page 3 of 10

1 | *time.*
2 | KEOGH *"So what did that tell you?"*
3 | DOCTOR *" It told me that her complaints are likely due to compression of the nerves*
4 | *from her prior cauda equina syndrome and nerves slowly re-innervating.*
5 | KEOGH *"Is there a period of time that that re-innervation can occur?"*
6 | DOCTOR *" That is very variable."*
7 | KEOGH *"What are the parameters?"*
8 | DOCTOR *"I can tell you in my experience, I have patients that sometimes wake up and*
9 | *immediately have regained strength and some patients that can take years to regain strength.*
10 | *It's very unpredictable.*
11 | KEOGH *"So what was your impression of what Mrs. Rutledge's condition was then in*
12 | *August of '05 when you examined her?"*
13 | DOCTOR *"She had persistent back pain and she had persistent difficulties with her bowel*
14 | *and bladder.*
15 | KEOGH *"Did you come to a conclusion as to what the cause of those continued*
16 | *difficulties and continued pain was?*
17 | DOCTOR *"Continued difficulties can be from her prior insult, prior cauda equina*
18 | *syndrome. The pain can be from the fact that she herniated her disk and has degenerative disk*
19 | *disease at a level where she had a very large herniated disk.*
20 | KEOGH *"Are you able to tell us, Doctor, if you had seen her sooner than August 27,*
21 | *2004, whether or not her outcome from the surgery would have been different?*
22 | DOCTOR *"I cannot say that. I do not know that. That's guesswork on my part.*
23 | KEOGH *" Prior to August of 2004, you had heard of cauda equina syndrome; correct?"*
24 | DOCTOR *"Yes."*
25 | KEOGH **"Is this a condition that a medical care provider at an urgent care facility**
26 | **should know about?**
27 |
28 | 4

Again, it was pointed out that Army Regulation 27-40 prevents the fact witness from giving expert opinions. The regulation has steps that the Plaintiff can take to request such expertise. The Army Surgeon can not be called upon to testify as to his opinions about other providers, except as allowed by the regulation. As was stated "...*27-40 prevents him from offering an expert opinion as to the knowledge of other providers in the field...*" Page 49 of the deposition.

The Army's regulations are not unique in the federal government. Many other agencies have regulations governing how their employees are to used in litigation.[1] The most cited case on these regulations is Touhy v. Ragen, 340 U.S. 462 (1951). In that case an FBI agent was found to be in contempt by a District Court for not complying with a subpoena decus tecum. The agent was following the regulations of his agency (then Department Rule No 3229, now at 28 C.F.R. § 16.22). The Court of Appeals reversed and the Supreme Court affirmed the reversal. Today, agency regulations such as the Army's Regulation 27-40 are known a "Touhy Regulations" (pronounced like "2 E").

Since the Touhy opinion, " an unbroken line of authority directly supports the contention that a federal employee may not be compelled to obey a subpoena contrary to his federal employer's instructions under valid agency regulations." Moore v. Armour Pharm. Co., 927 F.2d 1194, 1197 (11th Cir. 1991). *See also* FBI v. Superior Court of California, 507 F.Supp.2d 1082 (N.D. Cal. 2007) ("DOJ regulations restricting a subordinate employee's ability to disclose information in a legal proceeding are valid in light of 5 U.S.C. § 301 and the Supreme Court's decision in Touhy.").

---

[1] As one example, *See* Matthews v. Storgion, 2006 WL 988792, 174 Fed. Appx. 980, * 990 (C.A. 6, Tenn.) ("After defendant's challenged Scott's suitability as an expert, the trial court ruled that he could not testify as to the applicable standard of care. ...Scott revealed that he was testifying as a fact witness...and that the FDA, in fact, prohibited him from testifying as an expert witness.") (21 CFR Sect. 20.1(a) (2006)), *also* O'Neil v. Novartis Consumer Health Inc, 55 Cal Rptr 3d 551 (Cal App 2 Dist, 2007).

5

The regulations work well to prevent the common inclination of litigants to disregard the need to hire their own experts, and instead to attempt to rely on the gratis expertise of government employees. It is also harmonious with the general legal principal that fact witnesses are generally not used as experts, certainly not without a foundation. In the case of questions to Doctor Orchowski, it was inappropriate to ask him to give his opinion about the level of knowledge that the clinic at Andersen Air Force Base should have. There was no foundation for such a question and it brought him outside of his area of knowledge.

Plaintiff has avoided the hiring of his own expert with Spinal Surgery or Neurosurgery expertise. The temptation to convert the government doctors into inappropriate experts is discouraged by the Army's regulation, as it should be. This case would have benefitted greatly from Plaintiff's consult with a expert with specific experience with Cauda Equina, it's manifestation and its treatment. Plaintiff's efforts to convert a treating physician into an expert on the treatment offered by other health care providers, outside his knowledge, was the source of frustration for Plaintiff at the deposition of Doctor Orchowski.

It should be noted that the Plaintiff was able, through the appropriate wording of questions and by relating the questions to the Doctor's treatment of the Plaintiff, to get a significant amount of the information he was seeking about Cauda Equina and its treatment. It was only when he specifically asked for the Doctor to act in violation of the Army Regulation that an objection was appropriately raised.

/
/
/
/
/
/

6

The witness was accurate and informative and the United States has no objection to the entry of his deposition testimony into the record at this time.

Respectfully submitted this 11th of March, 2008.

LEONARDO M. RAPADAS
United States Attorney
Districts of Guam and CNMI

By: _____
MIKEL W. SCHWAB
Assistant U.S. Attorney

KATHARYNE P. CLARK
Special Assistant U.S. Attorney

Attachment 1

U.S. Army Regulation 27-40

(Page 16)

Army Regulation 27-40

Legal Services

# Litigation

Headquarters
Department of the Army
Washington, DC
19 September 1994

**Unclassified**

records privileged from release should be retained by the custodian pending the court's ruling upon the Government's motion.

(2) When a motion to quash or for a protective order is not filed, or the motion is unsuccessful, and the appropriate DA official has determined that no further efforts will be made to protect the records, copies of the records (authenticated if necessary) will be submitted to the court (or to the clerk of court) in response to the subpoena or order.

*d. Classified and privileged materials.* Requests from DOJ, U.S. Attorneys, or attorneys for other Governmental entities for records that are classified or otherwise privileged from release will be referred to the Litigation Division. (See para 7–2g.)

## Section III
## DA Personnel as Witnesses in Private Litigation

### 7–8. Response to subpoenas, orders, or requests for witnesses

*a. Policy.* The involvement of present or former DA personnel in private litigation is solely a personal matter between the witness and the requesting party, unless one or more of the following conditions apply:

(1) The testimony involves official information.(See glossary.)
(2) The witness is to testify as an expert.
(3) The absence of the witness from duty will interfere seriously with the accomplishment of a military mission.

*b. Former DA personnel.* Former DA personnel may freely respond to requests for interviews and subpoenas except in instances involving official information (*a*(1) above) or concerning expert testimony prohibited by paragraph 7–10 below. In those instances, the subject of the request or subpoena should take the action specified in paragraphs 7–2c and 7–3 of this regulation.

*c. Present DA personnel.* Present DA personnel will refer all requests for interviews and subpoenas for testimony in private litigation through their supervisor to the appropriate SJA or legal adviser.

*d. Discretion to testify.* Any individual not wishing to grant an interview or to testify concerning private litigation may seek the advice of an Army attorney concerning the consequences, if any, of refusal. Any individual not authorized to consult with Army counsel should consult with private counsel, at no expense to the Government.

### 7–9. Official information

*a.* In instances involving paragraph 7–8*a*(1) above, the matter will be referred to the SJA or legal adviser serving the organization of the individual whose testimony is requested, or to HQDA pursuant to paragraph 7–3*a* above. The deciding official will determine whether to release the information sought under the principles established in paragraph 7–5 above. If funding by the United States is requested, see paragraph 7–16*d* of this regulation.

*b.* If the deciding official determines that the information may be released, the individual will be permitted to be interviewed, deposed, or to appear as a witness in court provided such interview or appearance is consistent with the requirements of paragraphs 7–10 and 7–11 below. (See, for example, fig 7–2.) A JA or DA civilian attorney should be present during any interview or testimony to act as legal representative of the Army. If a question seeks information not previously authorized for release, the legal representative will advise the witness not to answer. If necessary to avoid release of the information, the legal representative will advise the witness to terminate the interview or deposition, or in the case of testimony in court, advise the judge that DOD directives and Army regulations preclude the witness from answering without HQDA approval. Every effort should be made, however, to substitute releasable information and to continue the interview or testimony.

### 7–10. Expert witnesses

*a. General rule.* Present DA personnel will not provide, with or without compensation, opinion or expert testimony either in private litigation or in litigation in which the United States has an interest for a party other than the United States. Former DA personnel will not provide, with or without compensation, opinion or expert testimony concerning official information, subjects, or activities either in private litigation or in litigation in which the United States has an interest for a party other than the United States. (See fig 7–3.) An SJA or legal adviser is authorized to deny a request for expert testimony, which decision may be appealed to the Litigation Division.

*b. Exception to the general prohibition.* If a requester can show exceptional need or unique circumstances, and the anticipated testimony will not be adverse to the interests of the United States, the Litigation Division may grant special written authorization for present or former DA personnel to testify as expert or opinion witnesses at no expense to the United States. In no event, may present or former DA personnel furnish expert or opinion testimony in a case in which the United States has an interest for a party whose interests are adverse to the interests of the United States.

*c. Exception for AMEDD personnel.* Members of the Army medical department or other qualified specialists may testify in private litigation with the following limitations (see fig 7–4):

(1) The litigation involves patients they have treated, investigations they have made, laboratory tests they have conducted, or other actions they have taken in the regular course of their duties.

(2) They limit their testimony to factual matters such as the following: their observations of the patient or other operative facts; the treatment prescribed or corrective action taken; course of recovery or steps required for repair of damage suffered; and, contemplated future treatment.

(3) Their testimony may not extend to expert or opinion testimony, to hypothetical questions, or to a prognosis.

*d. Court-ordered expert or opinion testimony.* If a court or other appropriate authority orders expert or opinion testimony, the witness will notify the Litigation Division immediately. If the Litigation Division determines it will not challenge the subpoena or order, the witness will comply with the subpoena or order. If directed by the Litigation Division, however, the witness will decline respectfully to comply with the subpoena or order. (See *United States ex. rel. Touhy v. Ragen*, 340 U.S. 462 (1951).)

*e. Expert witness fees.* All fees tendered to present DA personnel as an expert or opinion witness, to the extent they exceed actual travel, meals, and lodging expenses of the witness, will be remitted to the Treasurer of the United States.

### 7–11. Interference with mission

If the absence of a witness from duty will interfere seriously with the accomplishment of a military mission, the SJA or legal adviser will advise the requesting party and attempt to make alternative arrangements. If these efforts fail, the SJA or legal adviser will refer the matter to the Litigation Division.

## Section IV
## Litigation in Which the United States Has an Interest

### 7–12. Response to subpoenas, orders, or requests for witnesses

*a. Referral to a deciding official.* Requests, subpoenas, or orders for official information, interviews, or testimony of present or former DA personnel in litigation or potential litigation in which the United States has an interest, including requests from DOJ, will be resolved by the SJA or legal adviser pursuant to the principles of this chapter. The Litigation Division will be consulted on issues that cannot be resolved by the SJA or legal adviser.

*b. Reassignment of witnesses.* When requested by the U.S. Attorney, the SJA or legal adviser will ensure that no witnesses are reassigned from the judicial district without advising the DOJ attorney. If a witness is vital to the Government's case and trial is imminent, the SJA or legal adviser should make informal arrangements to retain the witness in the command until trial. If this is not feasible, or if a satisfactory arrangement cannot be reached with the

Case 1:06-cv-00008   Document 125   Filed 03/12/2008   Page 10 of 10