LAW OFFICE OF
**ROBERT L. KEOGH**
POST OFFICE BOX GZ
HAGATÑA, GUAM 96932
TELEPHONE (671) 472-6895

Attorneys for Plaintiffs



**FILED**
DISTRICT COURT OF GUAM

MAR 2 4 2008 ℟·Ⅾ·

**JEANNE G. QUINATA**
Clerk of Court

IN THE DISTRICT COURT OF GUAM

| | |
|---|---|
| DEBORAH K. RUTLEDGE and THOMAS R. RUTLEDGE, | CIVIL CASE NO. CIV06-00008 |
| Plaintiffs, | |
| vs. | |
| UNITED STATES OF AMERICA, | |
| Defendant. | |

# PLAINTIFFS' PROPOSED

# FINDINGS OF FACTS AND

# CONCLUSIONS OF LAW

ORIGINAL

## JURISDICTION AND VENUE

1. Plaintiffs brought this action under the Federal Tort Claims Act ("FTCA") for damages arising out of the alleged negligent acts or omissions of employees of the United States of America while acting within the course and scope of their employment under circumstances where the United States of America, if a private person, would be liable to the plaintiffs under the laws of Guam where the acts or omissions complained of occurred. 28 U.S.C. §1346(b). <u>Warren v. United States</u>, 999 F. 2d. 546 (9th Cir. 1993).

2. Plaintiffs satisfied the conditions precedent to bringing a lawsuit against the United States under the FTCA, as set forth in 28 U.S.C. §§2675 and 2401 (Plaintiffs' Exhibit 2).

3. This court has original jurisdiction pursuant to the provisions of 28 U.S.C. §1331 and 1346(b). Jurisdiction of this Court over the defendant United States of America is invoked pursuant to 28 U.S.C. §2671, et. seq.

4. Venue in the District Court of Guam is proper under Title 28 U.S.C. §1402(d) because the negligent acts and omissions complained of occurred in Guam.

## FINDINGS OF FACTS

5. Plaintiffs Deborah K. Rutledge and Thomas R. Rutledge are husband and wife. Deborah is the dependent wife of Master Sergeant Thomas R. Rutledge who is a serviceman in the United States Air Force.

6. Deborah K. Rutledge received medical care at the AAFB Medical Clinic on July 27, 2004, August 2, 2004 and August 17, 2004 (Plaintiffs' Exhibits 3, 5, and 8.)

7. On July 27, 2004, Deborah Rutledge presented to the AAFB Medical Clinic. She was seen by then Major Natalie Y. Giscombe, an Adult Nurse Practitioner. Deborah Rutledge complained of low back pain, numbness in the groin area and urination frequency.

8. Major Giscombe ordered a urine analysis and performed a physical examination. The urine analysis was normal and did not show signs of a urinary tract infection. Major Giscombe concluded that Deborah Rutledge was probably drinking too much water. Her conclusion in this regard was based partly on her specific recollection that Mrs. Rutledge had told her they had just arrived on Guam a few days earlier, even though the fact is the Rutledges arrived on Guam nine month before. Major

Giscombe diagnosed Deborah Rutledge with right sciatica and prescribed her pain medications. (Plaintiffs' Exhibit 3). Plaintiffs' expert Gary Towle, Board Certified in Emergency Medicine, testified that failing to perform further testing to investigate Deborah Rutledge's complaint of urination frequency after the urine analysis ruled out the possibility of a urinary tract infection was below the standard of care.

9. Major Giscombe testified that Deborah Rutledge did not complain of numbness in her vagina on July 27, 2004 and that the complaint of loss of sensation in the groin area was actually at the bottom fold of where a woman's underwear would end. In her deposition, however, Major Giscombe admitted that she did not address Mrs. Rutledge's complaint of loss of sensation in the groin area on July 27, 2004. Major Giscombe admitted that she did not have Deborah Rutledge undress during her examination. Major Giscombe admitted that she did not consult with her physician preceptor nor refer Mrs. Rutledge to a specialist on July 27, 2004. Plaintiffs' expert, Dr. Gary Towle, testified that failing to undress a patient who complains of numbness in the groin area to further investigate this subjective complaint and/or failing to consult with one's physician preceptor given Deborah Rutledge's presenting symptoms is below the standard of care.

10. There is conflicting testimony as to whether or not Major Giscombe identified herself to Deborah K. Rutledge as a nurse practitioner. Major Giscombe admitted that a nurse practitioner is considered a midlevel provider. Deborah Rutledge testified that Major Giscombe introduced herself as "Major Giscombe" and did not inform her that she was a Nurse Practitioner. Major Giscombe, on the other hand, testified that she identifies herself to all her patients as "Major Giscombe, Nurse Practitioner." The Court believes that Deborah Rutledge was not properly informed that Major Giscombe was a Nurse Practitioner. Deborah Rutledge believed she was under the care of a medical doctor. This is evidenced by the letter of complaint lodged by Mr. and Mrs. Rutledge with the US Air Force where they refer to Major Giscombe as Dr. Giscombe. Clearly, as late as October 2004, Mrs. Rutledge was still under the belief that she had been cared for by a medical physician. (Defendant's Exhibit Y).

11. On August 2, 2004, Deborah Rutledge presented again at the AAFB Medical Clinic. She complained of continued low back pain for two weeks, loss of sensation in the groin area and taking longer to use the bathroom. Captain Rau, a Physician Assistant, saw Deborah Rutledge on this visit. He documented

- 2 -

her complaint as "numbness in her right gluteal/thigh area, pain down her left leg to her calf." He admitted to knowing that this was Deborah Rutledge's second visit to the AAFB Clinic for unresolved back pain and urinary complaints because he saw the lab results on the computer.

12. On August 2, 2004, Captain Rau performed a physical examination and ordered L-spine x-rays.

13. Captain Rau testified that based on the urine analysis taken 6 days earlier on July 27, 2004, he came to the medical conclusion that Deborah Rutledge was dehydrated based upon the specific gravity in her 6-day old lab results of the July 27, 2004 urine analysis. Dr. Towle testified that it was not reasonable for Captain Rau to come to the medical conclusion that Deborah Rutledge was dehydrated because the specific gravity in her 6-day old urine analysis lab result taken on July 27, 2004 was within normal limits and indicated that she was probably at most a glass of water behind. Captain Rau further testified that he suspected urethritis but did not discuss sexual activity with Deborah Rutledge or document this suspicion. There is nothing on the record that would support this medical finding. Captain Rau failed to adequately address and investigate Mrs. Rutledge's complaint of "peeing and then having to pee again." Dr. Gary Towle testified the failure to perform further testing to investigate Deborah Rutledge's continuing complaint of urinary problems was below the standard of care.

14. Captain Rau also failed to adequately address or investigate Deborah Rutledge's complaint of loss of sensation in the groin area. Captain Rau testified that Deborah Rutledge pointed to her suprapubic bone when asked to point to where she was numb. Captain Rau admitted that he did not have Deborah Rutledge undress during his examination. Captain Rau admitted that he did not consult with his physician preceptor nor refer Mrs. Rutledge to a specialist on August 2, 2004. Dr. Gary Towle testified the failure to undress Deborah Rutledge for further testing or to consult with his physician preceptor on August 2, 2004 given Deborah Rutledge's alarming symptoms was below the standard of care.

15. At trial it was established that the August 2, 2004 medical record of Deborah Rutledge by Captain Rau was never reviewed nor countersigned by Captain Rau's supervising physician at any time. In fact, at the AAFB Clinic not all of the medical records are regularly reviewed by a physician assistant's supervising physician. The policy at the AAFB medical Clinic

- 3 -

was to review 10 records at the end of every month (Jablonski Deposition).

16. There is conflicting testimony as to whether Captain Rau identified himself to Deborah Rutledge as a physician assistant. Captain Rau admitted that a hysician Assistant is considered a midlevel provider. Deborah Rutledge testified that Captain Rau introduced himself to her as "Captain Rau" and that he was wearing his BDUs (battle dress uniform) at the time she was seen by him. Thomas Rutledge also testified that he saw Captain Rau twice that day and he saw Captain Rau dressed in BDUs because he read his name on the BDU then looked at his rank as he is accustomed to doing with all military personnel he encounters. Captain Rau, on the other hand, testified that he introduced himself to Deborah Rutledge as "P.A. Rau," that he was wearing his white lab coat with the word "Physician Assistant" embroidered across the left chest and had his physician assistant identification on him. The Court believes that Deborah Rutledge was not properly informed that Captain Rau was a Physician Assistant. Deborah Rutledge believed she was under the care of a medical doctor. This is evidenced by the letter of complaint lodged by Mr. and Mrs. Rutledge with the US Air Force where they refer to Captain Rau as Dr. Rau. Clearly, as late as October 2004, Mrs. Rutledge was still under the belief that she had been cared for by a medical physician. (Defendant's Exhibit Y).

17. On August 16, 2004, upon the advise of a neighbor, Deborah Rutledge called the AAFB Clinic and asked for a referral to the US Naval Hospital because, as she testified, she felt that "the doctors at the AAFB Medical Clinic did not know what they were doing." Deborah Rutledge was informed that she had to come in for an appointment at the AAFB Medical Clinic before she could obtain a referral to US Naval Hospital. Deborah Rutledge was given an appointment to see Major Giscombe the next day at 9:45 a.m.

18. On August 17, 2004, Deborah Rutledge presented again at the AAFB Medical Clinic to see Major Giscombe and get her referral.

19. There are two completely different versions to this August 17, 2004 visit. Deborah Rutledge testified that when she was handed the Adult Low Back Pain Form at the reception area upon checking in for her appointment, she refused to fill it out stating that she had filled it out twice in the past and she still hasn't gotten better. She stated that she was just there to get a referral to the US Naval Hospital. She was

- 4 -

taken to see Major Giscombe. She was not examined by Major Giscombe. She insisted that Major Giscombe enter the referral into the computer system in her presence while she still was in the room because the last time a physical therapy referral was supposed to be ordered by Captain Rau, it was never done. Major Giscombe entered the referral into the computer and told her that it was done. Deborah Rutledge testified that the meeting with Major Giscombe lasted about 10 minutes.

20. Major Giscombe's version of the August 17, 2004 visit, on the other hand, is that she had to fill out the entire Adult Low Back Pain form in her own handwriting because the patient refused and was uncooperative. She testified during the plaintiffs' case-in-chief that she discussed each and every item in the YES/NO portion on the top part of the form with the patient. She stated that Deborah Rutledge did not complain of any urinary problems at that time. She noted that Deborah Rutledge complained of slight numbness to peritoneal area. Major Giscombe acknowledged that the word peritoneal which appears three times in this form is erroneous and was supposed to be perineal. She also testified that Deborah Rutledge was rude and uncooperative and she was able only to perform a limited examination. Major Giscombe noted on the Adult Low Back Pain form that the patient complained of low back pain with numbness to right gluteal/peritoneal area, right thigh/left lower extremity to foot, positive limp. Major Giscombe did not indicate on the form that the patient was uncooperative and that consequently she was only able to perform a limited physical examination. Major Giscombe testified that she filled out the Adult Low Back Pain form and at the same time entered the routine referral to Orthopedics at the US Naval Hospital for Deborah Rutledge. For the computer referral and the adult low back pain form to have been generated simultaneously, it is inexplicable how Major Giscombe was able to use the word perineal correctly in typing out the referral to orthopedics but used the word peritoneal incorrectly three times in the Adult Low Back Pain form which appears entirely in her own handwriting. Although Major Giscombe stated at the start of her testimony during plaintiffs' case-in-chief that she had a clear independent recollection of the events surrounding Deborah Rutledge's visits to AAFB Medical Clinic, she was unable to recall the name of her medical technician or recall how she got Deborah Rutledge's vital signs that day. Deborah Rutledge's testimony that Major Giscombe did not have a piece of paper in front of her during that visit which lasted only 10 minutes casts doubt on Major Giscombe's version of the August 17, 2004 visit. It is also not believable that Deborah Rutledge would have said

- 5 -

NO to any urinary complaints when it was later confirmed by documentation made by Dr. Douglas Duncan at the US Naval Hospital 10 days later that "patient squeezed bladder for extended period prior to appointment to urinate as is accustomed to doing for the past three weeks" (Defendant's Exhibit N USNH 001/Plaintiffs' Exhibit 13 RUT 046). The Court notes that it is in a patient's self-interest to provide truthful statements about their condition to obtain the right medical diagnosis and treatment. It is for this reason that such statements are deemed so inherently reliable as to merit an exception to the hearsay rule. (Fed. R. Evid. 803(4)).

21. Major Giscombe admitted that she did not objectively investigate Deborah Rutledge's complaint of slight numbness in the perineal area on August 17, 2004. She did not have Deborah Rutledge undress during her physical examination. Major Giscombe admitted that the way to test numbness in the perineal area would be to perform a vaginal exam and/or a rectal exam. Major Giscombe admitted that she did not consult with her physician preceptor nor refer Deborah Rutledge to a specialist that same day. Dr. Gary Towle testified that failing to consult with her physician preceptor given Deborah Rutledge's alarming symptoms that day was below the standard of care.

22. Major Giscombe acknowledged that on August 17, 2004 she knew that Deborah Rutledge had seen her on July 27, 2004 and from the CHCS record of her x-ray results, she knew that Deborah Rutledge was seen at the AAFB Medical Clinic on August 2, 2004. By AAFB 36th Medical Group Instruction 40-112 (Plaintiffs' Exhibit 33) which Nurse Practitioner Natalie Giscombe testified to as being the same as the regulation in effect in July and August 2004, Major Giscombe, as a mid-level provider, was required to refer her patient to her assigned physician preceptor as she had not improved after the second visit. Major Giscombe testified that since she was referring Deborah Rutledge to higher specialty care, she did not think it was necessary to refer Deborah Rutledge to her physician preceptor.

23. The referral given by Major Giscombe to Deborah Rutledge for consultation with an orthopedist at the US Naval Hospital was a routine referral and not an emergency or urgent referral. As a result, Deborah Rutledge was not given an appointment to see an orthopedist at the US Naval Hospital until August 23, 2004. Due to a passing typhoon, this appointment was cancelled by the US Naval Hospital and rescheduled for August 27, 2004, six days later.

- 6 -

24. On or about August 24, 2004, Deborah Rutledge experienced fecal incontinence while she was vacuuming. She attributed this event to stress. She considered it an "accident" and did not recognize the medical significance of this event.

25. There is conflicting testimony from Deborah Rutledge and Major Giscombe as to whether Deborah Rutledge was advised to watch out for bowel or bladder incontinence and/or was advised to go to the emergency room. The Court believes that Deborah Rutledge was not advised about the significance of bowel or bladder incontinence. Major Giscombe testified that she did not know about cauda equina syndrome at the time Deborah Rutledge presented to her at the AAFB Medical Clinic on July 27, 2004 and on August 17, 2004. Captain Rau likewise testified that he did not consider cauda equina syndrome at that time. It is therefore not credible that Major Giscombe and Captain Rau advised Deborah Rutledge of the medical significance of bowel and/or bladder incontinence in the context of her low back pain and other symptoms.

26. On August 27, 2004, Deborah Rutledge was seen at the US Naval Hospital by orthopedic surgeon, Dr. Douglas Duncan. Based on her historical account of her symptoms, Dr. Duncan performed a physical examination which included a rectal exam and a post void residual urine examination. Dr. Duncan quickly came to the medical conclusion that Deborah Rutledge was suffering from long standing cauda equina syndrome for approximately three weeks. He immediately arranged for Deborah Rutledge to be admitted to the US Naval Hospital pending her emergency medical air evacuation to the Tripler Army Medical Center (TAMC) in Hawaii where Dr. Joseph Orchowski had, upon telephone consultation with Dr. Douglas Duncan, agreed to accept Deborah Rutledge for emergency care. Dr. Orchowski accepted Deborah Rutledge upon arrival at the TAMC in Hawaii and performed an emergency diskectomy after the MRI confirmed their preliminary diagnosis of a large herniated L5-S1 herniated disc causing a cauda equina syndrome.

27. At trial, Dr. Douglas Duncan testified that he did not have an independent recollection of the day he examined Deborah Rutledge other than what is stated in his records. He testified that he was a "newly minted orthopedic surgeon" who was on his first day on the job. He stated that this was an "impressive case" of a rare condition called "cauda equina syndrome." He testified that he had to coordinate with the AAFB for an airplane to arrange for emergency air evacuation of his patient to the Tripler Army Medical Center in Hawaii where an orthopedic surgeon was ready to accept his patient

- 7 -

for emergency diskectomy. He stated that he did not recall the specifics of his conversation with Major Natalie Giscombe. It is highly unlikely that Dr. Duncan would have no independent recollection of that day other than what is stated in his records. Dr. Duncan also testified that during the break in the proceedings, he had a discussion with defendant's expert, Dr. Michael Meriwether, in the presence of counsel for defendant because he had a concern about "keeping his testimony within bounds." Dr. Douglas Duncan testified that he could not recall whether or not he told Mr. and Mrs. Rutledge on 2 separate occasions that the medical treatment Deborah Rutledge received at the AAFB Medical Clinic was "criminal." His testimony in this regard was simply that "it doesn't sound like something I'd say." Dr. Duncan, however, did not categorically deny making the statement. The Court has ruled that the statements made by Dr. Duncan are nonhearsay as an admission by a party opponent.

28. On that same day, upon the orders given by Dr. Douglas Duncan, Deborah Rutledge was immediately medically air evacuated to Tripler Army Medical Center for emergency MRI and surgery. The MRI confirmed the finding of a large centrally extruded herniated disc compressing the cauda equina nerve roots of Deborah Rutledge. A successful diskectomy and laminectomy was performed by Dr. Joseph Orchowski that same day.

29. Plaintiffs testified that they met with Dr. Orchowski after the surgery in preparation for their return to Guam. At that time, Dr. Joseph Orchowski told them that it may take up to two years for her neurological symptoms to improve or get better. Dr. Orchowski further stated that "it was too bad that the disc sat on your spine for 3 weeks." The Court has ruled that the statement made by Dr. Orchowski is nonhearsay as admission by a party opponent.

30. Defendant United States, in its defense did not present any testimony on the standard of care.

31. Defendant presented expert opinion testimony through Dr. Michael Meriwether, a neurosurgeon. Dr. Meriwether gave the opinion that Deborah Rutledge's condition of cauda equina syndrome was acute and occurred suddenly on or about August 24, 2004 when she experienced fecal incontinence. The Court finds that Dr. Meriwether's opinion on the acute nature of Deborah Rutledge's cauda equina syndrome is not supported by the facts of this case and is contradictory to his own expert report and testimony. Dr. Meriwether testified that not all cauda equina syndrome patients present with all the signs and

- 8 -

symptoms of Cauda equina syndrome (Defendant's Exhibit "A" RUT 399). The medical records of Deborah Rutledge's July 27, 2004 visit to the AAFB Clinic contains signs and symptoms already indicative of cauda equina syndrome. On that day, Mrs. Rutledge complained of loss of sensation in the groin area (saddle anesthesia), with 4-5 days low back pain and a new urinary symptom identified as urination frequency. The August 2, 2004, medical record from AAFB demonstrates a progressing deterioration of Deborah Rutledge's neurological condition specifically involving her sacral nerve roots. By August 2, 2004, her symptoms had become bilateral and were described as numbness in her right gluteal/perineal area, pain down her left leg. By the time Deborah Rutledge presented to the AAFB Clinic on August 17, 2004, she had a positive limp clearly indicating a continued progressive decline of her condition. By the time Deborah Rutledge presented at the US Naval Hospital with a history of 2 days fecal incontinence, her condition was immediately diagnosed as cauda equina syndrome for approximately 3 weeks. Her rectal tone was altered and she had urine retention as confirmed by a urine residual analysis test performed. An emergent MRI taken several hours later in Hawaii confirmed the diagnosis.

32. Dr. Meriwether testified that he would not have diagnosed Mrs. Deborah Rutledge with cauda equina syndrome when she presented to the AAFB. However, on cross examination, he admitted that the key to diagnosing cauda equina syndrome in a patient is by taking an MRI. An MRI, though available on Guam in July and August 2004, was not taken of Deborah Rutledge's lumbosacral spine at any time during her treatment at the AAFB medical Clinic on July 27, 2004, August 2, 2004 and August 17, 2004. On further cross examination, Dr. Meriwether testified that he would have definitely started to become suspicious by the third visit (August 17, 2004), but that he would have missed it on the first two visits. What was there to miss were the signs and symptoms of cauda equina syndrome which were already present when Deborah Rutledge consulted at the AAFB Clinic on July 27, 2004, August 2, 2004 and August 17, 2004.

33. Defendant United States, in its defense, also through the opinion testimony of Dr. Michael Meriwether, suggested that fecal incontinence is a serious symptom like crushing chest pain that should alert a person to an urgent need to report to an emergency room. The Court finds that if the healthcare providers at AAFB failed to recognize the alarming neurological symptoms of Deborah Rutledge as needing emergency medical attention, then it is not reasonable to expect a person who has no medical background or training to recognize

- 9 -

the emergency nature of her condition. Deborah Rutledge was under the mistaken belief that she was under the care of medical doctors. Nothing in their treatment of her complaints led to her believe that her condition was serious or emergent.

34. Plaintiff's expert, Dr. John C. Steele testified that if Deborah Rutledge was properly diagnosed and treated in a timely manner on July 27, 2004 she would have no permanent disability; that Deborah Rutledge would, within a reasonable degree of medical certainty have only minor urinary symptoms if she had been diagnosed and treated in a timely manner on August 2, 2004; that Deborah Rutledge would have suffered residual symptoms of urinary retention and overflow incontinence but she would not have bowel incontinence and is unlikely to have had significant leg weakness, gait abnormality or painful paresthesiae if she had been diagnosed and treated in a timely manner on August 17, 2004 (Plaintiffs' Exhibit 22).

35. Defendant did not challenge Dr. John C. Steele's opinions on causation.

36. After examining Deborah Rutledge on two separate occasions on June 2, 2006 and again on February 17, 2008 just before trial, Dr. John Steele reviewed and classified her physical deficits and performed a disability rating pursuant to the American Medical Association guides. Dr. Steele found that Deborah Rutledge suffered a "gait disorder" due to her antalgic gait. He further found that Deborah Rutledge suffered from bowel and bladder neurologic disorders and neurologic sexual impairment. He further found that Deborah Rutledge suffered an impairment due to pain or sensory deficit resulting from peripheral nerve disorder, or causalgia. After assessing these impairments under the AMA Guides Dr. Steele assigned a 76 to 96 % whole person disability after the June 2, 2006 examination and increased it to a 88 to 98% whole person disability after the 2008 examination. Dr. Steele explained that this rating was the type of assessment he routinely does in his practice to determine if a person is entitled to medical retirement benefits from the Government of Guam Retirement Fund. The disability assessment is not meant to imply that the person being assessed is totally unable to perform some functions of daily life, as Deborah Rutledge obviously can do, but rather just as an evaluation of her disability of functional capacity when compared to a "normal" population.

37. As a result of the delay in diagnosing Deborah Rutledge's emergent condition of cauda equina syndrome her sacral nerve

roots were irreversibly damaged. Consequently, Deborah Rutledge suffers permanent neurological and genito-urinary injuries and resulting damages in that she has numb buttocks, a numb vagina, a neurogenic bladder, bowel dysfunction and neuropathic pain for which she takes a cocktail of medications. Deborah Rutledge also suffers from paresthesia down the back of legs and feet. Her intermittent neuropathic pain has been described as a searing, burning pain, like a hot poker that could last anywhere from 45 to 60 seconds. This paralyzing pain can strike at any time and anywhere where her spinal nerve roots and their anatomic distributions have been damaged. Deborah Rutledge's current condition is not likely to improve given the fact that it has been almost four years since the date of her injury. The Court finds that Deborah Rutledge is unable to sit like a normal person, unable to walk for an extended period of time without experiencing pain and is permanently disabled as a whole person.

38. As a result of the permanent neurological and genito-urinary injuries of Deborah Rutledge, her husband Thomas Rutledge has suffered the loss of love, companionship consortium and services usually provided by a spouse in good health and of unimpaired vigor and strength. Thomas Rutledge testified that before his wife's injuries, they were always "on the go." They went shopping, to the movies, attended social gatherings and barbeques, went dancing, etc. Presently, Deborah Rutledge prefers to confine herself to the home where she can sleep and rest and have the comfort of her own bathroom available and nearby.

39. Plaintiff Deborah Rutledge, born in December of 1960 was 43 years old when she sustained injury in this case. Her life expectancy, based upon the Actuarial Period Life Table contained in plaintiffs' economic expert's report (Exhibit 23, Tab 7) from the date of injury is 38 years or approximately 13,870 days, 1976 weeks or 456 months.

40. On the matter of economic damages, plaintiffs and defendant each presented expert testimony on Deborah Rutledge's past and future lost income. Plaintiffs presented testimony by Gary Hiles, Chief Economist for the Government of Guam, Department of Labor, whose economic report contained a detailed lost earnings capacity calculation. Mr. Hiles used Deborah Rutledge's history of earnings throughout her life and the growth rate represented in that earnings history to project her future earning capacity.

- 11 -

41. Defendant United States presented testimony by Dr. Laura Taylor, an economist whose report the court finds flawed in two glaring respects. First, Dr. Taylor relied upon a Bureau of Labor Statistics data source for predicting Deborah Rutledge's lost stream of income. She selected three employment categories of cashier, sales clerk and supervisor of food services. Deborah Rutledge's highest employment in the food services industry, however, was as a General Manager at a Wendy's Restaurant. The wages rate of a food services General Manager is significantly higher than the categories selected by Dr. Taylor. The Court finds that Deborah Rutledge's highest earning capacity is that of a fast food restaurant General Manager and therefore Dr. Taylor's basic premise is erroneous and unreliable. Dr. Taylor also reduced Deborah Rutledge's stream of income by 24% based upon an opinion that she was likely to voluntarily remove herself from the workforce for 24% of her remaining work life. The Court finds that based upon Deborah Rutledge's employment history of continued employment, even through child birth, except for the specific period on Guam, the 24% reduction of the amount of lost income attributable to Deborah Rutledge is unreasonable. It is also noted that Dr. Taylor removed Deborah Rutledge from the workforce at age 62, rather than the Social Security full retirement age of 67, before reducing her expected work life by the 24% factor.

42. Mr. Hiles presented a calculation during rebuttal testimony of what the lost income capacity would be utilizing all of Dr. Taylor's assumptions but utilizing the Bureau of Labor Statistics food services General Manager wage rate. (Exhibit 43). The Court finds that using the General Manager wage rate and by adding the 24% reduction back in produces a more appropriate result and one that is remarkably close to Mr. Hiles's other conclusions in his initial report, Exhibit 23. Plaintiffs' Exhibit 43 produces a result of $738,068.00. To reach that result applying a 24% reduction would necessitate an earnings figure of $970,000.00. The Court finds this figure to fairly represent the lost earnings capacity of plaintiff Deborah Rutledge.

43. Deborah Rutledge, testified that she is unable to perform a substantial amount of her normal house chores such as cleaning the bathrooms, vacuuming, laundry and ironing, which she was able to adequately perform prior to her injury. She further testified to two quotes she received from home cleaning services. (Exhibit 29). One of the quotes received by Deborah Rutledge from American Maid was for $50.00 per hour and the other quote from Home Maid Service, Inc. was for the

amount of $95.00 per week after an initial $300.00 deep cleaning for the first visit.

44. The specifics of the economic damages award is set forth below in the Court's discussion on damages.


## CONCLUSIONS OF LAW

### 1. Applicable Law

Since this is an action brought under 28 U.S.C. §1346(b) of the Federal Tort Claims Act, the District Court of Guam will apply Guam law which is where the alleged negligent acts and/or omissions occurred. Warren v. U.S., 999 F.2d. 546 (9th Cir. 1993) citing Brock v. United States, 601 F.2d 976, 978 (9th Cir.1979). Guam law will apply to both substantive tort liability as well as to the nature and measure of damages to be awarded. Lawson v. U.S., 454 F. Supp. 2d 415 (D. Md. 2006).

### 2. Burden of Proof

The plaintiffs in the present case have the burden of proving by the greater weight of evidence the following: 1) defendant owed plaintiffs a duty of care; 2) the alleged acts and omissions of defendant breached that duty of care; 3) defendant's breach of duty is the direct cause of plaintiffs' injuries; and 4) as a result of plaintiffs' injuries, they have suffered damages.

Defendant owed plaintiffs a duty of care to provide healthcare services within a certain standard of care. The standard of care on Guam is defined as "the prevailing standard of duty, practice, or care by a reasonable physician in the same field practicing medicine in the community at the time of the alleged malpractice" (10 GCA §10106). In the instant case, the Court is persuaded by the testimony of plaintiffs' expert, Dr. Gary Towle that the standard of care for midlevel providers in an urgent care clinic such at the AAFB Medical Clinic required that the neurological basis of Deborah Rutledge's complaint of groin numbness be investigated and diagnosed during her visits at the AAFB Medical Clinic and that a consultation with the midlevel provider's physician preceptor on the same day should have been made. The Court finds that the standard of care also required that her treating healthcare providers follow up on her urinary symptoms after the urine analysis did not explain what could be causing it.

At no time during Deborah Rutledge's 3 healthcare visits to the AAFB Medical Clinic did any of her healthcare providers entertain

- 13 -

a differential diagnosis to explain her progressing urinary complaints and continued complaint of numbness in her groin in the context of progressive low back pain and other additional neurologic complaints of pain and numbness in her legs. Plaintiffs' emergency medicine expert testified that a differential diagnosis is a method used by physicians to rank the potential diagnostic possibilities most consistent with a patient's complaints. In all her AAFB Medical Clinic visits, her presenting signs and symptoms were clearly far in excess of what is seen in a normal adult low back pain patient.

On July 27, 2004, Deborah Rutledge already presented with mild symptoms consistent with cauda equina syndrome which was urination frequency, numbness in the groin and 4-5 days low back pain. Dr. Michael Meriwether agreed that most patients do not present with all the characteristics features of cauda equina syndrome (Defendant's Exhibit "A" RUT 401) and because it is impossible in a significant portion of patients to exclude the diagnosis of a prolapsed intervertebral disc in the context of referral with suspected cauda equina compromise. Dr. Meriwether further agreed with the recommendation of the authors of the study he attached to his report that urgent MRI assessment in all patients who present with new onset urinary symptoms in the context of lumbar back pain or sciatica is necessary. (Defendant's Exhibit "A" RUT 404.) Compliance with the standard of care as established by the testimony of Dr. Gary Towle required a recognition of Deborah Rutledge's neurological symptoms as unusual and required at the very least a consultation with a physician preceptor. The Court finds that the treatment provided by Major Giscombe to Deborah Rutledge at the AAFB Medical Clinic on July 27, 2004 fell below the standard of care and was therefore negligent.

On August 2, 2004, Deborah Rutledge presented with additional signs and symptoms indicative of a continuing serious neurological problem. Captain Rau's differential diagnosis of musculoskeletal back pain clearly did not take into consideration Deborah Rutledge's urinary complaints, her complaint of numbness in the groin or her bilateral numbness/pain symptoms in the context of her progressing low back pain. Compliance with the standard of care as established by the testimony of Plaintiff's Expert Dr. Gary Towle, required a recognition of Deborah Rutledge's progressing neurological symptoms as unusual and not typical of an adult low back pain patient which required at the very least a consultation with a physician preceptor. The Court finds that the treatment provided by Captain Rau to Deborah Rutledge at the AAFB Medical Clinic on August 2, 2004 fell below the standard of care and was therefore negligent.

- 14 -

Captain Rau's medical record of his consultation with Deborah Rutledge was never reviewed and/or countersigned by his supervising physician. This failure by a supervising physician to review and countersign his physician assistant's August 2, 2004 medical record within 7 days is below the standard of care established by Guam law (10 G.C.A. §121607(a) and §121607(b)) and is therefore negligent.

On August 17, 2004, Deborah Rutledge presented with worsening neurological symptoms and progressive four weeks low back pain. She was determined to have radiculopathic (radiating) pain to her left lower extremity to foot, positive limp, numbness in her right thigh/ and inferior aspect of right glut/perineal area. At this time an MRI was already being suggested by the radiologist who had given his findings of degenerative disc disease at the L5-S1 and suggested a correlation with the patient's symptoms. Despite these findings, a routine referral was given by the midlevel provider to orthopedics at the US Naval Hospital. Compliance with the standard of care as testified to by Dr. Gary Towle required a recognition of Deborah Rutledge's progressing neurological symptoms as unusual, progressing and alarming which required immediate and urgent consultation with a physician preceptor or a neurological or orthopedic specialist. The Court finds that the treatment provided by Major Giscombe to Deborah Rutledge at the AAFB Medical Clinic on August 17, 2004 fell below the standard of care and was therefore negligent.

Furthermore, on August 17, 2004, Deborah Rutledge's 3rd visit to the AAFB Medical Clinic, Major Giscombe was mandatorily required to comply with 36th Medical Group Instruction 40-112 (Plaintiffs' Exhibit 33). As a midlevel provider, Major Giscombe was mandated to consult with her assigned physician preceptor if a patient's condition has not resolved after the second visit. The Court finds that Major Giscombe's routine referral of Deborah Rutledge to orthopedics at the US Naval Hospital did not constitute compliance with the said AAFB regulatory requirement and was therefore negligent.

It must be noted that Plaintiffs' Exhibit 33 consists of the 36th Medical Group Instruction 40-112 effective June 15, 2005 and January 24, 2007. The 36th Medical Group Instruction 40-112 effective on May 28, 2004 referenced therein and which Major Natalie Giscombe testified was the same, was requested by plaintiffs and never produced by defendant. "[W]here relevant evidence which would properly be part of a case is within the control of a party whose interests it would naturally be to produce it and he fails to do so, without satisfactory explanation, the only inference which the finder of fact may draw is that such evidence would be unfavorable to him. In so holding, we have

- 15 -

noted, '(t)his rule is uniformly applied by the courts and is an integral part of our jurisprudence.'" Pier 67, Inc. v King County, 89 Wash. 2d 379, at 385-6, 573 P. 2d 2, at 6 (1977) citing British Columbia Brewers (1919) Ltd. v. King County, 17 Wash. 2d 437, 455, 135 P. 2d 870, 877 (1943). See also, Albertson's, Inc. v. Arriaga, 2004 WL 2045389 at *2 (Tex. App.)("a party's failure to produce evidence within its control raises the presumption that, if produced, the evidence would operate against him.").

The Court finds that the Plaintiffs have met their burden of proving that defendant United States' employees, namely, now Lt. Col. Giscombe formerly Major Natalie Y. Giscombe, Adult Nurse Practitioner and Captain Steven D. Rau, Certified Physician Assistant had a duty to diagnose and treat plaintiff Deborah Rutledge with the requisite care and skill ordinarily used by healthcare providers in the same field of medicine practicing under similar circumstances and they failed in that duty. Defendant's employees were repeatedly negligent in providing medical care and treatment to Deborah Rutledge in all her visits to their medical facility at the Andersen Air Force Base Clinic on July 27, 2004, August 2, 2004 and August 17, 2004.

Having found repeated acts of negligence and dereliction of duty in the provision of medical treatment to Deborah Rutledge by the healthcare providers at the Andersen Air Force Base Medical Clinic, the Court does not find it necessary to take into consideration the statements made by Dr. Douglas Duncan and Dr. Joseph Orchowski to make a determination that the acts and omissions of the healthcare providers at AAFB medical Clinic fell below the standard of care and therefore negligent.

The Court further finds that the failure by the defendant United States' employees to timely and properly medically treat Deborah K. Rutledge is the direct cause of her neurological injuries and resulting damages, as well as the resulting loss of consortium of Deborah K. Rutledge's husband, Thomas R. Rutledge. No evidence was adduced at trial to show that Deborah Rutledge's injuries and resulting permanent neurological problems and the resulting damages are caused by anything other than the delayed diagnosis of her cauda equina syndrome.

The Court finds that but for the negligent conduct of defendant United States of America, the damages complained of by plaintiffs would not have occurred. The Court is persuaded by the testimony of Dr. John C. Steele, a well-respected neurologist on Guam, that Deborah Rutledge would likely have recovered without any neurological damage if she had been diagnosed and treated in a timely manner on July 27, 2004 (Plaintiffs' Exhibit 22 page 2);

- 16 -

that Deborah Rutledge would, within a reasonable degree of medical certainty have only minor urinary symptoms if she had been diagnosed and treated in a timely manner on August 2, 2004; that Deborah Rutledge would have suffered residual symptoms of urinary retention and overflow incontinence but she would not have bowel incontinence and is unlikely to have had significant leg weakness, gait abnormality or painful paresthesiae if she had been diagnosed and treated in a timely manner on August 17, 2004.

## 3. Damages

In a Federal Tort Claim Act case, the law of the state where the negligence occurred governs substantive tort liability, including the nature and measure of damages to be awarded. <u>Calva-Cerqueira v. US</u>, 281 F.Supp.2d 279 (D.D.C. 2003) citing <u>Richards v. US</u>, 369 U.S. 1, 11, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962).

Under Guam law, there is no limit to the amount of damages that can be awarded to plaintiffs in a medical malpractice case. 10 G.C.A. §10131 specifically states that "damages shall be monetary only and shall be without limitation as to nature or amount unless otherwise provided by law." The only limitation to the award of damages to plaintiffs here is the limitation imposed by the Federal Tort Claims Act which is the amount of the claim presented to the federal agency. In this case, the limit is $11,000,000.00: Deborah K. Rutledge requests an award of $10,000.00 for her economic and non-economic damages and Thomas R. Rutledge requests an award of $1,000,000.00.

7 G.C.A. §16102(a) and (c) defines economic and non-economic losses as follows:

> "(a) Economic loss shall mean any pecuniary loss resulting from harm, including the loss of earnings or other benefits related to employment, medical expense loss, replacement services loss, loss due to death, burial costs, and loss of business or employment opportunities, to the extent recovery for such loss is allowed under applicable local law."

> "(c) Non-economic loss shall mean loss for physical and emotional pain, suffering, inconvenience, physical impairment, mental anguish, disfigurement, loss of enjoyment of life, loss of society and companionship; loss of consortium, other than loss of domestic service; hedonic damages; injury to reputation

- 17 -

and all other non-pecuniary losses of any kind
or nature.

The purpose of compensatory damages is to make the plaintiffs
whole. <u>Fajardo v. Liberty House Guam</u>, 2000 WL 38719 (Guam Terr.)

As to economic damages, plaintiff Deborah Rutledge is entitled to
loss of earnings and earnings capacity and other benefits related
to employment as well as replacement services loss. 7 G.C.A.
§16102(a).

## ECONOMIC DAMAGES

### 1. Loss of earnings and earnings capacity

The Court adopts the calculation of Mr. Hiles in Exhibit 43,
but adds back in the 24% deduction made for voluntary unemployment,
as representing a fair lost wage earning capacity calculation in
the amount of $970,000.00

### 2. Replacement services loss

"Replacement services loss" is an element of economic damage on
Guam. Replacement services loss is the value of obtaining ordinary
and necessary services in lieu of those the injured person would
have performed, not for income, but for the benefit of himself or
herself or his or her family, if he or she had not been injured.
<u>Lenz v. Depositors Insurance Company</u>, 561 N.W.2d 559, 561 (Minn.
App. 1997)

The Court finds that as a result of her permanent neurological
injuries and deficits, Deborah Rutledge, is unable to perform a
substantial amount of her normal house chores such as cleaning the
bathrooms, vacuuming, laundry and ironing, which she was able to
adequately perform prior to her injury. Consequently, the Court
finds that Deborah Rutledge is entitled to compensation for
replacement services loss in the amount of $95.00 per week for the
remainder of her life expectancy of 1,976 weeks, or $187,720.00.
The Court does not find the need to perform a present value
calculation of this amount since any such reduction in value would
most likely be outweighed by the increased costs of such services
in the future.

### NON-ECONOMIC DAMAGES OF DEBORAH RUTLEDGE

As to non-economic damages, plaintiff Deborah Rutledge is entitled
to physical and emotional pain and suffering, inconvenience,

- 18 -

physical impairment, disfigurement and loss of enjoyment of life. An award to plaintiffs for each component itemized above is not considered duplicative. In awarding damages, the court in <u>Scott v. U.S.</u>, 88 F.2d. 1280 (9th Cir. 1989) held that damage awarded for physical impairment and damage awarded for loss of enjoyment of life was not duplicative. Likewise, in <u>Ogden v. J.M. Steel Erecting, Inc.</u>, 201 Ariz. 32, 31 P.3d 806, (2001), the court held that "hedonic damages can be a component of a general damages claim, distinguishable from, and not duplicative of, damages for pain and suffering."

## 1. Pain and suffering

There is no definite and specific rule for a court to follow in arriving at a dollar figure for actual compensation for pain and suffering. In such a case as this, the measure of recovery shall be governed by the enlightened conscience of an impartial judge. Pain and suffering includes mental suffering. Anxiety, shock and worry are examples of what might be included under mental pain and suffering, and loss of capacity to work, labor and enjoy life-separately from monetary earnings-may be considered as an item causing mental suffering. <u>MacDonald v. U.S.</u>, 900 F.Supp. 483, 488 (M.D. Ga. 1995). Since plaintiff's pain and suffering will continue into the future, the court is to award damages for her future pain and suffering, the standard for such award also being the enlightened conscience of the judge. <u>MacDonald</u>, supra.

Plaintiff Deborah Rutledge is fully aware of her many neurological and genito-urinary deficits. She has numbness in her vagina and buttocks and feels that part of her is dead. She suffered and continues to suffer mental anguish when she is told that she will not improve much more than where she is (neurologically and genito-urinarily) now. She will always have a numb buttock, a numb vagina, and a neurogenic bladder for which she takes a cocktail of medications. She has limited control over her bowels and is often constipated. Deborah Rutledge also suffers from paresthesia down the back of her legs and feet. She experiences intermittent neuropathic pain which had been described as a searing, burning pain, like a hot poker that could last anywhere from 45 to 60 seconds. This paralyzing pain can strike anywhere where her spinal nerve roots and their anatomic distributions have been damaged. Her neuropathic pain symptoms appear consistent with her neurological injury because they affect only the areas where her nerves below the L5-S1 distribution have been damaged.

Deborah Rutledge is also conscious and frustrated about her inability to function sexually. Deborah Rutledge has paresthesia and anaesthesia in certain parts of her body and decreased

sensation down her leg and right heel. She has a minimal ankle reflex (1+) on the right and no ankle reflex is present on the left which is evidence of a permanent neurological injury. She gets depressed at times and has had to come to grips with her permanent neurological deficits.

The Court finds that Deborah Rutledge suffers from physical and mental pain and suffering both past, present and future as a result of her permanent neurological and genito-urinary injuries. In determining damages for the future consequences of a tort, a plaintiff must prove with reasonable certainty that the future consequence will occur or is likely to occur. See <u>Wood v. Day</u>, 859 F. 2d 1490, 1492, 1493 (D.C. Cir 1988). The Court is persuaded by the testimony of neurologist, Dr. John Steele, that Deborah Rutledge's neurological deficits are likely to remain as they are and not likely to improve given that she is now almost four (4) years status post.

Plaintiff Deborah Rutledge, born in December of 1960 was 43 years old when she sustained injury in this case. Her life expectancy, based upon the Actuarial Period Life Table contained in plaintiffs' economic expert's report (Exhibit 23, Tab 7) from the date of injury is 38 years or approximately 13,870 days, 1,976 weeks or 456 months.

In <u>Porter v. Tupaz</u>, 1984 WL 48854 (D. Guam, App. Div.), this court sitting in its appellate division capacity over Guam Superior Court cases, held that an award of $1,500.00 per month for 12 months for a "common whiplash" temporary 12 month injury was not an unreasonable or erroneous award. The Court finds that Deborah Rutledge's neurological and genito-urinary injuries are permanent and considerably more severe than a "common whiplash" injury, and thus deserve a substantially higher award than what is reflected in <u>Porter v. Tupaz</u>, supra. The Court further notes that the <u>Porter</u> award was made in 1984, more than 24 years ago.

The Court finds that Deborah Rutledge is entitled to an award for past, present and future physical and mental pain and suffering.

## 2.    Inconvenience

Deborah Rutledge no longer enjoys the convenience of a lot of the things normal people take for granted. She is unable to drive herself to places of interest and must always depend on someone else to take her. She is unable to enjoy the convenience of having normal bowel and bladder movements. Deborah Rutledge takes several medications for her various neurological deficits and must suffer the inconvenience of their side effects. The Court finds that

Deborah Rutledge is entitled to a separate award for past, present and future inconvenience.

## 3. Physical Impairment

Prior to this incident, Deborah Rutledge enjoyed an active sexual life with normal sexual intercourse approximately 2-4 times a week (Plaintiff's Exhibit 21 page 6). As a result of her neurological and genito-urinary injuries, Deborah Rutledge is no longer able to feel her vagina and no longer able to give and receive sexual pleasure. In addition, her neurological deficits and resulting damages have practically rendered her unable to bear a child which both she and her husband had planned to have.

Guam law defines physical disability as a "physical impairment which substantially limits one or more of a person's major life activities" 7 G.C.A. §22101(7). This definition of physical impairment is similarly defined by the American With Disabilities Act, 42 U.S.C. §12102(2)(A). A major life activity is an activity of central importance to daily life, including functions such as caring for oneself, performing manual tasks, seeing, hearing, speaking, breathing, learning, and working which the Supreme Court in <u>Bragdon v. Abbott</u>, 524 U.S. 624, 638, 118 S. Ct. 2196, 2199, 141 L. Ed. 2d 540 (1998) commented upon as a list that is merely illustrative and not exhaustive and thus, it had little difficulty in concluding that reproduction and the sexual dynamics surrounding it are central to the life process itself and is a major life activity.

The Court in <u>McAlindin v. County of San Diego C.A.</u>, 192 F.3d 1226 (1999) stated that "engaging in sexual relations, just like procreation, is a major life activity. The number of people who engage in sexual relations is plainly larger than the number who choose to have children. Moreover, according to the reasoning employed by the Fifth Circuit with respect to working as a major life activity, sexuality is important in how 'we define ourselves and how we are perceived by others' and is a fundamental part of how we bond in intimate relationships" citing <u>EEOC v. R.J. Gallagher Co.</u>, 181 F. 3d 645, 654 (5th Cir. 1999).

The Court finds that Deborah Rutledge is entitled to a separate award for past, present and future physical impairment.

## 4. Disfigurement

As a result of her neurological injuries and the resulting damages therefrom, Deborah Rutledge walks with an altered gait which is a broad-based way of walking to avoid pain and provide stability.

This altered gait has been described by Dr. John C. Steele and Deborah Rutledge's other healthcare providers as an "antalgic gait". Her gait was adequately demonstrated to the Court. A disfigurement caused by an altered gait and which affects a person's overall appearance is a disfigurement of the entire body. Streets v. Tim O'Connell and Son, Inc., 2000 WL 1211522 *1 (Del. Super). Deborah Rutledge's antalgic gait clearly affects her overall appearance and easily identifies her from afar as someone who has suffered a neurological injury. See Humphrey v. U.S., 2006 WL 2850548 at *7 (E.D.Mo.).

The Court finds that disfigurement is an element of damages that plaintiff Deborah Rutledge is entitled to under Guam law.

## 5. Loss of enjoyment of life

Evidence adduced at trial clearly established that there is permanent impairment to Deborah Rutledge's ability to enjoy life. She is constantly in need of rest from feelings of fatigue. Although she is able to engage in activities such as shopping, walking, or even weeding the garden, she has to "pay for it" in terms of pain afterwards as her husband Tom Rutledge testified. Deborah Rutledge has limited her outside excursions and social activities as she tires easily, is usually in pain and prefers to be near her own bathroom where she can spend an otherwise embarrassingly long time in the toilet waiting for her bowel movement to occur. Deborah Rutledge has difficulty sleeping through the night and needs the help of hypnotic medication such as Ambien to sleep. The Court accepts Dr. John Steele's findings that Deborah Rutledge's neurological condition will not likely improve.

## 6. Loss of consortium claim

On Guam, a loss of consortium claim is considered a derivative claim. See Dueñas v. Yama's Co., Inc. F. Supp 1992 WL 97213. As to the claim of Thomas R. Rutledge, a devoted husband who is supportive of his wife's needs, is careful not to impose demands upon his injured wife. Many couples wed repeating the words "in sickness and in health" but most do not imagine a future which includes a seriously injured and partially dependent spouse every hour of every day of each year. Such is the reality for Thomas Rutledge. The Court finds Thomas Rutledge, due to his wife's condition, which is the result of the negligence of the United States and the failure of the AAFB medical Clinic practitioners to act within the standard of care, has experienced and will continue to experience a loss of consortium.

- 22 -

Prior to this incident, Thomas and Deborah Rutledge enjoyed an active sexual life with normal sexual intercourse approximately 2-4 times a week (Plaintiff's Exhibit 21 page 6). As a result of his wife's injuries, they have not engaged in any satisfying sexual activity. Thomas Rutledge testified that they have had sex maybe twice since the injury.

The Court once again notes the decision in _Porter v. Tupaz_, 1984 WL 48854 (D. Guam, App. Div.), where it held that an award of $450.00 per month for 12 months for a spouse's loss of consortium claim based upon a "common whiplash" injury was not an unreasonable or erroneous award. The Court finds that Thomas Rutledge's loss of consortium damages are considerably more severe and permanent than those experienced from a temporary "common whiplash" injury, and thus deserve a substantially higher award than what is reflected in _Porter v. Tupaz_, supra.

Since Thomas Rutledge is younger than his wife, the Court bases his loss of consortium claim on Deborah Rutledge's life expectancy of 38 years or approximately 13,870 days or 456 months.

**CONCLUSION**

For all these reasons, the court grants the plaintiffs Deborah Rutledge and Thomas K. Rutledge the following compensatory damages:

$5,548,000.00 for past, present and future pain and suffering of Deborah Rutledge calculated at $400.00 per day for 13,870 days;

$970,000.00 for past, present and future loss income and other opportunities of Deborah Rutledge;

$187,720.00 for past, present and future replacement services loss of Deborah Rutledge calculated at $95.00 per week for 52 weeks multiplied by 38 years;

$346,750.00 for past, present and future inconvenience of Deborah Rutledge calculated at $25.00 per day for 13,870 days;

$50,000.00 for the permanent disfigurement of Deborah Rutledge;

$1,387,000.00 for past, present and future loss of enjoyment of life of Deborah Rutledge calculated at $100.00 per day for 13,870 days;

$1,500,000.00 for the permanent physical impairment of Deborah Rutledge; and

- 23 -

$1,000,000.00 for past, present and future loss of consortium of Thomas R. Rutledge calculated at $100.00 per day for 13,870 days amounting to $1,387,000.00 but reduced to the $1,000,000.00 limit which is the amount of the claim presented to the federal agency under the FTCA claim (Plaintiffs' Exhibit 2).

The total award to Plaintiff Deborah Rutledge is $9,989,470.00. The total award to Plaintiff Thomas Rutledge is $1,000,000.00.

The Court notes that no damage award is sought by plaintiffs for past or future medical expenses since plaintiffs are eligible for military medical benefits. The damages awarded issued herein is for those itemized above only. No award is made for past or future medical expenses and the judgment entered in this matter does not in any respect include such an award.

Respectfully submittted,

**LAW OFFICE OF ROBERT L. KEOGH**
Attorneys for Plaintiffs

DATE: 3/17/08                    By: _____
                                       **ROBERT L. KEOGH**

- 24 -