1

2

3

4

5

6                          DISTRICT COURT OF GUAM

7                            TERRITORY OF GUAM

8

9

10   DEBORAH K. RUTLEDGE and THOMAS,          Civil Case No. 06-00008
     R. RUTLEDGE,
11
                  Plaintiffs,
12
           vs.
13                                            **FINDINGS OF FACT AND
                                              CONCLUSIONS OF LAW**
14   UNITED STATES OF AMERICA,

15            Defendant.

16

17         This matter came before the court for a bench trial beginning February 19, 2008 and

18   concluding on March 18, 2008.  The Plaintiffs, Deborah K. Rutledge and Thomas R. Rutledge,

19   were represented by Robert L. Keogh, Esq.  The Defendant, the United States of America, was

20   represented by Assistant United States Attorney Mikel Schwab and Special Assistant United States

21   Attorney Katharyne Clarke from Louisiana.  The Plaintiffs brought this medical malpractice action

22   against the United States under the Federal Tort Claims Act.

23         THE COURT, having considered the evidence, oral and documentary, hereby issues the

24   following Findings of Fact and Conclusions of Law pursuant to Rule 52(a) of the Federal Rules

25   of Civil Procedure.[1]

26

27   _____

28         [1]  To the extent that a finding of fact should be deemed a conclusion of law, or a conclusion of law
     deemed a finding of fact, it shall so be considered.

## JURISDICTION AND VENUE

Plaintiffs brought this action under the Federal Tort Claims Act for damages arising out of the alleged negligent acts or omissions of employees of the United States of America ("United States") while acting within the course and scope of their employment under circumstances where the United States, if a private person, would be liable to the Plaintiffs under the laws of Guam, where the acts or omissions complained of occurred. 28 U.S.C. §1346(b); _Nationwide Mut. Ins. Co. v. Liberatore_, 408 F.3d 1158, 1163 (9th Cir. 2005).

Plaintiffs satisfied the conditions precedent to bringing a lawsuit against the United States under the Federal Tort Claims Act. _See_ 28 U.S.C. §§ 2401 and 2675. (Plaintiffs' Trial Ex. 2).

This court has original jurisdiction pursuant to the provisions of 28 U.S.C. §§1331 and 1346(b)(1). Jurisdiction of this court over the United States is invoked pursuant to 28 U.S.C. §2671, _et. seq_.

Venue in the District Court of Guam is proper under 28 U.S.C. §1402 because the negligent acts and omissions complained of occurred on Guam.

## FINDINGS OF FACT

1.      Plaintiff Deborah K. Rutledge ("Mrs. Rutledge") at all times pertinent herein was married to an active duty service member and considered a United States Air Force dependent. As the spouse of an active duty service member, Mrs. Rutledge's primary health care benefits were provided by the Department of Defense through a network of medical clinics and hospitals. (Testimony ("Test.") Mrs. Rutledge, 2/19/08).

2.      Plaintiff Master Sergeant Thomas R. Rutledge ("Master Sergeant Rutledge") was, at all relevant times, an active duty service member in the United States Air Force. (Test. Master Sergeant Rutledge, 3/4/08).

3.      During the months of July and August of 2004, Mrs. Rutledge received medical treatment rendered by government employees of the military health care network located on Guam. (Test. Mrs. Rutledge, 2/19/08).

///

2

### JULY 27, 2004 APPOINTMENT AT ANDERSEN AIR FORCE BASE CLINIC

4.      Mrs. Rutledge received medical care at the Andersen Air Force Base Family Practice Clinic on July 27, 2004, August 2, 2004 and August 17, 2004. (Test. Mrs. Rutledge, 2/19/08, Plaintiffs' Trial Exs. 3, 5, and 8).

5.      Mrs. Rutledge first sought treatment at the Andersen Air Force Base Clinic on July 27, 2004, because when she awoke that morning, "the right side of [her] vagina felt numb." (Test. Mrs. Rutledge, 2/19/08).

6.      Mrs. Rutledge called Andersen Air Force Base Clinic and told the receptionist at the Clinic that she needed an appointment because her vagina felt numb. Specifically, she stated that she needed to see a doctor about her condition. She received an appointment for 2:40 p.m. the same day. (Test. Mrs. Rutledge, 2/19/08).

7.      When Mrs. Rutledge arrived at the Andersen Air Force Base Clinic, personnel provided her with a form called "Low Back Pain - Adult" (hereinafter referred to as "Adult Low Back Pain form"). This form included a checklist of symptoms relevant to the evaluation of low back pain in an adult. (Test. Mrs. Rutledge, 2/19/08, Defendant's Trial Ex. M 5).

8.      Mrs. Rutledge completed the checklist portion of the form. She checked "yes" to the following questions: "pain worse at night in bed," "new urine or stool problems like leakage or incontinence," and "loss of sensation in the groin area." (Test. Mrs. Rutledge, 2/19/08, Defendant's Trial Ex. M 5).

9.      Mrs. Rutledge was seen by Nurse Practitioner Natalie Y. Giscombe on July 27, 2004. At that time, Nurse Practitioner Giscombe was an Air Force officer, holding the rank of Major in the United States Navy, and was licensed to practice as an adult nurse practitioner. (Test. Giscombe, 2/22/08, 3/12/08).

10.      Major Giscombe has since been promoted and presently holds the rank of Lieutenant Colonel (hereinafter referred to as "Lt. Col. Giscombe") in the United States Navy. (Test. Giscombe, 2/22/08).

11.      Lt. Col. Giscombe ordered a urinalysis for Mrs. Rutledge. (Test Giscombe, 2/22/08, Defendant's Trial Ex. M 7).

3

12.     Mrs. Rutledge  remained at the Andersen Air Force Base Clinic  to await the results of the urinalysis.  After Lt. Col. Giscombe received the results, she informed  Mrs. Rutledge that the urinalysis was normal and did not show signs of a urinary tract infection. (Test. Giscombe, 2/22/08).

13.     Lt. Col. Giscombe diagnosed Mrs. Rutledge with right sciatica and prescribed Naproxen, Vicodin, and Flexoril for Mrs. Rutledge. She did not order an x-ray because she believed it was not warranted at that time. (Test. Mrs. Rutledge, 2/19/08, Test. Giscombe, 2/22/08, Defendant's Trial Ex. M 6).

14.     After the urinalysis ruled out the possibility of a urinary tract infection, no further testing was performed to investigate Mrs. Rutledge's complaint of urination frequency.  Lt. Col. Giscombe concluded that since Mrs. Rutledge was "new to Guam," she was drinking a lot of water. In fact, Mrs. Rutledge had arrived on Guam almost ten months before, in October 2003.  (Test. Mrs. Rutledge, 2/19/08, Test. Giscombe, 2/22/08).

15.     Plaintiffs' expert, Dr. Gary Towle, Board Certified in Emergency Medicine, testified that it was below the standard of care to fail to perform further testing to investigate Mrs. Rutledge's complaint of urination frequency after the urinalysis ruled out the possibility of a urinary tract infection.

16.     At the July 27, 2004 appointment, Lt. Col. Giscombe did not address Mrs. Rutledge's complaint of loss of sensation in the groin area. (Mrs. Rutledge, 2/19/08).

17.     At the July 27, 2004 appointment, Lt. Col. Giscombe did not request Mrs. Rutledge to undress during her examination. Lt. Col. Giscombe failed to consult with her physician preceptor.  Lt. Col. Giscombe did not refer Mrs. Rutledge to a specialist. (Test. Mrs. Rutledge, 2/19/08, Test. Giscombe, 2/22/08).

18.     The United States expert, Dr. Michael W. Meriwether, Board Certified in Neurological Surgery, testified that the only accurate way to test for numbness is to have the patient undress so that the affected area is exposed for examination. (Test. Meriwether, 3/10/08).

19.     As a Nurse Practitioner, Lt. Col. Giscombe is considered a midlevel provider. (Plaintiffs' Trial Ex. 33).

4

1  20.     A physician preceptor is a medical doctor in the Air Force who is assigned to a

2  midlevel provider to review their work.  Even though Lt. Col. Giscombe was assigned a particular

3  physician preceptor in July and August of 2004, she was free to consult any one of the three other

4  preceptors at the Andersen Air Force Base Clinic. (Test. Giscombe, 2/22/08).

5  21.     Mrs. Rutledge believed she was being treated by a physician and that Lt. Col.

6  Giscombe was a medical doctor.  Consistent with this belief, even three months after her initial

7  visit to the Andersen Air Force Base Clinic, the Plaintiffs referred to Lt. Col. Giscombe as Dr.

8  Giscombe, when the Plaintiffs wrote a letter of complaint to the United States Air Force in October

9  2004. (Test. Mrs. Rutledge, 2/19/08, Defendant's Trial Ex. Y).

10  22.     The court finds that, even assuming _arguendo_, that Lt. Col. Giscombe informed

11  Mrs. Rutledge that she was a nurse practitioner and not a medical doctor, her actions on July 27,

12  2004, still fell below the standard of care when she failed to consult a physician preceptor about

13  Mrs. Rutledge's case.

14  23.     Mrs. Rutledge's condition did not improve after the July 27, 2008 appointment. Her

15  condition worsened, and she experienced greater numbness in her vaginal area, and experienced

16  numbness in her buttocks, the backs of her thighs, and soles of her feet.  Additionally, she testified

17  that she needed to press on her bladder in order to urinate.  (Test. Mrs. Rutledge, 2/19/08).

18  <u>**AUGUST 2, 2004 APPOINTMENT AT ANDERSEN AIR FORCE BASE CLINIC**</u>

19  24.     Mrs. Rutledge called the Andersen Air Force Base Clinic on August 2, 2004, and

20  insisted on receiving an appointment with a physician for the same day.  She informed the

21  appointment clerk of her inability to urinate without pressing on her bladder, and that the sensation

22  of numbness had spread to her lower body.  Mrs. Rutledge subsequently received an appointment

23  at the Andersen Air Force Base Clinic for treatment that same day. (Test. Mrs. Rutledge, 2/19/08,

24  Defendant's Trial Ex. M 8).

25  25.     Staff at the Andersen Air Force Base Clinic again provided Mrs. Rutledge with the

26  Adult Low Back Pain form. (Test. Mrs. Rutledge, 2/19/08, Defendant's Trial Ex. M 8).

27  26.     Mrs. Rutledge completed the checklist portion of the form.  She checked "yes" to

28  the question "loss of sensation in groin area." (Test. Mrs. Rutledge, 2/19/08, Defendant's Trial Ex.

5

1 M 8).

2　　　27.　　At the second visit, on August 2, 2004, Mrs. Rutledge was seen by Captain Steven

3 Rau ("Capt. Rau"), an Air Force officer and a licensed physician assistant. (Test. Rau, 2/25/08).

4　　　28.　　Mrs. Rutledge informed Capt. Rau of her worsening condition and explained that

5 she was experiencing greater numbness in her vagina, and that the numbness had spread to her

6 buttocks, the backs of her thighs, and soles of her feet.  Additionally, she told Capt. Rau that she

7 needed to press on her bladder in order to urinate. (Test. Mrs. Rutledge, 2/19/08).

8　　　29.　　Capt. Rau documented her complaint as "numbness in her right gluteal/thigh area,

9 pain down her left leg to her calf."  (Defendant's Trial Ex. M 8).

10　　　30.　　Capt. Rau was aware that this was Mrs. Rutledge's second visit to the Andersen Air

11 Force Base Clinic for unresolved back pain and urinary complaints because he had reviewed her

12 previous urinalysis lab results on the computer. (Test. Rau, 2/25/08).

13　　　31.　　On the August 2, 2004 visit, Capt. Rau performed a physical examination of Mrs.

14 Rutledge and ordered L-spine x-rays.  Just like Lt. Col. Giscombe, he did not ask Mrs. Rutledge

15 to undress during his examination.  Capt. Rau also did not perform tests addressing her complaint

16 of numbness. (Test. Rau, 2/25/08, Test. Mrs. Rutledge, 2/19/08).

17　　　32.　　Capt. Rau concluded that Mrs. Rutledge was dehydrated based upon the specific

18 gravity in her July 27, 2004 urinalysis lab results. (Test. Rau, 2/25/08).

19　　　33.　　Capt. Rau told Mrs. Rutledge that a radiologist at the United States  Naval Hospital

20 ("Naval Hospital") would read the x-ray and that the results would be back in one to three weeks.

21 (Test. Rau, 2/25/08).

22　　　34.　　Capt. Rau briefly looked at the x-rays taken on the August 2, 2004 visit, and told

23 Mrs. Rutledge that he did not see any "overtly concerning abnormalities on the x-ray" but that the

24 radiologist at Naval Hospital would be able to examine them more throughly. (Test. Rau, 2/25/08).

25　　　35.　　Capt. Rau prescribed Valium to be taken instead of the Flexoril prescribed by Lt.

26 Col. Giscombe.  Mrs. Rutledge was told to continue the use of both Naproxen and Vicodin. (Test.

27 Rau, 3/12/08, Defendant's Trial Ex. M 9).

28

6

36.     Mrs. Rutledge testified that Capt. Rau told her he would prescribe physical therapy for her back at the Naval Hospital. She testified that Capt. Rau told her to call the Naval Hospital that afternoon to set up an appointment, and in the meantime he would submit her referral for physical therapy at Naval Hospital. (Test. Mrs. Rutledge, 2/19/08).

37.     When Mrs. Rutledge called the Naval Hospital later that afternoon, as instructed by Capt. Rau, she discovered that Naval Hospital had no record of any referral for her. She subsequently called the Andersen Air Force Base Clinic to inform it of the situation, but never received any follow-up.  She concluded that Capt. Rau had changed his mind about her need for physical therapy. (Test. Mrs. Rutledge, 2/19/08).

38.     At the August 2, 2004 appointment, Capt. Rau instructed Mrs. Rutledge to return to the Andersen Air Force Base Clinic if her symptoms failed to improve. (Test. Rau, 3/12/08, Defendant's Trial Ex. M 9).

39.      Just like Lt. Col. Giscombe, Capt. Rau did not consult with his supervising physician preceptor concerning Mrs. Rutledge's condition.  The August 2, 2004 medical record of Mrs. Rutledge by Capt. Rau was neither reviewed nor countersigned by Capt. Rau's physician preceptor at any time. (Test. Rau, 2/25/08).

40.     According to Capt. Rau in August of 2004, not all of the medical records were regularly reviewed by a physician preceptor at the Andersen Air Force Base Clinic.  The policy was for medical doctors to randomly review approximately 10% of a physician assistant's records at the end of every month. (Test. Rau, 2/25/08).

41.     Capt. Rau failed to adequately address and investigate Mrs. Rutledge's complaint of loss of sensation in her groin area. Plaintiffs' expert, Dr. Towle, testified that failing to perform further testing to investigate Mrs. Rutledge's continuing complaint of urination frequency and consult with a supervising physician preceptor was below the standard of care. (Test. Towle 2/25/08).

42.     Mrs. Rutledge believed she was being treated by a physician and that Capt. Rau was a medical doctor.  Consistent with this belief, even three months after her initial visit to the Andersen Air Force Base Clinic, the Plaintiffs referred to Capt. Rau as Dr. Rau, when the Plaintiffs

7

wrote a letter of complaint to the United States Air Force in October 2004. (Test. Mrs. Rutledge, 2/19/08, Defendant's Trial Ex. Y).

43.     The court finds that, even assuming *arguendo*, that Capt. Rau informed Mrs. Rutledge that he was a physician assistant and not a medical doctor, his actions on August 2, 2004, fell below the standard of care when he failed to consult a physician preceptor about her case.

44.     Mrs. Rutledge testified that after her August 2, 2004 appointment, her condition did not improve, so she called the Andersen Air Force Base Clinic for a referral to the Naval Hospital. (Test. Mrs. Rutledge, 2/19/08).

45.     On August 16, 2004, Mrs. Rutledge called the Andersen Air Force Base Clinic for the third time since her symptoms began, complaining of back pain and numbness.  Mrs. Rutledge informed the receptionist that the medication she was taking was not working and she wanted a referral to Naval Hospital. (Test. King, 3/12/08, Defendant's Trial Ex. M 13).

46.     Triage nurse Captain Stephanie King ("Capt. King") returned Mrs. Rutledge's call. Mrs. Rutledge told Capt. King that the medication was not working and that she wanted a referral to the Naval Hospital Orthopedic Clinic.  In order to obtain a referral, Mrs. Rutledge was told she first had to come in for an appointment.  Capt. King scheduled Mrs. Rutledge for a 9:45 a.m. appointment the next day at the Andersen Air Force Base Clinic. (Test. King, 3/12/08, Defendant's Trial Ex. M 13).

### AUGUST 17, 2004 APPOINTMENT AT ANDERSEN AIR FORCE BASE CLINIC

47.     On August 17, 2004, Mrs. Rutledge arrived for her scheduled appointment at the Andersen Air Force Base Clinic.  Upon checking in for her appointment at the reception area, Mrs. Rutledge was again handed the Adult Low Back Pain form.  She refused to fill it out because she had completed it twice in the past and received no relief.  Mrs Rutledge told the staff she would not answer any question on the Adult Low Back Pain form because she was only there to get a referral to Naval Hospital. (Test. Mrs. Rutledge, 2/19/08).

48.     Instead of receiving an immediate referral she was taken to see Lt. Col. Giscombe. On August 17, 2004, Mrs. Rutledge still believed Lt. Col. Giscombe to be a physician. Mrs. Rutledge refused to be examined by Lt. Col. Giscombe, and instead insisted on a referral.  Mrs.

8

1  Rutledge made sure that Lt. Col. Giscombe enter the referral into the computer system in her

2  presence, because the last time a physical therapy referral was ordered by Capt. Rau, it was never

3  transmitted to Naval Hospital.   Lt. Col. Giscombe entered the referral into the computer. The

4  meeting with Lt. Col. Giscombe lasted approximately 10 minutes. (Test. Mrs. Rutledge, 2/19/08).

5       49.    When Lt. Col. Giscombe saw Mrs. Rutledge on August 17, 2004, she recalled

6  previously having examined Mrs. Rutledge on July 27, 2004.  Lt. Col. Giscombe also knew from

7  the record of her x-ray results, that Mrs. Rutledge had been seen at the Andersen Air Force Base

8  Clinic on August 2, 2004. (Test. Giscombe, 2/22/08).

9       50.    Mrs. Rutledge testified that Lt. Col. Giscombe told her after reviewing her chart,

10  that it looked like she had a herniated disc.  Mrs. Rutledge then asked Lt. Col. Giscombe when she

11  was going to be informed of that diagnosis.  Mrs. Rutledge testified that Lt. Col. Giscombe failed

12  to  respond to the question.  (Test. Mrs. Rutledge, 2/19/08).

13       51.    Mrs. Rutledge informed Lt. Col. Giscombe of her worsening condition and

14  explained to her that she experienced greater numbness in her vagina, and that the numbness had

15  spread to her buttocks, the backs of her thighs, and soles of her feet.  Additionally, she testified that

16  she told Lt. Col. Giscombe that she needed to press on her bladder in order to urinate. She told Lt.

17  Col. Giscombe that nothing was getting better, and that her condition was worsening. (Test. Mrs.

18  Rutledge, 2/19/08).

19       52.    Lt. Col. Giscombe did not further investigate Mrs. Rutledge's complaint of vaginal

20  numbness on August 17, 2004. Just like the July 27, 2004 visit, she did not ask Mrs. Rutledge to

21  undress.  Lt. Col. Giscombe failed to perform any tests regarding Mrs. Rutledge's complaints of

22  numbness. (Test. Mrs. Rutledge, 2/19/08).

23       53.    The United States' expert, Dr. Meriwether, testified that the only accurate way to

24  test for numbness is to have the patient undress so that the affected area is exposed for

25  examination. (Test. Meriwether, 3/10/08).

26       54.    Lt. Col. Giscombe knew that the only way to test for numbness in the perineal area

27  would be to perform a vaginal exam and/or a rectal exam.  Just as on July 27, 2004, Lt. Col.

28  Giscombe failed to consult with her physician preceptor and failed to refer Mrs. Rutledge to a

1  specialist. (Test. Giscombe, 2/22/08).

2  55.  Dr. Towle testified that failing to consult with her physician preceptor given Mrs.

3  Rutledge's symptoms, fell below the standard of care owed to Mrs. Rutledge. (Test. Towle,

4  2/25/08).

5  56.  Pursuant to Andersen Air Force Base 36th Medical Group Instruction 40-112

6  (Plaintiffs' Trial Ex. 33), which was in effect in July and August 2004, as a mid-level provider, Lt.

7  Col. Giscombe was required to refer her patient to her assigned physician preceptor as her patient

8  had not improved after the second visit.  Because Lt. Col. Giscombe was referring Mrs. Rutledge

9  to higher specialty care, she did not think it was necessary to refer Mrs. Rutledge to her physician

10  preceptor. (Test. Giscombe, 2/22/08).

11  57.  Lt. Col. Giscombe discontinued the use of Naproxen, as Mrs. Rutledge said it was

12  ineffective, and instead prescribed Vioxx for pain. (Test. Giscombe, 2/22/08, Defendant's Trial Ex.

13  M 15).

14  ## ORTHOPEDIST REFERRAL TO NAVAL HOSPITAL

15  58.  The referral given by Lt. Col. Giscombe to Mrs. Rutledge on August 17, 2004, was

16  a *routine referral* and not an *emergency or urgent referral* with an orthopedist at the Naval

17  Hospital.  As a result, Mrs. Rutledge was not given an appointment to see an orthopedist at the

18  Naval Hospital until August 23, 2004. (Test. Giscombe, 2/22/08, emphasis added).

19  59.  Mrs. Rutledge's condition did not improve during the period between her August

20  17, 2004 appointment, and her scheduled August 23, 2004 appointment.  She testified that during

21  that time she was in constant pain and had difficulty sleeping. (Test. Mrs. Rutledge, 2/19/08).

22  60.  Super Typhoon Chaba was approaching Guam over the weekend of August 21,

23  2004.  Due to the impending storm, the Naval Hospital called Mrs. Rutledge on August 22, 2004,

24  to cancel the orthopedic appointment scheduled for August 23, 2004.  She was told that the

25  appointment would be rescheduled after the storm passed, and that she would be among one of the

26  first people called to reschedule and given one of the earliest appointment times, since her

27  appointment had been scheduled for Monday morning. (Test. Mrs. Rutledge, 2/19/08, Test. Master

28  Sergeant Rutledge, 3/4/08).

61.     On or about August 24, 2004, Mrs. Rutledge experienced an episode of fecal incontinence while she was vacuuming. She attributed this event to stress. She considered it an "accident" and was ignorant of the medical significance of this event. (Test. Mrs. Rutledge, 2/19/08).

62.     Mrs. Rutledge neither called 911 nor sought immediate medical care following her episode of fecal incontinence.  Mrs. Rutledge testified that both Lt. Col. Giscombe and Capt. Rau never informed her that she should seek immediate medical attention if she experienced fecal incontinence. (Test. Mrs. Rutledge, 2/19/08, Test. Master Sergeant Rutledge, 3/4/08, Defendant's Trial Ex. N 1).

63.     No one from the Naval Hospital called between August 22 and August 25, 2004 to reschedule Mrs. Rutledge's appointment.  On August 25, 2004, Mrs. Rutledge called the Naval Hospital to reschedule her orthopedic appointment.  She insisted on receiving an appointment for that week.  She received an appointment for August 27, 2004. (Test. Mrs. Rutledge, 2/19/08).

64.     On August 27, 2004, Mrs. Rutledge was seen at the Naval Hospital by orthopedic surgeon, Dr. Douglas Duncan. Because she felt she was unable to drive herself,  Mrs. Rutledge's neighbor drove her to the appointment. (Test. Mrs. Rutledge, 2/19/08).

65.     Mrs. Rutledge informed Dr. Duncan of all of her symptoms, including the numbness in her vaginal area, buttocks, the backs of her thighs, and soles of her feet.  She did not immediately inform him of her episode of fecal incontinence.  However, she told him about the episode when he questioned her about her bladder and bowel problems.  Based on the history of her symptoms, Dr. Duncan had Mrs. Rutledge undress and performed a physical examination which included a rectal exam and a post void residual urine examination. He determined that she had little to no rectal tone, was incontinent of bowel, and was experiencing symptoms of Cauda Equina Syndrome. He immediately arranged for Mrs. Rutledge to be admitted to the Naval Hospital pending an emergency medical air evacuation to the Tripler Army Medical Center in Hawaii. (Test. Mrs. Rutledge, 2/19/08, Test. Duncan, 2/22/08).

66.     On August 27, 2004, Dr. Duncan immediately diagnosed Mrs. Rutledge with Cauda Equina Syndrome, and noted on his report that she had the condition for approximately three

11

1    weeks.[2] (Test. Duncan, 2/22/08).

2    <u>**IMMEDIATE TRANSFER TO HAWAII'S TRIPLER ARMY MEDICAL CENTER**</u>

3    67.    Dr. Joseph Orchowski ("Dr. Orchowski"), a neurosurgeon at Hawaii's Tripler Army

4    Medical Center, had agreed, upon telephone consultation with Dr.  Duncan, to accept Mrs.

5    Rutledge for emergency care.  Upon arrival at Tripler Army Medical Center, on August 27, 2004,

6    Dr. Orchowski ordered a magnetic resonance imaging test ("MRI"), which confirmed the

7    preliminary diagnosis of a large herniated L5-S1 disc causing Cauda Equina Syndrome. As a result,

8    Dr. Orchowski performed an emergency diskectomy. (Deposition of Dr. Orchowski, 3/1/07, p. 10-

9    17).

10    68.    Plaintiffs met with Dr. Orchowski after the surgery in preparation for their return

11    to Guam. At that time, Dr. Orchowski told them that it may take up to two years for Mrs.

12    Rutledge's neurological symptoms to improve. He  further stated that "it was unfortunate that the

13    disc set [on Mrs. Rutledge's nerves] for three weeks."[3] (Test. Mrs. Rutledge, 2/20/08).

14    69.    Mrs. Rutledge ran into Capt. Rau in the spring of 2005 at the Andersen Air Force

15    Base Health and Wellness Center, where he told her, "I'm sorry for what happened to you." (Test.

16    Rau, 2/25/08).

17    <u>**DR. MERIWETHER'S TESTIMONY**</u>

18    70.    The United States failed to present any testimony on the standard of care for

19    negligence actions on Guam, nor did it address the standard of care when cross examining any of

20    the Plaintiffs' medical expert witnesses.[4]

21    ───────────────

22    [2]  The court notes the professionalism and quick thinking exhibited by Dr. Duncan, who
23    had only arrived on Guam six days before.  Although Guam was Dr. Duncan's first duty station
      as an orthopedic surgeon, he immediately recognized the gravity of Mrs. Rutledge's situation
24    and took quick action to address the damage to Mrs. Rutledge's nerves and to prevent further
      damage from occurring.
25

26    [3]  At trial on March 13, 2008, the court ruled that the statement made by Dr. Orchowski
      was non-hearsay as admission by a party opponent.
27

28    [4]  The court finds it disturbing that the United States attorneys failed to present a
      defense in this regard, particularly in light of the fact that millions of dollars were at risk in this
      action.

12

71.     The United States presented expert opinion testimony through Dr. Michael W. Meriwether, who testified on cross examination that typical symptoms of Cauda Equina Syndrome include: pain, saddle anesthesia (numbness in groin and perineal areas), bowel or bladder dysfunction (including incontinence, retention, constipation, and urination frequency) and bilateral symptoms.  Dr. Meriwether testified that the appearance of these symptoms would constitute an emergency situation, and would need to be addressed immediately.  (Test. Meriwether, 3/10/08).

72.     Dr. Meriwether also testified that not all Cauda Equina Syndrome patients present with all the signs and symptoms of Cauda Equina Syndrome. (Defendant's Trial Ex. A, RUT 399).

73.     The medical records of Mrs. Rutledge's first visit to the Andersen Air Force Base Clinic on July 27, 2004 contained signs and symptoms indicative of Cauda Equina Syndrome. On that day, Mrs. Rutledge complained of loss of sensation in the groin area (saddle anesthesia), with 4-5 days low back pain and a new urinary symptom identified as urination frequency. (Defendant's Trial Ex. M 5).

74.     Dr. Meriwether admitted that three of the four symptoms of Cauda Equina Syndrome that he listed in his testimony were present at Mrs. Rutledge's July 27, 2004 visit. (Test. Meriwether, 3/10/08).

75.     Dr. Meriwether testified that it is his personal practice to make his patients undress at least to their undergarments when testing for numbness. He testified that in order to accurately test for perineal numbness, a patient would have to remove both their clothes and undergarments. (Test. Meriwether, 3/10/08).

76.     The August 2, 2004 medical records from the Andersen Air Force Base Clinic demonstrate a progressing deterioration of Mrs. Rutledge's neurological condition specifically involving her sacral nerve roots. By August 2, 2004, her symptoms had become bilateral and were described as numbness in her right gluteal/perineal area, and pain down her left leg. (Defendant's Trial Ex. M 8).

77.     By the time Mrs. Rutledge sought further treatment on August 17, 2004, she had a positive limp clearly indicating a continued progressive decline of her condition. (Defendant's Trial Ex. M 14-15).

13

78.     When Mrs. Rutledge presented at the Naval Hospital on August 27, 2004, with a history of two days fecal incontinence, her condition was immediately diagnosed as Cauda Equina Syndrome.  Her rectal tone was altered, and she had urine retention as confirmed by a urine residual analysis test.  An MRI taken several hours later in Hawaii confirmed the diagnosis. (Test. Duncan, 2/22/08).

79.     Dr. Meriwether testified that the key to diagnosing Cauda Equina Syndrome in a patient is by taking an MRI. An MRI, though available on Guam in July and August 2004, was not taken of Mrs. Rutledge's lumbosacral spine at any time during her treatment at the Andersen Air Force Base Clinic on July 27, 2004, August 2, 2004 and August 17, 2004. (Defendant's Trial Ex. M 5).

80.     The court finds that the signs and symptoms of Cauda Equina Syndrome were already present when Mrs. Rutledge consulted at the Andersen Air Force Base Clinic on July 27, 2004, August 2, 2004 and August 17, 2004.

81.     The healthcare providers at the Andersen Air Force Base Clinic failed to recognize the alarming neurological symptoms of Mrs. Rutledge as needing emergency medical attention. Mrs. Rutledge was under the mistaken belief that she was under the care of medical doctors. Nothing in their treatment of her complaints led her to believe that her condition was serious or emergent.  It is reasonable that the emergency nature of Mrs. Rutledge's condition would not be immediately apparent to Mrs. Rutledge, a woman with zero medical background or training.

### DR. STEELE'S TESTIMONY

82.     Plaintiffs' expert, Dr. John C. Steele ("Dr. Steele"), a neurologist,  testified that if Mrs. Rutledge had been properly diagnosed and treated in a timely manner on July 27, 2004, she would not suffer from permanent disability today. (Test. Steele, 3/3/08).

83.     Dr. Steele testified, within a reasonable degree of medical certainty, that if Mrs. Rutledge had been properly diagnosed and treated in a timely manner on August 2, 2004, she would have only minor residual urinary symptoms. (Test. Steele, 3/3/08).

84.     Dr. Steele testified that if Mrs. Rutledge had been  properly diagnosed and treated in a timely manner on August 17, 2004, Mrs. Rutledge would have suffered residual symptoms of

14

urinary retention and overflow incontinence, but she would not have bowel incontinence and it would be unlikely for her to have significant leg weakness, gait abnormality, or painful paresthesiae. (Plaintiffs' Trial Ex. 22, Test. Steele, 3/3/08).

85. Dr. Steele personally examined Mrs. Rutledge on two separate occasions, on June 2, 2006, and on February 17, 2008. Dr. Steele reviewed and classified her physical deficits and performed a disability rating pursuant to the American Medical Association Guidelines. Dr. Steele found that Mrs. Rutledge suffered a "gait disorder" due to her antalgic gait. He further found that she suffered from bowel and bladder neurological disorders and neurological sexual impairment. (Test. Steele, 2/29/08).

86. After assessing these impairments under the American Medical Association Guidelines, Dr. Steele assigned a 76 to 96 percent whole person disability after the June 2, 2006 examination and increased it to an 88 to 98 percent whole person disability after the February 17, 2008 examination. (Test. Steele, 2/29/08).

87. Dr. Steele routinely performs this type of assessment in his practice to determine if a person is entitled to medical retirement benefits from the Government of Guam Retirement Fund. The disability assessment is not meant to imply that the person being assessed is totally unable to perform some functions of daily life, but rather it is an evaluation of a person's disability of functional capacity when compared to a "normal" population. (Test. Steele, 3/3/08).

### The Suffering of Mrs. Rutledge and Master Sergeant Rutledge

88. As a result of the delay in diagnosing Mrs. Rutledge's worsening condition of Cauda Equina Syndrome, her sacral nerve roots were irreversibly damaged. Consequently, Mrs. Rutledge suffers permanent neurological and genito-urinary injuries and resulting damages. She has numb buttocks, a numb vagina, a neurogenic bladder, bowel dysfunction and neuropathic pain for which she takes several different medications. Mrs. Rutledge also suffers from paresthesia down the back of her legs and feet. Her intermittent neuropathic pain has been described as a searing, burning pain that could last anywhere from 45 to 60 seconds. This paralyzing pain can strike at any time and in any part of her body where her spinal nerve roots and their anatomic distributions have been damaged. Mrs. Rutledge's current condition is not likely to improve given

15

the fact that it has been four years since the date of her injury.  Mrs. Rutledge has difficulty sleeping through the night and relies on hypnotic medication such as Ambien. She is unable to sit like a normal person, unable to walk for an extended period of time without experiencing pain, and is permanently disabled as a whole person.  (Plaintiffs' Trial Ex. 21).

89.     As a result of Mrs. Rutledge's  permanent neurological and genito-urinary injuries, her husband, Master Sergeant Rutledge has suffered the loss of love, companionship, consortium, and services usually provided by a spouse in good health and of unimpaired vigor and strength. Before his wife's injuries, the couple was always "on the go."  They went shopping, to the movies, attended social gatherings and barbeques, went dancing, and bowling. Presently, Mrs. Rutledge confines herself to her home where she can sleep, rest, and have the comfort of her own bathroom readily available and close by.  (Test. Mrs. Rutledge, 2/20/08, Test. Master Sergeant Rutledge, 3/4/08).

90.     Prior to this incident, Master Sergeant Rutledge and Mrs. Rutledge enjoyed an active sexual life with normal sexual intercourse approximately 2-4 times a week (Plaintiffs' Trial Ex. 21 p. 6). As a result of his wife's injuries, they have not engaged in any satisfying sexual activity. Master Sergeant  Rutledge testified that they have had sex "maybe twice" in the past year. (Test. Master Sergeant Rutledge, 3/4/08).

## TESTIMONY OF ECONOMIC EXPERTS

91.     Plaintiff Deborah K. Rutledge, born in December of 1960, was 43 years old when she sustained injuries in this case. Her life expectancy, based upon the <u>United States Life Tables 2003</u>, from National Center for Health Statistics, contained in the United States' economic expert's report from the date of injury is 38.3 years to age 81.9. (Defendant's Trial Ex. U).

92.     On the matter of economic damages, Plaintiffs and Defendant each presented expert testimony on Mrs. Rutledge's past and future lost income. Plaintiffs presented testimony by Gary Hiles, Chief Economist for the Government of Guam, Department of Labor. ("Mr. Hiles").

93.      Mr. Hiles used Mrs. Rutledge's history of earnings throughout her life and the growth rate represented in that earnings history to project her future earning capacity through regression analysis. (Test. Hiles, 3/5/08).

16

94.     The United States presented testimony by Dr. Laura Taylor ("Dr. Taylor"), who has a Ph.D. in Economics and has testified in various other courts as a forensic economic consultant.

95.     In calculating the lost earning capacity of Mrs. Rutledge, Dr. Taylor used the mean annual earnings in each of the occupations of Cashier, Retail Sales, and Supervisor of Food Service. The base wage for Supervisor of Food Service is higher than the employment history wage used by Mr. Hiles in his calculations.  (Test. Taylor, 3/6/08).

96.     Dr. Taylor testified that her calculations for earnings in each of these three occupations included fringe benefits, payroll taxes, and the discount rate.  She also made two separate calculations of each of these three occupations: one that included income taxes and one that excluded income taxes. (Test. Taylor, 3/6/08, Defendant's Trial Ex. U).

97.     Beginning in 2005 all of Dr. Taylor's calculations on Mrs. Rutledge's earnings are reduced by the 0.76 employment factor to account for statistically expected periods of voluntary unemployment.  No involuntary unemployment was assumed. (Defendant's Trial Ex. U).

98.     In predicting loss of income, it is important to consider Mrs. Rutledge's past work history.  Mrs. Rutledge testified at trial about her history of employment.  Her highest salary earned was when she was a general manager at a Wendy's restaurant.  (Test. Mrs. Rutledge, 2/20/08).

99.     Mrs. Rutledge has been employed throughout her adult life.  She began working as a cashier in 1978 at the age of 17 at a Kentucky Fried Chicken restaurant.  She worked there until 1981.  She then went to work for Wendy's.  She worked there for 12 years.  She started as a cashier, then was subsequently promoted to shift manager, assistant manager, co-manager, and finally as a general manager.  She became a general manager in 1991-1992.  She made roughly $21,000 per year as a general manager.  She resigned from her position at Wendy's in 1993, to try something different and to spend more time with her child.  (Test. Mrs. Rutledge, 2/20/08).

100.     She returned to work for Wendy's in 1998.  She started as a co-manager, then became general manager.  She worked as a general manager until a month before her marriage, in May 2001.  She resigned to prepare for the wedding and pack up her house, when she moved.  She went back to work in August of 2001, as a receptionist for an optometrist, and was also studying

17

to become an optician. She worked until May 2003, when she resigned because she was planning on attending college. Instead, in June of 2003, Master Sergeant Rutledge received orders to deploy to Guam. (Test. Mrs. Rutledge, 2/20/08).

101. Mrs. Rutledge did not work while on Guam. At the time Mrs. Rutledge developed Cauda Equina Syndrome, she was unemployed. Her original plan while on Guam was to remain voluntarily unemployed, and after she left Guam she would go to college to become a librarian, or become a manager at Wendy's. However, she changed her mind and applied to work at a pet store because she was bored and wanted part-time work. (Test. Mrs. Rutledge, 2/20/08).

102. Mrs. Rutledge has not been employed since leaving her receptionist position in 2003. She does not believe she is currently employable because she takes medicine that makes her drowsy, she does not drive, and, if she feels ill, she either spends the day in bed or on her couch. (Test. Mrs. Rutledge, 2/20/08).

103. After a careful review of the documents and analysis prepared by both economists, the court is persuaded by the testimony of the United States' expert, Dr. Taylor, and uses her calculations in determining damages as they concern loss of income.[5]

104. Plaintiffs' economic expert's report has credited Mrs. Rutledge twice for the same benefit by including both the employer's social security tax paid on Mrs. Rutledge's behalf during her work years as a fringe benefit received by Mrs. Rutledge and by including that same benefit during her retirement years in his calculations of her lost social security benefits. (Plaintiffs' Trial Ex. 23).

105. At the same time, Plaintiffs' economic expert's report has failed to account for the mandatory tax that Mrs. Rutledge would have to pay out of her earnings during her work life in order to participate in the social security system in her retirement years. (Plaintiffs' Trial Ex. 23).

106. Plaintiffs' economic expert's report also failed to account for statistically expected periods of voluntary unemployment. (Plaintiffs' Trial Ex. 23).

107. Plaintiffs' economic expert's report extended Mrs. Rutledge's work life to a

---

[5] The court was very impressed with the credentials, expert report, and testimony at trial of the United States economic expert, Dr. Laura J. Taylor.

1   statistically improbable age. (Plaintiffs' Trial Ex. 23).

2       108.    Plaintiffs' economic expert's report increased Mrs. Rutledge's earnings at the

3   aggressive, and highly improbable rate of 5%. This is almost twice the projected long-run rate of

4   inflation. This rate also exceeds projections of average wage growth across all occupations.

5   (Plaintiffs' Trial Ex. 23).

6       109.    Mrs. Rutledge testified that she is unable to perform a substantial amount of her

7   normal household chores such as cleaning, vacuuming, laundry and ironing, which she was able

8   to perform prior to her injury. She further testified to two quotes she received from home cleaning

9   services. One of the quotes received by Mrs. Rutledge from American Maid was for $50.00 per

10  hour and the other quote from Home Maid Service, Inc. was for the amount of $95.00 per week

11  after an initial $300.00 deep cleaning for the first visit. (Plaintiffs' Trial Ex. 29).

12      110.    The specifics of the economic damages award is set forth below in the court's

13  discussion on damages.

14                                  <u>**Conclusions of Law**</u>

15      Under the Federal Tort Claims Act, the United States is liable in damages to an injured

16  party for injuries arising from a negligent act or omission of its employees, if a private person

17  would be liable under the law of the place where the act or omission occurred. *See* 28 U.S.C. §

18  1346(b); *Mass. Bonding & Ins. Co. v. United States*, 352 U.S. 128, 128-29 (1956).

19      Whether the United States is liable for the negligence of its employees is a question of state

20  law.  See 28 U.S.C. §§ 1346(b).  Accordingly, the court will apply Guam law, which is where the

21  alleged negligent acts and/or omissions occurred. *Brock v. United States*, 601 F.2d 976, 978 (9th

22  Cir.1979).  Guam law will apply to both substantive tort liability as well as to the nature and

23  measure of damages to be awarded.  *See Lawson v. United States*, 454 F. Supp. 2d 373, 417 (D.

24  Md. 2006).

25      The Plaintiffs in the present case have the burden of proving, by the greater weight of

26  evidence, the following: 1) United States owed Plaintiffs a duty or obligation, recognized by law,

27  requiring the United States to conform to a certain standard of conduct, for the protection of others

28  against unreasonable risks of harm; 2) a breach of that duty by the United States, or failure to

19

1  conform to the required standard; 3) the breach of duty by the United States is the proximate cause

2  of Plaintiffs' injuries; and 4) as a result of Plaintiffs' injuries, they have suffered actual loss or

3  damages.  *Merchant v. Nanyo Realty, Inc.*, 1998 Guam 26 ¶ 14.

4  **S**TANDARD OF **C**ARE

5      The Defendant, United States, is required to provide healthcare services within a certain

6  standard of care. The standard of care on Guam is defined as "[t]he prevailing standard of duty,

7  practice, or care by a reasonable physician in the same field practicing medicine in the community

8  at the time of the alleged malpractice." (10 GCA §10106).

9      Although there is no Guam law on the issue of standard of care, generally in cases of

10  medical malpractice what is or is not the proper standard is a question for experts and it should be

11  established only by their expert testimony.  "In professional malpractice cases, expert opinion

12  testimony is required to prove or disprove that the defendant performed in accordance with the

13  prevailing standard of care, except in cases where the negligence is obvious to laymen." *See*

14  *Garibay v. Hemmat*, 161 Cal.App. 4th 735, 741, 74 Cal.Rptr.3d 715, 719 (Ct. App. 2008) (quoting

15  *Kelley v. Trunk*, 66 Cal.App. 4th 519, 523, 78 Cal.Rptr.2d 122 (Ct. App. 1998)).

16      The court finds from the testimony of Plaintiffs' expert, Dr. Towle, that the standard of care

17  for midlevel providers in an urgent care clinic such as the Andersen Air Force Base Clinic required

18  that the neurological basis of Mrs. Rutledge's complaint of groin numbness be investigated and

19  diagnosed during her visits at the Andersen Air Force Base Clinic and that a consultation with the

20  midlevel provider's physician preceptor on the same day should have been made. The court finds

21  that the standard of care also required that her treating healthcare providers follow up on her

22  urinary symptoms after the urinalysis did not explain what could be causing  said symptoms.

23  **F**AILURE TO **C**ONFORM TO **R**EQUIRED **S**TANDARD OF **C**ARE

24      At no time during Mrs. Rutledge's three healthcare visits to the Andersen Air Force Base

25  Clinic did any of her healthcare providers investigate a differential diagnosis to address her

26  progressing urinary complaints.  Nor did her healthcare providers address her continued complaint

27  of numbness in her groin in the context of progressive low back pain and other additional

28  neurological complaints of pain and numbness in her legs.

20

Plaintiffs' expert, Dr. Towle, testified that a differential diagnosis is a method used by physicians to rank the potential diagnostic possibilities most consistent with a patient's complaints. In all three of Mrs. Rutledge's Andersen Air Force Base Clinic visits, her presenting signs and symptoms were clearly far in excess of what is seen in a normal adult patient experiencing low back pain.

On her first visit to the Andersen Air Force Base Clinic on July 27, 2004, Mrs. Rutledge already presented with mild symptoms consistent with Cauda Equina Syndrome; specifically urination frequency, numbness in the groin and 4-5 days of low back pain.  Dr. Meriwether agreed that most patients do not present with all of the symptoms characteristics of Cauda Equina Syndrome (Defendant's Trial Ex. A, RUT 401), because it is impossible, in a significant portion of patients, to exclude the diagnosis of a prolapsed intervertebral disc with suspected cauda equina compromise.  Dr. Meriwether further agreed with the recommendation of the authors of the study he attached to his report that urgent MRI assessment is necessary in all patients who present with new onset urinary symptoms in the context of lumbar back pain or sciatica. (Defendant's Trial Ex. A, RUT 404).  Compliance with the standard of care as established by the testimony of Dr. Towle required a recognition of Mrs. Rutledge's neurological symptoms as unusual and required, at the very least, a consultation with a physician preceptor. The court concludes that the treatment provided by Lt. Col. Giscombe to Mrs. Rutledge at the Andersen Air Force Base Clinic on July 27, 2004 fell below the standard of care required under the circumstances and the overall treatment was therefore negligent.

On August 2, 2004, Mrs. Rutledge presented with additional signs and symptoms indicative of a continuing serious neurological problem.   Capt. Rau's differential diagnosis of musculoskeletal back pain clearly did not take into consideration Mrs. Rutledge's urinary complaints, her complaint of numbness in the groin or her bilateral numbness and pain symptoms in the context of her progressing low back pain. Compliance with the standard of care as established by the testimony of Dr. Towle required a recognition of Mrs. Rutledge's progressing neurological symptoms as unusual and not typical of an adult low back pain patient which required at the very least a consultation with a physician preceptor. The court concludes that the treatment

provided by Capt. Rau to Mrs. Rutledge at the Andersen Air Force Base Clinic on August 2, 2004, fell below the standard of care owed to Mrs. Rutledge and the overall treatment was therefore negligent.

Capt. Rau's medical record of his consultation with Mrs. Rutledge was neither reviewed nor countersigned by his supervising physician. This failure by a supervising physician preceptor to review and countersign his physician assistant's August 2, 2004 medical record within 7 days is below the standard of care established by Guam law, (10 G.C.A. §121607(a) and (b)), and the overall treatment is therefore negligent.

On August 17, 2004, Mrs. Rutledge presented with worsening neurological symptoms and four weeks of progressively worsening low back pain. She was determined to have 'radiculopathic (radiating) pain to her left lower extremity to foot, positive limp, numbness in her right thigh/ and inferior aspect of right glut/perineal area.' (Defendant's Trial Ex. M 14).

At that time an MRI was already being suggested by the radiologist who had given his findings of degenerative disc disease at the L5-S1 and suggested a correlation with the patient's symptoms. (Defendant's Trial Ex. M 11).  Despite these findings, a *routine referral* was given by the midlevel provider to orthopedics at the Naval Hospital. (Emphasis added).

Compliance with the standard of care as testified to by Dr. Towle required a recognition of Mrs. Rutledge's progressing neurological symptoms as unusual, progressing, and alarming which required *immediate and urgent consultation* with a physician preceptor or a neurological or orthopedic specialist. The court concludes that the treatment provided by Lt. Col. Giscombe to Mrs. Rutledge at the Andersen Air Force Base Clinic  on August 17, 2004 fell below the standard of care owed to her and the overall treatment was therefore negligent. (Emphasis added).

Furthermore, on August 17, 2004, Mrs. Rutledge's third visit to the Andersen Air Force Base Clinic, Lt. Col. Giscombe was mandatorily required to comply with 36th Medical Group Instruction 40-112 (Plaintiffs' Trial Ex. 33). As a midlevel provider, Lt. Col. Giscombe was mandated to consult with her assigned physician preceptor if a patient's condition had not resolved after the second visit. The court concludes that Lt. Col. Giscombe's *routine referral* of Mrs. Rutledge to orthopedics at the Naval Hospital did not constitute compliance with the said Andersen

22

1    Air Force Base regulatory requirement and therefore the overall treatment rendered to Mrs.

2    Rutledge was negligent. (Emphasis added).

3        It must be noted that Plaintiffs' Exhibit 33 consists of the 36th Medical Group Instruction

4    40-112 effective June 15, 2005 and January 24, 2007. Plaintiffs assert that the 36th Medical Group

5    Instruction 40-112, effective on May 28, 2004, referenced therein and which Lt. Col. Giscombe

6    testified was the same, was requested by Plaintiffs and never produced by the Defendant during

7    discovery. "[W]here relevant evidence which would properly be part of a case is within the control

8    of a party whose interests it would naturally be to produce it and he fails to do so, without

9    satisfactory explanation, the only inference which the finder of fact may draw is that such evidence

10   would be unfavorable to him. In so holding, we have noted, '(t)his rule is uniformly applied by the

11   courts and is an integral part of our jurisprudence.'" *Pier 67, Inc. v King County*, 89 Wash. 2d 379,

12   385-6, 573 P. 2d 2, 6 (1977) (citing *British Columbia Brewers (1918) Ltd. v. King County*, 17

13   Wash. 2d 437, 455, 135 P. 2d 870, 877 (1943)), *see also Albertson's, Inc. v. Arriaga*, No.

14   04-03-00697-CV, 2004 WL 2045389, at *2 (Tex. App. Sept. 14, 2004)("[A] party's failure to

15   produce evidence within its control raises the presumption that, if produced, the evidence would

16   operate against him.").  This is the case here.

17   **<u>DEFENDANT'S BREACH OF DUTY IS THE PROXIMATE CAUSE OF PLAINTIFFS' INJURIES</u>**

18       The court concludes that the Plaintiffs have met their burden of proving that the United

19   States' employees, namely, Lt. Col. Natalie Y. Giscombe, Adult Nurse Practitioner, and Capt.

20   Steven D. Rau, Certified Physician Assistant, had a duty to diagnose and treat Mrs. Rutledge with

21   the requisite care and skill ordinarily used by healthcare providers in the same field of medicine

22   practicing under similar circumstances, and they failed in that duty. The United States' employees

23   were repeatedly negligent in providing medical care and treatment to Mrs. Rutledge in all her visits

24   to their medical facility at the Andersen Air Force Base Clinic, namely, on July 27, 2004, August

25   2, 2004 and August 17, 2004.

26       The court further concludes that the failure by the United States' medical employees to

27   timely and properly treat Mrs. Rutledge is the direct cause of her neurological injuries and resulting

28   damages, as well as the resulting loss of consortium of Mrs. Rutledge's husband, Master Sergeant

23

1  Rutledge. No evidence was adduced at trial to show that Mrs. Rutledge's injuries and resulting

2  permanent neurological problems and the resulting damages were caused by anything other than

3  the delayed diagnosis of her Cauda Equina Syndrome.

4      The court finds that but for the negligent conduct of the United States, the damages

5  complained of by Plaintiffs would not have occurred. The court is persuaded by the testimony of

6  Dr. Steele, that Mrs. Rutledge would likely have recovered without any neurological damage if she

7  had been diagnosed and treated in a timely manner on July 27, 2004; that Mrs. Rutledge would,

8  within a reasonable degree of medical certainty, have only minor urinary symptoms if she had been

9  diagnosed and treated in a timely manner on August 2, 2004; that Mrs. Rutledge would have

10  suffered residual symptoms of urinary retention and overflow incontinence, but she would not have

11  bowel incontinence and would unlikely have had significant leg weakness, gait abnormality or

12  painful paresthesiae if she had been diagnosed and treated in a timely manner on August 17, 2004.

13  (Plaintiffs' Trial Ex. 22 p. 2).

14  ### BOTH PLAINTIFFS HAVE SUFFERED ACTUAL LOSS AND DAMAGES

15      In Federal Tort Claims Act cases, the law of the state where the negligence occurred

16  governs substantive tort liability, including the nature and measure of damages to be awarded.

17  *Calva-Cerqueira v. United States*, 281 F. Supp.2d 279, 292 (D.D.C. 2003) (citing *Richards v.*

18  *United States*, 369 U.S. 1, 11, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962)).

19      Under Guam law, there is no limit to the amount of damages that can be awarded to

20  plaintiffs in a medical malpractice case. Title 10 of the G.C.A. §10131 specifically states that

21  "damages shall be monetary only and shall be without limitation as to nature or amount unless

22  otherwise provided by law." The only limitation to the award of damages to Plaintiffs here is the

23  limitation imposed by the Federal Tort Claims Act, which is the amount of the claim presented to

24  the federal agency.  In this case, Mrs. Rutledge requests an award of $10,000,000.00 for her

25  economic and non-economic damages and Master Sergeant Rutledge requests an award of

26  $1,000,000.00, for non-economic damages.

27      Additionally, Title 7 of the Guam Code Annotated, sections 16102(a) and (c) define

28  economic and non-economic losses as follows:

24

(a) *Economic loss* shall mean any pecuniary loss resulting from harm, including the loss of earnings or other benefits related to employment, medical expense loss, replacement services loss, loss due to death, burial costs, and loss of business or employment opportunities, to the extent recovery for such loss is allowed under applicable local law

...

(c) *Non-economic loss* shall mean loss for physical and emotional pain, suffering, inconvenience, physical impairment, mental anguish, disfigurement, loss of enjoyment of life, loss of society and companionship; loss of consortium, other than loss of domestic service; hedonic damages; injury to reputation and all other non-pecuniary losses of any kind or nature.

Having made the determination that the government care providers breached the prevailing standards of care which proximately caused the injury to the Plaintiffs, the court makes the following conclusions with respect to damages:

### ECONOMIC DAMAGES

As to economic damages, Mrs. Rutledge is entitled to loss of earnings and earnings capacity and other benefits related to employment as well as replacement services loss. *See* 7 G.C.A. §16102(a). The purpose of compensatory damages is to make the plaintiffs whole. *Fajardo v. Liberty House Guam*, 2000 Guam 4.

**Loss of Income**

Mrs. Rutledge is seeking $970,000.00 for past, present, and future loss of income and other opportunities. This figure represents the calculations submitted by Mr. Hiles.  As noted above, after careful consideration, the court adopts the calculations of Dr. Taylor in United States Exhibit U. The court calculates damages for Mrs. Rutledge under the occupation of Supervisor of Food Service, and excludes income taxes as representing a fair lost wage earning capacity.

The court concludes that Mrs. Rutledge, as recommended by Dr. Taylor,  is entitled to $470,904.00 for past, present and future loss income and other opportunities.

**Replacement Services**

"Replacement services loss" is a type of economic loss as defined by Guam law.  7 GCA § 16102(a).  Replacement services loss is the value of obtaining ordinary and necessary services in lieu of those the injured person would have performed, not for income, but for the benefit of

25

himself or herself or his or her family, if he or she had not been injured. *See Lenz v. Depositors Ins. Co.*, 561 N.W.2d 559, 561 (Minn. App. 1997).

The court finds that as a result of her permanent neurological injuries and deficits, Mrs. Rutledge is unable to perform a substantial amount of her normal household chores, which she was able to adequately perform prior to her injury.  Those chores include cleaning, vacuuming, laundry and ironing.

Consequently, the court concludes that Mrs. Rutledge is entitled to compensation for replacement services loss in the amount of $187,720.00 calculated at $95.00 per week for 52 weeks a year, multiplied by 38 years. The court prefers not to perform a present value calculation of this amount since any such reduction in value would most likely be outweighed by the increased costs of such services in the future.

### NON-ECONOMIC DAMAGES

In awarding non-economic damages, the court in *Scott v. United States*, 884 F.2d. 1280 (9th Cir. 1989) held that damages awarded for physical impairment and loss of enjoyment of life were not duplicative. Likewise, in *Ogden v. J. Steel Erecting, Inc.*, 201 Ariz. 32, 31 P.3d 806 (Ct. App. 2001), the court held that "hedonic damages can be a component of a general damages claim, distinguishable from, and are not duplicative of, damages for pain and suffering." *Id* at 38, 31 P.2d at 812.

As to non-economic damages, the court concludes that Plaintiff Mrs. Rutledge is entitled to damages for physical and emotional pain and suffering, inconvenience, physical impairment, disfigurement and loss of enjoyment of life.  The court also concludes that Master Sergeant Rutledge is entitled to damages for loss of consortium.

### Pain and Suffering

There is no definite and specific rule for a court to follow in arriving at a dollar figure for actual compensation for pain and suffering. Pain and suffering includes mental suffering. "Anxiety, shock and worry are examples of what might be included under mental pain and

26

suffering, and loss of capacity to work, labor and enjoy life-separately from monetary earnings-may be considered as an item causing mental suffering." *MacDonald v. United States*, 900 F. Supp. 483, 488 (M.D. Ga. 1995). Since Mrs. Rutledge's pain and suffering will continue into the future, the court will award damages for her future pain and suffering. *See Id.*

Mrs. Rutledge is fully aware of her many neurological and genito-urinary deficits. She has numbness in her vagina and buttocks and feels that part of her is "dead." (Test. Mrs. Rutledge 2/20/08). She suffered, and continues to suffer, mental anguish when she is told that her neurological and genito-urinary conditions are not likely to improve. She will always have a numb buttock, a numb vagina, and a neurogenic bladder necessitating that she consume a cocktail of medications. She has limited control over her bowels and is often constipated. Mrs. Rutledge also suffers from paresthesia down the back of her legs and feet. She experiences intermittent neuropathic pain which has been described as a searing, burning pain, that could last anywhere from 45 to 60 seconds. This paralyzing pain can strike anywhere where her spinal nerve roots and their anatomic distributions have been damaged. Her neuropathic pain symptoms appear consistent with her neurological injury because they affect only the areas where her nerves below the L5-S1 distribution have been damaged.

Mrs. Rutledge is also conscious and frustrated about her inability to function sexually. Mrs. Rutledge has paresthesia and anaesthesia in certain parts of her body and decreased sensation down her leg and right heel. She has a minimal ankle reflex (1+) on the right and no ankle reflex is present on the left which is evidence of a permanent neurological injury. She often suffers depression and has had to come to grips with her permanent neurological deficits.

The court finds that Mrs. Rutledge suffers from physical and mental pain and suffering as a result of her permanent neurological and genito-urinary injuries. She has endured past suffering, current suffering, and will continue to endure it well into the future. In determining damages for the future consequences of a tort, a plaintiff must prove with reasonable certainty that the future consequence will occur or is likely to occur. *See Wood v. Day*, 859 F.2d 1490, 1493 (D.C. Cir. 1988). The court is persuaded by the testimony of Dr. Steele that Mrs. Rutledge's neurological

deficits are likely to remain as they are and not likely to improve given that almost four years have passed since her injury and subsequent diskectomy.

Mrs. Rutledge, born in December of 1960, was 43 years old when she sustained injury in this case. Her life expectancy, based on Dr. Taylor's report, from the date of injury is 38 years or approximately 13,870 days, 1,976 weeks or 456 months.

As cited by the Plaintiffs, the court is persuaded by a prior appellate decision, *Porter v. Tupaz*, DCA No. 82-0180A, 1984 WL 48854 (D. Guam, App. Div. June 12, 1984).  In *Porter v. Tupaz*, this court, sitting in its appellate division capacity over Guam Superior Court cases, held that an award of $1,500.00 per month for 12 months for a "common whiplash" temporary 12 month injury was not an unreasonable or erroneous award. *Id*. at *6. The court finds that Mrs. Rutledge's neurological and genito-urinary injuries are permanent and considerably more severe than a "common whiplash" injury, and thus deserving of a substantially higher award than what is reflected in *Porter v. Tupaz*. The court further notes that the *Porter* award was made in 1984, more than 24 years ago.

The court concludes that Mrs. Rutledge is entitled to an award for past, present and future physical and mental pain and suffering.  As damages for her pain and suffering, the court finds and awards as damages to Mrs. Rutledge the sum of $3,467,500.00; calculated at $250.00 per day for 13,870 days.

**Inconvenience**

Mrs. Rutledge no longer enjoys the convenience of many of the things normal people take for granted. She is unable to drive herself to places of interest and must always depend on another person to care for her. She is unable to enjoy the convenience of having normal bowel and bladder movements. Mrs. Rutledge takes several medications for her various neurological deficits and must suffer the inconvenience of their side effects.

The court concludes that Mrs. Rutledge is entitled to a separate award for past, present and future inconvenience.  As damages for her inconvenience, the court finds and awards as damages to Mrs. Rutledge the sum of $346,750.00; calculated at $25.00 per day for 13,870 days.

28

1    **Physical Impairment**

2
3       Prior to this incident, Mrs. Rutledge enjoyed an active sexual life with normal sexual
4    intercourse approximately 2-4 times a week (Plaintiffs' Trial Ex. 21 p. 6). As a result of her
5    neurological and genito-urinary injuries, Mrs. Rutledge has no feeling in her vagina and is no
6    longer able to give and receive sexual pleasure. In addition, her neurological deficits and resulting
7    damages have practically rendered her unable to bear children which both she and her husband had
8    planned to have.

9       Guam law defines physical disability as a "physical impairment which substantially limits
10   one or more of a person's major life activities." 7 G.C.A. §22101(7).  This definition of physical
11   impairment is similarly defined by the Americans With Disabilities Act ("ADA"), 42 U.S.C.
12   §12102(2)(A)(defining disability as "a physical or mental impairment that substantially limits one
13   or more of the major life activities of such individual").  The Rehabilitation Act, federal legislation
14   that empowers Americans with disabilities to maximize employment, economic and educational
15   activities, defines a 'major life activity' as an activity of central importance to daily life, including
16   "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking,
17   breathing, learning, and working."[6] 45 C.F.R. § 84.3(j)(2)(ii).

18      The Ninth Circuit in *McAlindin v. County of San Diego,* 192 F.3d 1226 (9th Cir. 1999)
19   stated that "engaging in sexual relations, just like procreation, is a major life activity. The number
20   of people who engage in sexual relations is plainly larger than the number who choose to have
21   children. Moreover ... sexuality is important in how 'we define ourselves and how we are perceived
22   by others' and is a fundamental part of how we bond in intimate relationships." *Id*. at 1234, (citing
23   *EEOC v. R.J. Gallagher Co.*, 181 F. 3d 645, 654 (5th Cir. 1999)).

24   ///

25

26   _____

27       [6] This definition is recited verbatim in the Senate and House committee reports on the ADA and in the
     EEOC's ADA regulations.  *See* S. Rep. No. 101-116, at 22 (1989); H.R. Rep. No. 101-485, pt. 2 at 52 (1990)
     (Committee on Education and Labor); H.R. Rep. No. 101-485, pt. 3 at 28 (1990) (Committee on the Judiciary); 29
28   C.F.R. § 1630.2(I).

1        The Supreme Court in *Bragdon v. Abbott*, 524 U.S. 624, 638, 118 S. Ct. 2196, 2199, 141

2 L. Ed. 2d 540 (1998) commented that the ADA's list is merely illustrative and not exhaustive and

3 thus, it had little difficulty in concluding that reproduction and the sexual dynamics surrounding

4 it are central to the life process itself and is a major life activity.[7]

5        The court concludes that Mrs. Rutledge is entitled to a separate award for past, present and

6 future physical impairment.  As damages for her physical impairment, the court finds and awards

7 as damages to Mrs. Rutledge the sum of $1,000,000.00.

8 **Disfigurement**

9

10        As a result of her neurological injuries and the resulting damages therefrom, Mrs. Rutledge

11 walks with an altered gait which is a broad-based way of walking to avoid pain and provide

12 stability. This altered gait has been described by Dr. Steele and Mrs. Rutledge's other healthcare

13 providers as an "antalgic gait."  Her gait was clearly demonstrated to the court. A disfigurement

14 caused by an altered gait and which affects a person's overall appearance is a disfigurement of the

15 entire body.  *See Streets v. Tim O'Connell and Son, Inc.*, No. 00A-01-012 RRC, 2000 WL

16 1211522, at *1 (Del. Super. July 21, 2000) (unpublished).  Mrs. Rutledge's antalgic gait clearly

17 affects her overall appearance and easily identifies her from afar as someone who has suffered a

18 neurological injury.  *See Humphrey v. United States*, No. 2:04 CV 72 DDN, 2006 WL 2850548,

19 at *7 (E.D.Mo. Sept. 30, 2006).

20        The court concludes that disfigurement is an element of damages that Mrs. Rutledge is

21 entitled to under Guam law.  As damages for her permanent disfigurement, the court finds and

22 awards as damages to Mrs. Rutledge the sum of $50,000.00.

23 **Loss of Enjoyment of Life**

24        Evidence adduced at trial clearly established that there is permanent impairment to Mrs.

25 Rutledge's ability to enjoy life. She is constantly in need of rest from feelings of fatigue. Although

26 she is able to engage in activities such as shopping, walking, or even weeding the garden, she has

27

28        [7] The United States Supreme Court has explained that the list in the ADA must be construed with regulations implementing the federal Rehabilitation Act.  Id. at 638, 118 S. Ct. at 2205.

to "pay for it" in terms of the pain she feels after the activities, according to the testimony of Master Sergeant Rutledge.  (Test. Master Sergeant Rutledge, 3/4/08).  Mrs. Rutledge has limited her outside excursions and social activities as she tires easily, is usually in pain, and prefers to be near her own bathroom where she can spend an otherwise embarrassingly long time in the toilet waiting for her bowel movement to occur. Mrs. Rutledge has difficulty sleeping through the night and relies on hypnotic medication such as Ambien. The court accepts Dr. Steele's findings that Mrs. Rutledge's neurological condition will not likely improve.

The court concludes that Mrs. Rutledge is entitled to an award for past, present and future loss of the capacity for the enjoyment of life.  As damages for her loss of the capacity for the enjoyment of life, the court finds and awards as damages to Mrs. Rutledge the sum of $1,387,000.00; calculated at $100.00 per day for 13,870 days.

**Loss of Consortium**

Master Sergeant Rutledge is seeking $1,000,000.00 for past, present, and future loss of consortium. On Guam, a loss of consortium claim is considered a derivative claim. *See Dueñas v. Yama's Co., Inc.* Civ. 90-00064A, 1992 WL 97213, at *1 (D. Guam App. Div. April 6, 1992). Master Sergeant Rutledge is a devoted husband who is supportive of his wife's needs and is careful not to impose demands upon his injured wife. Many couples wed, committed to being devoted to one another "in sickness and in health", but most do not imagine a future which includes a seriously injured and partially dependent spouse every hour of every day of each year. Such is the reality for Master Sergeant Rutledge. The court concludes that Master Sergeant Rutledge has experienced, and will continue to experience, a loss of consortium due to his wife's condition. This condition is the result of the negligence of the United States and the failure of the Andersen Air Force Base Clinic  practitioners to act within the standard of care owed to Mrs. Rutledge.

Prior to this incident, Master Sergeant Rutledge and Mrs. Rutledge enjoyed an active sexual life with normal sexual intercourse approximately 2-4 times a week (Plaintiffs' Trial Ex. 21 p. 6). As a result of his wife's injuries, they have not engaged in any satisfying sexual activity. Master Sergeant Rutledge testified that they have had sex "maybe twice" in the past year.  (Test. Master

31

Sergeant Rutledge, 3/4/08).

The court once again notes the decision in *Porter*, where the Appellate Division held that an award of $450.00 per month for 12 months for a spouse's loss of consortium claim based upon a "common whiplash" injury was not an unreasonable or erroneous award.  *Porter*, 1984 WL 48854, at *6. The court concludes that Master Sergeant Rutledge's loss of consortium damages are considerably more severe and permanent than those experienced from a temporary "common whiplash" injury, and thus deserve a substantially higher award than what is reflected in *Porter*.

The court concludes that Master Sergeant Rutledge is entitled to an award for past, present and future loss of consortium.  Since he is younger than his wife, the court bases his loss of consortium claim on Mrs. Rutledge's life expectancy of 38 years.  As damages for his loss of consortium, the court finds and awards as damages to Master Sergeant Rutledge the sum of $592,800.00 for past, present and future loss of consortium  calculated at $300.00 per week for 52 weeks a year, multiplied by 38 years.

## SUMMARY

Based on the above, the court finds that (1)  the Defendant United States owed a duty of care to Mrs. Rutledge and Master Sergeant Rutledge, that is, Lt. Col. Giscombe, Adult Nurse Practitioner and Capt. Steven D. Rau, Certified Physician Assistant, United States employees, owed to Mrs. Rutledge the requisite care and skill ordinarily used by healthcare providers in the same field of medicine practicing under similar circumstances; (2) the Defendant United  States breached such duty of care; (3) such breach of the duty of care owed by the Defendant United States of America was the direct and proximate cause of injuries suffered by Mrs. Rutledge and Master Sergeant Rutledge; and (4) as a result of such breach by the Defendant United States, the Plaintiffs Deborah K. Rutledge and Thomas R. Rutledge are entitled to the following compensatory damages:

///

///

32

•**$470,904.00** for past, present and future loss income and other opportunities of Mrs. Rutledge;

•**$187,720.00** for past, present and future replacement services loss of Mrs. Rutledge calculated at $95.00 per week for 52 weeks multiplied by 38 years;

•**$3,467,500.00** for past, present and future pain and suffering of Mrs. Rutledge calculated at $250.00 per day, for 13,870 days;

•**$346,750.00** for past, present and future inconvenience of Mrs. Rutledge calculated at $25.00 per day for 13,870 days;

•**$1,000,000.00** for the permanent physical impairment of Mrs. Rutledge;

•**$50,000.00** for the permanent disfigurement of Mrs. Rutledge;

•**$1,387,000.00** for past, present and future loss of enjoyment of life of Mrs. Rutledge calculated at $100.00 per day for 13,870 days; and

•**$592,800.00** for past, present and future loss of consortium of Thomas R. Rutledge calculated at $300.00 per week for 52 weeks multiplied by 38 years.

The total award to Plaintiff Deborah K. Rutledge is **$6,909,874.00.**

The total award to Plaintiff Thomas R. Rutledge is **$592,800.00.**

The combined total award to Plaintiffs is **$7,502,674.00.**

The court notes that no damage award is sought by Plaintiffs for past or future medical expenses since Mrs. Rutledge is eligible for military medical benefits. The damages awarded herein are only for those itemized above. No award is made for past or future medical expenses and the judgment entered in this matter does not, in any respect, include such an award.

In accordance with the foregoing Findings of Fact and Conclusions of Law, IT IS HEREBY ORDERED, ADJUDGED AND DECREED that upon consideration of the evidence produced at trial by the Plaintiffs, Master Sergeant  Rutledge and Mrs. Rutledge, and the evidence of the

33

1  Defendant, United States, that Judgment shall be entered in **FAVOR** of Mrs. Rutledge and Master

2  Sergeant Rutledge on their causes of action for medical malpractice under the Federal Tort Claims

3  Act, and **AGAINST** United States.  Each party to bear its own costs and attorney's fees.

4        **SO ORDERED.**

5

6

7

8                                    **/s/ Frances M. Tydingco-Gatewood**
                                          **Chief Judge**
9                                    **Dated: Aug 21, 2008**

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

34