1  LEONARDO M. RAPADAS
   United States Attorney
2  MIKEL W. SCHWAB
   Assistant U.S. Attorney
3  JESSICA F. CRUZ
   Assistant U.S. Attorney
4  Sirena Plaza, Suite 500
   108 Hernan Cortez Avenue
5  Hagatna, Guam 96910
   Tel: (671) 472-7332
6  Fax: (671) 472-7215

7  Attorneys for the United States of America

8
                    **DISTRICT COURT OF GUAM**
9
                     **TERRITORY OF GUAM**
10

11  DEBORAH K. RUTLEDGE and          CIVIL CASE NO. 06-00008
    THOMAS R. RUTLEDGE,
12
                  Plaintiffs,
13                                    **MOTION FOR NEW TRIAL OR**
                                      **RECONSIDERATION OR, IN THE**
       vs.                           **ALTERNATIVE, MOTION FOR**
14                                    **REMITTITUR**
    UNITED STATES OF AMERICA,
15
                  Defendant.
16

17       COMES NOW the United States and hereby humbly requests a new trial or

18  reconsideration pursuant to the Rules of Civil Procedure, Rules 59 and/or 60, on the tort claim.

19  In the alternative, the United States requests remittitur of the Court's award of $7,502,674.00 to

20  $750,000.00. The United States makes the Motion based on the following:[1]

21

22  [1] The United States does not have the benefit of a transcript of the approximately five-week trial at this writing.  A
    copy has been ordered but resources on the island territory of Guam are such that one will not be produced by the

23                                    1

24

ORIGINAL

# I. THE COURT SHOULD ORDER A NEW TRIAL OR AMEND ITS FINDINGS

The United States requests a new trial, or, in the alternative that the Court amend its Findings of Fact (FOF) to reflect the overwhelming evidence at trial. The United States believes the Findings are incorrect on the following points:

## A. The Time of Injury and the Standard of Care

With all due respect for the Court, and with an understanding of its perspective about a Plaintiff who believes someone is to blame for her most unfortunate and emotional experience with an extremely rare incidence of Cauda Equina Syndrome ("CES"), the United States contends that the Court missed the overwhelming medical evidence about both the time of the injury and the standard of care.

The medical records and medical testimony pinpointed the fact that Plaintiff was suffering from the common malady of a bulging ("herniated') disc when she presented for the first time with a back complaint at the Andersen Air Force Base Clinic near her home on Andersen Air Force Base on Guam. She returned for a second visit, still showing the characteristics of an adult over 40 suffering from nerve irritation from a bulging disc. On a third visit she refused to cooperate and only wanted a referral to the U.S. Naval Hospital, located nearby but outside the base. She was still suffering from a bulging disc.

Sometime prior to her visit to the U.S. Naval Hospital, her disc, for reasons that are inexplicable to modern medicine at this time, violently burst, completely extruding all the caustic, gelatinous substance which fills the disc, the pulposa, into the spinal cavity and causing

Court for weeks or months. A copy of the United States' Proposed Findings of Fact and Conclusions of Law is attached hereto. It offers references, predicated on notes during trial, of the actions described in this Motion.

2

immediate damage to a nerve transit center in that cavity, known as the caudia equina. When the burst occurred it immediately affected the deep sacral nerves that transit there. This quickly caused serious reactions, including the complete loss of rectal tone, and thus, fecal incontinence, and quick deterioration of reflexes.

Plaintiff described that exact moment at trial. Three days prior to her visit to the U.S. Naval Hospital (and long after her visits to the Clinic), she was vacuuming inside her home when her pants suddenly filled with fecal waste. Through testimony the Court learned that every medical professional she had encountered to that point had emphasized the importance of any sign of such fecal incontinence. In spite of that, Plaintiff did not report to the hospital emergency room (two hospitals in the area were available at all times for emergency patients: U.S. Naval Hospital and Guam Memorial Hospital). Nor did she contact the Andersen Clinic located a few blocks from her home. The Naval Hospital records showed that she first canceled a physical therapy appointment on August 25 and then showed up for a medical appointment on August 27, three days after losing fecal control.

At Naval Hospital it was immediately recognized that she was suffering from the rare condition of CES. The military doctor who made that diagnosis medically evacuated (commonly known as "med-evac'd") to Hawaii where she received corrective surgery just hours after the diagnosis. The doctor who diagnosed her, Dr. Douglas Duncan, continued as her treating physician after the surgery.

Dr. Duncan was most vocal in stating at trial that he had made his diagnosis while the CES was emergent. He had caught it early. He was able to demonstrate from the medical

(Attached as Exhibit 1).

3

1 | records that Plaintiff was on a quick downward spiral from the recent 'insult' to the CES. He

2 | showed deterioration of her reflexes, compared it to the tests she received a few hours later prior

3 | to her surgery, and thereby showed how the damage being caused was on a steep slope. (He also

4 | testified, and showed in the medical records of tests of the Plaintiff taken over the months after

5 | her corrective surgery, that her reflexes substantially recovered.) He testified that it was *not*

6 | *medically possible* that Plaintiff's CES could have begun five weeks earlier when she was seen

7 | by the Clinic. She would have been in excruciating pain and not able to walk, never the less

8 | vacuum her carpet, had she not received treatment within days of the explosion and extrusion of

9 | the disc. He demonstrated, through the results of the tests documented in her medical records,

10 | how quickly she was deteriorating as she was preparing for emergency surgery.

11 | The military medical evacuation took place as soon as she brought her problem to the

12 | attention of a health care professional, which was not until 3 days after onset of the syndrome

13 | (onset being highlighted by occurrence of fecal incontinence).

14 | Plaintiff's claim that the Clinic failed to diagnose her CES is medically impossible.

15 | There is no way to predict that what seemed like an ordinary bulging ("herniated") disc will burst

16 | at some point in the future. Plaintiff's CES was the result of an unexplained, violent bursting of

17 | a disc. It is extremely rare. Rarer still, though cases have been documented, is a case like

18 | Plaintiff's where the disc bursts for no apparent reason (as opposed to most CES which occurs

19 | after a violent event like dropping a distance onto concrete or being hit by a vehicle). There is no

20 | such thing as a warning that a disc might explode in the future in such an unexplained manner.

21 | An X-ray or MRI scan cannot predict that a disc will burst.

22 | The Andersen Clinic medical personnel were well within the standard of care for the

4

treatment of an adult experiencing her first encounter with a bulging disc. Evidence of that standard of care was repeated in trial testimony and was undisputed.

What was in dispute was the timing of the onset of the CES. For Plaintiff to hold the clinic liable for what happened to her, she had to claim that the disc had already burst on the first day she presented at the Clinic. Dr. Duncan, Plaintiff's treating physician, disputed Plaintiff's claim and stated that it was *not medically possible*. The medical records and the treating physicians all disputed that claim.[2]

Dr. Duncan's medical testimony was bolstered by the testimony of the orthopedic spine surgeon who operated on the Plaintiff, Dr. Orchowski. Dr. Michael Meriwether, a neurosurgeon flown in for the trial from Tampa, Florida, because of his expertise in the rare syndrome, also testified that the marking event was the fecal incontinence and Plaintiff could not have had a burst disc (and thus CES) for weeks. Each of the medical providers who testified at the trial further bolstered Dr. Duncan's medical testimony about Plaintiff's condition and the approximate time that the disc burst causing the onset of CES.

The one exception was Dr. Steele, who testified as the expert witness for Plaintiff's claim that the CES had existed from the *first* time she presented at the Clinic. Dr. Steele is a Canadian trained doctor who failed to pass the exam for the U.S. Neurology Boards. Nevertheless, Dr. Steele is licensed to practice on Guam. He presently certifies Government of Guam employees for disability benefits. He has also spent years studying Lytigo Botig, a malady that afflicts long-

---

[2] On page 12 of the FOF, the Court quotes Mrs. Rutledge as stating that Dr. Orchowski told her, "it was unfortunate that the discs that [on Mrs. Rutledge's nerves] for three weeks" the Court failed to state that Dr. Orchowski based this three-week comment on Plaintiff's self-serving statement that it had actually occurred three weeks prior. The three-week onset was not Dr. Orchowski's medical conclusion.

5

1  term local, Chamorro residents of Guam in great numbers. Dr. Steele is thus familiar with the
2  relatives of many of the people on Guam and demonstrated his home team familiarity on the
3  stand. The District Court Judge revealed that she had brought her son to Dr. Steele for treatment
4  of headaches. The Judge asked the parties if they would waive any conflict objection and they
5  did.

6      Dr. Steele's testimony was that the clinic's treatment for a bulging disc was below the
7  standard of care because they did not anticipate the CES and that the bulging disc was "sitting on
8  the nerve". In direct contrast with the medical testimony of the orthopedic surgeon Dr. Douglas
9  Duncan (Board qualified and soon to be certified), Dr. Orchowski (orthopedic spine surgeon)
10  and Dr. Meriwether (Board Certified Neurosurgeon), he testified that the sudden onset of fecal
11  incontinence that happened three days before Plaintiff went to the hospital, was an *increasing*,
12  *incremental* manifestation of her CES over the weeks she was seen three times at the clinic, and
13  that the complete loss of rectal tone marked the point when damage to her cauda equina nerves
14  was irreversible. Alternately, he argued that the Clinic should have anticipated that the disc was
15  going to burst. Dr. Steele admitted that he had *no previous experience with CES*.

16      To believe that the Plaintiff had no time period in which she was suffering from a bulging
17  disc is contrary to the medical records and all the testimony from the treating physicians and the
18  expert with extensive experience with CES.[3] The overwhelming evidence is that the Plaintiff's
19  disc, for no known reason, suddenly, unpredictably and violently burst on or about three days

---

[3] Dr. Meriwether has national prominence in the diagnosis and treatment of CES. Dr. Duncan has also become
experienced with CES. Dr. Duncan has had *one* other opportunity to diagnose CES in a patient since the diagnosis
and treatment of Plaintiff. That patient had been in a serious motorcycle accident. The doctor's experience with
*two* cases now have made him the subject of consultation on the subject among his peers, he testified, because most
physicians in his field will never see a *single* case in their entire careers.

6

prior to her going to the U.S. Naval Hospital where she was immediately diagnosed, med-evac'd to Hawaii and then given corrective surgery. The Court should order a new trial or amend its findings to reflect the date that the disc burst.

The Court missed the essential and overwhelming evidence that Plaintiff had a bulging disc and was treated for it conservatively, well within the standard of care, by each of the medical providers at the Andersen Air Force Base Clinic. All of these providers had extensive health care training and experience and they testified and showed in the records where they made detailed inquiry into Plaintiff's condition to eliminate the possibility that she had CES at the time they treated her. Later, her disc burst causing the onset of long standing CES. For inexplicable reasons, she waited three days and then presented at the Hospital [4]

Medical science cannot explain why people age differently. It cannot be explained why the Plaintiff, in her 40s, suddenly developed two areas in her spine where a disc bulged and caused pain, numbness and discomfort. What medical science does know is that the problem afflicts many as they age. There was overwhelming evidence at trial that the medical providers at the Andersen Air Force Base Clinic were well within the standard of care for the treatment of lower back pain due to the onset of a bulging disc due to aging. There are no instruments of science that could have predicted that Plaintiff would subsequently suffer from an extremely rare, violent burst of one of her spinal discs.

That violent burst did occur while she was vacuuming her home, three days prior to her

---

[4] Plaintiff's rebuttal at trial included new testimony that she had called someone at the Naval Hospital and told them about her fecal incontinence and they told her it was nothing and she could just come in a few days. That is so far out of credibility that even the Court has chosen not to cite that claim. Plaintiff is, understandably, desperate to have the United States held liable for her CES.

7

presentation at the Naval Hospital. Her treatment at the Clinic was both well within the standard of care and was irrelevant to that unexplained and dramatic subsequent event.

### 1. Clinic Appointment on July 27, 2004

The Court incorrectly concluded, against the overwhelming evidence that the Plaintiff woke up on July 27, 2004, because the right side of her vagina was numb. (FOF 5). This would indicate a medical emergency. In fact, the evidence showed that she had back pain consistent with a bulging disc. Had Plaintiff told the clinic that her vagina was numb (FOF 6) she would have been referred to emergency care at an emergency room. Dr. Duncan and Dr. Meriwether both testified that if she was having the sacral nerve damage from the burst ("herniated") disc on July 27, 2004, she would not have been walking by the time she went to the hospital on August 27, 2004.

On the phone, Plaintiff spoke with an experienced triage nurse. The record shows that she described lower back pain. Once at the reception desk inside the clinic, she again described her problem and was given a form that was appropriate. She described lower back pain and was given the lower back pain form. Then she was seen by a Nurse Practitioner. Lt. Col. Giscombe, the Nurse Practitioner who treated her, has extensive medical experience and a stellar career serving her country.

Lt. Col. Giscombe made specific inquiry into all the responses that Plaintiff made on the form. She had her indicate specifically where she had some numbness. Guam is a sweltering tropical island located just above the equator. Plaintiff was wearing shorts so the Plaintiff would have been able to show the area where she said she was experiencing numbness without being completely naked. (The overwhelming evidence was that total nudity would have

8

1  been necessary only after the CES occurred on August 24th when the vagina and anus would
2  have to be probed for feeling and tone. That is not done for patients with lower back pain and
3  numbness not in the vagina or anal area.) She was questioned and examined on her complaint of
4  pain being worse at night and 'peeing a lot', including running a urinalysis. Had there been a
5  mention of numbness in the vaginal or anal area, as opposed to the surrounding groin or
6  buttocks, the Plaintiff would have set off alarms with all of the medical personnel she
7  encountered.

8        For the Court to believe that the facts occurred as told by Plaintiff, the Court
9  would have to believe that all the personnel, and all of the medical and surgical records, were not
10  truthful. That, combined with the medical impossibility of having had CES from the beginning,
11  leads overwhelming to the conclusion that Plaintiff presented with lower back pain from a
12  bulging ('herniated') disc.

13        Plaintiff's urinary frequency from drinking water in the tropical weather of Guam
14  had nothing to do with the subsequent burst of her disc that occurred more than a month later.
15  Testimony about the standard of care for urinary frequency from drinking water on Guam was
16  irrelevant and incorrect. Lt. Col. Giscombe testified about her treatment and the results of her
17  test and follow up.

18        Lt. Col. Giscombe did address the Plaintiff's presentation of pain and numbness,
19  contrary to the finding of the court. (FOF 16) She had Plaintiff describe the exact location to
20  make sure there was no nerve problem causing numbness at the vagina or anal area. She
21  concluded that Plaintiff was suffering from lower back pain, a conclusion consistent with all the
22  medical evidence. That conclusion and treatment was endorsed by both Dr. Duncan and Dr.

23                                              9

24

1 Meriwether at trial.

2     There was no need to ask the Plaintiff to be completely nude in order for her to
3 point out and have examined her groin area beyond the area of her vagina and anus. (FOF 17)
4 The testimony at trial with regard to having the patient be completely without clothing had to do
5 with a patient suffering from CES. The CES had not occurred at the July 27, 2004, examination.
6 Even Plaintiff's own statements of "three weeks" would put the onset problems at August 6, not
7 July 27.

8     Lt. Col. Giscombe operated her clinic duties under directives from the Air Force
9 Command that are universal throughout the Air Force's worldwide medical services (USAF
10 Instruction 41-119) as was testified to in Court. Those directives did not require her to consult
11 with a physician preceptor on each patient visit. The U.S. Air Force has significant discretion to
12 make policy decisions about the level of involvement for highly trained nurse practitioners in
13 providing medical care in its clinics throughout the world. She was in full compliance with the
14 requirements for interacting with and being supervised by a physician at the clinic.

15     Discretionary acts are not subject to FTCA claims. Supremacy dictates that the
16 military be able to set the structure and supervision of its medical care providers. As the
17 testimony showed, the military practitioners in the military facilities are not licensed on Guam
18 and Physician Assistants and Registered Nurses can write prescriptions and do other acts that are
19 not allowed by Guam law for the civilian community outside the military facilities.

20     Dr. Towle, a California doctor called by the Plaintiff as an expert in emergency
21 care, testified that in California where he works in a clinic at Yosemite, the State limits the
22 medical care provided by Nurse Practitioners. There a Nurse Practitioner checks with a doctor

23                                                10
24

1  for every visit with a patient. He testified that he had no knowledge of the system in place in the
2  U.S. Air Force.

3         There was no reason for a referral at the July 27th visit, a fact well documented by
4  Lt. Col. Giscombe, who testified as to the presentation of the plaintiff on that date. That
5  treatment was endorsed by both Dr. Duncan and Dr. Meriwether.

6         The Air Force has signs posted outside the offices of all of their Physician
7  Assistants and Nurse Practitioners who provide medical care at Air Force clinics. They are
8  trained to introduce themselves and their title. It is a title they are proud of. Lt. Col. Giscombe
9  testified that her title of Nurse Practitioner was posted outside of her office, it was on her Air
10 Force Identification Badge that she is required to wear, and she introduced herself as a Nurse
11 Practitioner. Again the structure of medical care is a discretionary act determined at policy
12 levels by the U.S. Air Force. The Air Force must determine how best to provide medical care to
13 its service members and their spouses in clinics and on the battlefield.

14        Lt. Col. Giscombe's medical care for the patient with lower back pain due to a
15 bulging disc, brought on by aging, was well within the standard of care. (FOF 22)

16        Plaintiff never reported that she was having trouble urinating and had to press on
17 her bladder. This is a warning signal that all medical professionals know to react to and record.
18 Plaintiff's medical records report no such complaint at the July 27 visit to the Clinic. She was
19 asked specifically about incontinence and denied having any such problems.

20        The Plaintiff was specifically and routinely told to return to the Clinic or go to the
21 emergency room if she did not improve or if there was any significant worsening of her
22 condition.

23                                           11
24

1

## 2. Visit to the Clinic on August 2, 2004

2      The Court incorrectly states that Plaintiff called the clinic and said that she could

3   not urinate without pressing on her bladder. (FOF 24). The clinic notes would reflect any such

4   claim of an emergency condition. She called a triage nurse for a same day appointment and then

5   presented at a desk where she again complained of low back pain and was given the low back

6   pain form to fill out. She did check "yes" on the form to the question of "loss of sensation in

7   groin area" and that was fully investigated to document where the sensation was and that it was

8   in the area common to lower back pain due to a bulging disc.

9      The overwhelming evidence is that she was then seen by Physician Assistant

10  Capt. Steven Rau, who introduced himself by saying, "I am physician assistant Rau". He wore

11  his white lab coat with "Steve Rau, Physician Assistant" embroidered on it. He also wore his

12  official Air Force identification badge which identified him as a physician assistant. He also had

13  a sign outside his office that stated "Physician Assistant Steven Rau". The overwhelming

14  evidence was that there was no basis for Plaintiff to believe she was seeing anyone other than a

15  physician assistant. (FOF 42)

16     Capt. Rau had the Plaintiff point to and describe where she was experiencing

17  complaints. She described a vague discomfort in the supra-pubic area, the area in the lower

18  abdomen over the bladder. She did not point to her vaginal or anal area (which would have

19  signaled deep sciatic problems that did not occur until the disc burst on or about August 24) and

20  there was no need for her to fully remove her clothing and be nude to be examined in areas

21  accessible by simply pulling up shorts or a light t shirt. The medical records clearly indicate that

22  she did not indicate at any time that she needed to press on her bladder in order to urinate. (FOF

23

24

12

1  28) Capt. Rau documented his testing of the areas she pointed to and described his findings. The

2  Court overlooks that and incorrectly states that he did not perform tests addressing her complaint

3  of numbness. (FOF 31)

4  Again, contrary to the overwhelming evidence, the Court confuses a patient with CES,

5  which occurred on August 24, with a patient suffering for the first time from pain, irritation and

6  numbness from a bulging disc.

7  Capt. Rau ordered an X-ray and spoke to her about it after it was completed. He

8  noted on her record the observation of spondylolisthesis in her spine, which was later confirmed

9  by the radiologist, Dr. Hugh McSwain, who testified that this is normal disc degeneration due to

10 aging and that it was a non-emergent situation at that time.

11 Again, Capt. Rau also told Plaintiff, as is standard, that she should return to the

12 clinic or go to the emergency room if there are significant changes in her condition.

13 The Court makes much of the fact that Capt. Rau and the Air Force Clinic were

14 following the directives from the Air Force that required that a Physician Assistant had 10% of

15 his medical treatment files reviewed monthly by a physician at the clinic. (FOF 40) Dr. Towle

16 from California testified that the standard of care is breached by the Air Force in not having the

17 treatment of Plaintiff on August 2 reviewed by a physician. Again, that is based on the

18 California laws that apply to his civilian clinic. Further, the Plaintiff did not develop CES until

19 her disc burst and extruded on approximately August 24, three days prior to her presentation at

20 the hospital.

21 **3.    Visit to the Clinic on August 17, 2004**

22 Plaintiff introduced evidence at trial that sometime before August 17, 2004, she

23 13

24

1 | spoke to a neighbor who told her that she could demand at the clinic and get an appointment with
2 | a specialized doctor at the Naval Hospital. She again called the clinic and spoke with a Triage
3 | Nurse. That nurse testified at trial. Again, nothing was said about a numb vagina (because it
4 | could not have occurred until approximately August 24, when the disc burst and CES struck).
5 | She told the nurse that her medication for low back pain was not working and that she wanted a
6 | referral to Naval Hospital. In order to obtain the referral she had to come to the clinic. Upon
7 | arrival, she again went to the desk and obtained a Adult Low Back Pain form. She did not fill it
8 | out and stated that did she not want to answer questions. She was taken to see Lt. Col.
9 | Giscombe, who then worked valiantly to examine the Plaintiff and determine her condition
10 | despite Plaintiff's lack of cooperation. Lt. Col. Giscombe was able to perform a limited back
11 | exam but Plaintiff would not allow her to examine further. Lt. Col. Giscombe observed that
12 | plaintiff was in about the same level of discomfort as she had been on the first visit. She was
13 | able to tell Plaintiff that the x-ray had been read and that it concluded that the results showed the
14 | disc degeneration; a bulging ("herniated") disc that was consistent with her treatment.

Lt. Col. Giscombe made the referral for a specialty evaluation to the U.S. Naval Hospital. Her referral exceeded the Air Force Medical Group Clinic instructions that require a referral to a physician after the second visit to the clinic. Lt. Col. Giscrombe referred her to a specialty doctor. The Court incorrectly concluded that the referral was below the standard set in the Air Force instructions. (FOF 56) Lt. Griscombe was able to repeat her standard advice to come back to the clinic or go to the emergency room if there was are any significant changes in Plaintiff's condition.

At no time did Plaintiff say that her vagina was numb (because that symptom was

14

1  the result from the August 24 burst of the disc) and there was no reason to ask Plaintiff to fully
2  de-clothe. The Court misses these points in its finding of facts. (FOF 51-52)

3  **4.    U.S. Naval Hospital Visit on August 27, 2004**

4             Referrals are set for a time and date, emergency or routine, by the U.S. Naval
5  Hospital when the patient calls to make the specific arrangements of time and date. Nothing in
6  Plaintiff's medical condition indicated that her disc had burst or was going to burst. There was
7  no way to know that an emergency was subsequently going to occur on August 24. The Navy
8  radiologist who read the X-ray taken of Plaintiff's back, Dr. Hugh McSwain, had confirmed the
9  presence of normal disc degeneration due to aging. It was non-emergent from the perspective of
10 Lt. Col. Giscombe and the U.S. Naval Hospital.

11            An initial appointment at Naval Hospital was cancelled due to a Typhoon that hit
12 the island. The emergency room remained open.

13            Plaintiff cancelled her physical therapy appointment for August 25 at the U.S.
14 Naval Hospital.

15            On August 27 she presented at the Hospital and Dr. Duncan discovered she had
16 the incidence of fecal incontinence three days earlier while vacuuming. Her lack of rectal tone
17 and reflexes were immediately diagnosed. She was experiencing long-standing CES. Dr.
18 Duncan testified that it was still "evolving" at the time of his examination. It "could not have
19 been present for more than 48-72 hours", he testified. This corresponded with the date of
20 incontinence on the 24th of August. He demonstrated this fact at trial by showing the reflex tests
21 conducted then and subsequently in Hawaii. Reflexes are not subjective. Plaintiff was promptly
22 evacuated to Hawaii for an MRI in preparation for corrective surgery. (Again, the Court

23                                                    15
24

misconstrued the evidence about MRIs. The MRI was in preparation for surgery. An MRI prior to August 24 was not justified and would not have predicted or prevented her subsequent CES.) Her surgery took place just hours after the diagnosis by Dr. Duncan at Naval Hospital.

Dr. Orchowski made detailed medical records and testified at deposition. At trial the Plaintiff said that Dr. Orchowski stated that the *disc* had *set* on the nerve for three weeks. The Court is in error in relying on this mis-characterization. (FOF 68). Dr. Orchowski's testimony was that the disc had burst and extruded pulposa. He performed a discectomy and removed a large volume of the pulposa material from where it was causing the damage to the cauda equina. A bulging disc was not the cause of the CES. It was the subsequent burst and complete emptying of the disc contents into the spinal area of the cauda equina. The Court was misled by both Plaintiff's misunderstanding of the medicine and Dr. Steele's lack of knowledge about the syndrome. Dr. Orchowski documented the extreme volume of pulposa he extracted. It was not an intact, bulging disc "setting" on the nerves.

The Court makes much of Capt. Rau stating to Plaintiff that he was "sorry" for what happened to Plaintiff, as though it were an admission of negligence. (FOF 69) All the medical professionals who treated the Plaintiff were dedicated and experienced professionals extremely concerned with their patient's well being. Some had seen combat, all had devoted years to healing. They were all sorry that this rare syndrome had happened to the Plaintiff.

### 5. Dr. Meriwether's Testimony

Dr. Michael Meriwether, a board certified Neurosurgeon with extensive experience with CES, testified, in his words, that the medical providers at the clinic did not fall

16

below the national standard of care in the treatment of Plaintiff.[5]  The Court would not allow Dr.

Meriwether to use the words "standard of care" because he had not used those words in his

report.[6]  He testified that Plaintiff had signs and symptoms consistent with low back pain until

August 24, 2008.  He testified that the earlier treatment given at the Clinic was appropriate for

the presentation of lower back pain due to disc degeneration.  He also testified that more radical

treatment, such as an MRI or any sort of surgery, would not have been appropriate.

Dr. Meriwether described the subsequent disc rupture of August 24 as like a "tire

blowing at 80 miles per hour".  It burst open and completely extruded the contents of the disc

into the spinal canal, he testified.  Dr. Meriwether described how the sudden onset of CES began

when the disc ruptured and would have been sudden and fast causing catastrophic results

including fecal incontinence.

His testimony also clearly stated that Plaintiff's signs and symptoms noted at the

Andersen Air Force Base Family Clinic were *not* and could not have been predictive of the onset

of CES, nor could the development of CES have been prevented prior to it occurring.  There

could be no better testimony that the treatment at the Clinic was within the standard of care for

the treatment of lower back pain due to normal degenerative disc disease; a bulging disc.  His

testimony endorsed the testimony of each of the health care providers that they were within the

---

[5]The US addressed the national standard of care for the treatment of Cauda Equina Syndrome as the syndrome had never occurred, to anyone's knowledge, on Guam prior to this instance.

[6] It is critical that the Court allowed Plaintiff's expert, Dr. Steele, to incorporate his addendum, the only place where the word causalgia appeared in an embedded chart from a textbook, as part of his conclusion in his initial report.  In contrast, the Court ruled that the addendum to Dr. Meriwether's report could not be incorporated as a part of his conclusions in his initial report.  Thus the Court ruled that he could not testify about the "standard of care." *See composite Exhibit 2 (the supplemental report of Dr. Meriwether and the supplemental report of Dr. Meriwether as redacted by order of the Court).*  Equally as important the redacted report includes information on major causalgia which was diagnosed as the cause of 90% of Plaintiff's injuries by Plaintiff's own expert.

17

standard of care. The Court's finding of fact that the standard of care was breached should be amended. (FOF 70).

Dr. Meriwether testified that when all the symptoms of CES are present, it is an emergent situation. He also testified that some of the symptoms of a person suffering from an bulging disc continue as part of the symptoms included in the CES. Of course, the back problem from a bulging disc were preliminary to a burst disc in this instance and the symptoms remained present after the disc had burst and the patient had developed long-standing CES. That in no way means that the symptoms from a bulging disc would indicate that the disc will burst and CES will occur. Dr. Meriwether's testimony was clear on this. The CES occurred when the disc burst on August 24, just three days prior to the Plaintiff presenting at the Naval Hospital. The Court's misreading of that testimony into an endorsement of the claim that she had CES from her first visit, or that it somehow had a gradual development that could have been predicted or prevented, is wrong. (FOF 71-77).

To rule that the Plaintiff's Cauda Equina Syndrome occurred, or could have been predicted prior to August 24, the Court would have to reject the testimony (and medical records) of Dr. Duncan, Dr. Orchowski and Dr. Meriwether (and all of the health care providers who treated Plaintiff at the Andersen Clinic). Further, the Court would have to accept that as many as nine (9) health care professionals in the Air Force and the Navy all conspired to ignore Plaintiff's statement of a numb vagina.

The overwhelming evidence is that the Plaintiff experienced an unusual, catastrophic burst of her disc on or about August 24, 2004, three days prior to her presentation at the U.S. Naval Hospital. The evidence was that the treatment at the Clinic was both within the standard

18

of care for plaintiff's lower back pain, but was also irrelevant to the rare and unexplained event that occurred when plaintiff's disc burst and extracted, while she was vacuuming, resulting in CES.

**B.     The U.S. Produced the Air Force Instruction**

The Court states in its Findings of Fact and Conclusions of Law, page 23, line 3, that the United States failed to produce the Air Force Medical Group Instruction 40-112 that was in effect at the time of Plaintiff's treatment. The Court may misunderstand the nature of the instructions. The instructions are kept in a manner similar to many CCH or BNA legal publications, where new pages are issued which replace the old pages. The United States produced the current instruction. The old parts are not retained. Lt. Griscombe explained at trial that the substance of the previous and current instructions were the same.

The United States provided an explanation as to why the previous instructions were no longer in the possession of the clinic. There was no Motion to Compel. Therefore, the Court should not make negative or unfavorable presumptions against the United States for its inability, not willful failure, to produce what no longer exists.

**II.     THE COURT SHOULD REMIT ITS EXCESSIVE AWARD**

**A.     The Award is Excessive Compared to Similar or More Severe Cases**

The Court's award of $7,500,000.00 is excessive and should be remitted. When determining whether an award of damages is excessive, a court must compare it with factually similar cases within its jurisdiction to maintain uniformity. Because CES is such a rare medical occurrence, case law on this issue is sparse. There are no cases on point in this district or in the Ninth Circuit.

19

The Court should follow its sister jurisdiction, the Third Circuit, in its <u>Murray v. Fairbanks</u> decision. <u>Murray v. Fairbanks</u>, 610 F.2d 149, 1979 U.S. App. LEXIS 10095 (3d Cir. 1979). <u>Murray</u> is often cited in back injury decisions to determine whether an award is excessive and should be remitted. <u>Murray</u> involves a severe case of CES. In <u>Murray</u>, a 34-year old instrument fitter dropped ten feet from an improperly welded cage onto a concrete floor while installing an electrical control panel. The plaintiff sustained injuries to his cauda equina. The damage to these nerves resulted in spontaneous urinations. The plaintiff had to wear a genital clamp to control his bladder. The bladder condition posed a threat of recurrent infections and the possibility that his kidneys may become fatally damaged. The court found that the plaintiff's prostate gland might have to be removed to protect his kidneys, which would likely worsen his incontinence and render him sexually impotent. The court found that pain from sitting forced plaintiff to lie down for two to three hours at a time and his injuries may likely confine him to a wheelchair. In <u>Murray</u>, jury only awarded the plaintiff $1,747,000 in damages[7]. Here, the Court awarded Mr. and Mrs. Rutledge a total award of $7,500,000, despite the fact that Mrs. Rutledge's injuries are clearly less severe than the plaintiff in <u>Murray</u>. Therefore, the Court should remit its award to maintain some degree of uniformity.

Numerous cases in the Ninth Circuit exist where medical negligence or negligent diagnosis resulted in paralysis, developmental delay, brain damage, seizures and other permanent and severe injuries. In these extreme cases, the Ninth Circuit affirmed non-economic damages

---

[7] The court noted that $1,747,000 was the highest award a Virgin Islands personal injury action. <u>Murray</u>, 610 F.2d at 152. Similarly, in this case, the award of $7,502,674 appears to be the largest award ever given in this District in any type of case, not just medical malpractice. It certainly is the largest amount ever awarded against the citizens of the United States in this District. The overwhelming evidence at trial mitigates such an award.

much less than this Court's award to Mrs. Rutledge. *See* McCarthy v. United States, 870 F.2d 1499 (9th Cir. 1988) (Medical negligence at an Army medical center resulted in a child's quadriparesis, microcephally, severe developmental delay and seizure disorder. Court awarded $200,000 for past pain and suffering and $2,000,000 for future pain and suffering for the life of the child); Siverson v. United States, 710 F.2d 557 (9th Cir. 1983) (medical negligence at a VA hospital rendered the plaintiff a quadriplegic. Court awarded $1,000,000 for pain and suffering); Phillips v. United States, 1994 U.S. App. 1562 (9th Cir. 1994) (failure to diagnose a child's meningitis at a United States Public Health Service hospital resulted in severe brain damage, partial blindness and deafness, and permanent mental retardation. The court awarded the plaintiff $1,300,000 for physical and emotional pain and suffering and loss of enjoyment of life *combined*). Taking into consideration Mrs. Rutledge's injuries compared to these more severe cases, the Court's award is clearly excessive and should be remitted.

## B.    The Court Should Reduce Award by 90%

There was overwhelming evidence of Plaintiff's negligence that was undisputed at trial. Plaintiff's statement was that she had developed CES, three weeks prior to her showing up at the U.S. Naval Hospital. Although both Dr. Duncan, her treating physician at the U.S. Naval Hospital, and two other surgeons, Dr. Orchowski and Dr. Meriwether, all testified as to medical conclusions that pinpointed the onset of the CES at approximately three days prior to her going to the hospital, both Dr. Duncan and Dr. Orchowski dutifully wrote down her verbal claim of three weeks ("3W") in the medical records. (The Court mistakenly concluded that the "3W" reflected the conclusion of the doctors. Dr. Duncan completely disputed that. The doctors' duty is to record what the patient says. Dr. Duncan concluded, based on the medical tests and his

21

1   knowledge of CES, that the CES occurred approximately three days prior to Plaintiff's showing

2   up at the hospital. Had it been longer, he testified, she would not have been walking.)

3        Even the Court grants that three weeks prior to the hospital visit was the time that the disc

4   violently ruptured, that would exonerate the first clinic visit that occurred on July 27, 2004, well

5   beyond the three weeks that Plaintiff claimed to have experienced the characteristics of the disc

6   burst. It would exonerate the second clinic visit of August 2, 2004. Again, this was outside the

7   three weeks she claimed on August 27, 2004. (Plaintiff never claimed that the standard of care

8   was breached for treated a bulging ("herniated") disc. Her claim was, alternately, that she

9   already had the CES or that it should have been anticipated by mounting symptoms.

10       The only clinic visit that could have occurred within the three weeks she claimed, was the

11  August 17, 2004, visit. By her own testimony, Plaintiff showed that she refused to fill out the

12  medical form and be examined on that day. She demanded a referral to the U.S. Naval Hospital

13  and would not cooperate with an examination. She demanded and got a referral to a specialty

14  doctor at the U.S. Naval Hospital.

15       Plaintiff admitted that every health care professional she encountered made significant

16  inquiry into whether she was experiencing incontinence. This was a major area of concern to all.

17  She said that she was vacuuming on August 24, three days prior to her hospital appointment

18  when she experienced incontinence of stool into her pants. She did not contact the clinic, the

19  hospital or ask anyone for help. She did not dispute the hospital records showing that she had

20  cancelled one physical therapy appointment for August 25 at the Hospital. On rebuttal she did

21  say that she had told the hospital over the phone that she had the incontinence and that the

22  hospital told her it did not matter. (This adds to Plaintiff's testimony that all the medical

23                                          22

24

1 | professionals she encountered until Dr. Duncan, which would include a triage nurse on the clinic
2 | phone, intake personnel at the clinic desk and the N.P. or P.A she saw at the clinic, all did not
3 | hear or react to her saying that she had a "numb vagina". This even though all the medical
4 | providers who testified stated that they are vigilant for such a statement, and that they inquired in
5 | detail about her condition, and she never said that she had a numb vagina[8].)

6 |       The overwhelming evidence is that the Plaintiff was negligent in not going to an
7 | emergency room or otherwise calling for medical help when she experienced fecal incontinence
8 | three days prior to her presenting at that Naval Hospital. The testimony was that the CES was
9 | emergent and quickly causing increasing interference to her deep sacral nerves. Dr. Duncan
10 | demonstrated on the stand the quick deterioration that was occurring just between his
11 | examination and the re-examination seven hours later in Hawaii. The medical tests performed
12 | on the Plaintiff and recorded in her medical records were undisputed proof of the "acute"
13 | (immediate) nature of her injury and the quick deterioration she experienced. That proof was not
14 | disputed at the trial.

15 |       The fecal incontinence was the marking moment of the disc bursting, unmistakably
16 | signaling the onset of CES. Plaintiff was negligent in not seeking medical care for three days.
17 | She delayed in spite of every single medical care professional that had contact with her at the
18 | clinic, where she presented with a herniated (bulging) disc, emphasizing the critical importance
19 | of any subsequent incontinence.

20 |

---

21 | [8] Again, she later testified that she spoke to a medical person at the Naval Hospital by phone and that alleged person
told just to come in for an appointment later. With contact with three medical professionals per clinic visit, and the
22 | claim of another person at Naval Hospital, that means that she is claiming that as many as nine (9) medical
professionals did not hear here say she had a numb vagina. The overwhelming proof is opposite of this allegation.

23 | 23

24 |

1  This court should adjust the award for the contributory negligence of the Plaintiff.

2  Also, this court was conscientious in its reduction of future earnings by a discounted

3  amount that reflected the reality of both inflation and present investment value. That present

4  value reduction should also be applied to the amounts awarded for maid service, loss of

5  consortium and pain and suffering.

6  Finally, the Court erred when it allowed Plaintiff to introduce a supplemental report to be

7  submitted on the morning of trial that offered a new diagnosis concluding that Plaintiff's

8  suffering was attributed 90% to Major Causalgia. The court allowed the supplemental report to

9  be submitted on the first morning of Plaintiff's case in chief and ruled that the United States

10  could rebut the report through its own expert later. Major Causalgia is not resultant from CES.

11  Even the medical text that Dr. Steele carried to the witness stand, which he referred to as a

12  "Bible of disability", indicated that Major Causalgia was not a malady resulting from CES.

13  Plaintiff's submitted testimony on the nature and extent of her disability would leave the

14  remaining 10 % of her damages as resultant from CES. That would be an award of $750,267.40.

15  The United States submitted its rebuttal from the Neurosurgeon, Dr. Michael Meriwether,

16  who has extensive experience with the diagnosis and treatment of the rare CES. The rebuttal

17  showed that Major Causalgia is not resultant from a spinal injury affecting the cauda equina.

18  The Court redacted all reference in the rebuttal to Major Causalgia on the grounds that

19  "causalgia" was listed in a chart incorporated into Plaintiff's original expert report. The Court

20  ruled that the United States should have addressed Major Causalgia then and could not rebut it in

21  its defense. Dr. Meriwether was not allowed to so testify in rebuttal to Dr. Steele's supplemental

22  expert report.

23                                          24

24

The Court should order a new trial to allow evidence as to Major Causalgia. In the alternative, the Court could consider, by judicial notice, that Major Causalgia is a sympathetic nerve reaction that is not associated with CES. The present award should be appropriately reduced by the 90% that could not medically be the result of the Plaintiff's bout with CES.

Plaintiff's injuries should also be reconsidered based on the overwhelming evidence presented at trial. When confronted with her medical records where she had recently complained to a doctor about the itchiness of her hemorrhoids, Plaintiff admitted that she could feel in her vagina and anal area, except that the feeling was reduced from what it was before the CES. Dr. Duncan testified that because he had diagnosed the CES just a few days after it occurred, the surgery did have a good outcome, with much of the feeling and reflexes returning. Plaintiff's post-operative medical records from Dr. Orchowski reflect the same conclusion.

Plaintiff testified that she was now concerned about not cleaning up completely after relieving herself. She had reduced the frequency of sex with her husband to twice a year. A person in Plaintiff's condition (with reduced feeling), while uncomfortable, could still be productive. The evidence did not add up to complete incapacity.

**III.    CONCLUSION**

The Court should order a new trial and/or amend its findings of fact to reflect the overwhelming medical evidence that Plaintiff developed the rare condition of Cauda Equina Syndrome ("CES") after her disc burst on or about August 24, 2004, three days prior to her presenting at Naval Hospital and more than five weeks after she first presented at the Andersen Air Force Base Family Clinic. The accusation that the Clinic failed to diagnose a syndrome that did not occur until a date after the examination fails on the medical facts. There is no way to

25

predict or prevent the rare syndrome. The United States diagnosed and treated Plaintiff quickly and effectively after she presented at the U.S. Naval Hospital on August 27, 2004, approximately three days after her disc suddenly and violently burst, causing the onset of CES on August 24, 2004.

WHEREFORE, the United States respectfully requests this Court to enter an order granting a new trial or amending its Findings of Facts and Conclusions of Law, or in the alternative, remitting its award.

RESPECTFULLY SUBMITTED: this 5th day of September, 2008.

LEONARDO M. RAPADAS
United States Attorney
Districts of Guam and CNMI

By: _____

MIKEL W. SCHWAB
Assistant U.S. Attorney
JESSICA F. CRUZ
Assistant U.S. Attorney

26

# TABLE OF AUTHORITIES

**Cases**

McCarthy v. United States, 870 F.2d 1499 (9th Cir. 1988) ............................................ 21

Murray v. Fairbanks, 610 F.2d 149, 1979 U.S. App. LEXIS 10095 (3d Cir. 1979). ................. 20

Phillips v. United States, 1994 U.S. App. 1562 (9th Cir. 1994) ..................................... 21

Siverson v. United States, 710 F.2d 557 (9th Cir. 1983) ............................................. 21

