# ORIGINAL

1 LEONARDO M. RAPADAS
United States Attorney
2 MIKEL W. SCHWAB
Assistant U.S. Attorney
3 KATHARYNE P. CLARK
Special Assistant U.S. Attorney
4 Sirena Plaza, Suite 500
108 Hernan Cortez Avenue
5 Hagatna, Guam 96910
Tel: (671) 472-7332
6 Fax: (671) 472-7215

**FILED**
DISTRICT COURT OF GUAM

MAR 2 4 2008 R.D
11:504M

JEANNE G. QUINATA
Clerk of Court

7 Attorneys for the United States of America

8

## DISTRICT COURT OF GUAM

9 ## TERRITORY OF GUAM

10

11 DEBORAH K. RUTLEDGE and THOMAS )      CIVIL CASE NO. 06-00008
R. RUTLEDGE,                        )
12                                   )
            Plaintiffs,             )      **UNITED STATES' FINDINGS OF**
13                                  )      **FACT AND CONCLUSIONS OF LAW**
                                    )
14          vs.                     )
                                    )
15 UNITED STATES OF AMERICA,        )
                                    )
16          Defendant.              )
    _____)

17

18              **United States' Proposed Findings of Fact**

**General Dispositive Findings of Fact**

19

GF 1.  Plaintiff alleges medical malpractice under the Federal Tort Claims Act, claiming that

20      health care providers at the Andersen Air Force Base (AAFB) Family Practice Clinic

21      allegedly failed to diagnose that Plaintiff had cauda equina syndrome, an extremely rare

22      malady resulting from a disc that ruptures and extrudes into the spinal canal.

23

24 GF 2.  Plaintiff alleges that on July 27, August 2 and August 17, 2004, when she was treated by

25      Nurse Practitioner, Col. Natalie Giscombe and Physician Assistant, Capt. Steven Rau at

26      the AAFB Family Practice Clinic, for low back pain, her disc had already ruptured and

27

28                                  1

GOVERNMENT
EXHIBIT

1

1      she was suffering from cauda equina syndrome.

2

3    GF 3.  Nurse Practitioner, Col. Natalie Giscombe, and Physician Assistant, Capt. Steve Rau
4           treated Plaintiff for Low back pain due to musculoskeletal deterioration, a relatively
5           common problem among adults as they age.

6

7    GF 4.  On or about August 24, 2004, Plaintiff suffered incontinence of bowel, an incident
8           heralding the onset of cauda equina syndrome.

9

10   GF 5.  On August 25, 2004, Plaintiff canceled a physical therapy appointment at the U.S. Naval
11          Hospital, Guam.

12

13   GF 6.  Plaintiff did not present to the AAFB Family Practice Clinic or to the Emergency Room
14          at the U.S. Naval Hospital upon experiencing the incontinence of bowel.

15

16   GF 7.  On August 27, 2004, Plaintiff presented to Dr. Douglas Duncan at the U.S. Naval
17          Hospital.   The doctor determined that she had little to no rectal tone, was incontinent of
18          bowel and was experiencing symptoms of cauda equina syndrome.

19

20   GF 8.  Plaintiff's treating physician, Dr. Duncan, determined that the onset of cauda equina
21          syndrome was recent and that the patient was quickly and dramatically experiencing
22          trauma to her cauda equina nerves.   This was documented in the medical tests, including
23          the reflex deterioration, from hyperreflexic to hyporeflexic, in the hours it took to
24          medically evacuate Plaintiff from Guam to Hawaii for emergency spinal surgery.

25

26   GF 9.  That a patient's disc may rupture in the future is an extremely rare occurrence  that can

27

28                                                2

1    not be predicted, by MRI or other diagnostic tool, prior to its occurrence.

2

3    GF 10. The Low back pain experienced by the Plaintiff in July and August of 2004 was not the

4        result of an act or omission by a federal employee.

5

6    GF 11. Plaintiff's ruptured disc, extruding the inner disc "pulposa" into the spinal canal,

7        occurring on or about August 24, 2004, was not the result of an act or omission by a

8        federal employee acting within his or her scope of employment.

9

10   **General Dispositive Conclusions of Law**

11   GC 1. The burden of proof is on the Plaintiff in a claim under the Federal Tort Claims Act to

12       show a causal connection, by a preponderance of the evidence, between the alleged injury

13       and the negligent act or omission on the part of a federal employee acting within the

14       scope of his or her employment.

15

16   GC 2. In the absence of proximate cause between Plaintiff's medical treatment and the

17       subsequent rupture of Plaintiff's disc resulting in an extrusion into Plaintiff's spinal canal,

18       and thus injury from cauda equina syndrome, there is no liability on the part of the United

19       States.

20

21   **Detailed Findings of Fact**

22   F 1.    Plaintiff Deborah Rutledge at all times pertinent was an Air Force dependant and as such

23        was entitled to medical care provided through military treatment facilities. (Test. D.

24        Rutledge 2-19-08)

25

26   F 2.    Plaintiff Master Sergeant Thomas Rutledge at all times pertinent was an active duty

27

28                                              3

1   service member in the United States Air Force. (Test. T. Rutledge 3-4-08)

2

3   F 3.   Plaintiff was receiving medical treatment from military treatment facilities before July

4          and August of 2004, during July and August of 2004, is presently receiving medical

5          treatment through military treatment facilities, and will continue to receive such medical

6          treatment for the remainder of her life as a military dependent. (Test. D. Rutledge 2-20-

7          08)

8

9   F 4.   On July 27, 2004, Plaintiff Deborah Rutledge telephoned the AAFB Family Practice

10         Clinic. The Telephone Triage note indicates that the call was received at 12:06. (Def. Ex.

11         M 3)

12

13  F 5.   The triage nurse returned Mrs. Rutledge's call at 12:25 on July 27, 2004. (Def. Ex. M 3,

14         Test. King 3-12-08)

15

16  F 6.   The telephone lines at AAFB Family Practice Clinic are staffed beginning at 07:30

17         Monday through Friday. (Test. King 3-12-08)

18

19  F 7.   The triage nurse who returned Mrs. Rutledge's call noted "Complains of numbness right

20         lower back, leg and buttocks. Unknown injury. Onset two days ago with progression,

21         denies loss of bowel and bladder, no acute distress." (Def. Ex. M 3).

22

23  F 8.   The triage nurse who returned Mrs. Rutledge's call scheduled her for an appointment at

24         14:40 with Nurse Practitioner Giscombe. (Def. Ex. M 3).

25

26  F 9.   AAFB Family Practice Clinic personnel provided Mrs. Rutledge with a form called "Low

27

28                                              4

1  Back Pain - Adult", which contained a checklist of symptoms relevant to the evaluation
2  of low back pain in an adult. (Def. Ex. M 5)

3

4  F 10.  Mrs. Rutledge completed the checklist portion of the form. She checked "yes" to the
5  questions "pain worse at night in bed," "new urine or stool problems like leakage or
6  incontinence," and "loss of sensation in the groin area". (Def. Ex. M 5)

7

8  F 11.  Col. Natalie Giscombe is and was an Air Force officer and licensed to practice as a nurse
9  practitioner. (Test. Giscombe 2-22-08, 3-12-08)

10

11  F 12.  Col. Giscombe greeted her patients by saying, "Hello, I am Maj Giscombe, nurse
12  practitioner." (Test. Giscombe 2-22-08, 3-12-08)

13

14  F 13.  On her uniform, Col. Giscombe wore an official Air Force identification badge
15  identifying her as a nurse practitioner. (Test. Giscombe 2-22-08)

16

17  F 14.  A sign on the wall next to the examination room used by Mrs. Rutledge noted, "Major N.
18  Giscombe, Nurse Practitioner". (Test. Giscombe 2-22-08, 3-12-08)

19

20  F 15.  Col. Giscombe asked Mrs. Rutledge for additional information for those questions she
21  answered "yes". (Test. Giscombe 2-22-08)

22

23  F 16.  Mrs. Rutledge told Col. Giscombe that her pain was worse at night and she was unable to
24  get comfortable and sleep. (Def. Ex. M 5)

25

26  F 17.  Mrs. Rutledge told Col. Giscombe she did not know what incontinence meant and for that

27

28                                            5

| | |
|---|---|
| 1 | reason had checked "yes" to describe that she had recently noted she urinated frequently |
| 2 | during the day. Mrs. Rutledge further told Col. Giscombe she believed her urination |
| 3 | frequency was related to drinking increased amounts of water due to the heat. (Test D. |
| 4 | Rutledge 2-19-08, Test. Giscombe 2-22-08) |

F 18. Col. Giscombe asked Mrs. Rutledge to point to the area on her body in which she noticed loss of sensation. Mrs. Rutledge pointed to the the right side and back of the right buttock, and right leg. She did not point to the vaginal area. (Test. Giscombe 2-22-08)

F 19. Col. Giscombe performed a physical, strength, reflex and sensation examination of Mrs. Rutledge. During the examination Col. Giscombe noted Mrs. Rutledge complained of intermittent tingling and numbness down the posterior lateral right leg ending just above the right knee. She did not complain of altered sensation to the vaginal or anal area. (Test. Giscombe 2-22-08, Def. Ex. M 6)

F 20. Col. Giscombe noted Mrs. Rutledge denied having incontinence of either bowel or bladder. (Test. Giscombe 2-22 08, Def. Ex. M 6)

F 21. Col. Giscombe ordered a urinalysis for Mrs. Rutledge. (Test Giscombe 2-22-08, Def. Ex. M 7)

F 22. Col. Giscombe asked Mrs. Rutledge to remain at the AAFB Family Practice Clinic to await the results of the urinalysis. Upon receiving the results Col. Giscombe discussed with Mrs. Rutledge that it did not appear she had a urinary tract infection. (Test. Giscombe 2-22-08)

6

1    F 23.  Col. Giscombe ordered Naproxen, Vicodin, and Flexoril for Mrs. Rutledge. (Def. Ex. M 6)

2

3    F 24.  Prior to her leaving, Col. Giscombe instructed Mrs. Rutledge to return to the AAFB

4          Family Practice Clinic if she did not improve. During this visit Col. Giscombe told Mrs.

5          Rutledge that a worsening of her pain or urinary or bowel incontinence were reasons to

6          return to the AAFB Family Practice Clinic or go to the emergency room. (Test. Giscombe

7          2-22-08)

8

9    F 25.  At no time on July 27, 2004 did Mrs. Rutledge provide a history of having awakened that

10          day with vaginal numbness, loss of feeling in her backside or numbness on the bottom of

11          her feet and back of her legs. (Test. Giscombe 2-22-08 & Ex. M 3-6)

12

13   F 26.  On August 2, 2004 Mrs. Rutledge again presented to the AAFB Family Practice Clinic for

14          treatment. (Def. Ex. M 8)

15

16   F 27.  Staff at the AAFB Family Practice Clinic again provided Mrs. Rutledge with a form called

17          "Low Back Pain - Adult", which contained a checklist of symptoms relevant to the

18          evaluation of low back pain in an adult. (Def. Ex. M 8)

19

20   F 28.  Mrs. Rutledge completed the checklist portion of the form. She checked "yes" to the

21          question "loss of sensation in groin area". (Def. Ex. M 8)

22

23   F 29.  Capt. Steven Rau is an Air Force officer and licensed to practice as a physician assistant.

24          (Test. Rau 2-25-08)

25

26   F 30.  Capt. Rau greeted Mrs. Rutledge by saying, "Hello, I am physician assistant Rau." (Test.

27

28                                                    7

1    Rau 2-25-08)

2

3    F 31.  Over his uniform, Capt. Rau wore a white lab coat embroidered with "Steve Rau,

4    Physician Assistant" over the breast pocket. Capt. Rau also wore on the lapel of his coat

5    an official Air Force identification badge identifying him as a physician assistant. (Test.

6    Rau 2-25-08, 3-12-08, Def. Ex. PP & QQ)

7

8    F 32.  A sign on the wall next to the examination room used by Mrs. Rutledge noted, "Physician

9    Assistant Steven Rau". (Test. Rau 2-25-08, 3-12-08)

10

11   F 33.  Capt. Rau reviewed the items Mrs. Rutledge had completed on the form. She was not able

12   to pinpoint when the pain began, but said it was a couple days before her July 27

13   appointment. (Def. Ex. M 8)

14

15   F 34.  Capt. Rau discussed the urination problem with Mrs. Rutledge and reviewed the urinalysis

16   from July 27, 2004. She told him she always felt like she had to urinate even after she had

17   just urinated. She denied incontinence. She did not say that she had to press on her

18   bladder to urinate. She did not report problems producing a urine specimen for the

19   urinalysis. Capt. Rau considered urethritis as a possible diagnosis. (Test. Rau 2-25-08, 3-

20   12-08)

21

22   F 35.  Capt. Rau asked Mrs. Rutledge to point to the area on her body where she noticed loss of

23   sensation. Mrs. Rutledge described a vague discomfort in the suprapubic area, the area in

24   the lower abdomen over the bladder. She did not point to the vaginal or anal area. (Test.

25   Rau 2-25-08, 3-12-08)

26

27

28                                                    8

F 36.  Capt. Rau discussed the right side back numbness and again asked her to point to the area on her body where she noticed a loss of sensation. Mrs. Rutledge pointed to the lower part of her right buttocks written as the inferior right glut. (Test. Rau 2-25-08, 3-12-08, Pt. Ex. 40)

F 37.  Mrs. Rutledge described pain as going down the left leg to the calf. (Test. Rau 2-25-08, 3-12-08)

F 38.  Capt. Rau performed a physical, strength, reflex and sensation examination of Mrs. Rutledge. During the examination Capt. Rau found a normal gait and station, full range of motion and equal, normal reflexes. (Test. Rau 2-25-08, Def. Ex. M 9)

F 39.  Mrs. Rutledge did not complain of numbness in the vaginal area, therefore Capt. Rau did not test the vaginal area for sensation. (Test. Rau 2-25-08)

F 40.  Capt. Rau ordered a spine-series x-ray which was performed after the physical examination. Capt. Rau noted on the chart a 10% spondylolisthesis at L-1, L-2 and diagnosed Mrs. Rutledge with musculoskeletal back pain. (Test. Rau 2-25-08, Def. Ex. M 9)

F 41.  Capt. Rau told Mrs. Rutledge that a radiologist at the U.S. Naval Hospital would read the x-ray and they would receive the results back in one to three weeks. (Test. Rau 2-25-08)

F 42.  Capt. Rau replaced the Flexoril ordered by Col. Giscombe with Valium and told Mrs. Rutledge to continue with the Naproxen and Vicodin. (Test. Rau 3-12-08, Def. Ex. M 9)

9

F 43. Capt. Rau instructed Mrs. Rutledge to return to the AAFB Family Practice Clinic if her symptoms failed to improve. (Test. Rau 3-12-08, Def. Ex. M 9)

F 44. On August 16, 2004 at 11:03 Mrs. Rutledge called the AAFB Family Practice Clinic again complaining of back pain and numbness. She said the medication was not working and she wanted a referral to Naval Hospital. (Test. King 3-12-08, Def. Ex. M 13)

F 45. At 12:54 triage nurse Capt. Stephanie King called Mrs. Rutledge and noted she complained that the medication was not effective and she was requesting a referral to Naval Hospital Orthopedic Clinic. Capt. King scheduled Mrs. Rutledge for 9:45 the next day at the AAFB Family Practice Clinic. (Test. King 3-12-08, Def. Ex. M 13)

F 46. Mrs. Rutledge's husband testified that, prior to the August 17, 2004, final visit to the AAFB Family Practice Clinic, she had spoken with a neighbor whose mother was a nurse, and the neighbor, a Navy wife, advised that Mrs. Rutledge should 'seek advice at US Naval Hospital.' (Test Mr. Rutledge, 3-5-08 early morning)

F 47. On August 17, 2004 Mrs. Rutledge arrived for the scheduled appointment at the AAFB Family Practice Clinic. Mrs Rutledge told staff she would not answer any question on the Low Back Pain - Adult over sheet because she was only there to get a referral to Naval Hospital. (Test. D. Rutledge 2-19-08)

F 48. Col. Giscombe told Mrs. Rutledge she needed the answers to the questions in order to make a referral to the Naval Hospital. Col. Giscombe verbally asked her all of the questions and documented the answers herself. Mrs. Rutledge answered "no" to all of the questions, including, "New urine or stool problems like leakage or incontinence". Mrs.

10

1  Rutledge did not tell Col. Giscombe she had to press on her bladder in order to urinate or
2  that she had vaginal numbness. (Test. Giscombe 2-22-08, 3-12-08)

3

4  F 49.  Mrs. Rutledge complained that the slight numbness was now also in the inner area of her
5  thigh and up to the labia majora, which Col. Giscombe recorded as the "peritoneal" area.
6  (Test. Giscombe 2-22-08, Pt. Ex. 35)

7

8  F 50.  Col. Giscombe told Mrs. Rutledge that she needed to examine her in order to complete the
9  referral. Mrs. Rutledge was not cooperative. She allowed Col. Giscombe to perform a
10  limited back exam but would not allow her to examine the perineal area. (Test. Giscombe
11  2-22-09, 3-12-08)

12

13  F 51.  Mrs. Rutledge said she only wanted to see a doctor at Naval Hospital and did not want to
14  anyone at AAFB Family Practice Clinic to touch her. (Test. Giscombe 3-12-08)

15

16  F 52.  Col. Giscombe was prevented from performing a thorough examination by the actions of
17  Mrs. Rutledge (Test. Giscombe 3-12-08)

18

19  F 53.  Col. Giscombe noted the patient appeared to be in about the same level of discomfort as
20  when she saw her at the first visit on July 27, 2004. (Test. Giscombe 2-22-08)

21

22  F 54.  Col. Giscombe told Mrs. Rutledge that the X-ray had been read and the results showed
23  degenerative disc disease. (Test. Giscombe 2-22-08)

24

25  F 55.  Lcdr. Hugh McSwain, M.D., the Navy radiologist who read the X-ray taken of Mrs.
26  Rutledge on her visit to the AAFB Family Practice Clinic on August 2, 2004, confirmed

27

28  11

1    disc degeneration at L1, L2. Dr. McSwain testified this was normal disc degeneration due

2    to aging and was a non-emergent situation. (Depo. McSwain, 5-22-07, p. 30: lines 4-5,

3    30:13-20, 30:23-24, 49:18-24)

4

5   F 56.  Dr. Meriwether testified that it is a common practice for radiologists to suggest an MRI

6          following plane films of the spine. However, it is the clinical signs and symptoms that

7          guide the decision to obtain an MRI. As non-clinicians, radiologists do not make the

8          decision to obtain MRI or not. (Test. Meriwether 3-10-08 at 10:22 & 16:34 & 16:40)

9

10  F 57.  An MRI is an appropriate diagnostic tool when surgery is anticipated. Low back pain in

11         and of itself is not an appropriate indication for MRI. (Test. Duncan 2-21-08, Test.

12         Meriwether 3-7-08, approx. 16:00)

13

14  F 58.  Col. Giscombe entered a consult to Naval Hospital Orthopedic Clinic and included the

15         information contained in the radiologist's report. She instructed Mrs. Rutledge to call

16         Naval Hospital Orthopedic Clinic to make the appointment, as was the common practice

17         unless it is an emergent situation like a suspected fracture. (Test. Giscombe 2-22-08, Pt.

18         Ex. 11)

19

20  F 59.  AAFB Family Practice Clinic instructions which require referring a patient to the

21         physician preceptor after the second visit were exceeded when Col. Giscombe referred

22         Mrs. Rutledge for specialty evaluation. (Test. Giscombe 2-22-08)

23

24  F 60.  Col. Giscombe discontinued Naproxen, as Mrs. Rutledge said it was ineffective and

25         prescribed Vioxx for pain. (Test. Giscombe 2-22-08, Def. Ex. M 15)

26

27

28                                            12

1    F 61.  Col. Giscombe told Mrs. Rutledge that the instructions she gave her after the first visit

2           remain the same and that if there are any changes she should return to the AAFB Family

3           Practice Clinic or go to the emergency room. (Test. Giscombe 2-22-08)

4

5    F 62.  Mrs. Rutledge made an appointment with the Naval Hospital Orthopedic Clinic for August

6           23, 2004 (Test. D. Rutledge 2-19-08, Def. Ex. T 1)

7

8    F 63.  Super Typhoon Chaba was approaching Guam over the weekend of August 21, 2004.

9           (Test. D. Rutledge 2-19-08, Test T. Rutledge 3-4-08)

10

11   F 64.  Naval Hospital called Mrs. Rutledge on August 22 to cancel the orthopedic appointment

12          for August 23 due to the impending storm and said that it would be rescheduled after the

13          storm passed. (Test. D. Rutledge 2-19-08)

14

15   F 65.  The Naval Hospital emergency room always stays open but the specialty clinics must close

16          during the threat of typhoons. (Test. Duncan 2-21-08)

17

18   F 66.  Mrs. Rutledge had an appointment with Naval Hospital physical therapy for August 25,

19          2004. Mrs. Rutledge canceled this appointment. (Test. Rau 3-12-08, Test. Giscombe 3-

20          13-08, Def. Ex. T 1)

21

22   F 67.  During the evening of August 24 Mrs. Rutledge had an episode of fecal incontinence, i.e.

23          an involuntary bowel movement while vacuuming. (Test. D. Rutledge 2-19-08)

24

25   F 68.  Mrs. Rutledge did not obtain medical care following her episode of fecal incontinence

26          until three days later on August 27, 2004. (Test. D. Rutledge 2-19-08, Test. T. Rutledge 3-

27

28                                              13

4-08, Def. Ex. N 1)

F 69.   On August 25, 2004 Mrs. Rutledge called the Naval Hospital to reschedule her orthopedic
        appointment. She insisted on receiving an appointment for that week. She received an
        appointment for August 27, 2004. (Test. D. Rutledge 2-19-08)

F 70.   Mrs. Rutledge testified that she had three normal, volitional bowel movements from
        August 25 through 27 before her appointment with Dr. Duncan on August 27, 2004. (Test.
        D. Rutledge 2-19-08)

F 71.   Mrs. Rutledge testified she was told by an unidentified person at Naval Hospital that she
        did not need to see a doctor because she had an episode of fecal incontinence. (Test. D.
        Rutledge 2-19-08)

F 72.   Dr. Duncan testified that when he examined Mrs. Rutledge on August 27, 2004, she had
        "minimal to no [rectal] tone" and that she could not have held and passed a stool. (Test.
        Duncan, 2-22-08, 9:49)

F 73.   Dr. Duncan testified that it was "medically unlikely" that she had a normal bowel
        movement that morning. (Test Duncan, 2-22-08, 9:51)

F 74.   Dr. Meriwether testified that it is not at all consistent that Mrs. Rutledge experienced fecal
        incontinence on August 24, 2004, passed normal, volitional bowel movements for the next
        two days, and was found to have minimal to no rectal tone on August 27, 2004. Cauda
        equina syndrome is not 'on-again, off-again' (Test. Meriwether 3-10-08, 10:57)

14

F 75.   Dr. Meriwether also testified that, in the course of vacuuming, to experience 'fecal incontinence, is a sign of the onset of cauda equina syndrome.' (Test Meriwether, 3-10-08, 10:44)

F 76.   Dr. Meriwether also testified that, 'fecal incontinence is a tremendous tip-off [regarding cauda equina syndrome]. Numbness and tingling not so - as dramatic a sign you can have that cauda equina syndrome, and potential paraplegia, is upon you.' (Test Meriwether, 3-10-08, 10:45)

F 77.   Dr. Duncan testified that Mrs. Rutledge had recently developed cauda equina syndrome and that it was still "evolving" on August 27, 2004. (Test Duncan 2-22-08, 10:10-10:13)

F 78.   Dr. Meriwether testified that the cauda equina syndrome 'could not have been present for more than 48-72 hours' and that it was his opinion that the extrusion causing the cauda equina syndrome happened on or about August 24, 2004 (Test. Meriwether 3-11-08 approx. 14:00 - 14:09)

F 79.   Dr. Duncan testified that the cauda equina syndrome was brought on by the rupture of an intervertebral disc, with the extrusion of the disc contents into the spinal canal with resultant compression of the nerves of the cauda equina, which occurred at the time of the August 24, 2004 episode of fecal incontinence. "The incontinence event shows that – highlights an event either starting to occur or having occurred - things are starting to happen." (Test Duncan, 2-22-08, 10:13)

F 80.   Dr. Steele, in contrast, opined that the damage to the nerves was chronic, and was occurring over the previous weeks when Mrs. Rutledge was seen at the AAFB Family Practice Clinic. (Test Steele 3-3-08)

15

F 81.  Dr. Steele, also in contrast, described the incidence of incontinence as the 'seminal moment' when the 'sacral nerves would not recover from the compression'. (Test Steele, 3-3-08, 11:44 )

F 82.  In contrast, Dr. Duncan testified that his examination of Mrs. Rutledge's reflexes at Guam Naval Hospital on August 27, showed hyperreflexia, measured as 3+ with clonus. Her subsequent reflex examination done several hours later after a flight to Tripler Army Medical Center showed hyporeflexia at the ankles, measured at 1+. A postoperative examination done at Guam Naval Hospital, ten days after the surgery, showed reflexes of 2+ on the right knee, indicative of resolution. These findings are " strongly suggestive of an evolving event." (Test D. Duncan, 10:10, also, 2-22-08 10:06)

F 83.  Dr. Duncan testified that at his August 27, 2004, Guam examination, "the nerve had not been pinched long enough to knock out the reflexes yet". (Test Duncan, 2-22-08, 10:13)

F 84.  Dr. Duncan testified that Mrs. Rutledge could not have been walking around with the ruptured and extruded disc, and with cauda equina syndrome, for weeks because "with a disc as large as that [having ruptured] she would not be able to ambulate " for long. (Test Duncan, 2-22-08, 10: 13)

F 85.  Dr. Duncan testified that cauda equina syndrome "does not come and go. Once you have it the event has occurred and time starts moving." (Test D. Duncan, 2-22-08, 9:51)

F 86.  Dr. Duncan testified that there is no way to predict that a disc will rupture and cauda equina syndrome will ensue, and that an MRI showing a disc bulge can not predict the later development of cauda equina syndrome. (Test. Duncan 2-22-08, 9:50, Test.

16

1    Meriwether 3-7-08 approx. 10:29)

2

3    F 87.   Dr. Duncan testified that disc bulges, common in low back pain, are "almost always

4            contained." (Test D. Duncan, 2-22-08, 9:33) and that based on MRIs, there is "no

5            statistical significance between who would need surgery and who would not." (Test. D.

6            Duncan, 2-22-08, 9:35)

7

8    F 88.   Dr. Meriwether also testified that Mrs. Rutledge experience a sudden onset of cauda

9            equina syndrome when her disc ruptured and completely extruded into her spinal canal,

10           and that this event was sudden, fast and caused quick, catastrophic results, including fecal

11           incontinence. (Test M. Meriwether, 3-10-08, 11:23)

12

13   F 89.   Dr. Meriwether testified that Mrs. Rutledge had signs and symptoms consistent with low

14           back pain until August 24, 2004, when the disc at L5, S1, like a "tire blowing at 80 miles

15           per hour", burst open and completely extruded the contents of the disc into her spinal

16           canal. (Test. Meriwether 3-10-08, 11:29)

17

18   F 90.   Dr. Meriwether also testified that Mrs. Rutledge's signs and symptoms noted at AAFB

19           Family Practice Clinic were **not** predictive of the onset of cauda equina syndrome,  nor

20           could the development of cauda equina syndrome have been prevented prior to it

21           occurring. (Test. Meriwether, 3-7-08, 15: 20; 3-10-08, 9:40-5, 10:31, 10:40, 16:07, 16:24-

22           40; 3-11-08, 13:41)

23

24   F 91.   Dr. Steele, plaintiff's own expert, also testified, however, that 'with rest, analgesic and

25           physio-therapy, the profusion would have healed itself. That is what happens with most

26           disc protrusions.' ( Test Steele, 3-3-08, 11:44).

27

28                                                 17

F 92.  Dr. Meriwether also testified that rupture of a disc is rare, and rupture in a way that leads to disc content extrusion into the spinal canal, such as occurred with Mrs. Rutledge, is extremely rare. (Test Meriwether)

F 93.  Dr. Duncan testified that Mrs. Rutledge "should have come in" when she experienced fecal incontinence on August 24. (Test Duncan, 2-22-08, 10:10)

F 94.  Dr. Meriwether also testified that Mrs. Rutledge should have reported to a clinic or emergency room when she experienced fecal incontinence. (Test Meriwether, 3-10-08, 10:57; 3-11-08, 14:09)

F 95.  Mrs. Rutledge's disc at L5 S1 burst on or about August 24, 2004. (Test Duncan and Test Meriwether)

F 96.  A "large amount" of the disc contents extruded into Mrs. Rutledge's spinal canal when the disc ruptured. The extruded disc was later removed by Dr. Orchowski on August 27, 2004. (Depo Orchowski, 3-1-07, 24-25, Def. Ex. O TAMC 0078)

F 97.  The rupture of Mrs. Rutledge's disc and the resultant cauda equina syndrome was not caused by the acts or omissions of health care providers. (Test Meriwether)

F 98.  Dr. Duncan testified that the results from the surgery at Tripler were good. (Test Duncan 2-22-08, 10:39)

F 99.  Dr. Duncan testified that Cauda Equina Syndrome was "not her only problem". (Test

18

1   Duncan 2-22-08, 10:16). Dr. Duncan testifed that, having seen Mrs. Rutledge's MRI, he

2   found she has "multiple discs that show injury at L1 L2 and that may have caused

3   symptoms. She has a pinched nerve not to be confused with Cauda Equina

4   Syndrome." (Test Duncan, 2-22-08, 10:38)

5

6   F 100.  Physician Assistant Steven Rau had noted the possibility of disc degeneration at L1 L2

7          when he examined the x-ray he had taken of Mrs. Rutledge on her visit to the AAFB

8          Family Practice Clinic on August 2, 2004. (Test Rau, 2-25-08, 10:11 )

9

10  F 101.  Doctor McSwain, the radiologist who also examined the x-ray taken of Mrs. Rutledge on

11         her visit to the AAFB Family Practice Clinic on August 2, 2004, confirmed the disc

12         degeneration at L1 L2. (Deposition of Dr. McSwain, page 16).

13

14  F 102.  Doctor Meriwether also testified that Mrs. Rutledge had 'early to mid-life degeneration at

15         two points on her spine'.  (Test Meriwether, 3-10-08, 10:22)

16

17  F 103.  Dr. Duncan examined the Plaintiff approximately 10 days after her surgery at Tripler

18         Medical Center, and concluded that the Cauda Equina Syndrome had been caught early

19         and the results of the surgery were good.   This was further confirmed by her post-

20         operative records from Tripler.  (Test Dr. Duncan, 2-25-08, 10:40)

21

22  F 104.  On the first post-operative day after her surgery at Tripler, Dr. Orchowski noted that she

23         was able to feel the bladder catheter and had increased sensation in her groin. (Ex O, p.16)

24

25  F 105.  The second post-operative day Mrs. Rutledge reported the return of sensation in the

26         perineum, buttocks and inner thighs. The bladder catheter was removed and the patient-

27

28                                            19

1    controlled morphine was stopped. (Ex O, p. 16)

2

3    F 106. On the third post-operative day Mrs. Rutledge reported improvement of her perineal

4            sensation.   (Ex O, p. 17)

5

6    F 107. On the fourth post-operative day Mrs. Rutledge reported increased walking sensation and

7            no incontinence. (Ex O, p 23)

8

9    F 108. On the fifth post-operative day Mrs. Rutledge reported the sensation at her buttocks,

10           perineum and thighs to be in tact and she was discharged to go home. (Ex O, p26)

11

12   F 109. A January, 2005, urodynamic study showed Mrs. Rutledge has **no** incontinence. (Ex O, p

13           171)

14

15   F 110. In May, 2007, Dr. Mosca repeated urodynamics testing, which again showed **no**

16           incontinence. (Ex S, p 2)

17

18   F 111. On November 29, 2007 in a visit with physician assistant Christopher Howell Mrs.

19           Rutledge complained of no urinary incontinence.  He reports no genitourinary symptoms

20           and no incontinence.  (Def. Ex. V, CHCS 0023)

21

22   F 112. In April 29, 2007 during an examination by physician assistant Baroni, Mrs. Rutledge

23           complained that she may have hemorrhoids because she "itches all the time". (Def. Ex. V,

24           CHCS 0034)

25

26   F 113. Dr. Meriwether testified that if she has sensation she would feel the itching.  If she does

27

28                                                       20

1       not have sensation she could not feel the anal itching. (Test. Meriwether 3-10-08, approx.

2       13:26)

3

4 F 114. In January 2008, Dr. Adams noted Mrs. Rutledge had good rectal tone but no volitional

5       contraction. (Pt. Ex 27 pg 2)

6

7 F 115. Volitional contraction of the rectum can be controlled by the patient. (Test. Meriwether,

8       3-10-08, 13:32)

9

10 F 116. Dr. Adams noted Mrs. Rutledge displayed a 3/5 strength (markedly decreased) during

11       examination. However, Dr. Adams noted she was able to walk. (Pt. Ex. 27 pg 2)

12

13 F 117. A 3/5 strength and the ability to walk are inconsistent findings and may indicate the patient

14       is attempting to exaggerate weakness. (Test Meriwether, 3-10-08, 13:32-13:43)

15

16 F 118. Dr. Meriwether testified that, 'once the nerve has recovered it doesn't backslide. Slow and

17       progressive recovery. Once control of rectum returns, patient keeps it. Once bladder

18       control is recovered, patient keeps it. Once sensation returns, patient keeps it.' (Test

19       Meriwether, 3-10-08, 11:33 &13:25 commenting on Pt. Ex O, p 15).

20

21 F 119. Dr Meriwether testified that the nerves of the cauda equina are myelinated (insulated)

22       nerves, and recovery of nerve function usually occurs. (Test. Meriwether 3-7-08, 14:28)

23

24 F120. In 2004, plaintiff drafted a written account of her blame of the AAFB Family Practice

25       Clinic for her experiencing cauda equina syndrome. This included her allegation that the

26       treatment she received was "criminal". This account was distributed to her two hired

27

28                             21

experts. The narrative conflicts with the written medical records and the testimony of the health care providers. Her testimony at trial also conflicts with substantial parts of the written account. (Def. Ex. X)

**Damages**

F 121. Plaintiffs' economic expert's report has credited Mrs. Rutledge twice for the same benefit by both including the employer's social security tax paid on Mrs. Rutledge's behalf during her work years as a fringe benefit received by Mrs. Rutledge and by including that same benefit during her retirement years in his calculations of her lost social security benefits. (Pt. Ex. 23)

F 122. At the same time, Plaintiffs' economic expert's report has failed to account for the mandatory tax that Mrs. Rutledge would have to pay out of her earnings during her worklife in order to participate in the social security system in her retirement years. (Pt. Ex. 23)

F 123. The Plaintiffs' economic expert's report has also failed to deduct the income taxes Mrs. Rutledge would be required to pay on her earnings. (Pt. Ex. 23)

F 124. Plaintiffs' economic expert's report also has failed to account for statistically expected periods of voluntary unemployment. (Pt. Ex. 23)

F 125. Plaintiffs' economic expert's report has extended Mrs. Rutledge's worklife to a statistically improbable age. (Pt. Ex. 23)

22

1    F 126.  Plaintiffs' economic expert's report has grown Mrs. Rutledge's earnings at the aggressive,
2            and highly improbable, rate of 5%. This is almost twice the projected long run rate of
3            inflation. This also exceeds projections of average wage growth across all occupations.
4            (Pt. Ex. 23)
5
6    F 127.  Plaintiff medical expert report, by Dr. Steele, given to the Defendants on the first day of
7            trial, finds that Plaintiff suffers from three things that restrict her to her home;  severe
8            fatigue, severe and intermittent causalgia and bowel dysfunction.   (Pt. Ex. 34)
9
10   F 128.  Dr. Steele dramatically increased her disability rating by diagnosing her with major
11           causalgia.
12
13   F 129.  The literature on cauda equina syndrome does not include information on causalgia
14           because it is not related to cauda equina syndrome or to spinal surgery. (Test. Meriwether
15           3-10-08, 14:15 - 14:23)
16
17   F 130.  Dr. Steele's "bible" on disabilities, the AMA Guides to the Evaluation of Permanent
18           Impairment, does not include causalgia in its' section on cauda equina syndrome or back
19           surgery because it is not related to cauda equina syndrome or to spinal surgery. (Test.
20           Meriwether 3-10-08, 14:15 - 14:23)
21
22   F 131.  Plaintiff Deborah Rutledge is eligible for no cost medical care by virtue of hr husband's
23           military service.
24
25
26
27
28                                              23

**United States' Detailed Conclusions of Law**

C 1.   Under the Federal Tort Claims Act, in order to have a lawsuit against the federal government, you have to find that a federal employee committed negligence. Specifically the Federal Tort Claims Act allows for,

"claims against the United States, for money damages, ... , for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any **employee** of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."

In this case, the allegations of medical malpractice took place in Guam. Therefore, the negligence law of Guam is controlling.

C 2.   Under the Guam Code, "everyone is responsible not only for the result of his willful acts, but also for an injury occasioned to another by his want of ordinary care or skill in the management of his property or person, **except** so far as the latter has willfully **brought the injury upon himself.**" 18 G.C.A. §90107.

C 3.   While Guam law has not been developed in the area of medical malpractice, the law of Guam is informed generally by California law. Guam v. Yang, 800 F.2d 945, 947 (9th Circ. 1986) (stating that "absent controlling Guam authority... it [is] appropriate to look to California law for guidance") (quoting Smith v. Lujan, 588 F.2d 1304, 1306 (9th Cir. 1979)), on reh'g, 850 F.2d 507 (9th Cir. 1988); see also Guam v. Ojeda, 758 F.2d 403, 406 (9th Cir. 1985) (stating that when Guam law is unclear, California cases are persuasive).

24

1  Under California law, a plaintiff alleging medical malpractice must show that the

2  defendant owed the plaintiff a particular standard of care, that the defendant breached that

3  standard of care, and that that breach **proximately caused** the plaintiff's damages.

4  Hanson v. Grode, 76 Cal. App 4th 601, 606 (Cal. Ct. App 1999).

5

6

7  C 4.  The California Supreme Court has stated that the physician's standard of care requires

   "that physicians and surgeons exercise in diagnosis and treatment that reasonable degree of

8  skill, knowledge, and care ordinarily possessed and exercised by members of the medical

9  profession under similar circumstances." Burgess v. Superior Court, 2 Cal. 4th 1064, 831

10  P.2d 1197, 1206 (Cal. 1992). While Guam law does not explicitly define a physician's

11  standard of care for use in litigation, it defines the standard of care for use in medical

12  malpractice arbitration as, "[t]he prevailing standard of duty, practice, or care by a

13  reasonable physician in the same field practicing medicine in the community at the time of

14  the alleged malpractice." 10 G.C.A. §10106.

15

16

17  C 5.  Guam law provides that "for the breach of an obligation not arising from contract, the

18  measure of damages... is the amount which will compensate for all the detriment

19  **proximately caused** thereby, whether it could have been anticipated or not." 20 G.C.A.

20  §2225.  Guam allows damages for actual pain and suffering, Lampley v. Guam, 882 F.

21  Supp. 957, 959 (D. Guam App. Div. 1995), and has not adopted a statutory cap on non-

22  economic damages.  All future losses must be substantiated.  Id.

23

24  C 6.  Contributory negligence shall not bar recovery in an action by any person or his legal

25  representative to recover damages for negligence resulting in death or in injury to person

26  or property, if such negligence was **not as great as** the negligence of the person against

27

28                                           25

whom recovery is sought, but any damages allowed under the law on Compensatory Relief shall be diminished in proportion to the amount of negligence attributable to the person recovering. 405 Guam Model Instructions [1] ; 18 GCA § 90108. <u>Salas v. Hanil Dvlpt. Co.,</u> 1993 WL 128224, *4 (D.Guam App. Div. 1993) **(Guam follows the doctrine of comparative negligence...").**

C 7.    The Court must decide how much responsibility the plaintiff had, on a percentage basis, contributing to the plaintiff's injury. *Adapted from language in* 407 Guam Model Instructions.

C 8.    Causation: Substantial Factor. A substantial factor in causing harm is a factor that a reasonable person would consider to have contributed to the harm. It must be more than a remote or trivial factor. It does not have to be the only cause of the harm.   430 Guam Model Instructions.

C 9.    Damages. There are no provisions for punitive damages or prejudgment interest against the United States in the Federal Tort Claims Act.

C 10.   Mitigation of Damages. Plaintiff is not entitled to recover damages for that harm that the United States proved that Plaintiff could have avoided with reasonable efforts or expenditures. 3930 Guam Model Instructions.

---

[1]NOTE:   The Model Civil Jury Instructions were adopted by the Guam Supreme Court in a Promulgation Order No. 07-002-01, Supreme Court Case No. PRM07-002, filed on May 3, 2007.  The Guam Model Civil Jury Instructions are hereinafter referred to as "Guam Model Instructions" or "GMI".

26

C 11. Damages. Damages must, in all cases, be reasonable, and where an obligation of any kind appears to create a right to unconscionable and grossly oppressive damages, contrary to substantial justice, no more than reasonable damages can be recovered. 20 GCA § 2281.

C 12. Damages. Because a Plaintiff's harm may include future economic damages for loss of earnings in the future, the damages must be reduced to their present cash value. This is because money received now will, through investment, grow to a larger amount in the future. *See* 3904 Guam Model Instructions.

C 13. Damages. In determining an amount for future earnings, a discount rate must be applied that accounts for income stream over time, investment return, and inflation. The net discount rate must not be negative and must **not** be calculated inclusive of the aberrational years of 1954 to 1984. Trevino v. United States, 804 F.2d 1512 (9th Cir. 1986).

C 14. The Federal Tort Claims Act prohibits an award of punitive damages against the government. 28 U.S.C. § 2674. The punitive damages prohibition has been construed to mean that income taxes must be subtracted from gross income and future economic losses must be reduced to present value. Trevino v. United States, 804 F.2d 1512 (9th Cir. 1986); Shaw v. United States, 741 F.2d 1202 (9th Cir. 1984).

C 15. A discount factor must be applied in FTCA litigation as a matter of federal law. See, e.g., Colleen v. United States, 843 F.2d 329 (9th Cir. 1987); Hollinger v. United States, 651 F.2d 636, 641 (9th Cir. 1981); United States v. English, 521 F.2d 63, 70 (9th Cir. 1975).

27

C 16. Failure to deduct income taxes from the income calculation permits an excessive, punitive recovery in some cases. Felder v. United States, 543 F.2d 657, 670 (9th Cir. 1976).

Respectfully submitted this 24th day of March, 2008.

LEONARDO M. RAPADAS
United States Attorney
Districts of Guam and CNMI

By: _____
MIKEL W. SCHWAB
Assistant U.S. Attorney

28

**CERTIFICATE OF SERVICE**

I, Jacqueline Emmanuel, Administrative Assistant, working in the U.S. Attorney's Office, in the District of Guam, hereby certify that, on March 24, 2008, I caused to be served by personal service a copy of the "United States' Findings of Fact and Conclusions of Law", in Civil Case No. 06-00008, <u>Deborah K. Rutledge and Thomas R. Rutledge vs. United States of America</u>, to the following attorney of record:

> Robert L. Keogh
> Law Offices of Robert L. Keogh
> 251 Martyr Street, Suite 105
> Hagatna, Guam 96910

*[signature]*

JACQUELINE EMMANUEL
Administrative Assistant

## Michael W. Meriwether, M.D., Ph.D.
## Supplemental Expert Report

After reviewing a supplemental report from Dr. Steele received on February 19, 2008 containing a new diagnosis of causalgia, I have reviewed the following documents:

Deposition of Deborah Rutledge
Deposition of Thomas Rutledge
Deposition of John Steele, MD
Deposition of Gary Towle, MD
Deposition of Joseph Orchowski, MD
Deposition of Douglas Duncan, MD
Deposition of Natalie Giscombe
Deposition of Steven Rau
Report of Gary Towle, MD
Reports of John Steele, MD 10/19/06, 7/26/07, 2/16/08
Medical Records, Andersen AFB, Jan 2004 - August 2004
Medical Records, Naval Hospital Guam, Aug. 2004 - June 2005
Medical Records, Tripler Army Medical Center, Aug 2004 - Aug 2005
Medical Records, National Naval Medical Center, Bethesda, MD
Medical Records, Walter Reed Army Medical Center
Medical Records, Tinker AFB
Medical Summary, Dr. Phillip Mosca
Medical Records labeled CHCS through 22 Jan 2008
MRI Report, 1/29/2008
Correspondence of Dr. James Duncan, 1/24/08
Correspondence of Dr. Donald Adams, 1/14/08

Dr. Steele's conclusions regarding Mrs. Rutledge's medical condition are summarized under five headings using the American Medical Association Guide to the Evaluation of Permanent Impairments, 5th Edition.

1. Gait and station disorder - she is rated, as in his June 2006 report, as class 1 to 2 impairment.

2. Bladder impairment - she is rated as class 2 to 3 impairment.

3. Anorectal impairment - she is rated a class 2 to 3 impairment.

4. Sexual impairment - she is rated as a class 2 to 3 impairment.

5. Pain and sensory deficit - she was initially assigned a class 5 impairment due to causalgia in Dr. Steele's June 2006 report. This is her primary assigned deficit and



1

impairment and is now classified as class 6 impairment, with a whole body impairment of 81-95%.

Dr. Steele further gave a total disability rating of 88-98%, the primary component being causalgia pain. After 3 ½ years he rated her condition as permanent and that it would not improve, within a reasonable degree of medical certainty. His initial diagnosis of minor causalgia is now designated as major causalgia.

I reviewed a recent contrast MRI of the lumbar spine taken January 29, 2008 which shows degenerative disc disease at L1-2 and L4-5. Postoperative changes are seen at L5-S1, the site of her prior surgery. No evidence of arachnoiditis (severe scarring within the spinal sac of nerves) is seen. This is a usual picture of a postoperative lumbar scan, in my opinion.

Causalgia is a rare and unusual pain syndrome first described by Silas Weir Mitchell, a Civil War surgeon, in 1872. As with some 97 - 99% of all causalgia, it was first described as a result of severe, penetrating injuries, the majority of which, then and now, consist of military gunshot wounds. This is because of the high-velocity of military gunshot wounds. Occasionally a penetrating injury, such as a knife wound, can also produce causalgia. It is an exceedingly rare syndrome in lumbar surgery, especially in posterior approaches. Causalgia is virtually nonexistent in the literature of lumbar surgery.

The first report of a diagnosed and treated causalgia with a sympathectomy in the English literature was in 1996 at the University of West Virginia Medical School. An internet search for causalgia related to lumbar laminectomy revealed only 25 sources, of which nearly half were experimental rat model studies of causalgia. Several others were again related to military / war injuries; all gunshot injuries.

Mrs. Rutledge, in deference to Dr. John Steele who examined her twice, appears to have a rare type of causalgia without penetrating or blunt trauma, bilateral in nature and involving multiple nerve roots. It appears to affect her urogenital area as well as the bottoms of both feet. From the history and exam reviewed, I cannot dispute her presentation as such, but I cannot relate it to her cauda equina syndrome or her lumbar surgery, which was successful in relieving her cauda equina syndrome. Anxiety and emotional upheaval may have produced as well as exacerbated causalgia pain, as stated in the literature.

I cannot agree that her lumbar laminectomy producing back pain and radicular symptoms, which markedly improved in her initial 4 - 6 months postoperatively, would have much later turned into a causalgia pain syndrome. In my 32 years of experience as a spinal surgeon, performing over 10,000 spinal operations, I have never seen a causalgia develop after lumbar laminectomy, and I very strongly do not believe that is the case here.

Furthermore, standard pain medicine treatment of causalgia has proven to be very successful. Sympathetic blocks by injection, sympathectomy and the implantation of spinal cord

2

stimulators (as an outpatient procedure) has had historically over the past 15 years a very high cure rate. None of these have been performed on Mrs. Rutledge to my review of her records. I would highly recommend such an approach even at this late date 3 ½ years post surgery.

In a review of immediate pre-op and post-op medical records of Mrs. Rutledge, an observation of her neurologic examination led me to again, as in my earlier report, conclude that signs and symptoms more indicative of cauda equina syndrome led to orthopedic evaluation and diagnosis of cauda equina syndrome. Her disc extrusion (complete herniation) was acute, meaning sudden and rapid in onset, and caused compression of the cauda equina. This led to her August 27, 2004 diagnosis by Dr. Douglas Duncan and subsequent surgery.

To further explain, Dr. Duncan's initial exam showed motor and sensory deficits consistent with cauda equina syndrome, but her reflex exam was very hyper-reflexic (written as 3+) at the ankles. Airevac to Tripler Army Medical Center led to Chief Orthopedic Resident, Dr. Shawn Hermenau under Dr. Joseph Orchowski, showing reflexes being 3+ at the knees and 1+ at the ankles before surgery. This change from hyper-reflexia of the ankle on 8/27/04 (Guam) to hypo-reflexia of the ankle on 8/27/04 (Hawaii), a time difference of one day or less, shows that the cauda equina syndrome was acute in onset and evolving rapidly from the time of Dr. Duncan's exam to the time of Dr. Hermenau's exam. The ankle reflex is innervated by L5-S1 nerves, the site of Mrs. Rutledge's disc herniation that caused the cauda equina syndrome.

The follow up per Dr. Lynott at the U.S. Naval Hospital, Guam on September 27, 2004 showed the reflexes were unchanged from the Tripler orthopedic exam. This strongly supports the acute nature and quick onset of cauda equina syndrome between the episode of fecal incontinence on August 24 or 25, 2004 at home and the first evaluation by Dr. Duncan on August 27, 2004. It is very highly unlikely that she or any patient could have had a 3 to 4 week history of cauda equina syndrom, or that it had a waxing and waning nature.

All my opinions are rendered within a reasonable degree of medical certainty.

Dated: 3/5/08

Michael W. Meriwether, M.D., Ph.D.
Board Certified Neurosurgeon

3



# Michael W. Meriwether, M.D., Ph.D.
## Supplemental Expert Report

After ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, I have reviewed the following documents:



Deposition of Deborah Rutledge
Deposition of Thomas Rutledge
Deposition of John Steele, MD
Deposition of Gary Towle, MD
Deposition of Joseph Orchowski, MD
Deposition of Douglas Duncan, MD
Deposition of Natalie Giscombe
Deposition of Steven Rau
Report of Gary Towle, MD
Reports of John Steele, MD 10/19/06, 7/26/07, 2/16/08
Medical Records, Andersen AFB, Jan 2004 - August 2004
Medical Records, Naval Hospital Guam, Aug. 2004 - June 2005
Medical Records, Tripler Army Medical Center, Aug 2004 - Aug 2005
Medical Records, National Naval Medical Center, Bethesda, MD
Medical Records, Walter Reed Army Medical Center
Medical Records, Tinker AFB
Medical Summary, Dr. Phillip Mosca
Medical Records labeled CHCS through 22 Jan 2008
MRI Report, 1/29/2008
Correspondence of Dr. James Duncan, 1/24/08
Correspondence of Dr. Donald Adams, 1/14/08



1

GOVERNMENT
EXHIBIT
CC-1

██████████████████████████████████████████████████████
██████

██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████

I reviewed a recent contrast MRI of the lumbar spine taken January 29, 2008 which shows degenerative disc disease at L1-2 and L4-5. Postoperative changes are seen at L5-S1, the site of her prior surgery. No evidence of arachnoiditis (severe scarring within the spinal sac of nerves) is seen. This is a usual picture of a postoperative lumbar scan, in my opinion.

██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████

██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████

██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████

██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████

██████████████████████████████████████████████████████
██████████████████████████████████████████████████████

2

~~stimulators (an outpatient procedure) has had historically over the past 15 years a very high cure rate. None of these have been performed on Mrs. Rutledge to my opinion of these records. I would highly recommend such an approach even at this late date 3½ years post surgery.~~

In a review of immediate pre-op and post-op medical records of Mrs. Rutledge, an observation of her neurologic examination led me to again, as in my earlier report, conclude that signs and symptoms more indicative of cauda equina syndrome led to orthopedic evaluation and diagnosis of cauda equina syndrome. Her disc extrusion (complete herniation) was acute, meaning sudden and rapid in onset, and caused compression of the cauda equina. This led to her August 27, 2004 diagnosis by Dr. Douglas Duncan and subsequent surgery.

To further explain, Dr. Duncan's initial exam showed motor and sensory deficits consistent with cauda equina syndrome, but her reflex exam was very hyper-reflexic (written as 3+) at the ankles. Airevac to Tripler Army Medical Center led to Chief Orthopedic Resident, Dr. Shawn Hermenau under Dr. Joseph Orchowski, showing reflexes being 3+ at the knees and 1+ at the ankles before surgery. This change from hyper-reflexia of the ankle on 8/27/04 (Guam) to hypo-reflexia of the ankle on 8/27/04 (Hawaii), a time difference of one day or less, shows that the cauda equina syndrome was acute in onset and evolving rapidly from the time of Dr. Duncan's exam to the time of Dr. Hermenau's exam. The ankle reflex is innervated by L5-S1 nerves, the site of Mrs. Rutledge's disc herniation that caused the cauda equina syndrome.

The follow up per Dr. Lynott at the U.S. Naval Hospital, Guam on September 27, 2004 showed the reflexes were unchanged from the Tripler orthopedic exam. This strongly supports the acute nature and quick onset of cauda equina syndrome between the episode of fecal incontinence on August 24 or 25, 2004 at home and the first evaluation by Dr. Duncan on August 27, 2004. It is very highly unlikely that she or any patient could have had a 3 to 4 week history of cauda equina syndrom, or that it had a waxing and waning nature.

. All my opinions are rendered within a reasonable degree of medical certainty.

Dated: 3/5/08

Michael W. Meriwether, M.D., Ph.D.
Board Certified Neurosurgeon

3